PROTECTED DOCUMENTS

# CLAIMS MANUAL

## Table of Contents

I      The Insurance Industry and GEICO
II     The Claims Function
III    Reserving
IV     Coverage
V      Investigation
VI     Principles of Legal Liability
VII    Legal Damages – Bodily Injury and Property Damage
VIII   Physical Damage
IX     Suit Handling
X      Exhibits
XI     Subrogation
XII    Arbitration
XIII   Control File Handling and Procedures
XIV    Performance Review

6-28-02

D 000323

Exhibit 13 Page 1

PROTECTED DOCUMENTS

# CHAPTER I

## THE INSURANCE INDUSTRY AND GEICO

### I.   DEVELOPMENT

The development of the insurance industry has been aligned with major economic needs. Dating back to early civilization, merchants saw the need for a service that would guarantee financial security in the event of a navigational catastrophe during the shipment of goods.  The concept was formed to distribute risk among large groups with similar characteristics.  As Society evolved, so did the insurance industry. Ocean Marine and Inland Marine may have started the industry but very large insurers occupying "niche" status today have no affiliation with either Ocean Marine or Inland Marine. Variety is the name of the game in insurance today.  A couple of broad categories and sub-specialties are listed:

- Personal Insurance includes life, annuities, retirement income, unemployment, accident and health.

- Property and Casualty Insurance guards against loss or damage to property, indemnifies against loss or damage by from specified hazards and protects against legal liability for bodily injury or property damage to others.  It includes fire/allied lines (homeowners, boatowners, and CPL), Automobile (Bodily Injury, Liability, Property Damage Liability and Physical Damage), Workers Compensation and Marine.

Furthermore, the insurance industry as a whole continues to change.  Mergers such as the one between CITICORP and Travelers show how the services offered by the financial industry continue to blend with Insurance operations. Our Company library has many books on the subject of insurance and its history.

### II.   TYPES OF INSURANCE COMPANIES

Property and Casualty Insurance companies are classified in one of the following ways:

- Stock Companies are companies with stock owned by shareholders and formed for profit making. Example: Allstate.

- Mutual Companies are companies that are essentially owned by their insureds. Their premium payment is treated like an investment in the company. They participate in the companies' function and share in its financial loss or gain. Example: State Farm

I-1

5-10-02

**D 000324**

Exhibit 13 Page 2

PROTECTED DOCUMENTS

- Reciprocal or Inter-insurance Exchange are companies that are similar in nature to mutual companies as each member shares in the financial loss or gain. These types of organizations are usually unincorporated and are underwritten on a pro-rata basis depending on the individual's underwriter's subscription. Example: Lloyds of London

### III.   INSURANCE DEFINED

There are many varying definitions for the term "insurance." In essence, insurance is an agreement or contract between an insured and the company. In exchange for a premium, the company agrees to indemnify or compensate the insured for compensatory damage or loss.

Insurance is a social device to control individual loss by combining a sufficiently large number of homogeneous exposure units to make their losses collectively predictable.

### IV.   THE CONTRACT OF INSURANCE

Certain elements must be present in order for there to be a valid insurance contract:

- There must be an insurable interest—that an actual loss will be suffered for a specified event by the insured.

- There must be the potential for or risk of loss.

- The insurer assumes the risk described in consideration of the premium payment.

- A premium must be paid in consideration for the protections described in the Policy.

The basic elements of any contract apply as well: an offer (an application for insurance), acceptance (issuance of a policy), consideration (payment of premium and a promise (indemnification by the company).

### V.   REGULATION OF INSURANCE

The purpose of insurance regulation is to protect the public interests. This includes protection from unfair treatment as well as ensuring that carriers maintain financial solvency. Regulations provide a set of standards for the industry to follow in order to best serve the needs of the general public. In most instances, the various States issue and enforce these regulations.

I-2

5-10-02

**D 000325**

Exhibit 13 Page 3

PROTECTED DOCUMENTS

Insurance companies are regulated by legislation, administration and court action. The department of insurance of each state sets regulations in the form of bulletins and codes.

The department of insurance's responsibilities include the establishment of licensing requirements and the supervision of operation and liquidation procedures. It also reviews rates (premiums), wording of policy language and revocation of an insurer's license or certificate, should that be warranted.

Each state has its own code and regulations, so there is no interstate uniformity. It is important for all GEICO associates to maintain a professional and cordial working relationship with the personnel of the department of insurance.

VI.  HORIZONTAL LOSS SHARING

Since the principle of insurance is based on the concept of many sharing the losses of few, the insurer has to measure the predictability of risk and effect a wide enough distribution of those risks to make insuring them profitable.

The insurer is able to do this though the use of the LAW OF LARGE NUMBERS. The process is an exact science based on selecting good risks, charging an adequate premium, calculating the predictability of risk, and spreading that risk over the larger group. Accumulated experience and calculated studies enable the insurer to refine its system of selection to "profitable insureds" or good risks. The Underwriting Department scrutinizes the acceptability of the applicants. Once the classification of acceptable risks is achieved, an appropriate premium rate is determined.

VII.  COMPULSORY LIABILITY INSURANCE

There are financial responsibility or compulsory liability insurance laws in most states. These laws require insurance to be made available to all persons including those who represent a less than favorable risk. Insurers have the right to reject risks and states have developed assigned risk plans to assist those who would otherwise be unable to get insurance on their own. These risks are usually charged a higher premium by the insurer and must be retained for a specified period of time, unless canceled for cause. Carriers have traditionally been assigned high-risk policies/drivers based on the number of policies they have written in that state in relation to the total number or policies written by all companies.

VIII.  THE COMPANY HISTORY

Government Employees Insurance Company ("GEICO") has come a long way since the late Leo Goodwin founded it in 1936. His idea was a new one: to restrict its

I-3

5-10-02

**D 000326**

Exhibit 13 Page 4

## PROTECTED DOCUMENTS

policyholders to government workers and to sell its automobile policies by direct mail at the lowest possible rates.

With the rapid growth of new policyholders, the home office was moved from Texas to Washington, D. C. In 1937, the company chartered under the laws of the District of Columbia. In 1948, GEICO offered its stock to the public.

Through the years, GEICO has founded many affiliate companies including Government Employees Life Insurance Company (GELICO), GEICO Indemnity, Government Employees Financial Corporation (GEFCO), GEICO General Insurance Company, GEICO Casualty Company, GEICO International, GEICO Annuity and Insurance Company and GEICO Investment Service Company (GEIVEST). Many are no longer operational.

In 1958, GEICO's eligibility list was expanded. It was again expanded in 1973 to open its doors to even more policyholders. However, following this decision, several problems arose in 1976, which almost precipitated the financial demise of the Company. A combination of several factors contributed to the crisis: inadequate underwriting practices; insufficient premium charge, improper claim reserving, and the instability of stock investments.

An immediate plan for recovery was instigated. It not only involved internal measures, but also a reinsurance treaty involving twenty-seven other companies in the Industry. The selling of preferred stock provided the capital needed to return the Company to profitability.

The Company's history has been unique and at times tumultuous, but our future seems brighter than ever. GEICO is now one of the strongest property and casualty insurers in the world.

The Company is a "direct writer" selling the bulk of our policies via telephone sales centers located in various parts of the country. This is very different from "agency companies" which are now attempting to duplicate GEICO's success in this arena. By eliminating agents and selling directly to our customers, we are able to pass along savings via lower premiums.

In 1996, Berkshire Hathaway completed its purchase of 100% of GEICO stock and we became a wholly owned subsidiary. The Company writes personal lines automobile insurance in most states. Like our sales department, we have five regional locations and three field offices throughout the country to handle claims.

IX.   SOME KEY OFFICERS AND DEPARTMENTS

President and Chief Executive Officer: Insurance Division – The chief executive officer of the Company appoints subordinates, supervises the overall insurance

I-4

5-10-02

**D 000327**

Exhibit 13 Page 5

**PROTECTED DOCUMENTS**

operation and has broad executive powers to carry out policies and procedures. The CEO reports directly to Berkshire Hathaway.

<u>President and Chief Investment Officer</u> – This officer reports directly to Berkshire Hathaway and is responsible for corporate investments.

<u>Senior Vice Presidents</u> – Responsible for the internal insurance operations of the Company. His or her duty is to assist and implement the decisions of the Chief Executive Officer.

<u>General Counsel</u> – Protects the legal interests of the Company and organizes and directs the Company's corporate programs and operations to assure compliance with corporate legal requirements.

<u>Corporate Secretary</u> – The Office of the Corporate Secretary has responsibility for creating, compiling and maintaining original corporate records pertaining to the GEICO Companies' Boards of Directors, Officers and company transactions; processing associate related garnishments and other withholding orders served on such companies and making certain state insurance compliance/regulatory filings for such companies.

<u>Actuarial Pricing Department</u> – Recommends and implements prices that will allow for profitable growth in GEICO's four property/casualty companies and provides state insurance departments with required statistical filings

<u>Claims Home Office</u> – This department provides claims technical and procedural policy to the regions and regulates the following: training guidelines, audits, statistical reports, claims security, claim forms, claims system and controls claims that are outside of the scope of regional authority.

<u>Communications Department</u> – Compiles and distributes the internal and external publications of the company and provides communications to employees, policyholders, news and media and the community at large.

<u>Corporate Planning and Management Information Department</u> – Manages GEICO Corporation's planning and budget development process. Assists the profit centers in developing key operating statistics and monitors and reports on them throughout the year

<u>Human Resources Department</u> – Provides the Company with personnel, administers salary and records, coordinates compensation and performance measurement, and provides internal services and benefits. Personnel activities are handled through each region's Human Resources Department.

<u>Information Services Department</u> – This department develops and implements programs that allow departments to access quickly and easily any and all information pertinent to their specific needs.

I-5

5-10-02

**D 000328**

Exhibit 13 Page 6

## PROTECTED DOCUMENTS

<u>Internal Audit</u> – The mission of the internal audit department is to facilitate management's oversight responsibilities and to provide consultative services that will assist the corporation in achieving its objectives.

<u>Legislative Counsel</u> – Plans and conducts the development and maintenance of Company relations with federal and state government departments, regulatory authorities and trade associations.

<u>Marketing Department</u> – Base on underwriting, actuarial and claims statistics, the marketing department advertises our product. Implements advertising and sales strategies to generate inquiries from prospective policyholders.

<u>Office of the Treasurer/Controller</u> – These departments control corporate finances. This includes the responsibilities for the fiscal day to day operations of the Company including disbursements, budget expenses, tax administration and capital expenditures and banking operations.

<u>Program Manager</u> – A general manager of all matters affecting a particular line. He or she monitors legislative and industry developments, then coordinates the implementation of procedural guidelines with the regions and departments.

<u>Quality Administration</u> – The goal of this department is to oversee the Quality Improvement Process (QIP) management. This is done by forming committees of company associates from varied backgrounds and experience to find ways to improve efficiency, productivity and customer service.

<u>Real Estate and Facilities Management Department</u> – This department manages the Company's real estate transactions, supervises the purchase of properties and mortgages, and controls the tax record papers. It is also responsible for the maintenance, engineering and security functions associated with the facilities.

<u>Regional Function</u> – The Company has divided its operation into regions according to geographic locations. Each region is responsible for the underwriting and claims functions in its territory.

<u>Staff Counsel</u>- This department provides legal representation to individual clients, renders legal advice and assistance to claim representatives on matters in litigation.

<u>Staff Development</u> – This department analyzes business processes and job performances to increase productivity through more effective staffing through GMCS/Cybernetics. It also monitors performance and provides training and evaluation tools to support associates in their jobs, such as coaching and performance analysis. It supports the recruiting, selection, and retention of all associates.

<u>Systems Operations Department</u> – This department is responsible for technical support of large systems, client/server environments, telecommunications, electronic output, the Internet, the Intranet and postal administration.

I-6

5-10-02

**D 000329**

Exhibit 13 Page 7

**PROTECTED DOCUMENTS**

Systems Security – This department is responsible for maintaining the integrity of the Company computer systems. It administers SECURID cards to dial up users. They also provide a list of the latest published versions of the Corporate Security Policies and related Standards, Guidelines and Procedures

Underwriting and Product Management – Establishes underwriting policies and also develops guidelines for the selection of new business and the retention of current business. This department establishes pricing policy, provides controls and audits regional underwriting procedures.

X.    **CLAIMS HOME OFFICE**

Claims Home Office is headed by the Vice President of Claims who is assisted by assistant vice presidents, directors and the home office staff.

The claims function is the shared responsibility of Claims Home Office and the regions. The Vice President is responsible for management of the claims function in a manner compatible with concurrent responsibilities of the Regional Vice Presidents. The responsibilities include maintenance of financial soundness and profitability at desired levels while meeting fiduciary obligations to deliver benefits and services due our policyholders expeditiously and at an affordable cost.

The department is also responsible for the development of guidelines for the proper handling of claims. The department provides support in carrying out this responsibility in the following ways:

- Provides training in legal matters, automobile liability, medical management and rehabilitation, auto damage, claims security, systems and procedures and structured settlements.

- Participates in the total development and subsequent implementation of new or revised claims systems and procedures to accomplish efficient and effective claims processing in all jurisdictions.

- Creates and uses claims performance review procedures to ensure that claims are handled within Company Policy and/or Guidelines.

- Formulates productivity standards and claims workloads for all associates involved in handling claims.

- Coordinates complex or unusual claims involving technical and/or legal issues and coordinates any claim when requested by any company claims unit.

- Furnishes authority on claims with values in excess of regional authority limits.

5-10-02

**D 000330**

Exhibit 13 Page 8

PROTECTED DOCUMENTS

# CHAPTER II

## THE CLAIMS FUNCTION

I.   GENERAL STATEMENT

It is company policy to settle claims fairly and promptly. Investigation is necessary for
every claim presented, but the extent of the investigation depends on the nature of the
claim. The real objective of the investigation is a fair resolution at the earliest practicable
time. At every step in the claim process the question should be raised, "how can this
claim best be resolved?"

Prompt service, however, does not justify paying claims the company does not owe. It is
as wrong to pay claims which should not be paid as it is not to pay claims which should
be paid. Promptness and fairness should be used throughout the handling of all claims.
All associates handling claims have a duty to deal frankly and openly with policyholders,
witnesses, attorneys, claimants, medical providers, and the general public.

Our claims associates have the obligation to treat policyholders and all interested parties
with respect and deal with their insurance issues fairly and as quickly as possible.

II.   PROFESSIONAL GUIDELINES

A.   Code of Conduct

The nature of claims work requires that claims associates comply with GEICO's
standard of competence and ethical conduct. Pride, self-respect and integrity are
characteristic of the successful claims person.

Traditionally, fairness, competence, and integrity have also been characteristic of
GEICO claims associates. We can be proud of these traditions; through them we
have earned the respect of all with whom we come into contact.

To many people, the GEICO claims associate is GEICO and may be the only
company employee a large segment of the public will ever deal with.
Accordingly, each associate has a responsibility and a corresponding obligation to
act in a professional manner that will reflect positively on themselves and the
companies.

Today, the insurance industry, as never before, is being examined in depth by
various executive and legislative branches of state and federal governments.
Significant portions of these examinations are directed toward the system under

II-1

5-10-02

**D 000331**

Exhibit 13 Page 9

PROTECTED DOCUMENTS

which claims are handled, and the manner in which the system is used by claims personnel. The GEICO Companies support the NAIC Model Unfair Trade Practices Act, and the individual state acts relating to claims settlement practices. Each claims associate should be familiar with these acts and should abide by their provisions.

- **The GEICO Claims Code of Conduct Booklet**

  Claims associates should be familiar with the code and behave accordingly. Each associate is given the booklet when hired and is required to sign off on any revisions.

**B.   Responsibility of the Claims Associate**

The basic responsibility of the claims associate is to bring about an equitable outcome of claims presented under the policy contract. Since the operational funds belong to our policyholders, the claims associate has an obligation to those policyholders to pay just and valid claims and resist those not owed.  This should be accomplished efficiently and economically.

Fulfillment of that obligation requires the exercise of sound judgment.  The claims associate should be able to select the proper course of action.  Decisions should be based on a thorough knowledge of the policy contracts, a working knowledge of legal principles, complete investigations, and sound evaluations.

Responsibility for the proper disposition of a claim rests with the claims associate to whom the case is assigned.  The claims associate should bring about suitable results through direct contact with the insured, claimant, or others, as necessary.

The only products we have are Service and Protection. The claims associate delivers both. The claims associate should be equitable, empathetic and accessible and handle all claims with integrity.

The most frequent problem in claims handling is disagreement as to what constitutes a fair settlement. The examiner or adjuster should be prepared to explain the Company's position in a clear and logical manner.  The response to a justified claims complaint should focus first on a timely and correct remedy to the complaint, and second on the initiation of appropriate steps to correct any deficiency.

**C.   Professional Ethics**

We at GEICO hold all of our claim representatives to a high standard of integrity and professionalism.  If, for instance, the settlement of a case is drawn out and the

5-10-02

**D 000332**

Exhibit 13 Page 10

**PROTECTED DOCUMENTS**

claimant inquires about the existence of a statute of limitations or its applicability to the case, the examiner or adjuster should never mislead the claimant into believing that the statute does not apply to the particular claim, if it actually does, nor should the adjuster tell the claimant that the company will waive the statute without specific permission from the VP of Claims Home Office or AVP of Claims Home Office Legal.

The claims person is expected to adhere to a standard of conduct, which not only is above reproach, but the appearance of which cannot possibly be construed as suggesting fraud or deceit. The corporate reputation of the GEICO Companies and the individual reputation of its claims associates are far too valuable to risk against the temporary advantage that might be gained by resorting to unethical practices in the handling of a claim.

### D.   Plaintiff's Attorneys

The companies or their representatives should not deal directly with any claimant represented by an attorney without the consent of the attorney. Once the company is put on notice, either by the claimant or by an attorney, that the claimant is represented by the attorney, all future dealings must be with the attorney. It is improper for the claims associate to negotiate directly with a represented claimant from this time forward unless he has the permission of the attorney to do so. However, there is no restriction on the right of the claims person to verify that representation. And there is no prohibition on an adjuster making inquiries about any allegations made by the attorney or in attempting to uncover any information from other sources which the attorney has refused to give.

The claims associate should request information on injuries and expenses and obtain the attorney's theory of liability. He should then advise the attorney that the GEICO Companies are ready and willing to discuss settlement anytime we have sufficient information to evaluate of the claim.

If one of our insured's is represented, it depends on the type of claim the insured is making as to whether or not we should deal directly with the insured instead of the attorney. For example, in a UM or UIM claim, we must deal with the attorney. In a PIP or Medical Payments claim, we may deal directly with the insured unless the attorney advises the insured desires us to deal with the attorney directly.

### E.   Confidentiality of Claim File Information

#### 1. General

The information contained in our claim files is of a confidential nature and its

II-3

5-10-02

**D 000333**

Exhibit 13 Page 11

## PROTECTED DOCUMENTS

use is restricted. It should not be reviewed or discussed in idle conversation. Information contained in either a paper file or an electronic file shall not be released except under certain circumstances. Reasonable application of common sense in the evaluation of information requests is most important. Release of any information from a claim file is subject to the guidelines indicated in the privacy acts of the various states, in accord with the discovery rules of the local court, and Company procedures.

The following guidelines are to assist you in deciding whether to release information and what kind of information may be released without either the consent of the insured or the claims manager and/or claims attorney (whichever is indicated):

- Property damage estimates/appraisals/repair bills on insured's car to support our subrogation claim.

- Medical bills, loss of wages or income statements of an insured when it is necessary to support our subrogation claim under Medical Payments, Personal Injury Protection, or Uninsured Motorist Coverages. (Claims associate may release.)

- Requests by governmental agency or by a valid subpoena properly served on us. (Claims Legal must be consulted before complying.)

If there is a request for information from our file, which does not fall within one of the above categories, the examiner or adjuster should discuss it with the claims manager prior to releasing it. REMEMBER, judgment and common sense should be exercised in responding to all information requests.

* 2.   ISO-Claim Search Inquiries

GEICO participates in the industry wide ISO-Claim Search (formerly BI Index) program. The Claim Search program provides member carriers (the "Provider Carrier") the opportunity to provide the Claim Search program with certain basic information about a claimant, such that another carrier (the "Inquiring Carrier") may have access to this information in the event that the same claimant is involved in a different claim with that other carrier (i.e. the Inquiring Carrier). Then the Inquiring Carrier receives notification from the Claim Search program that the subject of the inquiry has been involved in another claim (a "hit"), the Inquiring Carrier would receive from the Claim Search program the same basic information as well provided to the Claim Search program by the Provider Carrier. The claims handler from the Inquiring Carrier then might contact the Provider Carrier so as to obtain additional information.

II-4

5-26-11

**D 000334**

Exhibit 13 Page 12

**PROTECTED DOCUMENTS**

When an Inquiring Carrier contacts GEICO because the Inquiring Center received a hit from the Claim Search program about a person who was a claimant or insured on a GEICO claim, GEICO will not disclose any additional information about that person unless we are provided with that person's signed authorization to release the information.

3.  Double Insured Cases

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits.

File contents should not be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross-referenced file and should be retained in the file to be reviewed.

Written authorization is <u>not</u> always needed when:

- Handling non-conflict of interest claims at the CSR level.  See TCM titled "ADJUSTER AGENT OR INDEPENDENT CONTRACTOR-MULTIPLE GEICO INSUREDS'-CLAIMS HANDLING-ALL".

- Sharing recorded interviews if verbal authorization is secured on the recording.  The adjuster should request authorization to share the interview by asking the following question:  **There may be other examiners who will handle other aspects of this accident.  Do I have your permission to share this recorded interview with the other examiners on this and/or the other file?**

In the event of litigation, a subpoena may be obtained if authorization is not voluntarily given.

Cases in which authorization is needed would include permission to review No-Fault or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

An authorization form has been developed for use in this type of case.  It is called the "Information Authorization Form" (C-240).  Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

II-5

5-26-11

**D 000335**

Exhibit 13 Page 13

PROTECTED DOCUMENTS

F.    **Our Relationship with Insureds and Claimants**

In third party cases, the examiner or the adjuster owes a duty and loyalty to our insureds.

If there is a real doubt concerning the interpretation of a portion of the policy or the dollar value of the claim, every reasonable effort should be made to give fair consideration to the question from the viewpoint of the policyholder, the Company, and the claimant.

In first party cases, the company should analyze the policy contract fairly and attempt to resolve questionable situations equitably whenever possible. We should clearly explain all available coverages and benefits. The policy terms clearly spell out conditions/exclusions and a decision should not be made in favor of the insured if his/her policy indicates the loss is not covered.  Likewise, the company owes it to its policyholders to pay only those claims which are covered by the policy.

In addition to our contractual duty to our insureds, we recognize our obligation to claimants.  The policy of endeavoring to settle claims as promptly as possible applies to third party claims as well.

III.   **TECHNICAL CLAIMS HANDLING**

A.    **Facing the Future**

Change is fundamental to success.  The best insurer is constantly analyzing its operation to provide a better product.  As times change, GEICO's method of claims handling will change.

Needed products and services will be determined by the desires of the public as shown in opinion surveys, marketing polls, analysis of legislation, and other public opinion results.

It is our policy to be alert to changing concepts of claims handling which reflect this new climate without violating our duty to our policyholders.  This requires the examiner and the adjuster to accept new ideas and accept change.

In keeping with change, the company employs claims handling techniques such as: rehabilitation specialists, structured settlements, computerized estimates, computerized claims systems and handling,

Medical Cost Containment and Benefits Restoration, and Special Investigation Units are but two examples of innovative concepts in claims handling.  The years

II-6

5-10-02
**D 000336**

Exhibit 13 Page 14

PROTECTED DOCUMENTS

ahead probably will bring other ideas designed to benefit both the insurance industry and the public. It is the responsibility of all claims associates to be aware of new concepts; to recognize individual claims to which the concepts might apply; and to make early recommendations concerning the application of these new methods to individual claim files.

We want to market quality insurance and related services to the insuring public, at a price advantage. Claims associates make this goal a reality.

**B.   Settlement Techniques**

The claims associate should be realistic in the early appraisal of the claim. <u>If we owe it, pay it.</u> Settle claims fairly at the earliest practical time whenever possible.

Recognizing their need, we must utilize various settlement concepts. We have open-end releases, whereby, in addition to the consideration stipulated, we agree to pay additional amounts of money in the future. Property damage claims (including claims for loss-of-use) that are owed, are paid as soon as possible whether or not there are pending bodily injury claims arising from the same accident.

Rehabilitation programs, structured settlements, advanced payments, open-end releases, and "walk-away" settlements are some of our claims handling techniques for serving our industry and our public. Properly utilized, they can be effective responses to the public demand to help the seriously injured more expeditiously. The various types of settlements are covered in Chapter V.

**C.   Unfair Claims Practices**

In Chapter I, we referred to the regulation of insurance by grouping the methods into three categories: 1) legislation 2) administration and 3) court action.

The industry itself imposes self-regulatory systems. Trade associations and various groups related to the industry have developed claims settlement practices within the framework of legal systems, government regulations, and contractual provisions. The National Association of Independent Insurers (NAII), the American Insurance Association (AIA), and the National Association of Independent Insurance Adjusters are a few such organizations.

The National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act (cited in Unfair Settlement TCMs and in the NAII Manual) categorizes these principles generally and specifically by state. The act prohibits unjust, dilatory, and unethical claims practices. The claims associate should be prompt, fair, and forthright. Claims should be settled timely whenever possible, on merit basis, with professional etiquette. Claims associates should be thoroughly familiar with and abide by the Unfair Claims Practices Acts and

II-7

PROTECTED DOCUMENTS

regulations in each jurisdiction, as well the GEICO Claims Code of Conduct (C-253).

D.   **Our Relationship with Attorneys and Independent Adjusters**

The company is represented by attorneys and selected independent adjusters throughout the country.  Those who regularly represent the company are listed in the Attorney and Adjuster Code Book, which is now housed in the computer under transaction "AAI".

The selection and replacement of attorneys and claim representatives within regions is made by the assistant vice president for claims with the concurrence of the vice president of claims.  (See TCM-29.)

All claims associates have an obligation to keep their regional claims management informed of any developments which might suggest the benefit of a change in representation in any particular area.  If an alternate representative is needed on a temporary basis, approval can be obtained from the claims manager with concurrence of Claims Home Office Legal.

The companies' representatives are carefully selected on the basis of ability and reputation.  The companies review the quality of service and claims handling of these representatives, and delegate authority on a case by case basis. The nature of the relationship dictates these representatives should follow GEICO standards of competence, integrity, and professional and ethical conduct.

The instructions to an independent adjuster should be specific so the representative knows precisely what is expected.  When authority is delegated, the claims associate should explain exactly how the negotiations should be conducted. All directives should be clearly defined.  Any departure from the instructions should be questioned.  Normally, the claims associate should direct the investigation and reserve the negotiation phase of the claim for him or her self.

It is the companies' objective to have a mutually beneficial relationship with the independent adjusters and attorneys. The claims manager and the claims associate must be aware of problems in the field and judge the firms accordingly. Disagreeable circumstances can often be avoided by clear supervision given in advance.  Open communications and mutual respect are essential to cost effective settlements.

Our defense attorneys are chosen on the basis of their professional knowledge, ability, and experience.  In most instances, they are local leaders in their fields. They are limited agents with authority delegated to the particular case assigned. The fiduciary relationship between the attorney and the client-principal dictates that the attorney represents the client with the highest degree of loyalty and fidelity.

II-8

5-10-02
**D 000338**

Exhibit 13 Page 16

**PROTECTED DOCUMENTS**

On each case, the attorney acts solely in the best interest of his client within the bounds of the law.

The primary duties of an attorney are: 1) advise and counsel, 2) prepare legal instruments, and 3) perform services in the courts of justice. The attorney seeks the lawful objectives of the client through reasonable means permitted by law and advises the client of legal considerations. Authority to make a decision is exclusively that of the client. However, the attorney must exert every effort to ensure the decision is made only after the client is informed of all relevant considerations and practicalities of such a decision.

The attorney may represent multiple clients whose interests are not potentially different, such as an insurer and insured. If suit were filed directly against the company, the defense attorney would represent the company as the client. When the insured is sued by a third party, the defense attorney <u>solely represents the insured</u> as the client; but the company has the right, under the policy contract, to select the defense firm to be used and to control the settlement decisions. Situations may arise where there is a conflict of interest. One example of this would be a coverage question in the matter being defended. The attorney must promptly inform both the insured and the Company in writing the nature and the extent of the conflicting interests. The insured should be invited to retain his own counsel depending on the circumstances. The attorney owes undivided allegiance to the insured which forbids any collusion between the company and the attorney against the insured. If this situation occurs, the claims associate must discuss the claim with the claim manager, Regional RLA and Claims Home Office Legal.

The companies have a corresponding obligation to their insureds. The insured must be informed of the progress of the pending suit. Although the company provides the defense, it is primarily the insured's suit. The company has the duty to answer the insured's questions and to report any circumstances which may subject the insured to personal loss.

Suit handling is covered in Chapter IX. However, it is important for the claims associate to be aware of the flow of responsibility and the corresponding duties in the special relationship which exists between the principal and agent, the insured and the company, the insured and the attorney, and the company and the representative.

\*   E.   Correspondence and Documentation

    1. Letters

        The ability to express yourself clearly and persuasively is an essential attribute for a successful claims associate. Because of the nature of the companies operation, a portion of the communications with policyholders, claimants, and attorneys is through correspondence. Little is accomplished if an examiner or

II-9

12-23-08

**D 000339**

Exhibit 13 Page 17

**PROTECTED DOCUMENTS**

adjuster has superior technical knowledge but cannot convey their thoughts to others.

It is company policy to reply courteously to all letters that call for a response within a reasonable period of time.

The claims associate's communications should display leadership, good sound judgment, and decisiveness. Simple and direct language avoids misinterpretation. To be effective, the communication should express the claims associate's position in a clear, concise, easy to read and understand manner. Its tone should be professional and businesslike, words spelled correctly and proper grammar utilized.

Correspondence with independent adjusters and attorneys requires particular attention. It is through such communication that direction is exercised over the handling of claims. To assure high quality service from independent adjusters and attorneys, and to check the cost of their work, demands intelligent supervision. Proper direction from the claims associate should be reflected in their work product.

Correspondence to independent adjusters should outline what is needed – early claimant contact, signed statements, police reports, photos, diagrams -- whatever is necessary to avoid a decision delay. Instructions on negotiation techniques should accompany settlement authority.

The independent adjuster should forward timely and complete status reports within 30 days. Their activities should be in accordance with the claims associate's instructions and within company guidelines. There may be occasions when the claims associate disagrees with a representative's case handling. The claims associate should be able to offer constructive criticism to correct the deficiencies. If the disagreement is of a serious nature, the claims associate's supervisor should become involved.

Our defense attorneys are presumed to be experts in the legal field. The claims associates need not instruct them on points of law or procedure, but should monitor their activities and maintain direction of the case.

Follow-up is essential. Once the claims associate has told the representative what is required, the instructions should be accomplished within a reasonable period of time. The claims associate should assure that the representative responds as promptly as possible. If a timely report is not received, a letter or telephone call may be required.

Do not use hand written correspondence if a letter or phone call is required. Any significant correspondence with anyone should be typed. Handwritten memoranda are unacceptable. All communication, whether by

II-10

12-23-08
**D 000340**

Exhibit 13 Page 18

**PROTECTED DOCUMENTS**

correspondence, telephone, or in person, should create a favorable impression. The claims associate's correspondence reflects the image of the company. It is the responsibility of the examiner or the adjuster to maintain that image of high GEICO standards through effective communication.

Claim system enhancements have added form letters and templates to our arsenal of claim tools that improve efficiencies in claim file documentation. We generally know when to send such letters and what events trigger a specific letter or template.

Unfair claim settlement practice acts generally set out requirements for responding to correspondence. In addition, we have claim processes and procedures regarding documenting telephone calls, facsimile transmissions and other communication in the claim file. These various sources set minimum standards.

We need to be constantly vigilant that we are not shortsighted in our task of documenting claim files with correspondence made to fit into an existing format.

There are times when telephone communication is best documented by both an Alog entry and sending a confirmatory letter. Unusual requests or those that cause us not to do something are examples of situations that should cause us to send a letter. It should detail what was said and why we are doing or not doing what we planned to do. For instance, if we receive a telephone call from an attorney who tells us he would not accept an offer of our policy limits, if made, and we believe it is a case where we should be tendering our limits, in addition to documenting the conversation in Alog, we should confirm in writing that we are prepared to offer the limits but for his refusal. In addition, we also convey our intent to pay the limits once he tells us how to make the check payable and otherwise offer the limits notwithstanding his professed inability to accept them.

This is especially necessary where it can be reasonably anticipated that the contents of a singular ALOG entry may be denied later by the speaker

We must constantly be aware of the best method of communicating and documenting our claim files, using multiple methods where prudent.

2. Email

One of the most used communication tools today is email. The growing use and importance of email requires that we use it as effectively as possible to communicate with customers regarding claims. To ensure the proper use of email, the following practices and policies should be followed by all

12-23-08
**D 000341**

Exhibit 13 Page 19

**PROTECTED DOCUMENTS**

associates, contractors, consultants, and temporary workers that use our email system.

The use of email is intended to be used for communicating with other associates and, where approved, with other businesses and customers. The right to use internal or external email is subject to your adherence to the following guidelines:

    a. To send ECF or Eloquence letters approved for email if permission to communicate by email has been secured from the interested party.

    b. For iNet CSRs to respond when appropriate to customer email inquiries received through the Cisco E-mail Manager (CEM).

    c. To communicate with our defense counsel. Email may be used instead of letters or written memos to our counsel and may be used with either staff or fee counsel.

    d. To deliver arbitration packages to Arbitration Forums or adverse carriers. These messages should have no text, only the arbitration package as an attachment.

    e. To send estimates or total loss evaluations to customers if they request copies by email.

**Email should not be used other than for these four (4) purposes unless authorized by CHO.**

Email other than ECF letters:

Customers may request that we communicate with them via email other than ECF letters. Each of these requests should be considered on a *case-by-case basis.* Any exception should be approved by regional management Exceptions should be considered based on the <u>need</u> of the customer to communicate with us by email, not on the customer's desire to communicate with us by e-mail.

This exception will be most common in the following two scenarios:

    1) A customer is unable to communicate via the telephone and requests communication via email (ex: military personnel deployed on ships at sea).

    2) A customer wishes to send us digital photos.

<div align="center">II-12</div>

12-23-08
**D 000342**

Exhibit 13 Page 20

**PROTECTED DOCUMENTS**

In these types of circumstances, if regional management determines e-mail communication is acceptable, claims associates should use the following procedure:

1) The communication should be sent and received by a designated "Email Coordinator". This coordinator will be either the claims handler's supervisor or a representative chosen by management. The coordinator will review all outgoing email for content, spelling, grammar (spelling and grammar check should be used on all outgoing e-mail) and format. All e-mail will be sent or received by the designated coordinator. No email will be sent or received by the claims handler.

2) The body of any incoming or outgoing email should be cut and pasted to ALOGI or the e-mail should be printed and scanned to the ECF file as a document.

3) Any attachment (such as digital photos) should be printed and scanned to the ECF file.

Claim emails should contain only claim specific information and should include the claim number. They should not include any solicitations or marketing , such a recommendations to add or increase coverage.

Auto-signatures should include the claims handler's name, title and phone number and should not include quotes, logos or graphics. Stationary backgrounds or borders should not be used. All email should be in 12-point Arial font.

When the Email Coordinator is not in the office, a designated substitute should monitor the coordinator's incoming email and review any outgoing email as needed.

As more uses for email become available, this manual will be updated and claims users will be notified.

All claims associates, contractors, consultants, and temporary workers that use our email system must follow proper procedures when using email to avoid releasing information that could be damaging to either the customer or the Company. Following the guidelines outlined above will ensure email is used properly to efficiently and effectively communicate with customers regarding their claims.

II-13

12-23-08

**D 000343**

Exhibit 13 Page 21

PROTECTED DOCUMENTS

# CHAPTER III

## RESERVING

### I.    BASIC RESERVING POLICY

A "reserve" is the dollar amount that the Company can reasonably expect to pay for a complete settlement of the claim, including anticipated allocated expenses.  It is based on the facts known at the time the reserve is established or adjusted.

Claim reserves must be established on the basis of probable cost based on present values. A probable cost reserve is that amount of money that the best available judgment indicates it will cost to pay all future losses and expenses under that particular coverage. Present value means that present costs are used to estimate the value of a future damage settlement.

### II.   IMPORTANCE OF PROPER RESERVES

It is impossible to overemphasize the importance of establishing and maintaining accurate claim reserves.  For management to accurately evaluate the company's financial position, it must have assurance that claim reserves are appropriate.

A reserve should be established as soon as it is <u>probable</u> that a claim may be made.  We do not establish a reserve based on the mere possibility that a claim will be made, nor do we fail to reserve for a probable claim even if we believe it can be successfully defended. <u>Reserve adjustments should be made timely as the facts of each case warrant.</u>

Examples:

*    1.   Insured calls in the at-fault loss; indicates he has damage to his vehicle and wants to make a COL claim; indicates there was no damage to the claimant's vehicle.

Do not open a property damage reserve at this time.  You must speak to the claimant first.  Open a property damage reserve if he tells you that there is damage to his vehicle.

*    2.   Insured calls in the at-fault loss; indicates he has damage to his vehicle; indicates he is unsure of the claimant had damage or not.

Do not open a property damage reserve at this time.  You must speak to the claimant first.  Open a property damage reserve if he tells you that there is damage to his vehicle.

III-1

12-23-08

**D 000344**

Exhibit 13 Page 22

**PROTECTED DOCUMENTS**

     \*   3.   Insured calls in the at-fault loss; indicates he has damage to his vehicle; indicates
there may have been damage to the claimant's vehicle or property but has no info on
the claimant owner and left none of his info for the claimant.

> Do not open a property damage reserve at this time. You must speak to the
> claimant first. Open a property damage reserve if he tells you that there is
> damage to his vehicle/property.

When considering the establishment of a BI feature in a no-fault state with a verbal tort
threshold, a reserve should not be opened unless there is evidence that the tort threshold
has been or will be pierced. An exception to this is when an attorney represents the BI
claimant and the attorney, on behalf of the injured party, has placed us on notice of his
representation of the claimant and his intention to prosecute a BI claim. In this situation,
the BI feature should be established.

### III.   TYPES OF RESERVES

The Companies use two types of claim file reserves: Average Reserves and Case
Reserves.

#### A.   Average Reserves

The Actuary determines the average reserve amount required for each claim
reported under the various coverages by calculating the actual loss experience
under each coverage. At the moment an "open feature" transaction is keyed
without a specific dollar amount in the "reserve amount" field of the claim inquiry
screen, the system will automatically establish the average (STAT) reserve.

Automobile claims with values of less than $50,000 are initially reserved on an
average basis. If the claim has a reserve value of $50,000 or more, case reserves
must be established immediately. If any feature, in one claim (BI, UM, UIM or
PIP) has a reserve value of $50,000 or more, then all BI, UM, UIM, and PIP
features must have a case reserve established immediately. For example, if a
claim has three minor BI claims, one BI claim with a reserve value of $50,000 or
more and four PIP claims, all BI and PIP claims must be placed on case reserve
immediately. In this example, none of the features can be permitted to remain on
"stat" reserves. Claims with a value of less than $50,000 are transferred to case
reserves at the end of the second month after the reported month.

#### B.   Case Reserves

This type of reserving requires the establishment of a dollar reserve under each
feature involved. When case reserves are first set up, there may not be sufficient
information to permit a realistic appraisal; as subsequent information is
developed, the reserves must be adjusted. Establishing case reserves involves the

12-23-08

**D 000345**

Exhibit 13 Page 23

**PROTECTED DOCUMENTS**

exercise of good judgment and the consideration of such factors as probable liability, amount of special damages, estimates of damage, nature of injuries and any permanency, probable expenses of investigation, litigation and related matters.

Reserves are established by probable cost based on present values. A probable cost reserve is based on present costs and is used to estimate paying all future losses and expenses under a particular coverage.

At the end of the second month after reported month, a 90 Day Control List (see page III-10) for each claim handler is generated for open files. Reserves for all features, with the exceptions of those noted below, should be changed from average to case basis upon completion of the a 90 Day Control List Summary in ALOG (see page III-11) during the 60 to 90 day case life period. Persons with reserve authority equal to or greater than the suggested reserve must approve case reserves.

Under the Claim Record Information System (CRIS), the physical damage features including Comprehensive, Collision Property Damage, Loss of Use and Medical Payments, and the other listed coverages below do not have to be converted at 90 Day Control List time from average to case reserve unless the examiner estimates that the loss and expense payments under the feature will amount to $10,000 or more. If the feature is to remain open after the completion of a 90 Day Control List Summary in ALOG and the exposure is not $10,000 or more, the feature remains on average reserve.

If a feature is reopened, an individual with the authority to set the reserves as indicated in TCM-50 must reopen it on a case basis.

When establishing case reserves, special damages, location of accident, permanent injuries and any other such factors are taken into consideration.

The following are coverage/claim symbols, which do not require case reserves unless the estimated amount of loss and expense payment are estimated to be $10,000 or more:

| Description | Coverage | Claim Symbol |
|---|---|---|
| Broad Form Collision* | Coll | CBF, CWD |
| Combined Additional<br>Citizens Band Radio | CA<br>PCB | PAO<br>PCB |
| Collision | Coll | COL, CWV, CDV |

III-3

6-28-02

D 000346

Exhibit 13 Page 24

**PROTECTED DOCUMENTS**

| | | |
|---|---|---|
| Comprehensive | Comp | PVM, PGL, PTH, PDV, PFO, PPT, PAO, PFL, PFI, PAN, PWN, PEF |
| Mechanical Breakdown | MBI | MBB, MBO, MBS, MBE, MBD, MBT |
| Property Damage | PD | APD, APP, LPD, ADV, DPD, EPD, COP |
| Auto Home Contents | Comp | AHC |
| Stereo Buyback | Comp | PST |
| Fire, Lightning, Theft | FLT | PTH, PPT, PFI |
| Loss of Use | PD | LOU |
| Limited Collision* | Coll | LTC |
| Medical Payments Coverage | MP | MED |
| Personal Effects | PE | PEF |
| Per. Effects/Comb. Additional | PE/CA | PEF |
| Rental Reimbursement | RR | REN |
| Towing & Labor | TOW | TOW |
| Emergency Road Service | ERS | ERS |
| Uninsured Motorist Property Damage | UM | UPD |
| Underinsured Property Damage | UM | XPD |

\* = MI Only

III-4

6-28-02

**D 000347**

Exhibit 13 Page 25

**PROTECTED DOCUMENTS**

The following are coverage/claim symbols, which do require case reserves:

| | | |
|---|---|---|
| Uninsured Motorist Bodily Injury | UM | UBI, UMD, UMS, UBX |
| Excess Underinsured Bodily Injury | UM | XBI, UMB |
| Underinsured Bodily Injury | UM | UIM, UIX |
| Bodily Injury | BI | ABI, BID, RBI, DBI, DPR, LBI |
| Basic Personal Injury Protection | PIP | NBB, NBD, NBS, NDB NBF, NBI, NBW, NDF NBM, NBR, NBA, NWL FNL, DBC |
| Basic Preferred Provider Organization | PPO | NPA, NPM, NPR, NPS, NPW, NPC, NPL, NCC, NCR |
| Additional Personal Injury Protection | APIP | NEI, NEM, NEF, NES, NER, NEW, NEA, NBB |
| Additional Preferred Provider Organization | APPO | NAA, NAM, NAR NAS, NAW, NDM, NDR |
| Medical Payments Coverage | MP | LER, MEB |
| Extraordinary Medical Benefits | EMB | EMB |
| Accidental Death and Disability | ADD | ADE, ADI |

III-5

6-28-02

D 000348

Exhibit 13 Page 26

PROTECTED DOCUMENTS

IV.   DEVELOPMENTAL RESERVES

This reserve is developed by the Actuary to compensate for the impact of inflation on claims department establishment of "present values reserves."

V.   ESTABLISHING, ADJUSTING, MAINTAINING RESERVES

Examiners and adjusters must carefully analyze initial loss reports and indicate the features involved. Reserves should be established for each feature when a claim appears probable, but not for coverages under which there is no probability of a claim. As the character of the file changes, it may be necessary to adjust the feature reserves. Reserves may be changed at any time. The effectiveness of our reserve procedures depends on the examiner's or adjuster's ability to identify the need to open, close, or revise the reserves as the facts of the case warrant.

Reserves are subject to the guidelines listed in the next section with the requirement that the responsibility for establishing and maintaining all case reserves is vested with Supervisors, Managers, Directors, RLA's and AVP's. This responsibility cannot be delegated and the authorizing party should review thoroughly the file content prior to extending reserve authority. A Supervisor, Manager, Director or RLA must authorize all reserves under Bodily Injury, Uninsured and Underinsured Motorists Bodily Injury Coverage.

A C-86 Manager/Supervisor Reserve Worksheet form (See Exhibit 1, Page III-17) should be completed for each claim on the 90 Day Control List, accounting for each BI, UM or UIM feature and on any subsequent reserve change under these coverages.

BI, UMBI and UIM loss and expense reserves include an "inflation factor." See Exhibit 2, Page III-18 for current inflation trends.

Examiners and adjusters are responsible for reviewing the accuracy of the reserves each time the file crosses the desk.

VI.   GUIDELINES FOR ESTABLISHING RESERVES

Automobile claims with exposure of $50,000 or more under one feature or a combination of features should be placed on case reserve immediately.

- All case reserves must be approved by persons with settlement authority equal to or greater than the reserve amount, and where BI, UM or UIM reserves are concerned, the reserve must be approved by a supervisor, manager or director.

- All changes in reserves that will result in the new reserve exceeding the examiner's or adjuster's settlement authority must be approved by a claims associate who has

III-6

6-28-02

D 000349

Exhibit 13 Page 27

**PROTECTED DOCUMENTS**

- authority to approve the new reserve. See TCM-50 for loss/expense and reserve authorization guidelines.

-

- Supervisors and Claims managers should approve and review reserves at all 90 day, 6 month and 18 month file reviews.

- Reserves should be changed if the value of the claim changes by $300.00 or more. Adjustments of less than $300.00 should not be made.

- Although it is not necessary to reopen every closed file for the purpose of making a loss or expense payment, premature closure of a file should be avoided. Closed files must be reopened to accommodate loss or expense payments of $300.00 or more.

- We must have detailed facts about the precise nature of injuries, treatment and prognosis to ensure accurate reserves. This is particularly important during the first two months of the case. Examiners and adjusters must obtain complete information promptly from claimants and attorneys and be consistently mindful of reserve maintenance.

- A negative reserve occurs if a payment exceeds the reserve amount established under a specific feature. Our claim systems prevent a negative reserve from occurring; loss payments cannot be issued unless there are reserves established in excess of the loss payment. Therefore, before a payment can be issued, the reserve must be increased to a sufficient amount.

- Catastrophic PIP cases can present a unique problem in accurately predicting case reserve amounts. The type of injury, treatment and rehabilitation periods vary with each claimant. If, after considering all factors, the examiner or adjuster still questions the proper reserve amount, he or she should ask the supervisor or manager for assistance.

- When settlement of a pending case has been negotiated, and the file will be closed within the same calendar month, no reserve adjustment is necessary if the payment is less than the reserve amount.

- Features involving first party physical damages need not be placed on case reserve unless loss and expense are expected to amount to $10,000 or more.

- When a reserve is to be increased beyond regional authority, it may be necessary to call Claims Home Office Legal for approval in order to complete a change before the end of the current month. The Control File Alert Form may also be used to obtain a reserve change (see Exhibit I, Chap. XIII).

- Do not set an inadequate reserve as an interim reserve while awaiting approval from appropriate claims attorney or AVP of Claims Home Office

III-7

11-15-05

D 000350

Exhibit 13 Page 28

**PROTECTED DOCUMENTS**

- Telephone calls to Claims Home Office Legal (CHOL) are required for reserve approval on new control files when it will take more than 5 days to get the Control Alert Form to CHOL. Telephone calls are also required when we are within 5 days of the end of the month. Otherwise, the Alert Form may be sent with a recommended reserve.

## VII.   RESERVE INCREASE PROCEDURES

When a file is considered for control status (Chapter XIII) and a reserve increase is warranted, a representative from the region (the examiner, manager, or RLA) may call Claims Legal to review the case. This will include providing the Claim Home Office Legal Attorney with the claim number, insured's name, loss location, date of loss, policy limits, facts and circumstances of the loss, and injuries to the claimant(s), age(s), and occupation(s). Notes will be posted to ALOG

The region will recommend a new reserve figure. If the Claims Home Office Claims Attorney is in agreement, it is approved. If not, advice is given to the regional representative on what is appropriate under the circumstances. Approval of the appropriate reserve adjustment is transmitted via ALOG/SYSM. In addition, a notation is placed on ALOG that the file is to be submitted to Claims Home Office in the near future as a control file. ALOG approval of the reserve adjustment is usually done within 24 hours of the phone call and should not exceed two business days. Alternatively, a reserve adjustment may be recommended on a Control File Alert Form.

If a reserve increase has been authorized, but the file has not been placed on control soon after confirmation of the reserve adjustment, either a phone call is placed to the examiner or message via SYSM/ALOG is sent to the examiner requesting that the file be placed on control.

## VIII.   THE CLAIMS SYSTEM AND CLAIMS CONTROL LISTS

The CRT/PC is used for all reserve changes. The systems manual provides the procedures to follow. The following forms are used to review and change reserves and to review file handling:

| |
|---|
| 90 Day Control List |
| 6 Month Control List |
| 18 Month Control List |

III-8

6-28-02

**D 000351**

Exhibit 13 Page 29

**PROTECTED DOCUMENTS**

A.    90 Day Control List

    1.    When using this computer-produced list, the supervisor combines file review with changing reserves from average to case for each claim on the list. The list is produced monthly and shows each open file, which has aged for two months from reported date.  A 90 Day Control List summary must be completed by the end of the third month at which time all open features still on average reserve will be transferred to case reserve.

    2.    Claims handlers must create a 90 Day Control List Summary in ALOG for every claim on the 90 Day Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG. Each Summary and supervisor/manager review must be completed by the end of the month in which the 90th day falls.

    3.    A sample of a 90 Day Control List is on the next page and a sample of a 90 Day Control List Summary Format follows.

III-9

6-28-02

D 000352

Exhibit 13 Page 30



**PROTECTED DOCUMENTS**

REPORT NO. CLL50M-101
REPORT DATE   12/29/01

GEICO PROPERTY/CASUALTY COMPANIES
**90 DAY CONTROL LIST**
RELEASE DATE
DECEMBER 29, 2001

PAGE 256
RUN DATE 12/29/01

ADJUSTER CODE:   XXXX
FCC     -   05                          XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 0018565980101101 | 04 | APD | 01 | |
| | 05 | APD | 01 | 1001 |
| | 06 | APD | 01 | 1001 |
| 0019304400101114 | 02 | LOU | 01 | 1001 |
| 0061300730101052 | 01 | COL | 13 | 1001 |
| 0090599370101091 | 02 | POA | 13 | 1001 |
| 0102558420101044 | 02 | LOU | 01 | 1001 |
| 0122333870101019 | 02 | APD | 01 | 1001 |
| | | | | 1001 |

Exhibit 13 Page 31

6-28-02

**D 000353**

**PROTECTED DOCUMENTS**

**CONTROL LIST SUMMARY FORMAT**

1.  Loss Description  -    What happened?
                          Is investigation complete?  If not, why?

2.  Coverage          -    Is coverage in order?   Any coverage problems?
                          Any limits problem?

3.  Liability         -    Who is at fault?  Why?
                          Comparative negligence?   What is the % attributed to each?

4.  Damages           -    What features are still open?  Name claimant and feature number.
                          Note any payments made.
                          Any vehicle inspections still pending?
                          Any subrogation potential?

                          List each injured party's name, age and occupation.
      •       Diagnosis (What is the injury?)

      •       History (Medical background, related injuries, prior
              injuries?)

      •       What sort of treatment are they receiving?  How often?
              What type of provider?
                    o       MD      Medical doctor
                    o       DC      Chiropractor
                    o       DO      Osteopath
                    o       RPT     Registered Physical Therapist
                    o       LMT     Licensed Massage Therapist

      •       Prognosis.  How much longer will treatment continue?
              Additional tests recommended?  Other treatment
              recommended?  Length of future treatment?

      •       What are the total bills paid to date?   Any outstanding
              bills?   Projected future bills?

      •       Will they have a loss of earnings claim?  How much?  Any
              disability?

5.  Course of Action  -    What needs to be done to close?
                          What can we do to resolve?
                          Address each open injury feature.  Does any feature need a
                          reserve?
                          If so, what amount do you recommend?

                          III-11

                                        11-15-05

                                        **D 000354**

                                        Exhibit 13 Page 32

**PROTECTED DOCUMENTS**

* Every review should include the elements set out in parts 1 thru 5 above. Reserves should be addressed when completing Part 5. The claims representative, as part of the review process, should discuss each open feature and comment on the reserve for that feature. If no change in reserve is needed, the file should reflect that the reserve was considered and left unchanged. If a change in the reserve is needed, the claims representative should describe the new information which led to this conclusion. The claims representative should then make a recommendation for increasing or decreasing the reserve for the particular feature. Every review <u>must</u> specifically address reserves for every open injury feature. Management personnel are responsible for insuring that reserves are considered and that the consideration is documented when completing all 90 day (C-71), 6 month (C63) and 18 month (C-178) reviews.

III-12

11-15-05

D 000355

Exhibit 13 Page 33

PROTECTED DOCUMENTS

B.  **6 Month Control List**

   1.   The 6 Month Control List is used to identify all open claim files that aged five months from reported month.

   2.   Claims handlers must create a 6 Month Control List Summary in ALOG for every claim on the 6 Month Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG.

*  3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary. Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

   4.   All 6 Month Control List Summaries and supervisor/manager reviews by the end of the 6th month

   5.   A sample of a 6 Month Control List is on the next page.

11-15-05

**D 000356**

Exhibit 13 Page 34



**PROTECTED DOCUMENTS**

REPORT NO. CLL50M-201          GEICO PROPERTY/CASUALTY COMPANIES                    PAGE     84
REPORT DATE  11/24/01                  6 MONTH CONTROL LIST                         RUN DATE 11/24/01
                                         RELEASE DATE

                                        NOVEMBER 24, 2001

ADJUSTER CODE:    XXXX
FCC      -    05                    XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 0094287530101093 | 01 | COL | 13 | 0601 |

Exhibit 13 Page 35

6-28-02
**D 000357**

**PROTECTED DOCUMENTS**

C.   18 Month Control List

    1.   The 18 Month Control List is used to identify all open claim files that aged 17 months from reported month.

    2.   Claims handlers must create an 18 Month Control List Summary in ALOG for every claim on the 18 Month Control List. Supervisors and managers review each summary and give direction, comments and instruction in ALOG.

    3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary.  Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

    4.   All 18 Month Control List Summaries and supervisor/manager reviews must be completed by the end to the 18th month.

    5.   A sample of an 18 Month Control List is on the next page.

III-15

11-15-05

D 000358

Exhibit 13 Page 36

D 000359

PROTECTED DOCUMENTS

Exhibit 13 Page 37

PROTECTED DOCUMENTS

## IX.   INCURRED BUT NOT REPORTED CLAIMS (IBNR)

The total amount of money, which the Company earmarks for claim purposes, includes both reported claims and those incurred but not reported.  Reported claims are those for which claim files have been established.  Incurred but not reported claims are those for which claim files have not been established although the accident or loss has occurred and we may or may not have the report at the Company.  Actuary determines the reserve for incurred but not reported claims.

## X.   REINSURANCE RECOVERABLE RESERVES

Reinsurance recoverable reserves are not actually reserves but are estimates of the amount in excess of our retention, which we can expect to recover from the reinsurance carrier.  Automobile and homeowners, CPL and pacesetter reinsurance recoverable reserves will be established, maintained and closed by Claims Home Office.  A copy of the accounting document will be sent to the claims file for retention.

Under the CRIS system, there is no field for the entry of a reinsurance recoverable reserve and these reserves are accounted for in a manual account maintained in Claims Home Office.  Where a reinsurance reserve is being maintained on a claim processed under the CRIS system, the reinsurance indicator should be activated in the CRIS system so that the claim is identified as having reinsurance involvement.

Under PIPS, reinsurance recoverable reserves are established and maintained by PIC's Claims Processing Unit at the direction of the Claims Home Office.

## XI.   REINSURANCE RECOVERABLE PAYMENTS

The Claims Home Office handles reinsurance recovery payments.  Examiners must maintain their claim files on an open basis until notified of the receipt of the reinsurance recovery payment.

## XII.   REINSURANCE TREATY

The Company had a reinsurance treaty to protect it against large losses under its policies.  Between April 1, 1993 and August 7, 2001, losses were reinsured above $1 million to a limit of $10 million.

As of August 7, 2001, the Company will be self-insured for most of its policies.  The exceptions will be motorcycle policies and all policies written in New Hampshire.  They will continue to be covered under a reinsurance treaty until February 7, 2002.  After February 7, 2002, the Company will be totally self-insured.

III-17

6-28-02
**D 000361**

Exhibit 13 Page 39

PROTECTED DOCUMENTS

EXHIBIT I

## MANAGER/SUPERVISOR RESERVE WORKSHEET
## BI-UM-UIM

Page _____ of ____

CLAIM NUMBER _____      POLICY LIMITS_____

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 |
|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | _____ |
| INFLATION FACTOR | _____ | | _____ | _____ |
| NEW NET RESERVE | _____ | | _____ | _____ |
| **Approval Initials & Date** | _____ | | _____ | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 |
|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | _____ |
| INFLATION FACTOR | _____ | | _____ | _____ |
| NEW NET RESERVE | _____ | | _____ | _____ |
| **Approval Initials & Date** | _____ | | _____ | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 |
|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | _____ |
| INFLATION FACTOR | _____ | | _____ | _____ |
| NEW NET RESERVE | _____ | | _____ | _____ |
| **Approval Initials & Date** | _____ | | _____ | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 |
|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | _____ |
| INFLATION FACTOR | _____ | | _____ | _____ |
| NEW NET RESERVE | _____ | | _____ | _____ |
| **Approval Initials & Date** | _____ | | _____ | _____ |

**Cumulative Totals:**

| | | | | |
|---|---|---|---|---|
| TOTAL PROBABLE CURRENT LOSS | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT EXPENSE | _____ | | _____ | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | _____ |
| TOTAL NEW NET RESERVE | _____ | | _____ | _____ |

III-18

11-15-05

**D 000362**

Exhibit 13 Page 40

**PROTECTED DOCUMENTS**

EXHIBIT 2

**BODILY INJURY INFLATION RATE: 10.6%**

| MO | FACTOR | MO | FACTOR | MO | FACTOR |
|---|---|---|---|---|---|
| 1. | 1.01 | 21. | 1.19 | 41. | 1.41 |
| 2. | 1.02 | 22. | 1.20 | 42. | 1.42 |
| 3 | 1.03 | 23. | 1.21 | 43. | 1.43 |
| 4. | 1.03 | 24. | 1.22 | 44. | 1.45 |
| 5. | 1.04 | 25. | 1.23 | 45. | 1.46 |
| 6. | 1.05 | 26. | 1.24 | 46. | 1.47 |
| 7. | 1.06 | 27. | 1.25 | 47. | 1.48 |
| 8. | 1.07 | 28. | 1.27 | 48. | 1.50 |
| 9. | 1.08 | 29. | 1.28 | 49. | 1.51 |
| 10. | 1.09 | 30. | 1.29 | 50. | 1.52 |
| 11. | 1.10 | 31. | 1.30 | 51. | 1.53 |
| 12. | 1.11 | 32. | 1.31 | 52. | 1.55 |
| 13. | 1.12 | 33. | 1.32 | 53. | 1.56 |
| 14. | 1.12 | 34. | 1.33 | 54. | 1.57 |
| 15. | 1.13 | 35. | 1.34 | 55. | 1.59 |
| 16. | 1.14 | 36. | 1.35 | 56. | 1.60 |
| 17. | 1.15 | 37. | 1.36 | 57. | 1.61 |
| 18. | 1.16 | 38. | 1.38 | 58. | 1.63 |
| 19. | 1.17 | 39. | 1.39 | 59. | 1.64 |
| 20. | 1.18 | 40. | 1.40 | 60. | 1.65 |

III-19

6-28-02
**D 000363**

Exhibit 13 Page 41

PROTECTED DOCUMENTS

# CHAPTER IV

## COVERAGE

I.   OVERVIEW

In every claims situation, the initial task of the examiner is to verify proper coverage.  In the vast majority of claims, this is easily done by reviewing computer data regarding the policy, the insured vehicles and the insured persons involved in the loss.  The examiner will review computer screens that provide system information regarding all three of these elements.  Occasionally a claims handler, at some level of the claims resolution process, will be confronted with a coverage question.  It is the purpose of this Chapter to highlight the most prevalent coverage issues that might be encountered and to outline the procedures to be used to resolve the coverage question.  Correct coverage decisions are the most important tasks of the claims examiner at any level.  Adverse coverage decisions by the Company expose our insureds to real financial hardship – sometimes catastrophic.  Just imagine in your own life if you had a traffic accident resulting in substantial property damage and/or personal injury where your insurance company refused to cover the loss.  Regardless of whether the coverage position is right or wrong, from the insured's point of view, a denial of coverage can be devastating.  If a disappointed insured proves to a jury that our denial of coverage was wrong and wrongful, the effect upon the Company can also be devastating in terms of extracontractual liability, commonly known as "bad faith liability."

As this Chapter will mention many times, one of the keys to coverage decision-making is prompt and appropriate investigation.  Coverage decision-making is not a game nor is it to be viewed as a jousting contest with the insured.  Doubts are to be resolved in favor of the insured after appropriate and timely investigation.  If our insured refuses to cooperate in our coverage investigation by failing to provide pertinent information, we may have more latitude in our investigation, but we must avoid a "stonewall" or "vendetta" attitude.  It is your job to find coverage and to service covered claims.  The Company is not served by a cynical approach to coverage issues.  On the other hand, if coverage does not exist for a particular loss based upon facts determined by a full and fair investigation, we should not shrink from a coverage denial/disclaimer.

This Chapter will address many of the coverage issues you might encounter and the process by which these issues are to be resolved.  Coverage decision-making is more than merely reading the policy and denying coverage.  It is much more than reacting "off-the-cuff" to a claim situation presented to you over the phone.  Examiners must avoid casual comments to our insureds regarding potential lack of coverage.  We must be sure we are on firm ground when we deny coverage to our policyholder.

5-10-02

D 000364

Exhibit 13 Page 42

PROTECTED DOCUMENTS

**II.     SOURCES OF COVERAGE**

Coverage may be confirmed by the computer record and/or by the policy file and/or information or papers relevant to the coverage issue held by the insured or others.

The following guidelines apply to coverage:

- In most cases, we will assume that the computer record is correct and proceed with claim handling.

- Payments should not be made if you doubt the credibility of the computer record. If you "think" the computer record is incorrect, obtain documentary proof from the policy file or possibly even from the insured.

- Search for the policy file if it is necessary to resolve a coverage question.

- Advise the Auto Damage Adjuster or the independent adjuster immediately if there is any coverage problem, which would affect claim handling. Ask staff and independent adjusters to obtain coverage documents and statements from the insured. The insured should be advised if we are investigating to determine coverage and nothing should be done to mislead the insured in any way.

- In cases involving BI, UM or UMBI, the Regional Liability Administrator (RLA) and/or a Claims Home Office Attorney should be consulted for permission to deny coverage. Any decision to deny must be made as soon as possible.

- Making decisions as promptly as possible may at times be difficult, especially in those cases where every effort has been made to confirm coverage from computer records and policy files with no success, and even in cases where the insured is unable to develop and provide any evidence of coverage. Delaying settlement in the vague hope that coverage may somehow not be valid is a clear disservice to the public and is a violation of most Unfair Claims Practices Acts.

**III.    TYPES OF COVERAGE QUESTIONS**

There are two types of coverage questions: those in which no Company policy was in force at the time of the loss and those in which a policy is in force but the loss is not covered by that policy under the particular factual situation. It is important to understand the distinction between these two types of coverage questions. In the first situation, all coverage is <u>denied</u>. In the second situation, coverage for <u>this loss</u> is <u>disclaimed</u> because of particular circumstances.

IV-2

5-10-02

**D 000365**

Exhibit 13 Page 43

**PROTECTED DOCUMENTS**

Coverage questions can arise from many situations. Here are a few of the more common questions you will see.

**A.     Policy Expiration And Cancellation**

If the computer system shows that the policy **expired** prior to the loss, the insured should be advised of this coverage problem but no direct denial should be made in early conversations with the insured. If the expiration was over 30 days prior to the loss and the insured does not dispute the expiration, the coverage can be denied upon approval by a Claims Manager. Complications can arise if the expiration is 30 days or less or the policyholder denies receipt of the expiration notice. In such cases, the issue must be referred immediately to the RLA for review before a denial can be issued. If the system information indicates that the policy in question was cancelled prior to the loss, we must be prepared to prove the validity of the cancellation in the event our coverage position is contested. The necessary evidence should be identified prior to the decision to deny coverage. This will be discussed again later in this Chapter.

There are times when an uninsured person who causes an auto accident tries to purchase coverage over the phone after the fact. Any time a loss is reported to have occurred on the date of policy inception, great care should be taken to confirm the timing of the accident and the binding of the policy. Generally, the police report will establish the time of the accident and our computer system will record the time that the direct sale of coverage was made. If the loss is property damage only and no police report was made, the examiner must be creative in determining the time of the loss and then determine if the policy was in effect.

**B.     Is The Vehicle Covered?**

Our automobile policy covers both people (insureds) and vehicles depending upon the circumstance of the loss. For physical damages coverages, the vehicle must be a "described vehicle" -- one listed on the declaration page of the policy. For liability coverages, the issue is not so clear. Our defined insureds (named insured, spouse and resident relatives) are insured for use of "owned" and "non-owned" vehicles. Where the vehicle is owned by someone in the insured's household but is not described in the policy declaration page (referred to as a "dec-sheet"), then that vehicle is neither "owned" (because it is not described on the dec-sheet) nor is it"non-owned" (because it is owned by a defined insured). Consequently, use of that vehicle is not covered.

Owned auto – Our insurance policy has a very specific definition of an owned auto. The auto must not only be owned by our named insured, it must be declared on the policy (listed on the dec-sheet). A vehicle properly declared on the policy is called a "described" vehicle. There are also vehicles that meet provision definitions of "owned auto". These are "replacement vehicles," "additional vehicles," and "temporary substitute vehicles".

IV-3

5-10-02

**D 000366**

Exhibit 13 Page 44

**PROTECTED DOCUMENTS**

Non-owned auto – Defined insureds are covered, with certain limitations, while driving vehicles owned by others. This coverage is based upon the status of the insured person and the circumstance of his/her operation of the non-owned vehicle. For an insured under a Company policy to be insured while driving a non-owned vehicle, it must be established that the use of the non-owned vehicle was with the permission of the owner of the vehicle and that the use was within the scope of the permission. Permission to use a non-owned vehicle is a rather common coverage question.

C.     **Is The Driver Or Passenger Covered?**

Even when a described vehicle is involved in an accident, there may be issues regarding coverage for the driver or passengers if they aren't defined insureds. A person driving the described vehicle who lives outside the insured household is covered only if driving with permission of the owner. For example, if any insured loans a described vehicle to his neighbor to run an errand, the neighbor is fully insured as long as she keeps within the scope of the permission given by the owner. In this situation, the neighbor is called a "first permittee". If the neighbor happens to allow her husband to drive the described vehicle, the husband becomes a "second permittee". Coverage for "permittees" is problematic and very fact specific. Permissive use of the described vehicle by a person outside the insured household presents a coverage question. Cases involving permissive use issues, **which involve personal injury, must be presented to the RLA.**

Most states allow the issuance of "Named Driver Exclusions" (called NDEs). There are two types of NDEs: voluntary and involuntary. Voluntary NDEs result when our policyholder elects specifically to exclude a person from the policy who would otherwise qualify as a defined insured. This situation allows the policyholder to reduce her premium by excluding a high-risk resident relative. Involuntary NDEs arise where the Company informs a policyholder that we will continue to insure them only if a specific risk is excluded.

D.     **Is It A Covered Loss?**

Occasionally, there are losses claimed that are not covered by our contract with the insured. It is essential that you refer to the correct policy form and determine if the loss is described under <u>Losses We Will Pay</u>. Also, be sure to review the policy definitions under the appropriate section of the policy from which coverage is sought.

IV-4

5-10-02

**D 000367**

Exhibit 13 Page 45

PROTECTED DOCUMENTS

E.   **Has The Insured Complied With The Policy Conditions?**

The agreement we have with the insured binds both sides to the policy contract conditions. If the insured fails to meet these conditions, a coverage question may evolve. Common breaches include failing to report a loss timely, failing to cooperate and failing to provide timely notification of a lawsuit. The circumstances surrounding the breach should be discussed with your supervisor and/or RLA immediately. Appropriate coverage investigation will follow to determine the extent of the breach and if it has or may influence coverage.

IV.   OTHER POSSIBLE COVERAGE QUESTION SITUATIONS

A.   **Misrepresentations**

For claims purposes, a misrepresentation may be defined as a misstatement given to the Company to induce it to write a policy. To constitute a valid question of coverage, the misrepresentation must be material. The test of materiality is our answer to the question whether the policy would have been issued, or written at the same premium, if the true information had been known.

An inaccurate statement of occupation, if both occupations are of the same general character, may not be material to the risk. On the other hand, a false statement about a recent driver's license suspension or revocation is generally regarded as material.

Immediately upon discovering a possible misrepresentation, discuss the file with your supervisor and then refer claim file to the appropriate Underwriting Manager for a written opinion. On receipt of the Underwriting Manager's decision (paper or electronic) supporting a denial of coverage, <u>Claims Home Office Legal must be consulted immediately before any action is taken.</u> As soon as possible after receipt of the written opinion, the Underwriting Department should be notified as to how the claim will be handled.

B.   **Other Insurance, Excess And Escape Clauses**

To provide for situations where two policies cover the same risk, insurance contracts contain "other insurance" clauses. These clauses apply if the insured has purchased two policies and the policy periods overlap, or when the insured is driving a non-owned vehicle on which there is insurance.

If there are two insurance policies covering the same loss, generally, both policies would contain an excess insurance clause. This clause might read:

IV-5

5-10-02

**D 000368**

Exhibit 13 Page 46

**PROTECTED DOCUMENTS**

> If "the insured has other insurance against a loss covered by
> Section I of this policy, we will not owe more than our pro rata
> share of the total coverage available.
>
> This policy is excess over any other valid and collectible insurance
> that applies to a temporary substitute auto or non-owned auto."

When wording of this type appears in both policies, the general rule is:  (1) the
insured must be covered, (2) the terms of each policy are in conflict, and
therefore, (3) both carriers are liable.

In the instance where the insured is driving a non-owned vehicle, which is
covered by insurance, the general rule is that insurance follows the vehicle.  The
insurance on the vehicle would be "primary".  The driver's insurance would be
"secondary" and only become involved if the limits of the primary carrier had
been exhausted.  In potentially serious cases, opinions should be sought from the
Regional Liability Administrator or Claims Home Office Legal.

**C.    Who Is A Resident Of The Same Household For Purposes
Of The Omnibus Clause?**

The policy contract not only affords protection to the named insured, but under
the omnibus clause, it extends coverage by means of specific language and
definitions to another class of person.  This class includes relatives of the named
insured living in the same household, and/or, by definition, a person using the
insured's vehicle with permission.

Under the definition of an <u>owned automobile,</u> an insured is:  (1) the named
insured and any resident relative, (2) any other person operating the insured
vehicle within the scope of permission and (3) any other person or organization
liable for the conduct of an insured in the use of an owned auto.  Number 3
encompasses both (1) and (2) and would afford coverage, for example, in the case
where the insured is driving his car in the scope of his employment and is
involved in an accident injuring a third party, who would have a subsequent claim
against both the employer and the insured; in this case, the terms of the policy
would apply to each.

There have been several interpretations by the courts on the meaning of the word
"residence".  Most courts agree that the term means more than a place of abode
and, in determining the qualifications of a residence, have applied measurement
criteria such as: addresses on bank accounts, voter registration, hospital records,
registration of automobiles and driver's license.  It appears that the term
"residence," when used in a statute is equated by the courts to the term
"domicile".  When used in an automobile liability policy, however, the term
"resident" seems to be given a less permanent restriction, so as to cover persons
who are merely temporarily residing with the named insured.  This, of course, is

IV-6

5-10-02

**D 000369**

Exhibit 13 Page 47

**PROTECTED DOCUMENTS**

an advantage to the company when excluding coverage for non-owned automobiles (automobiles "not owned by or furnished for the regular use of either the named insured or any relative"), but operates as a disadvantage to the Company when we consider that relatives of the named insured are covered with respect to non-owned automobiles as persons insured under our policy, as are residents of the same household as the named insured with regard to owned automobiles.  Likewise, the term "relative" is used under Part II of the Family Automobile Policy covering expenses for medical services, etc.

Under the definition of a <u>non-owned auto</u>, the following persons or organizations are insured:  (1) the named insured;  (2) any resident relative operating with permission of the owner; (3) any other person or organization liable for the acts or omissions of an insured using an auto not owned or hired by the person or organization.  Despite the language used in defining "relative" under the Family Policy, there are certain guidelines for the examiner or adjuster to follow with respect to this matter, which are as follows:

- A person may have several residences but can have only one domicile.

- While the term "resident" as used in our policy should not be interpreted to require that degree of permanency inherent in the term "domicile," it does require more than temporary physical presence in the named insured's household.  The presence of the individual claiming to be (or not to be) a resident of the same household as the named insured must be accompanied by an intention to remain there for some length of time, although he need not intend a change of domicile.

- A person on a mere temporary visit to the named insured's home is not a "resident" as contemplated by the policy.

- Domicile means that place where a person has a true, fixed, permanent home,  habitation and principal establishment, without any present intention of removing therefrom, and to which place he or she has, whenever absent, the intention of returning.

**D.     What Constitutes Regular Use Of Non-Owned Automobiles?**

The Family Automobile Policy defines a non-owned automobile as "an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute automobile.  An auto rented or leased for more than 30 days will be considered as furnished for regular use"  This raises several questions each time a non-owned automobile is driven, in addition to the question of permissive use.  For example, the examiner or adjuster must determine whether the automobile is owned by either the named insured or any relative, or whether it is furnished for the regular use of either named insured or any relative.

IV-7

5-10-02

**D 000370**

Exhibit 13 Page 48

**PROTECTED DOCUMENTS**

The courts have encountered difficulty in deciding these questions and this section will be directed solely to the question of what constitutes regular use of a non-owned automobile as determined by the courts. Legal opinions vary from state-to-state. When necessary, check with your RLA and/or Claims Legal. The main question to be determined by the claims person is whether the non-owned automobile is being driven without restricted permission as to the time period within which the operator may use the vehicle or whether the vehicle is loaned on a temporary or restricted basis. The courts which have considered this question have generally held that the question is one of determining whether the insured had the unrestricted right to use the vehicle at any time he or she desired, either on business or pleasure, rather than one of determining the specific number of times the car was used. The only situation where the specific number of times the car was used becomes important is where the right to use the car is restricted in time. Generally speaking, if the insured has the unrestricted right to use the vehicle at any time, whether it be a specific vehicle or one of a number of vehicles, furnished for his or her use, the courts have held that this is a vehicle furnished for regular use and is not covered under the Family Insurance Automobile Policy. This would cover, for example, the standard motor pool situation wherein our insured is allowed to use one of any number of vehicles available in the motor pool furnished by an employer. Regardless of the number of times he or she may have used the vehicle in question, the courts have normally held this to be a non-owned automobile furnished for regular use for which there is no coverage under the Family Automobile Policy.

The majority of non-owned auto situations will involve our policy only as excess coverage. The following rules should assist you in making a determination on the coverage issue.

- If the insured has the right to use the vehicle in question at any time he or she so desires, either on business or pleasure, regardless of the fact that it may be one of a number of vehicles in a pool of cars furnished, this is a car that may be furnished for regular use.

- The question to be determined is not a specific number of times which he or she has used the car in issue, but as to whether the insured has the unrestricted right to use the car or any one of a number of cars at any time.

- If the car is furnished for a restricted time period only, or in some instances for a restricted use only, then the question narrows and the majority of courts have decided that the car was not furnished for regular use. This would include short-term rental vehicles rented for a period of one month or less, or the case of a relative not residing with the owner of the car who must have specific permission to use the car each time.

IV-8

5-10-02

**D 000371**

Exhibit 13 Page 49

PROTECTED DOCUMENTS

- Whenever specific permission is required for each separate use of the vehicle, the courts normally hold that this is not "furnished for the regular use of the named insured" due to the permission restriction.

- The use to which the car is being put at the time of the accident usually has no bearing on the question, the question being one of status of the vehicle and not the use to which it is being put, to wit: is the car furnished (available) for the regular use of the named insured?

## V.    WAIVER

A waiver is the relinquishment of a known right; in this instance, the Company's relinquishment of the right under the policy contract to deny coverage. For a waiver to exist, the Company must know about the coverage question. Although a waiver does not usually have all the elements of a contract, it is in the nature of a contract, based on an expressed or implied intention of the parties. The intention to waive may be implied from the actions of the claims technician.

An example of a waiver might be a case in which there was a delay of six months in reporting an accident. Obviously there is a coverage question based on a breach of the policy condition requiring prompt reporting. The question of coverage may be waived by the claim technician's expressly agreeing to do so or by implying such an intention by investigating and attempting to settle the claim without first issuing a Reservation of Rights or obtaining a signed Non-Waiver Agreement.

## VI.    ESTOPPEL

The doctrine of equitable estoppel may prevent a valid denial or disclaimer of coverage. If the Company acts or fails to act in such a manner that would (1) reasonably lead the insured to believe coverage is in order, and (2) the insured acts to his/her detriment in reliance upon that belief, the Company may be "estopped" from denying or disclaiming coverage.

For example, the Company may learn at the time the insured reports a serious accident, that when the insured applied for insurance, he or she inadvertently neglected to inform the Company of a prior insurance cancellation by another company. Although this may raise a question of coverage, the claims examiner or adjuster may investigate and even attempt to settle the claim. Perhaps suit is filed and the insured sends the suit papers to the Company, but the Company returns the suit papers to the insured ten days before trial indicating that it is withdrawing from the case and contending that the policy was void ab initio because of misrepresentation.

IV-9

5-10-02

D 000372

Exhibit 13 Page 50

PROTECTED DOCUMENTS

Under these circumstances, the insured appears to have been justified in relying on the Company to do what it represented it would do. Because the insured has been deprived of any reasonable opportunity to investigate and attempt to settle the claim, if he or she has acted in good faith, it would appear unjust and inequitable to permit the Company to take advantage of the coverage question at that late date. The Company could be estopped from denying coverage.

It is becoming increasingly difficult to distinguish between waiver and estoppel. In many jurisdictions, they are regarded as synonymous and in others; a waiver is not binding unless it is supported by an estoppel. It is sufficient for you to be aware that the application of either doctrine can prejudice the Company's position.

## VII. DEALING WITH OUR INSURED IN COVERAGE QUESTION SITUATION

While investigating a coverage question, the claims handler must be careful to preserve the rights of both parties to the insurance contract: the insured (or person seeking coverage) and the Company. Once a coverage question is recognized, the handler must seek guidance from Claims Management and, in appropriate cases, the RLA to determine a plan of action to resolve the coverage question. This plan may include issuance of a Reservation of Rights letter or, in some circumstances, a Non-Waiver Agreement or Agreement to Defend. These devices provide protection to both the people seeking coverage and the Company while the coverage investigation proceeds.

## VIII. RESERVATION OF RIGHTS (ROR) LETTER

A reservation of rights letter (known as a "RoR") is used promptly to inform an insured that a coverage question has arisen concerning her/his claim and that we (the insurer) require time fully to investigate the question. The RoR is intended to advise the insured that the question exists, the nature of the question and that our efforts to investigate the question will require some additional time. The RoR is an important legal document. It can cause apprehension on the part of the insured. Its use must be carefully controlled and drafted. What follows are essential considerations in drafting and issuing RoRs:

### A. Timing of RoR

Because the very purpose of a RoR is to give notice to the insured of a coverage question, these declarations must be made promptly after a coverage question is recognized. This does not mean that a RoR letter must be sent before preliminary investigation is made to confirm coverage. The law does not require that we guess about basic coverage based upon bare allegations. Mere suspicion regarding coverage does not require or even justify a RoR. However, there should be no significant delay in sending adequate notice to the person seeking coverage explaining why the coverage decision is not resolved. No RoR should

IV-10

5-10-02

**D 000373**

Exhibit 13 Page 51

**PROTECTED DOCUMENTS**

be sent in any case without documented approval of a supervisor.  The level of the supervisory approval required will depend on the loss involved.

**B.     Contents of RoR**

A RoR issued in an auto claim must fully and fairly describe all reasons why the Company questions coverage in the particular case and the general facts, which support the need for the coverage investigation.  Where there are genuine questions or facts upon which the coverage depends, these questions should be expressed in a letter, which relates the facts as known, by the Company.  The RoR will declare that both parties retain all rights and benefits under the insurance policy during the coverage investigation and that the Company reserves its rights to deny or disclaim coverage if the coverage question is resolved against the person seeking coverage.  The insured must be advised of his/her right to retain personal counsel and must be advised clearly of the issues, if any, that create a conflict of interest between the insured and the company.  Individual states may have specific requirements for such letters and these must be addressed.  Please consult all applicable TCMs.

**C.     Presentation of RoR**

Questions often arise as to who should receive the RoR (or a copy of the RoR).  Again, recognizing that the purpose of a RoR is notice, the RoR should be addressed to the person(s) seeking coverage under the policy.  If the named insured is not the person against whom primary liability might be assessed (i.e. the insured vehicle was driven by a permissive user); the RoR is addressed to the permissive user (with an info copy to the named insured).  On the other hand, in those states where the owner may be vicariously liable for the negligence of a permissive user, any RoR that sets forth a reservation of rights that is applicable both to the owner and the permissive user should be addressed to both parties.  A copy of the RoR should be sent to all other interested parties affected by the coverage denial when required by statute or regulation.  In all other cases, a separate letter that simply advises that the company is reserving its rights to disclaim or deny coverage for the loss should be sent to the interested parties.  This is a complex issue and the examiner must seek supervisory guidance.

**IX.    DISCUSSIONS REGARDING ROR**

- RoRs should not be used where we have decided our coverage position.  It is not a proper purpose of a RoR to "buy time" when we know our coverage position.  If we have a firm coverage position, it should be stated directly and forthrightly.

1-30-08

**D 000374**

Exhibit 13 Page 52

**PROTECTED DOCUMENTS**

- Some coverage questions will involve intricate issues involving sales, policy service and underwriting processes and procedures. As a direct-seller, we are subject to allegations involving what was said during a telephone contact with the insured. These issues should be handled with care and with full supervisory involvement.

- When there is more than one person (or other entity) seeking coverage, special care must be taken in resolving the coverage issues. We must recognize our contractual obligations to "other insureds" and satisfy those obligations.

- By their very nature, RoRs are intended to be temporary. If complications arise in the course of the coverage investigation, the person(s) seeking coverage should be advised of these complications and a stale RoR should be refreshed by another letter reminding the person(s) seeking coverage that the coverage question remains unresolved and that we continue to reserve our rights to deny/disclaim coverage. Ultimately, unresolved coverage questions will often result in the company's having to provide coverage unless the reason the question is unresolved was beyond the control of the Company. A person seeking coverage cannot defeat a coverage question by refusing to cooperate in the coverage investigation. Failure of the person seeking coverage to cooperate in the coverage investigation may be reason for a renewed RoR adding lack of cooperation as a basis for potential disclaimer of coverage.

### X.   NON-WAIVER AGREEMENTS

Non-Waiver Agreements (NWA) are most often used to obtain the agreement of the insured that our coverage for a loss or defense of a lawsuit is conditional upon future events or determinations of fact. This device is useful where the defense of a person seeking coverage is undertaken initially, but it is contemplated that the defense of the lawsuit will be withdrawn if specified events occur or facts are determined. The advantage of a NWA is that it is a bilateral agreement rather than merely a unilateral declaration (RoR). This device is not common in automobile insurance cases. Care should be taken in drafting a NWA to make sure it is clear regarding the nature of the coverage questions and the specific conditions upon which the defense may be withdrawn. A typical example of where a NWA may be used is where the Company undertakes the defense of a person seeking coverage in an underlying tort lawsuit while simultaneously seeking a judicial declaratory judgment regarding its coverage obligations. The NWA would be used to secure the agreement of the person seeking coverage that the defense of the lawsuit would be withdrawn if the court should determine that the Company properly denied/disclaimed coverage. Again, the purpose of the NWA is to put the person seeking coverage on notice of what will happen if a coverage question is resolved adversely to that person. Claims Home Office Legal coordination is required any time a NWA is contemplated.

IV-12

5-10-02

**D 000375**

Exhibit 13 Page 53

PROTECTED DOCUMENTS

### XI.   AGREEMENTS TO DEFEND

Occasionally, the Company's first notice of a potentially covered loss will be notice that a lawsuit has been filed.  In such a case, there may not be time to conduct a proper coverage investigation (assuming there is a coverage question) before an answer to the lawsuit must be filed.  A specific agreement to a limited defense can be used to take immediate action to protect the person seeking coverage.  This agreement will specifically limit our obligation to defend and/or indemnify pending resolution of the coverage question.  Such an agreement is very similar to a non-waiver agreement except that it is more specific about what the Company will undertake in response to the lawsuit.  Care must be taken not to obligate the Company inadvertently to a full defense. Claims Home Office will be contacted prior to entry into an agreement to defend.  Every effort should be made to resolve quickly any coverage question where we have undertaken a limited or conditional defense.  Undue delay in such a situation can result in the Company not being permitted to withdraw from the defense of the underlying claim.

### XII.   DECLARATORY JUDGMENTS

Critical coverage questions may be appropriate for judicial determination by use of an action for declaratory judgment (DJ) in state or federal court.  Such an action – also called an action for declaratory relief in some states – asks the court to decide the parties' obligations under the insurance contract.  A variety of coverage issues can be litigated with a DJ action, but it is particularly useful when there is a dispute over the interpretation or application of policy language or the validity of policy exclusions.  This remedy can be very expensive because, in most states, if the ruling is against the position taken by the insurer, the insurer must pay the reasonable attorney fees incurred by the insured.  DJ actions must not be initiated without the approval of Claims Home Office Legal.

It is important to name all parties in the DJ action. If the parties reside in diverse jurisdictions, a DJ may not be appropriate. Even where a DJ is likely, a reservation-of-rights letter will be needed to cover the time needed to investigate the situation prior to the filing of the DJ action.

### XIII.   DISCLAIMER

Disclaiming is denying liability under an existing policy contract and withdrawing from the handling of the claim because of a breach of a policy condition.  The Company takes no further action with respect to investigation, negotiation, defense, etc.  Denial of a claim on the basis that the accident or loss occurred after a date of expiration or other proper termination of the policy (or because claim is made under a coverage properly omitted from the policy,) is not a disclaimer, but rather is a "denial" of coverage.

IV-13

5-10-02

**D 000376**

Exhibit 13 Page 54

## PROTECTED DOCUMENTS

There are certain risks in disclaiming. If the Company disclaims coverage in a Bodily Injury Liability claim and the claimant subsequently files suit, the insured is under no obligation to send suit papers to the Company or to give notice of the suit. In the event that judgment is taken against the insured after a trial, or even by default, for failure to defend, and there is a later determination that the disclaimer was improper and coverage was effective, the Company may be bound by the judgment.

In most states, (in the factual situation of where the insurance company disclaims coverage and the plaintiff proceeds in the lawsuit) after a plaintiff obtains a judgment against the insured, and the insured assigns his or her rights against the insurance company to the plaintiff, the plaintiff can then proceed directly against the Company. Questions of liability and damages are not then an issue as they have already been settled. The only issue is whether the policy covers the particular accident. If the plaintiff, in the original action, recovers on the judgment and collects from the insured, the insured might then sue the Company for the amount he or she was required to pay within his policy limits, plus expenses. The only issue would be whether the policy was effective.

Disclaimer should always be made by letter to the insured, (person seeking coverage). The disclaimer letter should be sent by Certified Mail, Return Receipt Requested, Addressee Only.

A copy of the disclaimer should be sent to all other interested parties when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is not providing coverage for the loss should be sent to the interested parties.

In some states, either a copy of the disclaimer letter to the insured or a separately dictated letter must also be sent to the liability claimant and/or the legal representative within a specific time or the Company loses its right to disclaim.

A letter of disclaimer must be very carefully worded and must set out the specific reasons for disclaiming coverage in understandable terms.

If it is decided to declare a policy void from inception, it may be necessary to arrange, through the Underwriting Manager, to return premiums to the insured. Declaring a policy void ab initio ("ab initio" means from the beginning) is a joint underwriting and claims function and the letter to the insured should go out from the Underwriting Department. We should have a copy of the Underwriting Department's letter in the claim file.

If a decision is made to rescind the policy, it is usually necessary to refund the insurance premium to the insured. The return of the premium to the insured must be coordinated with the appropriate Underwriting Manager. The RLA and Claims Home Office Legal must approve all coverage disclaimers.

IV-14

5-10-02

D 000377

Exhibit 13 Page 55

PROTECTED DOCUMENTS

## XIV.   COVERAGE DENIALS

Coverage denials are sent when no policy was in effect at the time of the loss.  Questions as to whether a policy was in force at the time of the accident or loss, along with proper investigative material, should be referred to Underwriting for an opinion as to whether the policy was effective.  In certain circumstances, referral to Underwriting may not be necessary if the lapse of coverage is readily apparent after a careful review of the policy screens.  If the Supervisor/Claims Manager does not agree with Underwriting's opinion, the case should be discussed with the Regional Liability Administrator.

If the Regional Liability Administrator also disagrees with the opinion of the Underwriting Department, the coverage question should be referred to Claims Home Office for a decision.  In these circumstances, the Underwriting Department should be informed how the case will be handled as soon as possible.

Managers are permitted to sign off on coverage denials without RLA involvement if all of the following criteria are satisfied:

- The policy must have been cancelled at least 30 days prior to the loss or have expired 30 days or more before the loss.

- The only claim is for property damage (which includes collision and comprehensive).

- The policyholder does not challenge the cancellation or expiration.

- The appropriate PORS and cancellation notice are in the claim file.

- A Coverage Problem Worksheet has been completed.

- A manager has approved the denial in writing.

The Regions are not required to implement this modified rule and may retain mandatory RLA involvement in such cases.

Regional Liability Administrator (RLAs) may approve denials of coverage for claims involving Bodily Injury or UM/UIM Bodily Injury in the following limited circumstances.  All conditions must be present:

- The denial is based upon:

   - Cancellation of the policy for failure to pay premium where the cancellation notice and the PORS have been examined and support the cancellation; or

IV-15

5-10-02

D 000378

Exhibit 13 Page 56

## PROTECTED DOCUMENTS

- A valid named driver exclusion applies to the loss and clear evidence of the exclusion exists in the file; or

- Cancellation of the policy or removal of the involved auto was done pursuant to the policyholder's request prior to loss if the policy file information is clear and unambiguous.

• The former insured has been contacted and given an opportunity to present arguments. A good faith attempt to make this contact must be made before search for the former insured is deemed unsuccessful.

• There are no complications evident in the file. Such complications for cancellation cases include, but are not limited to:

- A premium payment was made subsequent to the effective date of the cancellation, which was not honored to resume coverage.

- The loss occurred within 10 days of the effective date of cancellation and the former insured contests receipt of the cancellation notice.

- The former insured alleges a telephone contact with the Company subsequent to the cancellation advising of submission of payment for the purpose of reissue.

- The insured has a prior history of late payments.

• Complications for a named driver exclusion case include:

- The most recent UE-119 for an excluded resident relative found in the file is over two years old ; or

- The UE-119 is for a named insured; or

- The named excluded driver is not a relative and would otherwise be a be a permissive user of the insured vehicle.

• Claims reported by adverse parties where we have no record of insuring the party alleged to be insured with GEICO.

Generally, guidelines for approval of such denials include checking the policy system under the alleged name or alleged policy number for a match; verification with the underwriting department if the alleged insured could not be located in the policy system; and a concerted effort to locate the person. We must contact the alleged insured either by phone, mail or face to face by an adjuster.

IV-16

5-10-02

D 000379

Exhibit 13 Page 57

PROTECTED DOCUMENTS

**XV.  COVERAGE PROBLEM HANDLING PROCEDURES**

The following are step-by-step outlines on handling various coverage problems.

**A.  General Procedure**

1. Recognize potential coverage problem

2. Send Coverage Issue Referral (C-380) or go to step 3 depending on coverage problem

3. Check PC in Oasis:

- Policy/Vehicle Summary Screen
- Vehicle Detail Inquiry Screen
- Additional Interest Vehicle Screen
- Transaction Detail Screen
- Driver Information Inquiry Screen
- Accident Detail Inquiry Screen
- Conviction Detail Inquiry Screen
- Related Policy Inquiry Screen

Or for Assigned Risk policies, check PC in IDOC:

- INDX – Client Index System
- IDIQ – Mini Accounts Receivable screens
- BINQ – Billing Inquiry Screen
- PLOGI – Screens used to record policy notes
- DRVI – Screen used to identify an excluded driver in UE119 situations

4. Alert your supervisor/discuss Coverage Screen sending a reservation of rights letter or transfer file for further investigation.

5. Investigate (must be resolved in 30 days)

   a. Contact Insured
   - opening
   - alert to possible problem and take recorded interview
   - explain what will happen next and when
   - thank insured

IV-17

2-9-07

D 000380

Exhibit 13 Page 58

**PROTECTED DOCUMENTS**

    b.   Contact Claimant
- opening
- explain potential problem
- explain what will happen next and when
- thank claimant

    c.   Obtain other information

    d.   Obtain documentation

6.    Complete coverage worksheet

7.    Obtain approval for denial or disclaimer from Manager, RLA or CHO Legal, whichever is appropriate.

8.    If denial/disclaimer

    a.  By Mail –
- prepare denial letter
- address to person seeking coverage; copy all interested parties only when required by statute or regulations.  Otherwise send a separate letter instead of the copy.
- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

    b.  By Phone – Call insured
- opening (name, purpose of call)
- explain clearly that there is no coverage and specific reason
- discuss so that insured's questions are answered
- explain what will happen next and when
- thank insured and again express your concern

    c.  Call claimant/other interested parties
- opening (name, purpose of call)
- explain clearly that there is no coverage (and why?)
- discuss options available

    d.  Claimant's own insurance (UM)
- explain that you would like to help but under terms of this policy are unable to.

<u>The following pages show steps that you can follow for particular coverage situations, which should be sufficient for most situations.</u>

IV-18

1-10-07

D 000381

Exhibit 13 Page 59

PROTECTED DOCUMENTS

B.    **NEW POLICY**

(Review regional new business procedure)

1. Check INDX in IDOC or Customer Identification screen in Oasis
   - is there a policy number for insured?

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call insured and take R/I

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Obtain information
   - copy of binder

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of a copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

IV-19

2-9-07

**D 000382**

Exhibit 13 Page 60

**PROTECTED DOCUMENTS**

C.   **NON-PAY CANCELLATION**

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call insured and take R/I

4. Call claimant
   - let him/her know that there is a coverage problem and that you will keep in contact

5. Obtain documentation
   - PORS
   - Cancellation notices

6. Reservation of Rights letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines -- See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-20

2-9-07

**D 000383**

Exhibit 13 Page 61

PROTECTED DOCUMENTS

**D.   CANCELLATION – UNDERWRITING REASONS**

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured and take R/I
   - ask questions such as:
        Was cancellation letter received?
        When?  How?
        What date cancelled?
        Are you aware of cancellation?
        Have you moved recently?
        When?
        Where?
        Was Company notified?
        How?
        When?
        Where?
        Whom spoke with?

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in
     contact

5. Obtain documentation
   - copy of cancellation letter
   - copy of PORS

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the
     policy
   - copy to liability claimant and attorney only when required by statute or
     regulation.  Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channel

IV-21

2-9-07

**D 000384**

Exhibit 13 Page 62

PROTECTED DOCUMENTS

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

E.   **VEHICLES DON'T MATCH - (temporary substitute, replacement, additional)**

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured
   - if necessary, take R/I
   - determine what category the vehicle will fit in, i.e. temporary substitute, replacement or additional

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

5. Obtain documentation
   - copy of bill or sale
   - copy of title

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant attorney only when required by statute regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

IV-22

2-9-07

**D 000386**

Exhibit 13 Page 63

PROTECTED DOCUMENTS

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parities only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

**F.   EXCLUDED DRIVER  (UE-119)**

1. Check DRVI in IDOC or Driver Summary screen in Oasis
   - who is the excluded driver

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Policyholder and take R/I

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Obtain documentation
   - copy of UE 119 from file

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines -- See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

2-9-07

**D 000386**

Exhibit 13 Page 64

PROTECTED DOCUMENTS

10. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

G.   **DRIVER OTHER THAN NAMED INSURED- (Permissive Use Questions)**

1.  Make your supervisor aware of the problem

2.  Call insured and take R/I

3.  Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4.  Obtain information from other sources
   - driver's interview

5.  Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

6.  Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

7.  Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

8   Denial/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-24

1-10-07

**D 000387**

Exhibit 13 Page 65

PROTECTED DOCUMENTS

**H.    EXCLUSION OR "DEFINITION" COVERAGE PROBLEMS**

1.  Make your supervisor aware of the problem

2.  Call Insured and take R/I
    - ask questions that will help determine whether the loss does not fall within
      the terms of the policy or if it might be excluded

3.  Call Claimant
    - let him/her know that there is a coverage problem and you will keep in
      contact

4.  Obtain information from other sources

5.  Obtain documentation

6.  Reservation of Rights Letter
    - list all possible reasons and be as specific as possible
    - send according to TCM-72 guidelines – See Exhibit 1
    - send to the individual or all individuals claiming protection under the
      policy
    - copy to liability claimant and attorney only when required by statute or
      regulation.  Otherwise send a separate letter instead of the copy.

7.  Coverage Problem Worksheet
    - form used to get authorization to deny or disclaim
    - fill in form completely
    - get appropriate supervisor/manager signatures

8.  Obtain approval from RLA or Claims HO Legal
    - approval should be obtained through the appropriate channels

9.  Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or
      regulation.  Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

**I.    VEHICLE USED IN GOVERNMENT BUSINESS**

1.  Make your supervisor aware of the problem

2.  Call insured and take R/I

3.  Call claimant

IV-25

1-10-07

**D 000388**

Exhibit 13 Page 66

**PROTECTED DOCUMENTS**

- let him/her know that there is a coverage problem and you will keep in contact

4. Obtain information from other sources
   - insured's supervisor's statement

5. Obtain documentation
   - copy of government's claim report

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TMC-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization or deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or HO Claims Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instated of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-26

1-10-07

D 000389

Exhibit 13 Page 67

PROTECTED DOCUMENTS

EXHIBIT 1
TCM-72
REVISED

# M E M O R A N D U M

TO:        ALL CLAIMS TECHNICAL PERSONNEL

FROM:    CLAIMS HOME OFFICE

SUBJECT:  DENIALS, DISCLAIMERS AND RESERVATIONS OF RIGHTS:
             PROPER FORM OF MAILING

DATE:      December 20, 2000

This revised TCM-72 replaces the one issued on November 22, 2000.

Please adhere to the following guidelines when mailing denials, disclaimers and reservations of
rights letters:

1.   Disclaimers, which are issued when there has been a breach of policy condition (e.g. notice,
     cooperation, etc.) must be sent via certified mail.

2.   Denials and reservations of rights letters may be sent via regular mail unless another form
     of mailing is mandated by state law or another requirement in the jurisdiction, in which case
     the letter must be sent in the manner mandated.

3.   Whenever a denial, disclaimer or reservation of rights letter is sent, a copy of the letter must
     be retained in the claim file.

A. STEPHEN KALINSKY

ASK:ghk

IV-27

5-10-02

**D 000390**

Exhibit 13 Page 68

PROTECTED DOCUMENTS

# CHAPTER V

## INVESTIGATION

I.  FUNDAMENTALS OF INVESTIGATION

The objective of an investigation is a fair settlement at the earliest possible time.

Some investigation of every claim is necessary, and the first step is to ask:

- Was the policy in effect at the time of the loss?

- Is coverage in order?  If so, are the circumstances covered?

- If it is a liability claim, is the insured legally liable?

- How much will it cost to settle the claim?

The extent of the investigation required depends on the nature of the claim.

In some comprehensive losses, i.e., glass and emergency road service claims, the report itself, in most instances, will be sufficient and further investigation may not be needed.

Investigation is not an end in itself.  It is merely the basis for the settlement, denial or compromise of a claim and is of real value only when it is commensurate with the size or the nature of the claim.  Once a claim is settled, there is no longer a need for investigation on that case.

The Company spends large sums of money for investigation of claims and the defense of lawsuits.  Telephone adjusters and claims examiners are responsible for making sound claim settlements and at the same time controlling expenses of investigation and defense. Ask yourself this question in every claim you handle, "Now that I've got the facts, can this claim be settled?".

While it is costly to over investigate claims, it is even more costly to under investigate. Judgment cultivated through experience enables a competent telephone adjuster or claims examiner to determine the proper level of investigation.

Liability claims may require a great deal more investigation than do first-party claims since there are always at least two people involved in the liability claim who have divergent interests – the insured, the driver of the other car, a pedestrian, a passenger, or the owner of some property damaged by the insured vehicle.  Experience has shown us that people involved in a liability claim will seldom agree on the facts of an accident.  If

V-1

5-10-02

**D 000391**

Exhibit 13 Page 69

**PROTECTED DOCUMENTS**

there are independent witnesses or passenger witnesses, there will frequently be as many different versions as there are witnesses.

Since the claim person's job is to determine whether legal liability exists, accurate facts must be determined.  Because one fact frequently leads to others, the claims person must have imagination and initiative.  Lawsuits are frequently won because one party made a more thorough investigation than did the other.

Prompt investigation is crucial.  Remember, the real objective of investigation is a fair settlement at the earliest possible time.

Avoid drawing conclusions based on assumption or speculation.  An erroneous conclusion can make the difference between settlement and denial.  If the denial is unsound, the result may be a complaint or a lawsuit, either of which could have been avoided.  Because some cases turn on very fine points, reports must be complete and accurate.

It is easy to assume, for example, that there were no witnesses because of the time of day or the area in which the accident occurred, but such a conclusion should not be reached until the possibility of witnesses has been thoroughly investigated.  Substitute initiative for assumption.

Remember that the accident probably is also being investigated by the adverse party's insurance carrier.  Therefore, the insured should be advised immediately by letter or orally that he or she should not give statements to or discuss the accident with anyone other than a representative of our company or a police official, unless a claim is being pursued against the adverse party.  This warning should be emphasized again if the case is being investigated by an adjuster.  Statements given to adverse parties or their representatives by the insured may prejudice the insured's and the Company's position in liability or subrogation claims.  The adjuster should request that if the insured provides a statement to an adverse party or their representative that a copy be obtained and provided to us, or that we are given written authorization to obtain the statement.

Thorough investigation is needed on files involving coverage issues, complicated factual situations, suspicious circumstances, questionable liability or questionable injuries.  The essential items include contact with the insured, claimant(s), potential witnesses and the investigating officer.  Recorded interviews or signed statements should be obtained to determine the various versions of the loss, the number of people involved and the injuries sustained.

Inspection of the vehicle is important not only to measure the dollar amount of damage owned, but for investigative purposes, the point of impact.  Photos of the accident scene from the direction of travel assist in reconstructing the accident.  While photographing the scene, the investigator should be sketching or noting the number of traffic lanes and any landmarks which may have obstructed vision or could be used in distance measurement.

V-2

5-10-02

**D 000392**

Exhibit 13 Page 70

PROTECTED DOCUMENTS

Other sources of investigation may include DMV driver record information from past accidents (some states require person's permission to obtain driving or license records), weather reports; city engineering records on malfunctioning traffic lights or road maintenance; and private investigating services to conduct activities checks, financial status, work habits, etc. It is important that the examiner or adjuster fit the investigation need to the circumstances.

When investigating an injury claim, we should have the injured person sign a medical authorization form initially. This form enables the investigator to secure the injured person's medical history from doctors and hospitals without lengthy "red tape" procedures and at a minimal cost. If this form cannot be secured, the claims person should request the bills and reports from the claimant or his or her representative directly. Send the medical authorization to claimant's attorney immediately or as soon as you get a letter of representation.

## II.    INVESTIGATION OF THE FACTS

The question of liability always hinges on the facts of the accident. Since no two accidents are precisely the same, it is impossible to suggest exactly how every accident should be investigated. Every item of investigation suggests something else to be done.

The outline below should not be considered exhaustive since it is intended merely to stimulate the thinking of the claims person. In some instances, not all the investigation is necessary, and in others, many things that are not mentioned should be covered. There is no substitute for original thinking, planning, imagination, initiative, and good judgement.

## III.   SEQUENCE OF INVESTIGATION

The sequence of investigation depends on the circumstances. Generally, the first move is to contact the insured driver if any questions on liability exist and/or the claimant as promptly as possible to establish clear communication and make an early disposition. Other investigation should be conducted as soon as possible and in the order dictated by good judgement. The following list applies to the majority of cases:

- Identify the insured car. This means a physical check of the make, model, year, and serial and engine numbers. Read the Auto Damage Adjuster's paperwork carefully,

- Interview the insured driver and obtain a detailed recorded interview or handwritten statement.

- If there is a coverage issue involved, a reservation of rights letter needs to be sent to all appropriate parties. In some states

V-3

5-10-02

**D 000393**

Exhibit 13 Page 71

**PROTECTED DOCUMENTS**

the reservation of rights letter would be sent only to those
parties (or their attorneys, if represented) who are seeking
coverage under the policy; in other states it would be sent to all
parties (or their attorneys, if represented) who have an interest
in the matter.  You will need to check the requirements for each
state when preparing and sending the reservation of rights
letters.

- If the driver is not the policyholder, spouse or a resident of the
  insured's household, a recorded interview of permissive use
  should be obtained from the named insured.

- If the automobile is not the insured automobile, obtain a
  statement explaining the conditions under which it is being
  used, i.e., non-owned, temporary substitute, permissive user,
  etc.

- Obtain recorded interviews from occupants of the insured car,
  covering fully their status and the circumstances of their
  presence in the car.

- Obtain recorded and/or handwritten statements from drivers of
  other cars involved.  If the owners were not driving, develop the
  relationship between the owners and drivers.

- Obtain recorded or handwritten statements from passengers in
  all other vehicles.  Include the status of each and the
  circumstances of his or her presence in the car.

- Obtain a copy of the police report.

- Take recorded or handwritten statements from impartial
  witnesses.

- Interview and take recorded interviews from ambulance and
  wrecker drivers and their assistants as to what they saw and
  heard at the scene or afterwards.  Do they know of any
  witnesses?

- Interview and take recorded or handwritten statements from the
  hospital attendants and doctors who admitted and treated the
  injured people after the accident.  Was there evidence of
  drinking?  Were they told or did they hear about how the
  accident happened?

V-4

5-10-02

**D 000394**

Exhibit 13 Page 72

# PROTECTED DOCUMENTS

- Have a field adjuster canvass the scene of the accident, if possible at about the same time of day as the accident, to discover additional witnesses.

- Interview the investigating police officers as to the facts of the accident, physical evidence and possible witnesses. The police report is not a substitute for an interview, and if possible, statements from the investigating officers should be obtained. Police officers can be quite cooperative if properly approached.

- Have a field adjuster prepare a diagram of the scene, showing the width of streets, traffic controls and any other pertinent physical characteristics.

- Consider having the field adjuster take photographs of the vehicles or of the scene. Photographs for information reasons can be taken by the adjuster with an inexpensive camera. (To preserve evidence for possible use in litigation, photographs could be taken by a commercial photographer). Check with your supervisor if any question when professional photographs should be secured.

- Check the applicable traffic laws such as speed limits.

- Look for evidence of drinking by either driver.

- Learn what the weather conditions were at the time of the accident.

- If the accident happened at dusk or dawn, determine whether the lights were in operation on either car and check the applicable ordinance or statute to see whether lights should have been lighted.

- If there was a traffic hearing, learn who testified, what the testimony was, and the result of the hearing.

- In a death case, learn the result of any inquest and obtain a copy of the transcript of the testimony.

- Find out if anyone was hurt and what the injuries were.

- Medical reports from attending physicians should be obtained. Contact and secure loss wage information from employers.

- In a death case, obtain a copy of the death certificate.

V-5

5-10-02

D 000395

Exhibit 13 Page 73

PROTECTED DOCUMENTS

- In a death case, learn the measure of damages, i.e., was the person a wage earner, sole supporter of a family, etc.

- List the special damages for each claimant.

- Determine whether independent medical examinations are necessary, and if so, see your supervisor and then arrange for them. Determine whether medical peer review should be secured. If so, see your supervisor.

- Check the extent of any disability or scarring and verify the disability.

- Determine the possibility of obtaining contribution from another defendant or insurance carrier.

- Determine the possibility of recovery of the Company's subrogation interest.

- Accident reconstruction experts may need to be called. See your RLA or Supervisor.

- Photographs of damage on the vehicles should be secured on minimal impact cases and on any other case where the points of impact or the nature of damage to the involved vehicles is significant.

IV.   **LOCATING WITNESSES**

One of the most difficult and time-consuming aspects of investigation is discovering disinterested witnesses. Rarely will an independent eyewitness come forward with his or her name and address since there is a natural reluctance to become involved in matters of this nature. People fear that they will be required to make a court appearance as a witness.

Every time anyone is interviewed in the investigation of an accident, the question should be asked, "do you know of anyone, or have you heard of anyone, who saw the accident?".

In some accidents, there simply are no independent witnesses. However, the experienced claims person who has initiative and an inquisitive mind will turn up witnesses in many cases. As the investigation proceeds, one thing leads to another until the identities of probable witnesses are uncovered.

Examine the police and motor vehicle reports for information that might offer a lead. When the officers are interviewed, question them about possible witnesses. They may at least have names and addresses of people who were at the scene and might have been witnesses.

V-6

5-10-02

D 000396

Exhibit 13 Page 74

PROTECTED DOCUMENTS

Have a field adjuster attend police court hearings and inquests on serious cases, because, along with other valuable information, identities of witnesses are sometimes disclosed. Other testimony, together with something else the adjuster knows, may lead to a witness. If it is impossible to attend the hearing, consider obtaining a copy of the transcript of testimony if the case is sufficiently serious to justify the expense. Try to determine what the cost will be before you order the transcript.

A canvass of the scene of the accident is often effective. Because people are, to a large degree, creatures of habit who do the same things at the same times, have the field adjuster make the canvass at approximately the same time of day that the accident occurred. Check with the local transit company for names of drivers who might have been in the area at the time of the accident.

Witnesses have been known to be discovered at busy, downtown intersections simply by having a claims person present at the intersection at the proper time of day and inquiring of people as they pass. When canvassing a residential neighborhood, consider short, negative statements from those who did not personally witness the accident.

Neighborhood stores and supermarkets are frequently visited by the same people at approximately the same time of day and the same day every week. If people interviewed did not see the accident and do not know of any witnesses, sometimes they can remember cars or trucks with signs or other identifying marks which were at the scene. If the name of the organization that owned the vehicle can be determined, the driver can usually be identified.

There may have been a newspaper deliverer or other delivery persons at the scene who are in that general area every day. In every serious accident, it is sometimes fruitful to advertise in newspapers and on neighborhood bulletin boards. To discover witnesses, the claims person must be thorough and persistent. It is easy to say, "There were no witnesses, and that's that!". The telephone adjuster or claims examiner should find that all-important witness through good solid investigation.

V.   "POLICE COURT" HEARINGS AND INQUESTS – PLEAS TO CRIMINAL CHARGES

All matters that have a bearing on liability are important. You should closely follow the developments of the criminal side of your very serious cases.

Pleas of guilty to criminal charges can, in some jurisdictions, be used as detrimental admissions in subsequent civil actions. Such a plea should be avoided when it is likely to adversely affect our ability to properly handle claims, particularly serious cases. Occasionally, an insured will solicit our advice with respect to his or her plea on a criminal charge. Unfortunately, we are precluded from giving direct instructions. We must never, under any circumstances, advise the insured to enter a guilty plea. The insured should be referred to personal counsel of his or her own choosing with respect to any plea regarding criminal charges and the consequences thereof.

V-7

5-10-02

**D 000397**

Exhibit 13 Page 75

**PROTECTED DOCUMENTS**

In serious cases, have a field adjuster attend the hearings and if the expense seems to be justified, have a court reporter present to take down the testimony.

It should be clearly understood that the Company is under no contractual obligation to provide counsel for the defense of criminal charges. Also, serious cases where the insured has arranged or is arranging an agreement allowing a guilty plea to a lesser charge, e.g., reducing manslaughter to reckless driving, should be discussed with the supervisor.

Sometimes it is helpful to have our attorney contact the insured or the personal attorney and review the case before the hearing to determine how the insured will plead, what the insured's testimony will be, and what other testimony is likely to be.

The insured is not compelled to testify. If it appears that there will be dangerous testimony, every effort should be made to settle the claim before the hearing. If that is impossible, consider having the Company's attorney work with the insured's personal attorney and attempt to obtain a postponement or to change the proposed method of handling; a delay in entering a plea to a criminal charge can allow us to pursue further settlement attempts.

Unusual and serious cases involving civil matters should be brought to the attention of Claims Home Office Legal.

**VI.   ASSIGNING INVESTIVATION TO FIELD REPRESENTATIVES**

In providing nationwide claims service, the Company does use independent field adjusters and attorneys to represent it in those areas which are not serviced by staff personnel. Our volume of independent adjuster activity has decreased sharply since the advent of telephone adjusting, but we still have firms on the books.

Claims are reported directly to the Company. Each claim received is assigned to an examiner or a telephone adjuster who is responsible for reviewing the initial report and determining whether it contains the fundamental information needed to process the claim. Some routine matters reported directly to the Company can be economically concluded by either Auto Damage or the telephone adjuster corresponding directly with the insured or claimant. However, if there is a serious loss and a reasonable question as to the facts of the loss or the amount of the claim, the staff examiner may well assign the case investigation to a field adjuster. The size and nature of the loss, the probable cost of the investigation, and the Company's obligation to the insured for prompt and efficient claim service should be carefully weighed. Serious losses in areas not covered by Company field adjusters are then assigned to an independent adjuster. Normally, the examiner will need supervisory approval for this assignment.

When referring a case to the field, select the attorney or adjuster nearest to the center of the area where most of the work will be done. If two adjusters are approximately the same distance, the more competent should get the assignment since the case will probably

V-8

5-10-02

D 000398

Exhibit 13 Page 76

**PROTECTED DOCUMENTS**

close earlier and at less cost. Occasionally, the cost of sending an especially competent representative a considerable distance may be justified in a serious claim.

Sometimes, an accident occurs or a lawsuit is brought in a remote area where we do not have a regularly assigned attorney or adjuster, or a conflict of interest situation in which our regular representative is representing another company or another insured may require the selection of some representative other than the regularly appointed one to handle the particular claim or suit for the company. Approval for such temporary representation can readily be obtained by telephone from Claims Home Office Legal. If you have any questions about independent adjusters you are now using, verify that Claims Home Office Legal has given standing approval to use them, and continue to secure such approval if any different firms are to be used. Standing approval of any independent adjuster in an area serviced by one if our company offices should include the purpose for which the approval is granted.

When selecting an independent adjuster, note the terrain between the representative's office and the accident scene. Even though one adjuster appears to be closer as the crow flies, there may be a drive around a mountain range, a lake, or some other natural obstacle that would cause another representative to be closer.

VII.   **ASSIGNING INVESTIGATION**

Decide what investigation is needed and how it should be obtained. The importance of the information should be weighed against the cost of obtaining it. If an outside adjuster or investigator is used, give that representative the information needed to complete the assignment without wasted motion. A claim representative's bill is based on time spent; wasted motion is charged to the Company at the same rate as constructive activity.

If the only information available is that an accident has occurred, it is impossible to give detailed instructions. The representative should be advised to commence investigation and to forward a preliminary report promptly. When the preliminary report is received, clear-cut instructions can be given. To determine what additional investigation is needed, analyze the case and then give explicit instructions to the representative.

Do not delay disposition of a claim by attempting to investigate yourself if it can be handled more rapidly by a field representative. Our policyholder should not be penalized in claim service for reasons of economy.

VIII.   **RAPPORT WITH REPRESENTATIVES**

One of the Company's major objectives is to have a collectively beneficial and profitable relationship built on mutual confidence and trust with our independent adjusters and attorneys in the field. The Company expects its representatives to provide the best service available in a given area; in turn, our representatives expect us to provide top-flight supervision, and to be the kind of Company they respect and are proud to represent.

V-9

5-10-02

**D 000399**

Exhibit 13 Page 77

## PROTECTED DOCUMENTS

They expect us to be demanding clients in addition to understanding their problems and their limitations. It is the responsibility of the claims person to gain this esteem; earned through tight supervision, administered in an environment of fairness and understanding.

The Company expects the claims adjusters and examiners to guide the destiny of every case through the use of basic claims management and common sense. Because the abilities of the representatives vary, the claims person cannot become a mere initiator of correspondence approving any action taken by the adjuster in the field. In some cases, representatives can be given wide discretion based on prior experience, and in others, nearly every activity must be directed.

Examiners must utilize the abilities of each representative to the greatest advantage. (Normally, the Examiner III will be directing a case involving the use of an independent adjuster.)

All communications, whether by correspondence, telephone or in person, should be calculated to create the impression that you, the claim technician, know your job. Your communications should reflect leadership, good judgment and decisiveness. Your instructions should be specific enough so that the field representative knows precisely what you expect and define those areas you are leaving up to his or her own judgment.

Place yourself in the position of attorneys or independent adjusters and consider their problems. They may represent a dozen or more insurance companies, all of whom have different policies and procedures. Some require more than others in investigation. Few companies agree completely about the need for and the timing of such things as appraisals, medical reports and photographs.

On the other hand, although you must appreciate the problems of the representatives, these problems should not be accepted as excuses for poor claim handling. If it is clearly understood that you demand efficient claim handling at a reasonable cost, representatives will respect you. Conversely, if you set the example for sloppy and inefficient claim handling, there is reason for some representatives to feel that work of a similar nature by them will be accepted.

You have an obligation to make helpful suggestions and must share the responsibility for mistakes. The inclination to offer nothing positive, but to criticize what has been done is detrimental to a proper relationship.

Work toward the creation of an atmosphere in which there can be a frank exchange of ideas. Communications on this basis will reduce misunderstandings and other difficulties. Always be tactful, mature, diplomatic and friendly. Sarcasm must be absolutely avoided. If you do not agree with the way the case was handled, secure the facts before becoming unduly critical. Then point out, in a constructive way, areas of disagreement and instances where Company policy has been broken so that the same mistake does not recur.

V-10

5-10-02

**D 000400**

Exhibit 13 Page 78

**PROTECTED DOCUMENTS**

All problems regarding particular representatives should be brought to the attention of your supervisor so corrective action may be taken. Each section, region and branch office maintains an Attorney and Adjuster File (Adjuster Performance Report – APR) which is periodically reviewed to evaluate the performance of our representatives. Request an extra copy of letters of praise or reprimand to a Claim Representative when:

- Questioning a bill for services.

- Criticizing those cases which reflect a pattern of deficiency in the quality of work from a particular office.

- Complimenting a representative for a particularly outstanding job.

Letters of criticism should usually be signed by the claims manager or supervisor and addressed to the manager of the independent office involved. An extra copy of the letter should be kept in the APR file.

The volume of cases referred to independent adjusters will be minimal, but some discussion of how to handle claims "long distance" is essential to your becoming a complete claims technician.

IX.   **PHYSICAL FACTS**

By physical facts we mean tangible evidence at the scene of the accident which tend to show how it occurred. They include skid marks, the damage to either vehicle, position of debris in the street, scraped bark from a tree, a broken telephone pole, the location of traffic controls, obstructions to vision or the characteristics of the accident scene.

Sometimes there are no independent witnesses or the witnesses are inaccurate in their versions of the facts. Physical facts then take on added importance. They can be used to corroborate, to impeach or simply, as direct evidence, and to show what the facts really are.

In the very early investigation of the more serious cases, have the field adjuster make a visit to the scene. The adjuster should observe all there is to see and to make careful notes. In serious accidents, the adjuster is to prepare a diagram and place the various physical facts, including all pertinent physical characteristics of the accident scene, in proper position. The field adjuster should always carry a tape measure and camera. He should proceed to take photos of the scene as well. Photos should be marked as to directions as well as to subject.

It is impossible to prepare an exhaustive checklist of physical facts to be used in every case since they vary from case to case. However, the following is a list of reports that may help you in your investigation process.

V-11

5-10-02

D 000401

Exhibit 13 Page 79

## PROTECTED DOCUMENTS

- <u>Weather Reports</u> – If weather played some part in the accident, a weather report may be obtained from the United States Weather Bureau through its local station.  Such reports include temperature, precipitation, cloudiness and sunshine, etc.

- <u>Diagrams</u> – A diagram by the field adjuster has two principal advantages:  (1) it forces an observation of the physical factors in closer detail and (2)  it may suggest additional investigation or reappraisal of the case.  A good diagram gives a much clearer and more concise picture of what happened for anyone reading the file.

  <u>The claims person's rough diagram should include the following:</u>

  - Compass directions with the top of the page representing north.

  - The width of the streets involved and the location of physical characteristics, such as traffic controls, obstructions to vision, etc.

  - The legal speed limit.

  - The position of vehicles before, during and after the accident.

  - The approximate point of impact in the street with reference to curb lines or other sypsical characteristics.

  - The measurements of skid marks or anything else bearing on the accident.

  - The location of witnesses other than occupants of the vehicles.

- <u>Photographs and Videotapes</u> – Snapshots and/or videotape taken by the field adjuster add information for those reviewing the file.  Sometimes it is almost impossible to adequately describe something and yet it can be pictured clearly in one snapshot or on videotape.

  In a serious case, some physical fact or characteristic may have an important bearing on the case's outcome.  To preserve this for possible use in a trial, arrange for professional photographs or videotape.  The professional photographer or video camera man selected should be competent, and at the same time, be a good witness.

  Because the purpose of photographs or videotape is to show conditions as they existed at the time of the accident, they should be taken as soon after the accident as possible, at approximately the same time of year and at about the same time of day.  Shadow and light conditions, as well as foliage, will then be about the same.

V-12

5-10-02

D 000402

Exhibit 13 Page 80

PROTECTED DOCUMENTS

An important consideration in taking professional photographs or videotape is the cost. This is usually justified only if there is something specific which the claims person or the trial attorney wants that will have some real bearing on a case.

At the time they are ordered, the claims person should have a clear understanding with the photographer or video camera man as to the amount of photos or videotape needed and the cost of the services provided.

- Surveys and Plats – An engineer's plat is helpful to a jury in visualizing the scene of an accident. Such plats are drawn to scale and are in great detail, showing all the physical characteristics of the surrounding area.

  Because the cost is substantial, the examiner or telephone adjuster should be cautious about arranging for such plats. An agreement as to the cost of the plat should be reached at the time it is ordered. Normally, they should be ordered only at the request of the trial attorney because there is something specific he or she wants to show at the trial.

  Diagrams drawn by adjusters are sufficient for most purposes.

- Accident Reconstruction – In complex or significant cases, accident reconstruction experts can help us analyze and evaluate how and why an accident took place. To be most effective, accident reconstruction should be undertaken as soon as possible after the loss takes place. Supervisory approval must be obtained prior to hiring an accident reconstruction expert.

## X.   DETERMINING COVERAGE

Chapter IV is devoted entirely to the subject of coverage. This section addresses the investigative process to be used when a coverage problem arises.

If coverage cannot be confirmed, coverage investigation will need to be implemented. The adjuster must be certain the Company's rights have been preserved while the investigation is undertaken. This is usually done by a Reservation of Rights letter or a Non-Waiver Agreement. The coverage question and the facts of the accident can usually be investigated simultaneously. However, when securing a recorded interview or signed statement, the questions of accident facts and coverage should be handled apart from each other. Two separate statements should be taken.

Investigation of coverage may include one or both of the following:

- Recorded Interview from the policyholder or from anyone else claiming to be an insured under our policy may be necessary. Do not include

V-13

5-10-02

D 000403

Exhibit 13 Page 81

PROTECTED DOCUMENTS

- information about the facts of the accident and the coverage question in he same statement. Reference to insurance in a statement describing an accident may make the statement useless in a trial. Separate statements should be taken, one regarding coverage, the other concerning the accident.

- A Court Reporter Statement may be necessary if it appears probable that the witness may refuse to sign a statement. Don't waive the Company's Rights to Sworn Statement Under Oath. In coverage questions, the testimony of an impartial recorder (the court reporter) as to the exact language of the witness may be even more important than in liability investigation.

## XI.   DETERMINING CONTRACTUAL OBLIGATION

Once coverage has been confirmed, it is up to the claims examiner or telephone adjuster to determine whether the loss is covered under the policy terms and then consideration is limited to the amount of the payment if one is to be made.

The following list will assist the claims technician in determining contractual obligation:

- Is the policy valid?

- Did the loss occur within the effective dates of the policy?

- Is there an insurable interest?

- Is the loss or damaged property covered under the policy?

- Did the loss result from an insured peril?

- Has the insured complied with all the conditions and terms of the policy?

The telephone adjuster or claims examiner must keep in mind that policyholders frequently are uninformed about the coverage afforded under their policies and the procedure to be followed in establishing the amount of loss compensable under the

policy. To properly manage the claims presented, the telephone adjuster or claims examiner must be totally familiar with the terms and scope of the policy and be able to make the determination of settlement or denial.

There are essentially two types of insuring agreements in the policy contract: those afforded under first party coverages and those under the third party coverages. First party coverages include Medical Payments, Personal Injury Protection, Uninsured Motorist Protection, Collision, Comprehensive, Multi-Risk, and Emergency Road Service. These coverages protect the insured against damage, injury or destruction of his or her person or

V-14

5-10-02

**D 000404**

Exhibit 13 Page 82

PROTECTED DOCUMENTS

property.  Third party coverage, liability, protects the insured when he is obligated to pay to others because of bodily injury or property damage, including loss of use.

When investigation begins, the examiner must determine:  (1)  coverage, (2)  liability or obligation to pay, and (3)  damages.  The first is based on the effectiveness of the policy contract; the second, based on insuring agreements by limiting payment to cases of legal liability on the part of the insured and/or those first party agreements with the insured; and the third, determined by the amount of damages payable due to the terms of the policy and/or caused by the insured's negligence and is limited by the limits of coverage in the insured's policy.

The examiner or adjuster should first confirm coverage and then determine whether the facts of the loss fall within the terms of the contract.  On a few occasions, the claims person may discover that a situation falls within an exclusion or is otherwise not covered.

Generally, prior to obtaining any information where a coverage issue is involved, a reservation in of rights letter needs to be sent to all appropriate parties.  In some states the reservation of rights would be sent only to those parties (or their attorneys, if represented) who are seeking coverage under policy; in other states it would be sent to all parties (or their attorneys, if represented) who have an interest in the matter.  You will need to check the requirements for each state and speak with your supervisor when preparing and sending the reservation of rights letter.

Because the extent of the contractual obligations under such coverage vary greatly, the investigation of individual cases must be tailored to fit each case.

Under Medical Payments, UM and PIP coverages, answers must be obtained to the following questions:

- Was the claim submitted in accordance with the terms of the policy?

- Does the policy cover the items claimed?

- Are the medical bills or items claimed reasonable and necessary as a result of the injury sustained?

- Is the amount claimed within the limits of the coverage?

- Is the file documented with the forms, reports and bills or receipts required to substantiate the Company's position?

If the answers to these questions are in order, the claim may be ready to be resolved, either by payment or denial.

To determine payments to be made under the Physical Damage Coverages, Comprehensive, Collision, Mechanical Breakdown and ERS, you must determine

V-15

5-10-02

D 000405

Exhibit 13 Page 83

PROTECTED DOCUMENTS

whether coverage exists, verify the cause of loss, and you must know the provisions of the applicable policy contract.

Comprehensive and Collision claim handling is discussed in depth in Chapter VIII.

XII.   DETERMINING LIABILITY TO THIRD PARTIES

Since payments under the liability coverages must be based on legal liability of the insured, an understanding of the phrase "legal liability" is necessary. Briefly, it means that as a result of some act or failure to act, the law imposes an obligation on the wrongdoer to respond in money damages. For our purposes, we may limit consideration of legal liability to that arising in tort and in limited circumstances, contractual liability.

A.   Under Contributory Negligence

Since every person using a highway is required to exercise ordinary care for his or her safety, the common-law rule is that a person who fails to exercise that reasonable care cannot recover for his or her injuries or damage by virtue of the fact that he or she contributed to the cause of the accident. In those states which follow a contributory negligence doctrine, if the claimant is guilty of any negligence, however slight, which contributed to the cause of the loss, recovery is barred. As a practical matter, juries may be inclined to overlook contributory negligence if it is not substantial.

The courts have acknowledged that it is inequitable to apply the defense of contributory negligence in all situations and consequently allowed the claimant specific defenses to permit recovery. Examples of those defenses under a contributory negligence statute area: Last Clear Chance, Attractive Nuisance, Rescue doctrine, Emergency doctrine and the doctrine of dangerous instrumentality.

These doctrines are discussed in Chapter VI – Principles of the Legal Liability.

The investigation of this type of claim requires careful examination of the accident facts as well as a full documentation of the Company's position. The investigative material must be sufficient to support the claimant's negligence without doubt. The claims person must weight the facts and measure the claimant's actions against those of a reasonably prudent person, and must then make the determination of probable settlement value. If the negligence was slight and the case can be settled for a reasonable amount, it may be in the insured's and the Company's best interest to make a compromise settlement rather than risking the chance of a favorable verdict for the claimant or incurring the expense of litigation. The negligence factor should be used in the negotiations to effect a compromise settlement.

V-16

5-10-02

D 000406

Exhibit 13 Page 84

**PROTECTED DOCUMENTS**

B.     **Under Comparative Negligence**

While a few states still adhere to the contributory negligence doctrine, most states have adopted the doctrine of comparative negligence. Under such a doctrine, the degree of negligence of each party is evaluated or compared and recovery is permitted in relation to the other person's degree of negligence. Since comparative negligence laws differ from state to state, claim persons should be well acquainted with the operation of the applicable comparative negligence statutes.

There are two different types of comparative negligence statutes: (1) the Pure Form, and (2) the Modified Form.

1.     The <u>Pure Form</u> allows the claimant to recover the amount of his or her damages <u>reduced</u> by the percentage of his or her contributing negligence. This is true even though the claimant's negligence is rated at 90% and the defendant's 10%. The claimant (plaintiff) would recover 10% of the value of his or her claim.

2.     Under the <u>Modified Form</u>, the claimant (plaintiff) is able to recover provided that his or her contributory negligence does not exceed that of the defendant. If the claimant's negligence contributed 51% or more to the cause of the accident, he or she is barred from recovery. There are two versions of the Modified Form: the first version allows the claimant to recover if his or her recovery was "not as great as" that of the defendant. (If the claimant and the defendant were <u>both</u> 50% at fault, the claimant could not recover.) and the second version, "not greater than" allows recovery where the parties are equally at fault, but any recovery is reduced by the percentage of negligence attributable to the claimant.

The application of these forms of negligence in liability defense is discussed in Chapter VI. For purposes of this Chapter, it is clear that once the investigation is complete, the examiner or adjuster must be able to: (1) apply the negligence rule of the accident locale to the facts of the accident, (2) evaluate the claimant's damage or injury, and (3) make a determination of settlement value or denial based on any percentage of negligence attributable to the claimant.

**XIII.   WHEN TO INVESTIGATE AND WHEN TO SETTLE**

In what detail an accident should be investigated depends upon its nature and probability of a reasonable settlement. It is impossible to predict which cases can be settled promptly and which cases will go into litigation. Claims may be separated into three broad classifications. Variations do exist and you should check with your supervisor.

V-17

5-10-02

**D 000407**

Exhibit 13 Page 85

PROTECTED DOCUMENTS

- The obvious cases for settlement; cases of clear liability against the insured.

- The ones of no apparent liability.

- Questionable cases.

As soon as it appears that a case is one for settlement, try to settle it without delay. Some degree of investigation may be necessary. The facts of the case will determine the type of investigation.

Cases of no apparent liability and questionable cases should be thoroughly investigated from the moment of first report.

Occasionally it is necessary to defend cases in court either because there appears to be no liability or because agreement cannot be reached as to settlement value. Litigation of bodily injury claims is a serious matter and should be avoided whenever possible, consistent with good claims handling. The amount of litigation and the results can be controlled to a large extent by the claims person who knows what to look for as he or she investigates.

**XIV.   RECORDED INTERVIEWS**

Although investigative techniques may vary among individual claims people, all will agree that the most fundamental step in conducting an investigation is to obtain a good recorded interview.

Statements promptly secured become one of the most accurate records of the facts, as the person being interviewed knows them. When obtained early in the case, the facts are still fresh in the mind of the witness and the danger of the person adopting hearsay as his or her own is minimized. Besides being a permanent record of the witness' version, it is a reliable indication of how this person would testify, leaving few areas of possible misunderstanding.

While a signed statement or recorded interview generally may not be admitted as direct evidence in a lawsuit, courts have sometimes received such statements when witnesses were incapacitated. The statements may be used in lawsuits to impeach or discredit a witness who attempts to change his or her story, or merely to refresh a witness' recollection of the facts of the accident. They may even be useful in convincing an opposing attorney concerning some particular fact.

**XV.   PLANNING THE STATEMENT OR RECORDED INTERVIEW**

Prior to making contact with any insured, claimant or witnesses, have the specific points to be covered thoroughly formulated in your mind. If taking a signed statement, be sure

V-18

5-10-02

D 000408

Exhibit 13 Page 86

**PROTECTED DOCUMENTS**

these points are noted on a piece of paper to be used as a reference while taking the statement. Often there is no advance information as to what a particular witness will say, so the need for a comprehensive statement, covering all aspects of the accident, is important. If the statement is taken by recorded interview, be certain to have your interview guide available.

The well-planned interview requires less time. Always allow sufficient time to cover the accident in detail. Schedule the interview at a time convenient to the insured, claimant or witness.

A recorded interview, generally, is preferable to a signed statement because it is less burdensome and time-consuming. It also has the advantage of producing the witnesses' own words and, because it can be taken over the telephone, saves on travel time and expense.

XVI.   PREPARING FOR THE STATEMENT – PRE-INTERVIEW

Don't take out a statement pad or recorder and start taking the statement as soon as you meet or contact the insured, claimant or witness. Have a preliminary casual conversation to remove the "jitters" and to develop a common understanding. If you are sincere and straightforward, you will gain the trust of all concerned and develop a rapport. Put the person at ease and explain the procedure involved in what you are about to do. This usually develops a feeling of confidence. Use the pre-interview to go over the names of the people involved, street names, spellings, direction of vehicles, etc.

On a few rare occasions, you may be confronted by telephone or in person with someone who refuses to give an interview. Salesmanship is necessary under such circumstances. If your approach is timid and negative, you will have little success. On the other hand, if you assume the attitude that there is no question but that the statement will be given because you are merely attempting to determine exactly how the accident occurred, you would probably be successful.

Before taking the statement, briefly discuss the facts and, if possible, have the witness draw a diagram which can be referred to during the course of the interview. Also, such data as auto registration numbers, license numbers, the names and addresses of parties involved and information regarding expenses, bills, estimates, etc., should be available prior to the actual taking of the statement.

Make sure you know how to work your recorder and be certain you have a new cassette in place.

Make no reference to insurance in the statement. It may be necessary to use the statement at a trial. Generally, any reference to insurance is considered prejudicial and may be cause for a mistrial. When a coverage question or some other matter relating to the subject of insurance is indicated, make it a separate statement.

V-19

5-10-02

**D 000409**

Exhibit 13 Page 87

**PROTECTED DOCUMENTS**

Because two people rarely see an accident in precisely the same way, a separate statement should be obtained from each witness.

Do not attempt to obtain a statement from someone who is intoxicated, under the influence of drugs or sedatives, or otherwise incapacitated. If a written statement is taken at a hospital, have it witnessed by the doctor or nurse. Obtain a separate statement from the attending doctor or nurse indicating that the witness is not under the influence of drugs or sedatives, or otherwise handicapped so as to be unable to give a lucid statement.

Speed and distance should be described in a manner that will be understandable to others. Reference to "right," "left," "over there," or "about this much" should be avoided. Use compass directions and refer to distance in feet, yards or some other common measurement.

Statements are taken in claims under all coverages, but most are in connection with either liability claims or first-party losses where there is some dispute. A few items appear in all statements, but the purpose for which a statement is being taken governs what is included in it. A statement from the insured on a comprehensive loss differs greatly from the matters covered in liability bodily injury claim.

## XVII. GETTING THE INSURED'S RECORDED INTERVIEW OR SIGNED STATEMENT

Because the Company is entitled by the terms of the policy to the assistance and cooperation of the insured, there should be no difficulty in obtaining a recorded interview or signed statement.

If an insured either refuses to give a statement or to sign it, he or she should be reminded of the Conditions of the policy requiring cooperation. Also, remind him of the benefits; we will have a permanent record of the facts, in his own words; it will save time; speed up the decision on liability and work towards getting the situation resolved.

## XVIII. GENERAL RULES FOR TAKING A SIGNED STATEMENT

When taking a signed statement write legibly. The statement is of no value if it cannot be read. Use short, simple sentences. Use the vocabulary of the witness. If he or she speaks ungrammatically, there is nothing wrong with such phraseology in a good statement. Conversely, if the person is well educated, your statement should reflect this.

Arrange statements chronologically. This makes for easier reading. Make sure, however, that all the facts are noted even if there is some loss of chronological order.

The statement should be of the straight, narrative type, beginning in the first person with a complete identification of the individual.

V-20

5-10-02

**D 000410**

Exhibit 13 Page 88

PROTECTED DOCUMENTS

Do not include the witness' conclusions and opinions. Describe what the witness saw and heard.

Below are items to be considered in taking written statements. Until you have had considerable experience, keep a similar list available during the interview. Even experienced field adjusters follow this practice. The outline is by no means exhaustive. Analyze the case before taking the statement and sketch in your mind the things you want to cover.

The word "witness" as it appears below should be given a broad meaning. It includes independent witnesses, as well as parties to the accident, insured, claimant, etc.

- Date, Time and Place Where Statement is Taken

    These items should be placed in the upper right hand corner of the first page of the statement. This information may be helpful should a witness deny having made the statement and will assist in pinpointing the circumstances under which the statement was taken.

- Identification

    This should be the first paragraph and should include the witness' name, age, martial status, address, occupation, business address, number of children, residence telephone number and business telephone number. Obtain the witness' Social Security Number, and in the case of service personnel, serial numbers should also be obtained, in addition to a permanent home address or address of relative who can always be reached.

- Date, Time and Location of the Accident

    Pinpoint the hour of day as nearly as possible, particularly in those accidents which occurred near dawn or dusk.

- Location and Reason for Witness' Presence

    Whether the witness was the driver or passenger of a car involved in the accident or in another vehicle, the direction of the vehicle in which he or she was riding and its approximate speed should be stated, as well as the circumstances of the witness being in the car. Where was the witness sitting? Where did the trip begin? Where was it to end?

    If the witness was a pedestrian near the scene, have him or her describe the direction he or she was facing and why the witness was there. Statements from passengers in the cars involved should indicate their relationship to the driver and whether they paid or promised compensation in any form for the ride.

V-21

5-10-02

**D 000411**

Exhibit 13 Page 89

PROTECTED DOCUMENTS

- **Owners and Drivers of Cars Involved**

   The owner and driver of each car should be identified.  If the driver was
   not the owner, the person should identify the owner and indicate whether
   the owner gave this person permission to drive.  It may be revealed that
   the person described in our policy as the owner is not the real owner.
   There is then a coverage question which should immediately be brought to
   the attention of the supervisor.

   A coverage or permission question might also develop in connection with
   the other car.

- **Identity of All Occupants in Cars Involved**

- **Facts**

   The accident should be described in detail.  Cover all matters seen or
   heard just before, during or after the accident, including such things as:

   - The direction the cars were traveling.

   - The estimated speeds of the vehicles.

   - The approximate distance separating the vehicles when the other car
     was first observed.  Where the witness was not a passenger, the
     distance separating the vehicle when they were first noticed.

   - The action taken by either driver to avoid the accident.

   - The approximate width of all streets concerned.

   - The approximate point of impact in the street, with reference to the
     centerline, curb or some other landmark.

   - The points of contact on each car.

   - How far each vehicle traveled and where it came to rest after the
     impact.

   - The length of skid marks left by either car, the location of debris, or
     description of any other physical evidence.

   - Detailed location and description of any traffic controls, such as
     stoplights or stop signs.

   - Describe the weather by indicating whether rain, snow or anything else
     played a part in the accident.  Was the sun a contributing factor?

   V-22

   5-10-02

   D 000412

Exhibit 13 Page 90

**PROTECTED DOCUMENTS**

- Did either car have its lights on?  Were other cars using lights?  What were the lighting conditions?

- A description of the damage to each vehicle.

- <u>Drinking and other Influences Impairing Driving Ability</u>

  Does the witness know if any of the drivers had been drinking, were sleepy or under the influence of narcotics, and if so, to what extent?  What actions suggest such a condition?

- <u>Cell Phone Use</u>

  Was either driver using a cellular telephone when the accident occurred?

- <u>Remarks Overheard by the Witness at the Scene/Admissions Against Interest</u>

  Was there indication that either driver was in a hurry or had been driving for a long period of time and was drowsy?  Did either make a remark concerning liability, such as, "I'm sorry I hit you," or "I must have fallen asleep"?

  (If such comments are material, they might be used as direct evidence should litigation result.)

- <u>Was There a Police Investigation?</u>

  If so, what charges were made?

- <u>Have the Witness Draw a Rough Diagram of the Accident in the Body of the Statement</u>

- <u>Include the Identification of All Injured People, as Well as a Detailed Description of the Injuries if known.</u>

  A description of the injury is particularly important if the witness is one of the injured persons.  Obtain any background information concerning pre-existing conditions.  If the witness was an occupant of one of the cars involved and was not injured, have him or her say so in the signed statement.

- <u>The Names and Addresses of any other Witness</u>

  Obtain from the witness names and addresses of all people observed at the scene, not only people known to be witnesses but also those who <u>might</u> have seen the accident.

V-23

5-10-02

**D 000413**

Exhibit 13 Page 91

PROTECTED DOCUMENTS

### XIX.  SIGNING THE STATEMENT

Always ask the witness to sign the statement if a handwritten one was taken.  Most witnesses will do so without objection.  Some, however, will flatly refuse.

Before the statement is signed, the witness should read it and should also make corrections if so desired.  If deletions or insertions are made, the witness should put his or her initials in the margin or between the lines near the correction.

There should be a concluding paragraph just above the signature that reads something like this, "I have read the above (number of pages) and they are true to the best of my recollection."

Frequently at the time a statement is taken, only you and the witness are present, and you must witness the statement.  It is, however, desirable that there be one, or preferably two, independent witnesses to the signature.  If a statement is so witnessed, you should obtain sufficient identifying information to locate these witnesses at some future time.  Learn the name and address of a relative or friend who will always know the location of the witness to the signature.

Occasionally, if the person giving the statement refuses to sign it, a third person who is present during the taking of the statement will sign his or her name under a sentence to verify that he or she heard the witness describe the accident and that the statement is a true and correct version of what he or she said.

### XX.  TAKING A RECORDED INTERVIEW

As in a written statement, the first thing to include is the identification of the person being interviewed.  So there is no question concerning the identity of the witness, ask the witness his or her full name, address, age, martial status and employer.  Next and most important ask, "Do you realize that I am recording this interview?"  (Be sure you get a "Yes" answer.  Ask then… "Do I have your permission to record this interview?"  (Again, be sure to get a "Yes" answer.))  In chronological order, cover the description of the accident, the injuries, if any, treatment and expense involved, any prior injuries, illnesses or accidents and other pertinent information.  During the course of the interview, be sure that the witness keeps to the point.  If any digression is noted, tactfully steers the witness back on course.  Repeat the question if necessary.  If it appears that a particular phrase did not record, or that a background noise blotted out the voice of the speaker, a repetition of the answer in a louder tone of voice should be requested.  A tactful example of such a request is as follows:  "I didn't quite catch your last remark, Ms. _____.  Will you please speak a little louder?"

If both parties begin to speak at the same time, it will be necessary to have the question or answer repeated since two voices recorded at the same time garble the reproduction of the sound.

5-10-02

**D 000414**

Exhibit 13 Page 92

**PROTECTED DOCUMENTS**

You should be prepared to direct and control the interview, ask the pertinent questions and get the answers with little digression. The preliminary interview assists greatly in this respect. There is an <u>Interview Guide</u> for your use which has lists of questions to be asked. It should be handy for reference during the course of the interview. These Interview Guides are only guides and are used more as checklists than as concise outlines.

Use the technical material provided by the manufacturer of the recording machine to ensure a clear and audible record.

Caution the witness not to mention insurance or to ask questions concerning the settlement of a claim while the interview is being recorded. Explain that all such questions will be fully answered when the recording is finished. You are only making a report of what happened at the time of the accident.

When it appears that all of the necessary materials have been covered, end with:

"Are there any facts about this accident that you would like to add?"

(Give the witness a chance to add anything to, or make any corrections of what has previously been said. At this point, the interview is ready to be concluded.)

The following dialogue will serve as an example of the technique used in concluding a recorded interview.

Q:    "Ms. _____, have you understood all of my questions?"

A:    "Yes."

Q:    Have all your answers been correct to the best of your knowledge?"

A:    "They have."

Q:    "You realize that this interview has been recorded?"

A:    "Yes."

Q:    "This recording was made with your permission?"

A:    "Yes."

Q:    "With your permission, I will now turn off the recorder."

A:    "All right."

Immediately after the witness" last words, turn off the recorder.

V-25

5-10-02

D 000416

Exhibit 13 Page 93

PROTECTED DOCUMENTS

## XXI.  INTERRUPTIONS

The recorded interview should run continuously from the time it begins until it is over and the machine is turned off.  If, for some reason it becomes absolutely necessary to interrupt the interview, you should make mention of this fact by means of the following dialogue:

Q:  Ms. _____, I understand that it is necessary for you to discontinue this interview for a few moments.  Do you agree that it is now 3:15 p.m.?"

A:  "Yes."

Q:  "With your permission, I will now turn the machine off."

A:  "All right."

When the witness is away from the area do not discuss the case with anyone.  Upon his or her return and the interview is to be continued, turn on the machine and state,

Q:  "Ms. _____, has now returned.  Ms. _____, do you agree that it is now 3:25 p.m.?"

A:  "Yes."

Q:  "Do you also agree, Ms. _____, that while the recorder was turned off there was no discussion of the accident between us or anyone else?"

A:  "That is right."

If the interview covers more than one cassette, the above procedure should be followed when the machine has to be turned off to change the cassette.  The time of ending on one tape and the beginning on the next should be mentioned.

Never record the statements of more than one person on the same tape.

The Telephone Interview – The foregoing procedures concerned the person-to-person interview with a portable voice recorder.  The recorded telephone interview follows the same general pattern.  When calling the witness, explain the purpose of your call, ask for permission to record the interview, and prepare him or her for the actual recording.  The preparation will include:  requesting the witness to have information, such as names, addresses, vehicle identification numbers, etc. available; and a reminder to the witness to just answer the questions asked until after the interview has been completed and the machine is turned off, at which time any other matters can be discussed.

V-26

5-10-02

D 000416

Exhibit 13 Page 94

PROTECTED DOCUMENTS

When the machine is turned on, the initial dialogue should adhere fairly close to the following format:

"Ms. _____, this is (identify yourself) calling from (state your phone number). I am talking with Ms. _____ at (the witness' phone number) about an accident which took place (date, time and place). Ms. _____, will you please state your full name and address?"

The witness should then be asked to state his or her age and martial status. If there is any question in your mind about the identification of the witness, have the witness spell out his or her first name or state the names of his or her spouse or children. At this point in the conversation, the witness confirms the fact that the conversation is being recorded and gives permission to proceed with the recording if the interview. The rest of the interview then proceeds in the same general way as the person-to-person interview.

## XXII. GENERAL RULES FOR RECORDED INTERVIEWS

Here are general rules to observe while conducting any recorded interview:

- Be sure the machine is working properly before you begin.

- Be sure the volume is high enough to pick up the conversation and low enough to eliminate undesirable background noise.

- Be sure to speak distinctly and loudly enough to be heard; caution the person being interviewed to do the same.

- Warn bystanders against interruption.

- Don't interrupt witness' answers. If you speak while the witness is speaking, the recording will be garbled. You may stop the witness from otherwise volunteering some valuable information.

- Avoid leading questions. Direct spontaneous answers have more impact than those suggested by the interviewer.

- Don't take information for granted. It may be necessary that he or she clearly explain certain meanings for the record. Other people hearing the recording must also be able to fathom the speaker's meaning.

- Follow-up on all information volunteered. A "somebody" could be a key witness that would otherwise go unnoticed.

- Avoid repeating the person's answers.

5-10-02

D 000417

Exhibit 13 Page 95

PROTECTED DOCUMENTS

- Keep your questions simple.

- Don't ask two questions at once.  You may only get an answer to one.

- Avoid digression.  Strive for direct answers to direct questions that are pertinent to the file.

- Avoid "Uhs," "Oks," "I sees," "All rights," etc.

## XXIII. TYPES OF STATEMENTS

### A.    Negative Statements

Sometimes, particularly in serious injury cases, signed statements should be obtained from people who may have been in a position to have seen an accident but insist that they did not.  A signed statement from all such persons, denying that they witnessed the accident, may prove very valuable at some later time should any of them appear as adverse witnesses claiming to have seen the accident.

An illustration in which negative statements might be useful is a child-pedestrian case in a residential area where the child lives.  Unless it appears that the injury is not serious or that a reasonable settlement can be made in the near future, the people in the neighborhood should be interviewed and negative statements taken from those who claim not to have seen the accident.  Each negative statement should indicate that the witness did not see the accident, has not heard anything about it and knows nothing about it.  Request the witness to describe where he or she was at the time of the accident.  The witness may have been out of town or some distance from the scene and by so stating, becomes useless as a witness to the other side.  If the witness did not see the accident but has heard something about it, include what has been heard and who said it.

There is a tendency when making a canvass of a neighborhood to interview people and not take negative statements. This can be embarrassing at a later date when a person interviewed testifies in a very positive manner during a trial. Taking negative statements is time-consuming, however, and the expense is not warranted in the average case.  Good judgment must dictate when this should be done.

Frequently, it is wise to combine elements of the positive and negative statements. The witness might be able to testify in a positive manner as to some of the facts, but claims he or she does not know or did not see other things.

V-28

5-10-02

D 000418

Exhibit 13 Page 96

PROTECTED DOCUMENTS

B.     **Statements Of Biased Witnesses**

Occasionally, a witness may attempt to favor one party or another by grossly exaggerating the alleged negligence of the insured, minimizing any negligence of the other party or professing not to know how the accident happened in order to avoid saying anything harmful to the favored party.

C.     **Exonerating Statements**

When taking statements from passengers in the insured car, develop as much information as possible to clearly portray the good driving habits of the driver. Do not distort the facts, but try to establish a pattern of careful driving. Exonerating statements should be taken as soon after the accident as possible before the process of rationalization sets in, when, if the passenger did sustain an injury, he or she may be less and less inclined to give a helpful statement.

Exonerating statements should include how often the witness rides with the driver and whether the driver is regarded as a good and safe operator. If the passenger offers the opinion that the insured was not responsible for the accident, set out in detail the insured's actions just prior to the accident, for example; the speed of the vehicle, the type of lookout the insured kept, what was done to avoid the accident, and whether the driver had been drinking.

If drinking was involved, what had the person consumed and how much? Did the witness believe the insured to have been intoxicated? Why? If not, what did the insured do to suggest that he or she was not under the influence? Did the passenger caution the insured about his or her driving? If not, why not? If the passenger did, how was it done? If it is known that the insured had been drinking, it may be equally important to have the passenger agree in the statement even though the driver was believed under the influence, the passenger rode with this person nonetheless.

D.     **Non-Injury Statements**

A non-injury statement is taken for the purpose of having the interviewee disclaim having been injured. In most accidents, it is desirable to have a non-injury statement from each occupant of all cars involved. Depending on the nature of the accident, it can be a long, detailed statement of facts including a denial that the witness was injured or a brief statement that merely included identification and a declaration of no injury. Every statement from a passenger should include the fact that the person either was or was not injured.

Consideration should be given to the nature of the accident and the severity of the impact. If there is a reasonable possibility of litigation, including the Company's asserting a subrogation claim, take non-injury statements from all passengers and the other driver. If there is no indication of injury and the accident is minor, a Claimant's Accident Report or a Witness Questionnaire may be adequate. If the

V-29

5-10-02

**D 000419**

Exhibit 13 Page 97

PROTECTED DOCUMENTS

accident is being handled by correspondence at the CSR level these forms may be
mailed to the passengers or the driver of the other car.

E.   Statement Of Permissive Use

When the "owned automobile" is used by someone other than the named insured
or any resident of his household, it may be necessary to obtain a recorded
interview from the named insured indicating whether or not the driver had
permission to use the car for the particular purpose for which it was being used.

If the driver had the named insured's expressed permission, the statement may be
a brief one simply indicating this.  In minor accidents investigated by mail, at the
CSR level, an Accident Report (Form C-4), filled out and signed by the insured
indicating that the driver had permission, will suffice.

If there is any indication that there was no permission given by the owner for the
driver to drive the vehicle in question, a reservation of rights letter will need to be
sent to all interested parties.  In some states the reservation of rights letter would
be sent to those parties (or their attorneys, if represented) seeking coverage under
the policy; in other states, it would be sent to all involved parties (or their
attorneys, if represented).  You will need to check the requirements of each state
when preparing and sending the reservation of rights letter.

If the driver did not have the expressed permission of the named insured, fully
cover all the circumstances surrounding use of the vehicle.  Include how many
times in the past the car was used by the particular driver, the relationship
between the named driver and the driver, whether it was necessary for the driver
to get permission each time the car was driven and if so, where the keys were
kept, etc.  The statement should develop all the facts on which to base a decision
as to whether there may have been implied permission to use the car.

F.   Court Reporter Statements

A court reporter statement is simply a qualified court reporter's recording of
questions asked by the claims person and answered by the witness.  There is no
signature since the court reporter is the witness to what was said and the reporter's
notes are the record.

Occasionally in a serious case, the claims person can anticipate that an important
witness will be antagonistic or illiterate, or there may be some other impediment
to getting an intelligible signed statement.  Not only is the court reporter statement
useful in such instances, but sometimes this is the only kind of non-injury or
negative statement that can be obtained.  Because we are charged for this service,
make certain that the statement will be worth the expense.  See your supervisor
before authorizing this technique.

V-30

5-10-02

D 000420

Exhibit 13 Page 98

PROTECTED DOCUMENTS

## XXIV. NEGOTIATION OF CLAIMS IN SUIT

One of the more difficult aspects of the Claim Examiner's job is to direct settlement negotiations through defense attorneys. Prior experiences with a particular defense attorney should determine the degree of control. Always be certain that the attorney has adequate dollar authorization. Is he or she going to negotiate or, are you? Make sure this is determined at the start of each suit. You, as the person most familiar with the case, are probably best suited to conduct settlement negotiations. However, a particular law office may have an attorney who is a superb negotiator. In that case, we may allow the firm to discuss settlement with the plaintiff's attorney.

As soon as a case appears to be one for settlement and there is sufficient information available on the general nature of the injury or damage, extend a settlement authorization even though the discovery may not yet be complete. Once it is obvious that a case should be settled, it is a waste of time and money to delay preliminary settlement negotiations until all possible discovery is done. Not having enough information to make a final evaluation is never an excuse to delay a preliminary authorization to be used in commencing negotiations.

## XXV. CONTROL OF INVESTIGATION EXPENSE

The cost of our investigations is one of the Company's largest items of expense. Our goal is to provide top quality claims service at reasonable cost, but high quality and low cost are not inconsistent if proper controls are exercised.

Attorneys and independent adjusters provide certain professional services, and they are compensated on the basis of their knowledge and the amount of time and effort exerted. We expect that reasonable charges will be made in every case. Before requisitioning checks in payment of bills, examiners and adjusters must review each bill carefully. The test of the reasonableness of a bill on a particular case is whether all the work done was necessary or helpful and whether we were charged a reasonable amount for the work that was done. Did we get what we paid for? Every bill from an attorney or adjuster should be examined carefully to make certain that it meets this test.

## XXVI. GUIDELINES FOR SETTLEMENT REQUIREMENTS

Every effort should be made to effect settlement as soon as sufficient information is secured to make a determination on liability and injury evaluation.

Investigation of injury claims includes verification of the injury and special damages. The claim file should contain the name and address of the treating physician and hospital or other medical facility furnishing treatment.

V-31

5-10-02

**D 000421**

Exhibit 13 Page 99

PROTECTED DOCUMENTS

All efforts should be made to document the file with bills, receipts and medical reports sufficient to produce an evaluation of injury severity and reasonableness of treatment. If loss of earnings is alleged, the name and address of the employer should be in the file.

Complicated factual situations, suspicious circumstances, questionable liability or questionable injuries may require considerably greater investigation than those cases which do not involve questions or problems. However, do not allow your-investigation to prevent your from reaching a reasonable and expeditious settlement.

## XXVII.  NEGOTIGATING THE SETTLEMENT OF LIABILITY CASES

### A.    Importance of Early Contact

In every case, there is a time for settlement.  Recognition of this time is essential in making good settlements.

The earlier the contact with claimants, the earlier the disposition of cases.  The claims person should contact the claimant, or a member of his or her family, as soon as possible after receipt of the assignment unless circumstances make this impossible. (The Company standard is attempt contact within one hour of receipt of claim.)  The claim file activity log (ALOG) should clearly record the claims technician's effort to contact the claimant.

As early as possible, the claims handler should convey to the claimant the Company's desire to reach a fair and equitable settlement.  The claims person should contact the claimant at proper intervals until settlement can be made, unless an attorney is retained to represent the claimant, in which case the contact should be with that attorney.

A fair resolution of the claim at the earliest appropriate time should be one of the claims person's most compelling interests.  Many claims can be settled on first contact.  In those that cannot be, the claims person must direct his or her efforts at establishing and maintaining cooperation.  Leave the door open for future discussion when it becomes apparent that settlement cannot be made during a particular telephone call.

In a death case, it would be in poor taste to make a settlement offer to the widow of the deceased the day following the accident.  Instead, make an early contact with a member of the family, or someone close to the family.  Make it known that you are available for discussion at the convenience of the family and disposed to do anything reasonable to assist the family.  This establishes a basis for settlement discussion at a later date.  It is important that the claims person tactfully assumes the initiative and not rely on the claimants to make the contact.

There are many techniques to ensure an opportunity for further discussion.  What works well for one may not work for another.  In some instances, it may be better

V-32

5-10-02

D 000422

Exhibit 13 Page 100

**PROTECTED DOCUMENTS**

to suggest that the claimant consider the matter further and arrange to call again at a specified time.

The most frequent causes of loss of cooperation are the failure to make an offer when the claimant is looking for one or making an offer that is wholly inadequate. All offers should be fair and reasonable.

Once the Company is put on notice, either by the claimant or by an attorney; that the claimant is represented by an attorney, <u>all future dealings must be made with the attorney</u>. It is improper for the claims person to attempt to negotiate directly with the claimant unless the attorney has given written permission to do so.

**B.    Walkaway Settlements**

Probably the simplest definition of the Walkaway Settlement is that when payment is made, no release is taken, and neither the Company nor the claimant contemplates any additional payment. The technique permits a disposition of the claim while not cutting off the claimant's right to compensation if additional expenses are incurred.

Generally speaking, the Walkaway Settlement is most suitable to cases involving only very moderate injury where it is believed there will be no further out of pocket expense.

Walkaway Settlements may be made in any amount covered by the authorization extended. Questions on value should be discussed with appropriate claims supervisor or manager.

**C.    Structured Settlements**

A structured settlement, unlike a lump sum settlement which provides for a one-time cash payment, consists of payments spread out over a period of time. The payments can be scheduled on a monthly, quarterly, annual or other basis the recipient prefers and can be for a definite number of years or for a lifetime. The periodic payments can be increased or decreased as the anticipated needs of the recipient change over a period of time and can be supplemented by additional fixed dollar payments at specified times. A structured settlement is a financial package tailored to meet the injured party's immediate and future needs.

To our society, a properly structured settlement provides security for the claimant and prevents the dissipation of settlement funds which often can result in a claimant being unable to provide for his or her family needs and causes society to have to provide for those needs.

The structured form of settlement stretches payment to the claimant over a number of years instead of providing a lump sum payment. It may involve up-front money consisting of a lump sum payment of cash for medical expenses and

5-10-02

**D 000423**

Exhibit 13 Page 101

**PROTECTED DOCUMENTS**

lost wages, funds for rehabilitation, attorney fees, education, as well as other agreed upon expenses. In addition, an income annuity based on the estimated lost earnings payable periodically for life or for a certain number of years can be agreed upon.

If you have a BI claim (or a UMBI claim) with exposure over $10,000, you may well have a case where the structured settlement could be explored. See your supervisor.

## XXVIII. RELEASES

### A.   General Releases

Bodily injury liability claims which <u>do not</u> involve an infant, a death or a husband and wife claim may be settled by having the injured person execute a release form if he or she is mentally competent to give a binding release. Release form C-27, or a similarly drawn document, may be used. If the claimant is mentally incompetent, settlement must be made on the claimant's behalf by a legal guardian. Usually such settlements should be court-approved if the size and nature of the claim justify the expense. If a guardian has not been previously appointed, court approval and appointment of a guardian can usually be handled in the same court proceeding. Husband and wife and parent/guardian releases are discussed in Chapter VI; special handling is required for these claims.

### B.   Covenants Not To Sue And Limited Releases

When an injury is caused by the negligence of two or more people, the injured person may have a claim against all the wrongdoers. Usually the most satisfactory manner of settling such a claim is for the individuals against who the claim is made, or their insurers, to contribute to the settlement on a basis mutually satisfactory to all. However, in some instances, it is impossible, or undesirable, to reach such an agreement. The claims person then considers settlement by having the claimant execute a Covenant Not to Sue (form C-47) if applicable to his or her jurisdiction. If the Covenant Not to Sue is not satisfactory, a limited or conditional release may serve the purpose.

A Covenant Not to Sue is an agreement whereby a claimant agrees, for a consideration, not to enforce the claim against the individual in whose favor the Covenant is drawn. The claimant is free to pursue his or her claim against any of the other wrongdoers. It is not a release; it is an attempt to circumvent the rule in most jurisdictions that a release of one tort-feasor releases all.

A Limited or Conditional Release expressly preserves the claimant's right to recover against another individual. To make the Limited or Conditional Release, simply add a statement to the general release to the effect that, "It is agreed that

V-34

5-10-02

**D 000424**

Exhibit 13 Page 102

**PROTECTED DOCUMENTS**

this settlement will in no way prejudice any claim which John Smith may have against Henry Brown resulting from….(the accident mentioned in the release)".

One of the dangers in using a Covenant Not to Sue or a limited release is that the individual against whom the claimant has reserved his or her claim may have an action over a cross-claim against the insured. The Claims person must know that protection is provided before utilizing either the Covenant Not to Sue or the limited release. Depending on the law of jurisdiction involved, nothing may be accomplished by either document. If there is a question, the examiner should call one of our attorneys for advice or ask the Regional Liability Administrator or Claims Home Office Legal.

In some states, a Covenant Not to Sue is interpreted as a full release against all parties involved. In other states, it is given no legal recognition. In a few states, the Covenant Not to Sue is regarded the same as a limited release.

In some jurisdictions, the limited release is not recognized. It is either interpreted as a full release or none at all. The claims person must know how the Covenant Not to Sue and the limited release are interpreted in the particular jurisdiction before using either.

C.   **Release And Agreement – Open End Release**

The Release of All Claims and Agreement Form (C-52) is simply our standard general release with an added agreement in which we promise to pay any reasonable and necessary medical expense incurred by the claimant within one year from the date of the accident not to exceed a specified sum.  It is designed to accomplish earlier and more reasonable liability settlements, particularly with those claimants who expect further treatment and expenses and are reluctant to sign a general release of all claims, whether or not they are represented by an attorney.

The following general rules are to be fully considered regarding the use of the C-52:

- The C-52 is to be used in those cases which are clearly ones for settlement, not as a substitute for the usual general release, but only if a general release is not acceptable.  Its particular value will be in those cases we have heretofore been unable to settle within a very few days following the accident because the claimant was fearful of being uncompensated for possible future unforeseen consequences of his or her injury.

- The limits amount in the "Agreement" part should always be a reasonable amount so as not to defeat the purpose of this type of settlement.

V-35

5-10-02

**D 000425**

Exhibit 13 Page 103

PROTECTED DOCUMENTS

- The limits amount in the "Agreement," when combined with amount of the consideration, must not exceed the general or specific authorization of the person taking the release; and obviously the total sum must not exceed the insured's policy limits in the particular case.

- Avoid, if possible, the prospect that we might have to pay the medical expenses of a claimant under both the "Agreement" part and under our medical payments coverage. If it is necessary and proper to obtain a C-52 when the releasor may also be entitled to payment under our medical payments coverage, the name of our Company should be inserted in the "Releasee" blank, in addition to other releasees, as follows: "and Government Employees Insurance Company for any medical payments coverage under policy no. 999-99-99."

It will generally be unnecessary to keep a file open or maintain a reserve solely for possible future payments to claimants who have signed a C-52, however, whether a file can be closed will depend on the likelihood of a further payment being made. See your supervisor if you have any questions on this. The file should be marked "Do Not Destroy" for at least as long as the time specified in the "agreement."

## XXIX. VOLUNTARY ARBITRATION

Voluntary arbitration is considered to be a valuable cost effective settlement technique. It is not to be used to avoid the day-to-day routine of traditional negotiations. Voluntary arbitration should be used only when a stalemate has been reached and there is no dispute over liability, just damages. The claims person must have his or her manager's approval before proposing the method to the claimant's attorney.

Voluntary arbitration was developed as an alternative to disposing of disputed cases through the courts. This involves utilization of a selected list of arbitrators who have agreed to make awards on injury claims. The arbitrators include retired judges, lawyers and claims officials. Fees paid to arbitrators are established as a standard schedule with hourly rates comparable to what we expect to pay attorneys.

Both parties must agree to arbitrate. The agreement must stipulate that, regardless of the amount of the award, the amount paid will neither be greater than the agreed upon high figure nor less than the agreed upon low figure. The arbitrator will not be advised of the agreed upon high and low figures prior to the time he or she enters an award. The arbitrator will make the decision entirely from the material presented.

The procedure for initiating arbitration is to be kept as simple as possible to encourage maximum use of the technique. When the claims person feels that negotiations have become stalemated, with the supervisor's or manager's approval, he or she is to propose voluntary arbitration to the claimant's attorney. Simultaneously, a list of arbitrators should be submitted to the claimant's attorney. If the claimant's attorney agrees to

V-36

5-10-02

**D 000426**

Exhibit 13 Page 104

**PROTECTED DOCUMENTS**

arbitration and selects an arbitrator, the claims person should then undertake to arrange arbitration by calling the arbitrator and sending a confirming letter to the claimant's attorney. Both sides should submit pertinent portions of their files to the arbitrator within a stated period of time. A covering letter should be sent to the arbitrator stating our position and arguing our case with pertinent portions of our file attached.

The arbitrator should be asked to make the award decision within two weeks after receipt of both files. The award should be in writing since it is binding and final.

The claim file should contain sufficient information to fully explain how the case was handled. The section should also maintain records containing brief but pertinent claim file information: the claim number, last demand, last offer, amount of award and name of arbitrator. The records should reflect trends which can be useful in the future. Also, the examiners and managers are encouraged to keep names of good prospects for potential arbitrator selection.

### XXX. VOLUNTARY MEDIATION

Mediation is a private, informal dispute resolution process in which a neutral third person, the mediator, attempts to help disputing parties reach an agreement. The mediator's role is to show both sides the strengths and weaknesses of their cases and to discuss the potential ways a case can be resolved. Mediations are most effective when the mediator is an experienced, forceful and well-respected attorney or retired judge in the area where the case would be litigated. Claims examiners should consult with their managers, a Regional Liability Administrator, the Claims Director or local counsel to identify the names of good mediators in a particular geographical area.

The types of claims or scenarios that are good for voluntary mediation include:

1. Multiple parties and the coverage limit in question is insufficient to fully compensate all parties;

2. The plaintiff has an unrealistically high expectation of the case's worth;

3. Where our getting a chance to see and speak with the claimant in person might help resolve the case (i.e., cases where scarring or disfigurement are involved or claims where we want to get a feel for how a claimant might come across before a jury if the case were to be tried).

Approval for use of a voluntary mediation should come from the examiner's supervisor and arrangements should be made to have someone familiar with the file represent the insured's or the Company's interest at mediation. In some Regions, the examiners assigned to the file fill that role while other Regions use field representatives or even local staff counsel to present the defense side of the case.

V-37

5-10-02

**D 000427**

Exhibit 13 Page 105

PROTECTED DOCUMENTS

Before the mediation is held, the parties should agree to how the mediator's expenses will
be paid and where the mediation will take place.

## XXXI. NO PAY CASES

A "No Pay Case" is defined as: "A claim where the liability clearly indicates to the
supervisor or manager that a defense verdict will be obtained if the case is litigated to a
conclusion."

Potential cases of this type should be discussed with your supervisor or claim manager.
The inside of the front file jacket should be marked "No pay" with the supervisor's
signature and date added.  This designation can be removed only by a supervisor of the
same or higher grade than the supervisor who originally placed it in the file.

## XXXII. GUIDELINES FOR CLOSING CLAIM FILES

When sufficient information in the file indicates no reasonable likelihood of exposure, or
further exposure, to the Company under coverages available on the policy in question, the
file should be closed.  The file should not be closed when there is reasonable expectation
that there will be a claim or an additional claim payment.

The following may be helpful in applying these guidelines:

- Files containing Third Party Liability exposure should not be closed until one
  or more of the following conditions exist:

  - All Bodily Injury or Property Damage claims known or reasonably
    expected are settled or otherwise concluded.

  - Liability is clearly not with the insured and appropriate
    investigation substantiating this conclusion has been completed.

- If suits have been filed, all suits must be dismissed and satisfactory evidence
  of this fact is contained in the file (usually a copy of the dismissal notice).

- Files containing Medical Payments coverage or Personal Injury Protection
  coverage should not be closed when we have knowledge that treatment is
  continuing and expenses are being incurred which could be the basis for an
  additional claim, unless sufficient time has elapsed since the claimant was last
  contacted for us to conclude there will be no claim or no further claim.

- Files containing First Party Physical Damage coverage should not be closed
  until after settlement, if we believe or have knowledge that damages probably
  exceed applicable deductibles, unless sufficient time has elapsed for us to
  reasonably believe there will be no claim, or we know that a claim will not be

V-38

5-10-02

D 000428

Exhibit 13 Page 106

PROTECTED DOCUMENTS

made under our policy (i.e., the other company paid our insured's liability claim).

The guidelines enunciated above may be restated as simply rules of common sense and practice of good judgment. There may be instances when, after files were closed, subsequent claims will be asserted. This is expected. However, it is our policy to close files as quickly as possible. Consistent with this purpose, we must exercise initiative and move aggressively to take all steps preliminary to file closure at the earliest practicable time.

## XXXIII. FRAUDULENT AND UNETHICAL CLAIM ACTIVITIES

As part of a growing industry-wide problem, our claim efforts have been inhibited by the increased occurrence of insurance fraud. A recent study by the United States Chamber of Commerce estimated 15% of all insurance claims involve some element of fraud. The annual cost of such fraud has spiraled to billions of dollars.

The Company has an active Regional Claims Security Investigative Unit to identify vulnerabilities, detect internal and external fraud and coordinate prosecution and recovery efforts with legal authorities. In addition, GEICO is a member of several insurance crime prevention associations and has implemented public relations and educational programs tailored specifically to deter insurance associated crimes.

The impact of insurance crime is recognized both by the insurance industry and by public authorities. Federal laws are in effect requiring automobiles to be equipped with anti-theft devices and all states now have explicit title laws. If the insurance crime involves the use of the United States Postal Service, prosecution would involve federal authorities. Some jurisdictions consider insurance fraud a felony, while others apply the misdemeanor classifications.

The three key areas affected are Property Damage, Personal Injury and support functions. Property Damage violations may appear in the form of inflated estimates, fictitious vehicles, kickbacks, dishonest salvage handling, staged accidents and fictitious thefts. Infractions against Personal Injury may involve collusion, non-existent passengers or claimants, kickbacks, and fabricated employment records. The support functions are susceptible to forgery, non-existent payees and counterfeit checks. The claims person should be constantly aware of the possibility of fraud.

## XXXIV. MINORS' CLAIMS

### A. Binding Settlements

Generally a binding settlement of a bodily injury liability claim for injuries to an infant (anyone below the age of majority) cannot be made without court sanction.
*   The age at which majority is reached in most states is eighteen. The law of the

Exhibit 13 Page 107

PROTECTED DOCUMENTS

state in which a release is executed usually determines whether a claimant has the capacity to give a binding release.

A parent may have a valid claim for loss of his child's services, loss of any income the child may have earned, and for medical expenses. The child's individual claim consists of pain and suffering, disfigurement and disability. When settling a claim of a minor, bear in mind that there are probably two claims to settle, the child's individual claim and that of the parents.

**B.** **Friendly Suits And Court-Approved Settlements**

\* There are generally three ways of making a binding settlement of a minor's claim. The most frequently used is to go before the court indicating that agreement has been reached as to settlement and ask for the court's approval. If approval is given, the court will appoint a guardian and issue an order indicating how the payment should be distributed.

\* The second way of making a binding settlement is to take the case through normal pleadings and have a judgment entered in the amount of the agreed-upon settlement. It is, of course, necessary that the claimant be represented by counsel.

\* The third common method is to resolve the case consistent with state statutes. For example, some states permit a parent or guardian to settle a claim of a minor if the amount of the settlement is less than a specific dollar amount. Others may permit them when the "net" to the minor (after paying fees and medical expenses) is less than a certain dollar amount. In those states, for those cases that qualify, court approval may not be necessary in obtaining a binding settlement. See generally the TCMs catalogued under the heading of minor settlements.

In all states, court approval must be obtained if:

- the minor sustained a broken bone,
- the minor sustained a head injury,
- the minor sustained permanent disability or permanent disfigurement, or
- the minor's medical expenses exceeded $1,500.

Court approval may be obtained in any case where it is deemed prudent to do so.

You must understand that, in many states, in any case in which court approval is not obtained, there is no settlement of the minor's claim. In those states, if court approval is not obtained, only the parents' claims arising from the injuries to their child are settled. Please see your RLA to determine if the state with which you are dealing is one of these states.

V-40

**PROTECTED DOCUMENTS**

C.  **Release Agreement**

*   If a decision has been made to waive court approval for any reason, settlement may be made by having the parents or legal guardians execute a Release Agreement. Although this release does not bind the child, it does bind the parents with respect to their claim.

Even though settlement of a minor's claim is court-approved, if money is paid to the parents in settlement of their claim, they should execute a release. It is preferable that the Parents' Release and Indemnity Agreement be used for this purpose, but any other form in which the parents' claim is properly released is satisfactory.

The Parents' and Guardians' Indemnity Release has been held to be unenforceable in some states. Therefore, a general release may suffice.

A C-52, Release of All Claims and Agreement (open-end release) may be modified to accommodate minor settlements by additional wording that spell out that the release is on behalf of the injured child. Any modification of a release requires supervisory approval.

D.  **Settlement Checks**

When an infant's or minor's claim is settled without court approval, settlement checks or drafts should be drawn to "Joe Doe and Mary Doe, as Parents and Natural Guardians of Richard Doe, a Minor." If there is a legal guardian, or one of the parents is deceased or is not joined in the claim for some reason, an appropriate revision should be made in the way the check is drawn. In each case, the payee should be identified as a parent or guardian on the face of the check. If the settlement is court-approved, the check should be drawn precisely as is indicated by the court order.

V-41

PROTECTED DOCUMENTS

# CHAPTER VI

## PRINCIPLES OF LEGAL LIABILITY

I.   FUNDAMENTALS

    A.   **Legal Liability Defined**

Liability is defined as a legally enforceable duty of a wrongdoer to respond in money damages to an injured party because of some act or failure to act.  Each person owes the duty of reasonable care to all other persons and the failure to exercise that care constitutes negligence.  The law provides a means of recovery when one fails in his or her duty to another.

The liability portion of the policy contract states that the Company agrees to pay on behalf of the insured all sums which the insured becomes legally obligated to pay.  We note the company's obligation is generally to an insured only and payments are based on the legal liability of an insured.  The insuring agreement obligates the insurer to pay when an insured becomes financially responsible to another party because of some act or failure to act.

    B.   **Criminal Law**

Criminal law deals with the conduct of the individual in relation to society (or the state).  Prosecution and punishment of the criminal offender is brought by and at the expense of the government.  Conversely, civil law governs the rights and duties between individuals.  An individual brings a civil action against another; the state merely provides the forum under which the injured party proceeds.

    C.   **Civil Law**

Civil law is divided into broad areas; the two which concern us are contract and tort law.   Contract law concerns a voluntary relationship between two or more parties.  Tort law concerns the involuntary or implied rights and duties existing between individuals, i.e., the obligation at law to exercise care for the safety of the person or property of others.

    D.   **Common Law**

The common law of England consists of a body of rules of action relating to the government and security of persons and property.  These rules derive from customs and usages and from the judgments and decrees of courts recognizing, affirming, and enforcing such usages.  This body of law came with early settlers to America.  The American system of jurisprudence is patterned after the English.

VI-1

5-10-02

**D 000432**

Exhibit 13 Page 110

**PROTECTED DOCUMENTS**

In the absence of a statute with respect to a particular matter, common law (case law) is usually applied.

E.    **Common Law vs. Statutes**

Common law has been handed down by court decisions and tradition.  When a dispute is litigated in the courts, the judge must base his or her decision on similar cases decided in the past, known as "precedent".  The principle of stare decisis (Latin for "the decision to stand") requires a court to adhere to, and abide by, previously decided cases.  Courts can create "new" common law, either by deciding a case of first impression or by overruling prior decisions when such a change is deemed necessary.  For major policy changes, courts may defer to the legislature.

Legislatures, both federal and state, enact statutes.  When a new statute is enacted, it will then be the task of the courts to construe it and to determine its legal effect.  The courts proceed on the basic premise that a statute which is contrary to or "in derogation of" the common law rule previously applied, will be strictly construed.  They will hold that the statute changes the common law only to the extent necessary to fulfill legislative intent.  Should there be any doubt as to the legislative intent in enacting that statute or its meaning, it will be construed most strongly in favor of the continuance of the common law rule then in existence.  The courts look primarily to the plain language of the statute and, secondarily, to the legislative intent which inspired it.

F.    **Conflict of Laws**

Since there are sometimes differences among the states as to which rules to apply in various situations, it is important to know which law to follow.  Problems appear when an accident occurs in one state and suit is filed in another.  Insofar as liability claims are concerned, the law of the state in which the accident occurred is usually applied to determine whether the substantive elements are present to make an enforceable claim.  Procedural law is usually determined by the laws of the state in which suit is pending.  Such things as rules of evidence, burden of proof and statute of limitations are considered procedural.

Where there is a conflict of laws, there are three significant concepts, which are termed a "choice of law rule".

1.    **Lex Locus Delictus**

Lex locus delictus is a Latin phrase, which means the law of the place where the tort is committed.  In conflict of laws situations, the general rule is that the law of the location of the accident determines the rights of the parties, regardless of whether the parties are residents of the state where the accident occurred.  Therefore, if an insured and spouse (his passenger) are injured in an accident in New York and bring suit against each other in

5-10-02

**D 000433**

Exhibit 13 Page 111

PROTECTED DOCUMENTS

their home State of Maryland, the court in Maryland would apply the substantive law of New York. The substantive law includes the laws which determine rights and liabilities, such as comparative negligence.

### 2. Significant Contacts Rule

This rule is applicable to those special circumstances that exist where one state has more significant contacts with the parties to the litigation. For instance, if all the parties in an action are residents of the state of Alabama where the action is brought, but the accident happens in Tennessee, it may be unreasonable to apply the law of the place of the accident. In theory, Alabama's interests and contacts with the litigants are more significant and meaningful than Tennessee's and its law should apply.

### 3. Lex Forum

Once the jurisdiction has been decided, the law of the state where the trial will be held will govern the procedure to be followed in the trial. Procedural law includes filing of summons and complaints, answers, interrogatories, deposition, etc. However, if suit is brought in federal court, then federal procedural law will be followed. This choice of law rule is called lex forum, which is Latin for the law of the place where the case is filed.

### G. Tort Defined

We define "tort" as a wrong, an unreasonable interference of one party with the legally protected rights or interests of another party. William Prosser, in his Handbook of the Law of Torts, states, "Broadly speaking, a tort is a civil wrong other then breach of contract for which the court will provide a remedy in the form of an action for damages."

Four essential elements must be present in order to recover damages: (1) a legally protected right or a duty owed; (2) an invasion of that right or breach of that duty; (3) injury; and (4) proximate cause. Failure to allege sufficient facts to establish each element will usually result in dismissal of the complaint.

### 1. Legally Protected Right or Duty Owed

Common law recognized certain basic rights as being legally protected. These are the rights of the individual to liberty, security of person, property and reputation. We have added others, either by passing legislation to create them or by judicial development of the common law. Added rights, created by legislation, include the right of dependents to bring an action for wrongful death or the right to continue an action against a deceased defendant.

VI-3

5-10-02

D 000434

Exhibit 13 Page 112

PROTECTED DOCUMENTS

2. **An Invasion of the Right or Breach of that Duty**

This element means either an intentional or negligent invasion of the legally protected right. It also includes acts which subject one to liability, even though the acts are neither intentional nor negligent, e.g., a situation of "strict liability" in a products liability case.

3. **Injury**

The term "injury" is often used synonymously with the term "damages", but there are clear conceptual differences. An injury may be a bodily, reputational, or property harm to a person. Obtaining "damages" is the plaintiff's objective and damages may consist of monetary compensation, interest, costs, or punitive awards.

An injury must not be conjectural; tortious conduct that does not result in injury will not result in an award. Traditionally, courts refused to recognize fright as a compensable injury because it is easy to allege and it is difficult to defend against or quantify, it would encourage litigation, and it seems to reward mendacity or fragility. In recent decades, the wall against fright claims has largely crumbled so people now recover for fear of AIDS or increased risk of cancer. With respect to witnesses or bystanders of a traumatic event, most courts impose a "zone of danger" rule. This means that the plaintiff must actually witness the event and must have been very close to the impact. In some states, this requirement is often waived for immediate family members who come upon the scene shortly after impact.

Proof of injury may be established by medical experts, lay witness testimony, photographs, demonstrative evidence, or physical evidence.

4. **Proximate Cause**

The Plaintiff must establish that he or she sustained an injury as a result of a breach of duty. It must be established that the injury was sustained as a direct result of the tort committed and that there is a direct chain of causation running from the tortious act to the injury. Courts often use a "but for" test: "but for this negligent act, that injury would not have resulted." The connection between negligence and injury must be proximate in both time and space so that no other inference can reasonably be drawn (See Intervening Cause, page VI –8, and Concurrent Cause, page VI – 8 ).

H. **Agency**

While a legal distinction is made between agent-principal and master-servant, for purposes of this discussion, both relationships will be referred to as employer-

VI-4

5-10-02

D 000435

Exhibit 13 Page 113

**PROTECTED DOCUMENTS**

employee. From a strict legal standpoint, however, employer-employee usually describes only the master-servant relationship. Generally, a master-servant relationship is employment for wages, whereas a principal-agent need not be.

Under the doctrine of Respondeat Superior (which is Latin for let the employer respond), the master/employer is responsible for tortious acts of employees committed in the scope of their employment relationship. If an employee is involved in an accident while performing some act in furtherance of his employment, the employer may be held liable. The employee is also liable for his own negligence, but frequently the prospects are better of recovering a larger verdict from the employer who may also have additional liability insurance available. If an employer is required to make some payment because of a negligent act of an employee, he is entitled to reimbursement from the employee and usually has a right of action to enforce such a claim. It is usually held that intentional tortious conduct by servants is not within the scope of employment.

For an agency relationship to exist, it is unnecessary that there be a formal employment arrangement. It is sometimes sufficient if one person merely performs some act for another.

II.   **PRINCIPLES OF TORT LIABILITY**

Tort liability may arise in one of the three following ways:

- Intentional Tort – An act which is done with the intent and design of causing an injury to the person or property of another. Although most policy contracts exclude coverage when the bodily injury or property damage is caused intentionally, occasionally, intentional acts are alleged and are covered losses. In all instances, we must investigate thoroughly.

- Liability Without Fault or Strict Liability – This is a legal theory which places a more rigid obligation on those who engage in activities involving more than usual dangers. The doctrine has its greatest application to situations where injury or damage appears to be almost inevitable. Although strict liability has little application to automobile liability claims, it can be important in claims under the Comprehensive Liability Policy.

- Negligence – Failure to exercise ordinary care. The claims person is generally concerned with claims arising as a result of some act of negligence by the insured. In some instances, legal liability may be imputed to the insured as a result of some negligent act by another person. This is known as vicarious liability (See Imputed Negligence, page VI –10).

VI-5

5-10-02

**D 000436**

Exhibit 13 Page 114

PROTECTED DOCUMENTS

A.   **Standard of Care**

The negligence theory is predicated on community standards of behavior.  The standard may be established by statutes, but in the absence of statutes, it is usually defined as what the ordinary, reasonable and prudent person would do under the same or similar circumstances.  For statutory negligence to exist, the injured person must be one of a class of persons the statute was intended to protect and the harm which occurred must be the type the statute was intended to prevent.

The "reasonable man" of ordinary prudence theory is a model only, a legal fiction and is based on reason and custom.  The theory is the standard of care measurement.  To emphasize this standard, many jurisdictions have made distinctions in terms of the degree of care owed—high, slight or ordinary.  Additionally, conduct which is willful, wanton or reckless misconduct is labeled "gross negligence."  These distinctions may be made by case law or statute.

B.   **Foreseeability**

The doctrine of foreseeability is applied to establish the boundaries of one's duty of care for the safety of others.  The "reasonable man" must foresee or expect the potential effect his acts (or failure to act) will have on others.  Generally speaking, if there is reason to anticipate one's actions may harm another, then the foreseeability requirement is satisfied.

Where the risk of harm to others cannot be reasonably anticipated or foreseen, one is not liable even though his or her act may be the proximate cause of the injury inflicted.

1.   **The Forseeable Victim**

In the case of injury to another, the defendant is charged with liability for injuries sustained as a result of his or her act where the risk of injury to others can be reasonably anticipated.

For example, assume that the insured has a heart condition and he has been advised by his doctor that he should avoid any stress or strain and, above all, he should not drive an automobile.  One day, the insured felt that he had improved to the extent that he could drive his automobile a short distance.  He drives his car and, during the course of the drive, suffers a heart attack.  The car goes out of control, injuring two pedestrians on the sidewalk.  The insured drove his car with the knowledge of his heart condition and against the advice of his physician.  He should have reasonably anticipated the risk of harm to others that would come about when he undertook to drive an automobile.  The pedestrians are foreseeable victims.

VI-6

**PROTECTED DOCUMENTS**

2.   **The Unforeseeable Victim**
The rule followed in most states is that one owes no duty of care to
persons whose exposure to a risk of harm could not be anticipated.

For example, assume that the insured has a latent heart condition of
which he was unaware.  One day, while driving his car, he suffers
a heart attack.  The car goes out of control and injures two
pedestrians on the sidewalk.  The insured had no previous
knowledge of his heart condition nor had this condition manifested
itself in any way.  Clearly, the insured could not foresee the risk of
harm to which the pedestrians would be exposed as a result of his
driving.

The doctrine of foreseeability can be applied to a number of factual
situations.  The owner or operator of a motor vehicle owes a duty
of care for the safety of people and their property, and a failure to
exercise the required degree of care will constitute negligence.
The required care consists of careful operation of the motor
vehicle, including obedience to traffic signs, signals, speed laws,
the maintenance of a careful and proper lookout, and maintaining
control of the vehicle.  It also includes the proper maintenance of
the operating parts of the vehicle.  For example, the vehicle must
be equipped with satisfactory brakes, lights, tires, engine,
transmission, etc.

If the owner knowingly entrusts his or her vehicle to an intoxicated
person, or to a driver who has a reputation for recklessness, the
owner may be responsible for the damages sustained by others as a
result.  The owner is obligated to anticipate the risks of harm
which will result to other persons as a result of making the vehicle
available to unsafe drivers.

C.   **Rescue Doctrine**

This doctrine may apply when it is foreseeable that if a tortious act, whether
intentional or negligent, places a person in a position of imminent danger, it is
reasonable to expect that others will come to the aid of the person in distress.  It is
likewise reasonable to anticipate that if any of the rescuers are injured in the
process of giving such aid, the injury to the rescuer would be the responsibility of
the defendant whose tortious act was the proximate cause of the victim's position
of peril.  The theory is that the same tortious act was the proximate cause of the
injuries to the rescuers.  Therefore, among the foreseeable consequences of a
tortious act endangering one person, is the likelihood of injury to an intervening
rescuer.  The rescuer is entitled to maintain an action for damages against the
person whose tortious act created the necessity for the rescue attempt.  This cause
of action is maintainable regardless of whether the rescue attempt was successful.

VI-7

5-10-02

**D 000438**

Exhibit 13 Page 116

**PROTECTED DOCUMENTS**

In order to establish the liability of the tortfeasor, the rescuer, in addition to proving injuries and the damages, must prove the following elements:

- The tortious act of the defendant was the proximate cause of the victim's position.

- The imminent danger to which the victim was exposed.

- The justifiable exposure to danger assumed by the rescuer in aiding the victim.

**D.    Superseding Cause (aka Supervening Cause and Intervening Cause)**

The doctrine of proximate cause can be defeated by showing a superseding cause: an independent cause, person or thing, which occurs between when the original negligent act was committed and when the claimant sustained damages. If the superseding cause was the immediate cause of the claimant's damages, then the original wrongdoer would be freed from liability since he or she was not the proximate cause of the loss. However, the original wrongdoer is not absolved from liability if the superseding act arose out of the original wrongful act and the intervention was foreseeable by the original wrongdoer, which means that if the superseding force was a foreseeable consequence of the first negligent act, then the original wrongdoer would still be liable.

The issue of superseding cause is normally an issue of fact. Issues of superseding cause are most commonly raised in sequential accidents.

**E.    Concurrent Cause**

If the actions of two or more wrongdoers or events combine to produce indivisible damages to a third party, then that combination of wrongful acts would be deemed concurrent causation. Either or both defendants may be held liable for the entire amount of damages.

An intersectional accident between two cars exceeding the speed limit with a resulting injury to an innocent passenger in one car could be considered a joint tort; the negligent acts of both drivers combined (concurrent causes) to produce the injury.

Another context in which the issue of concurrent causation arises is when an injury or damage results from two distinct causes where one cause is a covered hazard and the other cause is not covered. Plaintiffs have learned to plead artfully a negligent cause of action even though an intentional, non-covered act appears to be the essence of the claim. These issues require legal consultation. Under most such circumstances, a duty to defend is owed even though there is no duty to indemnify.

VI-8

5-10-02

**D 000439**

Exhibit 13 Page 117

PROTECTED DOCUMENTS

Later in this chapter we will discuss the law affecting the innocent party's recovery rights from the joint tortfeasors and the rights existing between the tortfeasors themselves.

**F.     Last Clear Chance**

The doctrine of last clear chance applies when the claimant's (plaintiff) actions contributed to the cause of loss, but the wrongdoer (defendant) has the "last clear chance" to avoid the loss. That failure to avoid the loss would be considered the proximate cause of the loss. The theory is based upon the fact that the wrongdoer (defendant) had sufficient opportunity and time to avoid the accident once the claimant's position of peril was, or should have been, observed. If there wasn't enough time to react, then the theory does not apply.

Recovery may be had under the last clear chance doctrine even though the injured party was contributorily negligent. It is most frequently applicable in those situations in which the injured party is inattentive and oblivious to dangers; for example, an elderly man walking into the path of a car while reading a newspaper.

The last Clear Chance Doctrine usually requires the following elements:

- The injured person must have been in a perilous position from which he could not extricate himself.

- The wrongdoer (defendant) could have discovered the injured person's predicament exercising reasonable vigilance.

- There must have been a sufficient period of time to avoid the accident.

- There must have been a failure on the part of the wrongdoer (defendant) to act with reasonable care.

In some jurisdictions the last clear chance doctrine has been modified, and it may even have been given a different name, such as the "discovered peril" doctrine.

This doctrine has effectively been abolished in comparative negligence jurisdictions because last clear chance is by definition included within the comparative fault calculation.

**G.     Imputed Negligence**

Situations involving imputed negligence are generally decided on the basis of the agency relationship existing between the master and servant, principal and agent, owner and driver, or parent and child. For an agency relationship to exist one person must be under the authorization, instruction or command of another. The agent (or driver) must be performing some act for the principal (or owner). If it can be established that this relationship exists, then the negligent actions of the

VI-9

5-10-02

**D 000440**

Exhibit 13 Page 118

PROTECTED DOCUMENTS

agent (driver) may be imputed to the principal (owner). The agent does not have to be under the immediate control of the principal, i.e., the owner in the car when the loss occurs. If the owner was in the car, there usually is a presumption of agency, since under ordinary circumstances the owner controls how and where the vehicle is driven.

In some states the negligence of the driver is imputed to the owner by statute if the vehicle is being driven with the permission of the owner. In other states the owner is liable for the negligent operation of a motor vehicle by a member of his family. (Family Purpose Doctrine). A few states make the owner liable only if the driver is a minor. Community property statutes in some states permit the negligence of one spouse to be imputed to the other. Where there are injured passengers involved, if the purpose of the trip was to accomplish something for the benefit of an injured passenger, it may be possible to impute the negligence of the driver to the passenger, thus affording a defense to the passenger's personal injury claim. However, the negligence of a driver usually cannot be imputed to passengers. Therefore, even though the driver may have been negligent, that negligence may not afford a defense to a personal injury claim of a passenger. There are, of course, exceptions to the general rule as a result of agency relationships, the application of the family car doctrine, and other statutes, which make it possible to impute the negligence of a driver to a passenger. Questions in this area should be directed to the RLA.

**H.    Joint Enterprise**

Joint enterprise exists when two or more persons are engaged for a common purpose and have a common or equal right to control. Each is the agent of the other and is liable for the other's negligent actions.

A common example of joint enterprise is the situation where a driver and passenger are traveling in an auto for the same purpose that primarily benefits the passenger. At common law, the negligence of the driver was imputed to the passenger, so the passenger could not bring an action against the driver. Note the similarities and differences between joint enterprise, family purpose (page VI-13), and Respondeat Superior (Page VI-12).

**I.    Strict Liability**

The strict or absolute liability concept imposes liability regardless of negligence, bad faith or ignorance. It is based on the right to compensation by an injured party because another's activities were deemed to be abnormally dangerous to the public. This is not predicated on fault, but merely that the act itself was of a dangerous nature and its consequences should have been anticipated and avoided.

An example of this may be applied in those states having Dram Shop laws. These laws impose liability, in the absence of negligence, upon the seller of liquor to an intoxicated person if, as a result of the sale, the intoxicated customer injures an

VI-10

5-10-02

**D 000441**

Exhibit 13 Page 119

PROTECTED DOCUMENTS

innocent third party. Although the seller did not actively cause the injuries, his or her activities were intrinsically dangerous and he or she may be held strictly or absolutely liable. Dram Shop Acts are becoming increasingly more important as the drive to keep the drunk driver off the road intensifies.

Strict liability has some application to auto claims in some jurisdictions. For example, the "brake failure" defense is not available in Louisiana. Both owner and driver are strictly liable for damages resulting from latent brake failure.

**J.   Negligence Per Se**

Negligence per se refers to the automatic finding of negligence, due to action or omission which is in direct violation of public law, statute or municipal ordinance. Violation of public law, like speeding or double parking, is deemed a breach of public policy and the courts in some states withhold this issue from the jury. No other evidence is required to prove negligence. In other states, violation of a statute is treated only as evidence of breach of duty.

**K.   Res Ipsa Loquitur**

This Doctrine raises a rebuttable presumption that the defendant was negligent without specific evidence of negligent conduct. Literally interpreted, this Latin phrase means "the act speaks for itself."

Generally, three conditions must prevail in a "Res Ipsa" case:

- The accident must have been of a type which ordinarily does not occur without a negligent act by someone.

- The agency or instrumentality through which the injury was caused must have been within the exclusive control of the defendant.

- The injured party must not have contributed in any way to the accident.

   An example of a potential res ipsa case in the auto context is where a car leaves the roadway and strikes a tree killing both the driver and a passenger. If there are no witnesses and it can be established that there was no mechanical defect, the estate of the passenger could allege that the accident had to be the result of driver negligence because cars normally do not leave the roadway and hit a tree but for negligent operation. The doctrine only creates a presumption of negligence and can be overcome by any evidence that the accident was caused by other than driver negligence.

VI-11

5-10-02

**D 000442**

Exhibit 13 Page 120

PROTECTED DOCUMENTS

**L.   Vicarious Liability – Employer's Liability For Act of Employee**

The doctrine of "Respondeat Superior" (Let The Master Answer) operates on the
same theory as agency (see page VI-5).  The Rule is basic:  The master (employer
or principal) is responsible not only for his or her own actions, but is also
responsible for the negligent acts of the servant (agent or employee) while that
person is acting under the master's control or within the scope of the master's
directions.

Vicarious liability may be briefly defined as the imputation of responsibility for
one person's conduct to another, whose actions may in no way, be wrongful.

**M.   Bailment**

A bailment is generally an arrangement whereby personal property is given by
one person, the "bailor", to another, the "bailee", for a particular purpose with the
understanding that it is to be returned at the end of a period of time or when the
purpose has been accomplished.

If the owner of a car permits another to use his vehicle for a particular purpose,
there might be a bailment arrangement.  In the absence of statutes as a general
rule, the negligence of the bailee is not imputed to the bailor.  However, if the
driver was performing some act for the owner of the car, or was a member of the
owner's family, the negligence of the bailee might be imputed to the bailor.  In
some states, the negligence of the driver of a motor vehicle is imputed to the
owner as long as it was being operated with the permission of the owner.  In a true
bailment situation, and in the absence of a statute or relationship which permits
the imputation of negligence from the driver to the owner, even though the driver
may have been negligent, if there is also some negligence on the part of the other
driver, the owner may be able to recover for damage to his car.  The bailor may be
liable for his own negligence in entrusting the bailed object.

The relationship between the owner of the other car and his or her driver (the
bailor and the bailee) should be thoroughly investigated.  If it develops that at the
time of the accident the driver was performing an errand for the owner, or was
acting as an agent or employee of the owner, a basis may be found for imputing
the negligence of the driver to the owner.

**N.   Omnibus Clause – Owner's Liability Where Vehicle Is Operated By Another**

Applying the common law rule, the owner is not responsible for the negligent acts
of the driver when the owner has no control over the operation of the vehicle,
unless an agency relationship exists.

Exceptions to this common law rule are 1) Negligent entrustment - the owner
knowingly permits an incompetent or irresponsible person to use his or her
vehicle; and 2)  Modification by state statute.  The latter varies between states.

VI-12

5-10-02

**D 000443**

Exhibit 13 Page 121

**PROTECTED DOCUMENTS**

Some states have modified the rule by holding the owner liable for the driver's negligent acts if the driver has the owners' consent, either expressed or implied to be driving the vehicle. Other statutes place liability on the owner by implying a presumption of agency relationship or a presumption based on the mere ownership of the vehicle.

The claims person must know the laws of the territories handled, particularly the statutes governing principal-agent, master-servant, employer-employee, and owner-driver (bailor-bailee). The omnibus clause provides coverage for the owner and permissive user. The examiner should therefore consider the likelihood of other insurance in these situations. The examiner should obtain a copy of the driver's liability policy with amendments. If the driver's omnibus clause states that the policy is excess over other insurance that applies to a non-owned auto, then the owner's policy is primary (see Excess Insurance, page VI – 25).

O.   **Family Purpose Doctrine**

To hold the head of a family responsible for the use of the family car by members of the family, a fiction has been devised through which the negligence of the driver is imputed to the head of the family, even though he or she was not present. It is reasoned that the owner of the vehicle, purchased or maintained for the purposes of the entire family, is liable for the injuries inflicted by the vehicle while being used by members of the family for their own purposes. Therefore, when one of the members of the immediate family is operating the family car with the permission of the family head, this is in furtherance of the business of the head of the family and the family head becomes responsible for the negligent operation of the car. For the Family Purpose Doctrine to be applicable, the driver must be a member of the immediate family and the vehicle must be driven with the permission of the family head.

Not all jurisdictions follow the Family Purpose Doctrine.

III.   **DEFENSES TO LIABILITY**

A.   **Affirmative Defenses**

Affirmative defenses can mitigate or bar the plaintiff's recovery even where the plaintiff proves all of the elements necessary for the cause of action. They are called affirmative defenses because the defendant has an affirmative duty to raise them in its answer to the plaintiff's complaint and to prove them at trial.

B.   **Contributory Negligence**

Basic to the Common Law of tort liability is the effect of contributory negligence on the part of the injured party being held as a complete bar to his or her recovery.

VI-13

5-10-02

**D 000444**

Exhibit 13 Page 122

**PROTECTED DOCUMENTS**

\* The law has held that even the slightest act of negligence on the part of the injured party, if found to be causally connected with the injury, would rule out a recovery. This negligent act of the claimant (plaintiff) must, of course, be a proximate cause of the injury sustained; if remote, the claimant will not be held to have contributed. When speaking of the negligence involved in a percentage measurement, an act which proximately contributed only 1% (as opposed 99% on the part of the defendant) could, in theory, preclude recovery.

The allegation of contributory negligence is a complete defense to the plaintiff's allegation of negligence. Once contributory negligence is alleged and evidence submitted on the allegation, the jury (or judge in a non-jury case) as the finder of fact must decide whether or not the plaintiff did contribute to his or her own injury.

Contributory negligence, as of 2001, only exists in Alabama, Maryland, North Carolina, Virginia, and the District of Columbia. South Carolina for causes of action arising before 7/1/91.

Contributory negligence is a defense to a negligence claim. As such, it may not be a bar to claims founded on strict liability theories or to the imposition of punitive damages.

**C.    Imputed Contributory Negligence**

Contributory negligence may be imputed from one person to another where the relationship between them is such that the law makes one responsible for the negligent acts of the other. For example, if an employee is driving the employer's vehicle while on employer's business and he negligently collides with another automobile, the employer is liable for the claim since the employer has the theoretical right to control the actions of the employee. Under the Doctrine of Respondeat Superior (let the master answer), the employee's negligence is imputed to the employer (see page VI-12).

It should be emphasized that the application of the principle of imputed negligence applies only to claims asserted by or against third parties.

The defense of imputed contributory negligence maybe encountered in a number of situations, especially where the following relationships are involved: Persons engaged in a Joint Enterprise, Partnership, Child and Parent (by statute), Employer and Employee, Driver and Passenger (compare joint enterprise, page VI-10). In these situations, you should check with your RLA.

**D.    Comparative Negligence**

The theoretical arguments in favor of reducing the harshness of the contributory negligence rule have rested on two bases:

VI-14

11-15-05

**D 000445**

Exhibit 13 Page 123

**PROTECTED DOCUMENTS**

- To avoid the possibility of a capricious application of such a rule when the equities would seem to favor some recovery for an injured party.
- To avoid relieving the defendant of liability when he or she is proximately responsible for injury to the plaintiff.

This later rule means the law is turning away from its original objective of indemnifying the injured party to one of making sure that the tortfeasor pays for the wrongs committed. Carried to its logical conclusion, each tortfeasor will be required to pay for his or her own part in an occurrence; this is the <u>PURE</u> form of comparative negligence.

Comparative negligence, in this pure form, operates to award the injured party, (at least the party that has brought suit) some part of his total damages even though the injured party's negligence would be as much as 99% of the total negligent conduct of all parties. If the defendant is found to be 75%, 50% or 25% negligent, the award to the plaintiff would be 75% or 50% or 25% respectively of the total damages. Under such a rule, if both parties were injured, each could bring an action against the other and collect some part of his own damages.

Comparative negligence does not do away with the contributory aspect, but does modify its effect. Contributory negligence of the injured person, if found, is still considered and will affect the amount of damages ultimately awarded the injured party. Basically, the rule requires that the negligence of the injured party and that of the defendant or defendants be compared, and an award made accordingly.

Few states follow the "pure" form of Comparative negligence, Instead, the majority of states now use a <u>MODIFIED</u> form. Under a modified form of comparative negligence, the injured person will not be awarded a recovery when his or her negligence is "more than" that of the at-fault party, or *tortfeasor*. There are two forms of this rule: (1) the injured person is allowed a recovery only if his negligence is "less than" that of the *tortfeasor*. (2) The injured party is allowed a recovery if his negligence is equal to or less than that of the *tortfeasor*. In each case, the injured person's percentage of recovery is inversely related to his own negligence (i.e. a driver who is 40% at fault may seek an award of 60% of his damages.

The application of this doctrine usually requires either a Special Verdict or a General Verdict from the jury. Most jurisdictions applying comparative negligence utilize the Special Verdict Rule which is a three-step procedure to establish the award, if any, going to the plaintiff. First, the trier of fact must decide two questions:

- What would be the total damages if the plaintiff were completely free of negligence?

VI-15

5-10-02

**D 000446**

Exhibit 13 Page 124

**PROTECTED DOCUMENTS**

- On the basis of total negligence being 100%, to what percent did each party contribute to the injury?

The court will then, reduce the damages awarded by the percentage of negligence found attributed to the plaintiff.

In a General Verdict jurisdiction, the trier of fact need only return the damages to be awarded, and it is assumed that they have applied a similar finding of percentage and reduced the total damages by that percentage. Theoretically, both the General and Special Verdict should result in the same award. Proponents of both comparative and contributory negligence doctrines argue this point and it is felt that the precision involved in a Special Verdict will result in a more equitable award being made. It is further felt that the separate finding of damages and the percentage of negligence forces a more thorough study of the evidence and a more deliberate decision on the part of the jury.

The Special or General Verdict system, when applied to a single plaintiff and defendant is a relatively simple rule to follow and administer. When joint tortfeasors are involved, however, the interpretation of the Comparative Negligence Rule has resulted in several applications of the percentage determinations. Not only is there a problem as to what percentage should be awarded to the plaintiff, but whether all or only some of the defendants should be paying toward that amount.

This is best illustrated by a hypothetical case. Imagine the following situation: There are two defendants involved and the jury finds total damages to be $1,000. It further finds that the plaintiff is 25% negligent, defendant "A" is 25% and defendant "B" is 50% negligent. The following determinations could result.

- Defendants "A" and "B" must pay $750 (total damages minus the plaintiff's negligence of 25%) and will be held equally accountable or made to contribute according to their own degree of negligence.

- Defendant "A" is let off: his or her negligence, being equal to the plaintiff's means that he/she is relieved of responsibility. Defendant "B," however, must pay $750 since the damages will be reduced only by the plaintiff's degree of negligence.

- Defendant "A" gets off and Defendant "B" pays $500: his or her own degree of culpability less the plaintiff's 25% negligence.

Additional information on which jurisdictions apply Comparative Negligence is found in the TCM-359 series.

Note that some states follow the "not greater than rule" which means that a plaintiff can recover if his negligence is not greater than the defendants negligence.

VI-16

5-10-02

**D 000447**

Exhibit 13 Page 125

**PROTECTED DOCUMENTS**

E.  **Assumption of Risk**

In some states, assumption of risk may be used as a defense. The underlying theory is that the injured person consented (either expressly or implicitly by his conduct) to relieve the defendant from liability for the defendant's negligence. For example, if the injured person consents to ride in an automobile driven by one he knows to be intoxicated, he or she assumes the risk of the consequences, i.e., that the driver may have an accident. The following usually makes the defense of assumption of risk applicable.

1.  The injured party must have knowledge of and appreciate the risk involved.

2.  The injured party must make a voluntary choice to encounter the risk.

Assumption of Risk is a complete defense in those limited states that still follow the contributory negligence rule. In comparative negligence jurisdictions, the application has been modified and/or eliminated. The claims person should check with the RLA for its application to the case at issue.

F.  **Sudden Emergency**

Under this rule, applicable in some states, a defendant who acts negligently may not be liable for that negligence when he acts as a result of a sudden peril created by someone or something other than himself (and, in rare cases, such as illness, "by" himself).

The doctrine has three important qualifications: (1) the defense cannot be invoked by one creating the emergency except possibly a defendant's sudden illness; (2) the emergency must not have been avoidable through due care; and (3)

the emergency must be so sudden as to leave no room for deliberation or intelligent action.
Examples of sudden emergencies potentially exonerating a defendant's negligent actions might be a motorist's evasive (but negligent) maneuver following the sudden crossing over a double yellow by an oncoming vehicle and a sudden and unanticipated medical emergency leading to loss of control of a motor vehicle.

G.  **Unavoidable Accident**

This defense may be briefly summarized as follows: If a motorist has exercised the highest degree of care the circumstances require, and has nevertheless injured another, the accident is said to be unavoidable, i.e., one for which no liability will

VI-17

5-10-02

D 000448

Exhibit 13 Page 126

PROTECTED DOCUMENTS

attach. An unavoidable accident is an inevitable occurrence that is not to be foreseen and prevented by vigilance or care.

To successfully use the defense, the defendant must show that the accident happened from an unforeseen cause, or in an unexplainable manner. These are questions for the jury to decide.

An example of situations where the defense might be used include mechanical failure despite proper maintenance or a child "dart-out" where the insured is proceeding at a lawful and reasonable rate of speed, maintaining a proper lookout, and otherwise obeying the rules of the road when a child suddenly runs out from between two parked cares into the driver's path.

H.   Act of God

An act of God has been defined as any accident, misadventure, or casualty when it happens by the direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man. An act of God can, however, include the sudden illness or death of a person. For example, a heart attack suffered by a driver who does not know, and has no reason to know, he has heart trouble could constitute an act of God. Where the injury or damage occurs solely as the result of an act of God, no liability can be imposed. If human agency or negligence concurs with an act of God, however, the person injured or suffering damage may recover.

Consider, for example, an individual claiming to have been injured due to a tree falling on the car in which he was riding. If the sole cause of the tree falling was the high winds of a tornado, the act of God defense applies. However, if winds and improper maintenance of the tree by the owner combined to cause the collapse, the act of God rule is not a defense.

I.   Governmental Immunity

The field of law regarding immunity of governmental bodies is complex and full of substantive and procedural traps. Immediate consultation with defense counsel/RLA and/or Claims Home Office Legal is required.

From a contribution or subrogation standpoint, the United States Government and state governments may not be sued without their consent. The United States has set out specifically by statute (entitled the Federal Tort Claims Act), the conditions under which it has consented to be sued (see Federal Tort Claims Act, VI –23. State governments, typically, have enacted statutes analogous to the federal act, which statutes may also govern the liabilities of counties or other political subdivisions. The particular statutes applicable in each state need to be consulted.

VI-18

5-10-02

D 000449

Exhibit 13 Page 127

PROTECTED DOCUMENTS

Municipal corporations (city governments) usually may not be sued as long as the conduct giving rise to the accident is connected with a "governmental" function as opposed to a "proprietary" one. Operations of the police department, fire department, sanitary department, etc., are normally considered governmental. Therefore, a city government may not be sued for a negligent act committed by a policeman in the performance of his duties, for example.

On the other hand, functions such as the operation of gas, electric power, or water utilities are considered proprietary in nature, so a city government might be sued for a negligent act committed by an employee of the water department. Examples where state or municipal liability may lie: negligent street repairs, inadequate signs, improperly parked vehicles.

The law should be checked carefully in each case to determine the status of governmental immunity, since provisions may be made for entertaining claims even though there may be no right to sue. For example, some municipalities waive immunity and purchase liability insurance. In other instances, statutes set out the conditions under which claims will be entertained.

If you feel that we have a valid claim for contribution or subrogation, notify the municipality (as well as RLA/defense counsel and/or Claims Home Office Legal) immediately. There could be a very short period for filing claims involved and we may well miss our chance if we don't act quickly.

J.    **Intrafamily Immunity**

1.    **Husband and Wife**

The original common-law concept of the unity of marriage merged the legal existence of the wife into that of her husband. In a word, when the marriage took place, they became "one." The husband succeeded to all

the legal rights of both with the wife retaining none of them. The wife could sue or be sued only in the name of her husband, with the husband acting as her guardian. The Married Women's Acts emancipated married women from this common-law disability. They allowed them to sue or be sued in their own names, without the involvement or concurrence of the husband. The courts reexamined the question of whether or not a married woman could sue her husband in tort, and what effect, if any, the statute had with relation to the problem. The majority of the courts held that the statute did not affect the family immunity doctrine. Such doctrine constituted a bar to the maintenance of any action against the husband based on tort liability. It was pointed out that even before the married woman was emancipated from her common-law disability, the husband was under no legal disability whatsoever. The family immunity doctrine prevented him from maintaining an action against his wife based on tort liability.

VI-19

5-10-02

D 000450

Exhibit 13 Page 128

**PROTECTED DOCUMENTS**

Inter-spousal immunity has been fully abrogated for torts arising out of automobile accidents in the District of Columbia and all states except Arkansas, Georgia, Louisiana, Utah and other jurisdictions have partially abrogated the immunity to the extent liability insurance exists. Questions in this area should be directed to your RLA.

2.     **Parent and Child**

The family immunity doctrine applies to actions in tort between a parent and an un-emancipated child on the theory that the barring of such suits is necessary for the preservation of family harmony and parental authority. The rule has been applied to various family configurations: natural father and mother, stepfather or stepmother, or any other person standing in place of a parent (in loco parentis) to the child. In short, the suit between these two parties is barred, whether brought by the child against the parent or by the parent against the child.

There has been a recent trend in the law to narrow or abolish parent-child immunity. The latest decisional law or statutes should be checked for the particular jurisdiction.

Where the child has attained the age of majority or has been emancipated (released from parental authority) prior to the occurrence of the accident, the reason for the rule no longer exists. Therefore, the doctrine is not applicable, and suits by such a child or suits by a parent against such a child are permitted.

Where the child has not attained his or her majority or has not been emancipated at the time of the accident and suit is begun either by the child against the parent or by the parent against the child after the child has been emancipated or has attained his or her majority, the general rule is that such suits are not maintainable because the rights of the parties are determined as of the date of the accident, not the date suit is brought. If the plaintiff—whether the child or the parent—could not maintain the action as of the date of the accident, the subsequent change in the child's legal status does not create a cause of action where none was permitted before.

K.     **Charitable Immunity**

There is no uniform rule as to whether charitable organizations are liable for injuries caused by their members while performing the organization's work. In some states, the organizations are immune, and in some, they are not. The tide of the law is away from immunity, however, and the law in each jurisdiction must be checked. Please note, also, that while an organization may be immune, the member performing the negligent act is in all likelihood not immune.

VI-20

5-10-02

D 000451

Exhibit 13 Page 129

**PROTECTED DOCUMENTS**

L.   **Statute of Limitations**

Each state has its own statutes of limitations specifically setting out the period of time within which an action for property damage or bodily injury must be instituted.  It is in the interest of orderly society that rights of action do not survive indefinitely.  In most states the statutory period for property damage claims is different from that for bodily injury actions.

The statute of limitation usually does not run if the defendant is out of the jurisdiction or conceals himself or herself within the jurisdiction.  The statute of limitations usually does not run against insane persons and infants.  Infants have a reasonable period of time after they reach majority in which to file suit.  Majority is usually considered the age of eighteen.

Time usually begins to run when the tort is committed and ceases when suit is filed.  If suit is filed before the statute has run, but service of process is not perfected until after the running of the statute, the action is usually not barred by the statute of limitations.  Ordinarily, limitations will be the law of the forum state, but there are exceptions (e.g., wrongful death).

Generally, there is a maximum period of time during which claims against an estate must be made.  After the prescribed statutory period, claims against the estate are barred.

IV.   **JOINDER AND CONTRIBUTION**

A.   **Liquor Control Laws/Dram Shop Laws**

All states require retail vendors of alcoholic beverages (i.e., bars, taverns, restaurants, liquor stores) to be licensed as a liquor vendor and require them to follow state regulations.  The sale of alcoholic beverages to minors or to obviously intoxicated persons is prohibited by law or regulation.  A violation may subject the vendor to a fine or other penalty.  Upon violation, the question arises what liability, if any, the vendor may have to a third person who is injured in an automobile accident caused by an impaired driver.

In some jurisdictions, the vendor of liquor to an intoxicated or minor driver is liable for damage caused by the driver.  In other states the liquor vendor who sells liquor which causes the purchaser to become intoxicated is responsible for damage which results.  Many states have enacted Dram Shop Laws (also called Civil Damage acts) which specifically permit an injured person to bring an action against a supplier of intoxicants (usually, but not always limited to commercial vendors) to another person (often limited to a minor or someone obviously

VI-21

5-10-02

**D 000452**

Exhibit 13 Page 130

**PROTECTED DOCUMENTS**

intoxicated) causing that person to become intoxicated.  It is important to explore
thoroughly the possibilities of obtaining contribution from liquor vendors in those
cases in which the insured is alleged to have been intoxicated.

**B.     Social Hosts**

Some states have now found liability on hosts serving alcohol to guests who later
cause injury to themselves or others.  When a social host supplies alcoholic
beverages to a guest who becomes intoxicated thereby, the question arises
whether the social host is liable to the intoxicated person or to third persons who
may be injured as a result of the imbiber's condition.  The general rule is that a
person who supplies alcoholic beverages at a party or other gathering owes no
duty to either the guest/drinker or the public at large and is not liable for the
consequences of an accident occurring as a result of such intoxication.

This general rule has been modified in some states by statute and imposes liability
on social hosts.  Usually, these cases involve intoxicated minors, on the theory
that the social host has violated a state statute:  i.e., prohibiting the furnishing of
alcoholic beverages to minors.

Some courts have even imposed liability on social hosts for providing alcoholic
beverages to an adult guest.  Some recent cases have involved the liability of an
employer who hosts a party where alcohol is served.  In an attempt to find
liability, the plaintiff may argue that even though there is no direct liability for
providing alcohol, there may be vicarious liability for the negligence of an
intoxicated employee.

**C.     Municipality Liability**

Some states have addressed whether or not police are liable for failing to arrest
drunk drivers.  Some states have held that a municipality may be held liable for
negligent failure of its police officers to remove a motor vehicle operator from the
highway who is under the influence of alcohol and who causes injury to others.
Other states say that not making an arrest or taking a person into custody or
releasing him/her, is a judgmental or discretionary duty from which a police
officer or a municipality is immune from negligence (see Governmental
Immunity, page VI –18).

**D.     Federal Tort Claims Act (FTCA)**

The Federal Tort Claims Act provides the only mechanism for instituting a claim
against the United States Government regarding property damage or personal
injury resulting from the acts of persons acting within the course and scope of
employment or duty as an employee or agent of the federal government.  The
FTCA creates an immunity from personal liability for federal employees who
cause damage or injury while driving a vehicle within the scope of employment.

VI-22

**PROTECTED DOCUMENTS**

If an insured is sued for damages caused while operating a vehicle in the course of employment with the federal government, the suit papers should be tendered to the individual's supervisor for processing under regulations implementing the FTCA. The first step is for the government agency to determine whether the accident occurred within the scope of employment. If the agency certifies that the accident was within scope, the appropriate US Attorney's office will have the Government substituted - in for the individual and have the case removed from state court into federal court. Once this is done, the insured is out of the action.

In cases where it appears that the FTCA should protect our insured, care must be taken to monitor the situation until the governmental agency has certified scope of employment. If the agency determines that the insured was not acting within the scope of employment at the time of the accident, we must be ready to step in to take over the defense of the insured. While it is possible to litigate the issue of scope of employment, our obligation to defend our insured continues until that issue is decided against the Government.

The FTCA applies only to employees (including military service members) of the federal government. Many states have similar statutes which apply to state government employees. Care should be taken to research local law when confronted with a claim based upon conduct of a state government employee in the scope of that employment. Some states require insurers to provide minimal liability coverage for federal or state employees. Coordinate these issues with your RLA and Claims Home Office Legal.

E.   **Joint Tortfeasors Contribution**

A joint tort may be loosely considered as a situation in which the wrongful acts of two or more individuals combine to produce a single indivisible result. Persons committing wrongful acts (torts) are described as tortfeasors. An intersectional collision where two cars are exceeding the speed limit with a resulting injury to a passenger in one car might be a joint tort. At common law, if the injured party recovered from one of the wrongdoers and executed a release, he or she could not recover from the other. A release of one tortfeasor releases all. Also, at common law, if one of the tortfeasors settled the claim, he or she could not obtain contribution or indemnity from the other.

In some jurisdictions the common law rules still prevail. However, in many states an injured party can make recovery from one wrongdoer and expressly reserve his or her claim against the other. In many jurisdictions if one tortfeasor has settled a claim, he or she can enforce contribution or indemnification from the other.

Not all states are in agreement as to whether the release of one tortfeasor releases all and whether contribution between tortfeasors can be enforced. It is important to understand the applicable law in each jurisdiction.

VI-23

5-10-02

**D 000454**

Exhibit 13 Page 132

**PROTECTED DOCUMENTS**

When faced with a joint tort situation, we should, as soon as possible, put all joint tortfeasors on notice of our intent to seek contribution from them. We should attempt to reach agreement with the insurers of the joint tortfeasors concerning the proper apportionment of liability among all tortfeasors. In defending cases involving joint tortfeasors, we should attempt to reach cost-sharing agreements where appropriate.

F.   **Joint and Several Liability**

The concept of joint and several liability concerns the obligation of one joint tortfeasor to pay the entire judgment even if it exceeds that tortfeasor's proportionate share of liability. At common law, any joint tortfeasor is jointly liable for the entire judgment without a direct right to seek contribution from other joint tortfeasors. For example, if one joint tortfeasor is 25% at fault for an accident and another joint tortfeasor is 75% at fault, the injured party may seek 100% of his/her damages from either one.

The common law in this regard has been changed in many jurisdictions largely as a result of a shift from contributory negligence to comparative negligence. Some states allow a joint tortfeasor to join other tortfeasors in any lawsuit by seeking contribution and/or indemnification from the other tortfeasors for any joint liability imposed upon the tortfeasor initially sued. Other states have done away with joint liability altogether by providing that each joint tortfeasor is liable only to the extent of his/her individual liability. Some states have limited the scope of joint and several liability for non-economic damages (see Damages, Page VI-26).

The claims handler must be aware of the rules regarding joint and several liability in the jurisdiction in hand. Where joint and several liability persists, care must be taken to avoid undervaluing a claim where there is an uninsured or otherwise judgment proof co-defendant. In such situations, the fact that the GEICO insured bears only a small portion of the liability in comparison to the co-defendant will not in reality reduce the exposure of the insured to the full value of the claim.

G.   **Contribution and Indemnity**

The legal terms "contribution" and "indemnity" are often used in tandem to express a single concept. However, the terms have distinct meanings. Indemnity refers to the duty to bear the financial consequences of the civil liability of another as determined by contract of indemnification in that the insurer agrees to bear the financial consequences—within limits—of the tort liability of the insured.

Contribution is a concept based upon equity whereby a joint tortfeasor who is liable for tort damages under theories of joint and several liability may seek contribution to that liability from other joint tortfeasors according to their proportionate liability. Many states have statutes which specifically provide for actions for "indemnity and contribution" to bring unnamed joint tortfeasors into a litigation. The use of the term "indemnity" in this context is largely misleading as

VI-24

5-10-02

D 000455

Exhibit 13 Page 133

PROTECTED DOCUMENTS

there is no contract involved in the obligation of the joint tortfeasor to contribute to the judgment.

Louisiana and Wisconsin allow an injured person to bring a direct action for damages against the insurer of the tortfeasor. This is a tort action based upon the duty of indemnification the insurer bears to its insured.

**H.**    **Worker's Compensation Exclusion/Family Auto Policy**

This exclusion, when it appears in the "Liability Coverages" section of some automobile policies, reads as follows:
**"When Section I does not apply**

> 6.  Bodily Injury to an employee of an insured arising out of and in the course of employment by an insured is not covered. However, bodily injury of a domestic employee of the insured is covered unless benefits are payable or are required to be provided under a Workers' or Workmen's Compensation Law."

What is the significance of this exclusion in addition to the employee exclusion? It specifies that any obligation imposed upon the employer by workers' compensation and similar laws is not covered under the liability policy.

Remember that the employee exclusion makes the policy inapplicable to claims by an employee against the employer for injuries arising in the course of employment.

**I.**    **Excess Insurance**

The problem of excess insurance arises in three common situations: 1) the driver (or owner) has an umbrella liability policy; 2) the driver and owner are both liable (see Omnibus Clause, page VI-13); 3) an employee driver and employer are both liable (see Agency, page VI-5 and Vicarious Liability, page VI –12). The important thing to realize is that the excess carrier usually has no duty to defend or indemnify unless the primary policy is exhausted or the coverage is inapplicable. The primary carrier owes certain duties of good faith toward the excess carrier. In this situation, the examiner should contact the RLA or Claims Home Office Legal for guidance.

**V.**    **DAMAGES**

Damages should not be confused with "injury" discussed above. We usually distinguish between legal damages (money) and equitable remedies (orders). Elements of damage in the typical bodily injury case consists of medical costs and lost wages (specials), disability, and pain and suffering. At common law, a claim for personal injury was extinguished by death of the victim. Every state has a wrongful death statute and a

VI-25

5-10-02

D 000456

Exhibit 13 Page 134

**PROTECTED DOCUMENTS**

survival statute which means that some or all of the decedent's damages survive death (see below).

A.    **Survival Statutes**

These apply where the deceased lived for a period after the accident. It must be shown that there was conscious pain and suffering. If the deceased would have had a cause of action against the person whose wrongful act caused his or her injury, the claim survives and passes onto the parties within the degree of kinship specified by statute. Such a claim is no better than it would have been had the deceased lived and the defendant has the same defenses he would have had if the decedent had lived.

The elements of damages in an action under a survival statute are about the same as in the personal injury action, except that usually nothing should be awarded for loss of income or medical expenses beyond those incurred at the time of death. Remember, the damages recoverable under survival of actions are distinct from wrongful death damages.

B.    **Wrongful Death Statutes**

This statute creates a new cause of action on behalf of persons within the degree of kinship specified by the statute. The purpose is to compensate them for the loss (usually financial loss) of a husband, father or other close relative. Only the specified individuals may bring suit.

There are two types of wrongful death statutes: some states follow the "estate" rule and others apply the "beneficiary" rule. Under a typical "estate" rule, specials survive as well as the present value of decedent's earnings reduced for consumption and taxes, and heirs take according to the intestacy statute. Under a typical "beneficiary" rule, immediate family members may assert claims for lost support, services, and consortium (care, guidance, affection). Within the past few decades, there has been a slow trend to apply "beneficiary" damages to injury claims as well as death claims. It should also be noted that a growing number of states recognize a viable fetus as a person in death cases. In medical malpractice, the cause of action of "wrongful birth" is well established, which means that a child may recover for injuries incurred pre-partum. In theory, the same cause of action could apply in auto collisions. A few states recognize "loss of enjoyment of life", or hedonic damages, in addition to those listed earlier. Tort reform is an important trend in the law of damages. The main thrust of tort reform is to put a cap on non-economic damages (pain and suffering, consortium, loss of enjoyment of life).

To evaluate a claim under a wrongful death statute, determine the age, occupation, income, education and social status of the deceased. These are clues to his or her probable future earning capacity. If the deceased was a child, consider the education, occupation and social status of the parents and other

VI-26

5-10-02

D 000457

Exhibit 13 Page 135

**PROTECTED DOCUMENTS**

relatives as an indication of what the deceased might have done had he or she lived. If the deceased was a school child, school records and teacher's opinion as to the probable future of the child should also be investigated. The martial status of the deceased and the number of dependents must be checked, each dependent identified and his or her relationship to the deceased defined. For example, it would make quite a difference in value if the deceased and his wife had not lived together for several years.

The probable life expectancy and work expectancy of the deceased should be determined. For instance, a 60-year old male laborer might have had a life expectancy of fifteen years, but it is unlikely that his work expectancy would be more than half of that, and this would have a bearing on his probable future earnings had he lived.

Funeral expenses are normally recoverable under wrongful death statutes.

Survival acts and wrongful death statutes are usually combined into one statutory scheme which specifies who the beneficiaries are, who must bring suit, any maximum amount recoverable, the measure of damages, the period of time during which suit must be filed, and other pertinent information.

The applicable death statute is always the statute of the state where the accident occurred. Summary and tabular information is in both the <u>Insurance Bar</u> and <u>Best's Recommended Insurance Attorneys</u>. The Company library may also be used. If there is a question about a statute, an opinion should be obtained from the Regional Liability Administrator or Claims Home Office Legal.

VI-27

5-10-02

**D 000458**

Exhibit 13 Page 136

PROTECTED DOCUMENTS

# CHAPTER VII

## LEGAL DAMAGES - BODILY INJURY AND PROPERTY DAMAGE

I.    **COMPENSATORY DAMAGES**

Compensatory damages are the amount that the plaintiff can recover for his injuries or loss sustained as a natural and probable consequence of the defendant's wrongful act. They are the major concern of the claims technician because recovery of such damages is sought in all claims.  There are two types of compensatory damages, general damages and special damages.

A.    **General Damages**

General damages are those that usually or necessarily result from the wrongful act alleged to be the basis of the claim.  It is unnecessary to mention them specifically in the pleadings since they are covered by general allegations.

For example, if the complaint alleges that two cars collided, it is unnecessary specifically to allege that there was property damage because such damage necessarily follows the impact of two cars.  Also, if it is alleged that the plaintiff sustained injury, he or she needs not plead specifically that there was pain and suffering since, if injury was sustained, pain and suffering is a usual or necessary consequence.

B.    **Special Damages**

Special damages must be pleaded specifically because they do not necessarily follow as a result of the wrongful conduct alleged.  They must be developed in detail since they have an important bearing on the evaluation of a claim.

*    Special damages include such things as loss of earnings, medical expenses, anticipated loss of earnings or earning capacity, anticipated future medical expenses, loss of services of a child or spouse, funeral expenses, loss of support in death cases and loss of use in property damage claims.

II.    **PUNITIVE DAMAGES**

Punitive damages are intended not to compensate, but to punish.  They are awarded in cases of outrageous conduct, and the amount is in relation to the financial condition of the defendant. In a proper punitive damage case, the award against a rich person would be larger than one against a poor one.

VII - I

Exhibit 13 Page 137

**PROTECTED DOCUMENTS**

In most jurisdictions punitive damages cannot be awarded unless there is evidence of malice, ill will, or conscious disregard of the safety of others. Not all states are in agreement as to the conduct necessary to establish punitive damages. The claims person must know the law of the particular state.

Whenever there is a request for punitive damages in a suit against an insured, they must be notified that liability is specifically denied for punitive damages. This will be done in the letter we send to the insured acknowledging we received the suit papers they forwarded to us unless the particular state says that punitive damages are covered.

III.   **RULE OF CERTAINTY**

The rule of certainty requires that the plaintiff establish his or her damages, without recourse to speculation or conjecture. The plaintiff must offer evidence as to exactly what damages he or she is claiming, the relationship of the damages to the injury, as well as the provable amount of each item so claimed. As to claims for injuries, the effects of which will continue beyond the date of trial, it is clear that the plaintiff cannot establish these damages with certainty until the losses have been incurred. In those cases, the rule of certainty is satisfied if the plaintiff can establish with a reasonable degree of certainty that the future losses will be sustained.

The plaintiff encounters difficulty where injuries are complicated by the existence of a pre-existing condition or where he or she has been the victim of more than one accident, all of which contribute to a disabling condition. He or she will be required to separate the effects of the pre-existing condition, or prior injuries, from the injuries for which claim is being made. Plaintiff will satisfy the rule of certainty if he or she can establish, by a preponderance of the evidence, the extent to which the condition is reasonably attributed to the loss. In other words, where there are such complications, the plaintiff must show the entire injury, and also must establish what portion of the injury he or she claims to be caused by the accident that is the subject matter of the suit.

The rule of certainty also applies to a situation where the plaintiff claims, as an item of damage, the value of a lost opportunity, such as an opportunity of employment or contract. The plaintiff must establish that the opportunity existed and that his or her injured condition was such that he or she could not take advantage of it. In addition, and more importantly, plaintiff must show that he or she would have profited by the acceptance of it, and also the exact extent of the profit. Speculative testimony as to the possibilities of profit will not be sufficient to meet the legal requirements of certainty of proof. In other cases, where the plaintiff's income is derived from a business in which he or she has a monetary investment and he or she claims a loss of salary as a result of a disabling condition, plaintiff will be required to establish the amount of income which is derived from his or her services, as opposed to that portion which represents a return on his or her investment.

VII-2

5-10-02

**D 000460**

Exhibit 13 Page 138

**PROTECTED DOCUMENTS**

IV.   **COLLATERAL SOURCE RULE**

The rule is that the tortfeasor is answerable in damages for the results of his or her wrongful act. Where, as a consequence of the injuries received, the plaintiff is entitled to (or receives) benefits from a source other than the tortfeasor (collateral or side source), the general rule is that the tortfeasor is not entitled to a credit for these benefits as against the total damages for which he or she is liable.

The most common example of this situation is a case in which the employer continues the payment of salary or wages to the injured person during the period of his disability. Such payments do not represent earned income, regardless of whether they are made solely as a gift or in accordance with some contractual obligation assumed in the injured's employment contract. In either case, the payments come from a source other than the wrongdoer and, as a consequence, the wrongdoer is not entitled to a credit for them. The same conclusion would apply to benefits received by the injured party as a result of medical, health, or accident insurance, which the injured party purchased for his or her own benefit. Such insurance benefits could include Blue Cross, Blue Shield, major medical, as well as various accident and health plans.

The practical effect of the application of the collateral source rule is that the injured person may claim the same items of damage, for which he or she has received compensation at least once, from the defendant tortfeasor and, thus, be paid again for the same damage.

> **Comment**
>
> Keep in mind that in jurisdictions that have adopted a no-fault statute or in which disposition of a claim or suit is regulated by application of such a statute; the claims person must look to the specific language of the statute to determine its effect on the collateral source rule. The applicable "tort threshold" must be met before the collateral source rule comes into play.

V.   **ADDITUR AND REMITTITUR**

The general rule is that the issue of the amount of damages is a question of fact to be decided by the jury. The court in a jury trial will not interfere or set aside a verdict rendered by the jury unless it is convinced that the verdict is against the weight of evidence or that the verdict is so high, or so low, as to "shock the conscience of the court". While the court may set aside a verdict on its own motion, the matter of the excessiveness or the inadequacy of the verdict is usually brought before the court by means of a motion brought by the aggrieved party for a new trial.

In an effort to reduce litigation and encourage settlement of disputed matters, in some states and on some occasions, the court will recommend either an increase or a decrease in the amount of the verdict. If the court's recommendation is acceptable to the parties, it will enter a verdict by consent and will deny the motion for a new trial.

VII-3

5-10-02

**D 000461**

Exhibit 13 Page 139

PROTECTED DOCUMENTS

For example, if the verdict for the plaintiff was $1,000.00 and a motion to set aside the verdict as inadequate was made, the court might consider the amount of the special damages and decide that a fair valuation of the case was $2,500.00. The court could suggest that the defendant accept an additur of $1,500.00. If this is agreeable to the defendant, the court will deny the motion for a new trial and enter a judgment in the amount of $2,500.00.

The converse is the procedure where the verdict is excessive. If the court believes that the verdict is excessive, it might suggest that the plaintiff accept a reduction in the amount (a remittitur). If this is acceptable to the plaintiff, the court will deny the motion for a new trial and will enter judgment for the reduced amount, assuming that the defendant also agrees.

## VI.  WHAT IS PROPERTY DAMAGE?

The measure of damages in most jurisdictions in automobile property damage liability claims is the difference in the condition of a car before and after an accident. Usually the best evidence of this is the cost of repair as shown by competitive repair estimates.

After repairs, there should be no diminution in value simply because a car has been involved in an accident. There is a presumption that proper repair will restore it to its condition prior to the accident with no loss in value. Some states permit "diminution of value" claims for damaged vehicles, that is, even though the car was properly repaired, it is not worth now what it was worth before.

Property damage liability claims are evaluated on the basis of the liability picture and the reasonable amount of the damage. Usually there are three elements of damage:

- Damage to the Car
- Loss of use
- Damage to other personal property

### A.  Damage to the Car

The amount of damage to the car is sometimes determined by obtaining competitive repair estimates. If repair estimates are complete and they are obtained from reputable and competent garages, the reasonable amount of the damage is the repair cost as indicated by the low estimate. Your Auto Damage Department can help you determine the reasonableness of competitive estimates. In most instances, however, a Company-employed Auto Damage Adjuster or an independent appraiser will inspect the vehicle and make this determination.

We should make proper deductions for betterment of such things as tires, batteries, seat covers, convertible tops and complete paint jobs. The Auto Damage Department has lists of depreciation schedules in the AD Adjuster Handbook.

VII-4

5-10-02

**D 000462**

Exhibit 13 Page 140

**PROTECTED DOCUMENTS**

If the reasonable cost of repair exceeds the value of the vehicle just prior to the accident minus the salvage value, the method of computing the damage changes. The vehicle is then regarded as a total loss and settlement should be based on the value just before the accident. This value is frequently called the "actual cash value". The Auto Damage Department will handle these total losses.

**B.**   **Loss of Use**

The courts are not in agreement as to when and under what circumstances a plaintiff is entitled to recover for loss of use. Most courts will allow a recovery for the period of time reasonably required to make repairs. Some courts have ruled that loss-of-use payments should start on the date of loss and continue until the car is returned to use. Check the laws and rulings in your area.

Handling these claims should be a coordinated effort between the claims technician and Auto Damage. The date that repairs are to be completed is critical and should be firmly established. If the vehicle is a total loss, reasonable time to find another vehicle should be allowed. In many states, no loss of use is allowed after the settlement of the total loss claim.

A special problem exists where the claimant demands assurance that the loss-of-use claim will be honored before we have enough information to make such a decision. The requirements for loss-of-use can be discussed but be sure to stress that the claimant must assume responsibility for all expenses incurred until we have determined liability.

As soon as you determine liability, let the claimant know. Refer him or her to several rental agencies if no other arrangements can be made. Remind the claimant that damages must be mitigated. Suggest the availability of another vehicle or public transportation, or a car pool, or taxi fares. (But remember that in many instances a daily car rental rate will be less than a day's taxi fares.) Remind the claimant that we will pay only what it costs the claimant over and above normal operating costs for his own vehicle. Mileage charges will usually not be reimbursable, gas expenses will not be paid, and no special charges for insurance will be included if physical damage coverage is applicable to the claimant's car. If the claimant doesn't carry Comprehensive or Collision on his car and the rental company requires that he pay the fee, we owe it.

The claimant is entitled to the same type of transportation he had. If claimant is driving a Cadillac and requests permission to rent a similar vehicle, he or she should be permitted to rent one. If a VW was damaged, we won't reimburse for renting a Cadillac. State and/or regional variances should be observed.

VII - 5

5-26-11
**D 000463**

Exhibit 13 Page 141

PROTECTED DOCUMENTS

Parts delays, particularly for older or foreign vehicles, may present a problem.
The Company usually cannot be held responsible for undue delays because parts
are not available, but some states say we must cover reasonable parts delay. We
may want to consider special delivery order for parts and a non-driveable car can
sometimes have temporary repairs done which would alleviate the need for a
rental. Again, you must work closely with the Auto Damage adjuster.

C.   Damage to Other Personal Property

Other items of personal property included in property damage claims are
appraised on the basis of value at the time of the accident. In many instances it
may be necessary to determine the replacement cost and make a deduction for
depreciation based on age and condition. Good judgment should be used in
computing depreciation. If it is practical to get competitive estimates, it is well to
do so.

As with personal injury claims, the liability picture in property damage claims must be
carefully analyzed since, if liability is questionable, a compromise settlement may be in
order. If it appears that the claimant might be able to recover, but there is just about as
good a chance of successfully defending the claim, we should try to reach a fair and
equitable compromise settlement. On the other hand, a firm position should be taken
where it appears there is no liability.

VII.   PHYSICAL AND MENTAL DISTRESS

This is an item of general damages the value of which is not subject to direct or certain
proof. It is sometimes referred to as "pain and suffering", "discomfort" or
"inconvenience", depending upon the degree of pain accompanying and following the
injury. It is a non-pecuniary loss in the sense that the injured person has not sustained
any monetary deprivation because of it. It is, however, compensatory, since it is designed
to reimburse (or pay) the plaintiff for the pain, which he or she has suffered. Distress of
this nature has no exchange value in the market, nor is there any guide or standard by
which the money value of it can be measured. The value of such distress is a question of
fact, which is submitted to the jury, under appropriate instructions from the court. The
jury, therefore, is the final arbiter of the valuation of this item of damage. In some states,
there is a limit on the amount of money that can be recovered for these damages.

In coming to their conclusions, the jurors usually will hear a description of the injury, the
pain that has been experienced, and the extent of the distress from the injured party. He
or she will usually be supported by the testimony of the physician, family members, the
hospital records, pictures of the injured person following the accident and, in some rare
cases, videotape of the operation to which the injured person was subjected.

The injured party is entitled to compensation for the physical or mental distress, which he
or she has experienced. Where the distress continues beyond the date of trial, the

VII-6

5-10-02

D 000464

Exhibit 13 Page 142

PROTECTED DOCUMENTS

plaintiff is entitled to recover for future distress, upon a showing by medical testimony that the distress will continue and for what period of time it would be expected to continue. This will include whether the distress will abate in intensity, remain constant, or increase in intensity with the passage of time.

## VIII.   EFFECT OF A PRE-EXISTING DISABILITY

The innocent victim of a tortious act is entitled to receive an award of money which will reasonably compensate him or her for the injuries suffered. The innocent victim may be young or old, suffering from a disability or disease, or in perfect health. The tortfeasor is responsible for the damages that are caused by his or her tortious act, regardless of the physical condition of the victim prior to the accident. The fact that a person may be in perfect health and would have sustained little disability is not taken into account in reducing the tortfeasor's liability where, by reason of age or existing illness, the victim is subjected to an extended period of medical treatment and disability.

Where the injured person's disability is extended because of a pre-existing condition, be it due to age, prior permanent injuries sustained or an existing illness, the jury's task in determining the amount of the injured person's damages is based on the recovery process for the injuries sustained in the accident. The amount awarded will reflect the damages actually sustained, without regard to the part played by the prior condition in extending the disability. Where the prior condition has been aggravated by accident, when the aggravation has ceased, the liability of the defendant is at an end.

Where there is a prior condition and the injuries sustained in the accident have no relationship to the prior condition (and can be entirely disassociated from it), the liability of the defendant is limited to the effects of the injury caused by the accident. However, a far more serious problem arises when the injuries for which the defendant is responsible, when superimposed upon the pre-existing condition, produce a greater disability than would ordinarily be the case if the injured party had not had the pre-existing condition. Unless the defendant can disassociate the two conditions, he or she will be held responsible for the entire result. For example, A is blind in one eye. Through the negligence of B, A loses the sight of his good eye and is now completely blind. B is answerable for A's blindness. The extent of his liability is not mitigated by the fact that A's prior condition contributed to the final result. Absent the accident, A would not have been blind. Therefore, the accident is the proximate cause of A's blindness and B is answerable in damages.

## IX.   LOSS OF CONSORTIUM

At common law, the relationship of the wife to her husband was that of a very superior servant to the master. Any tortious act of a third person (including personal injury) that interfered with the relationship and deprived the master (husband) of the services to

VII-7

5-10-02

D 000465

Exhibit 13 Page 143

**PROTECTED DOCUMENTS**

which he was entitled gave rise to a cause of action by the master (husband) against the wrongdoer for the damages that he sustained as a consequence of the loss of such services. It should be pointed out that this was an independent cause of action, which accrued to the husband because of the damages, which he himself had suffered, and for which only he could recover.  Under our present statutes, the wife may recover for her personal injuries, but the settlement or judgment recovered by the wife will not extinguish the husband's cause of action for loss of services.  The death of the wife will not abate the husband's cause of action, but it will limit his recovery to the damages, which he has sustained up to the time of her death.  In the case of divorce or separation after the tort has been committed, the husband's right to the services of his wife would be limited to the period of time measured from the date of the accident up until the date of the divorce or separation.  The modern state of the law permits a wife to bring an action for the loss of her husband's consortium.

Consortium consists of sex, society, and services.  Any injury to one spouse, which deprives the other spouse of one or more of these elements, will support the non-injured spouse's cause of action.

"Sex" refers to sexual congress and the amount to be awarded is left to the jury, under instruction from the court.  The jury may take into consideration the age and physical capacity of both husband and wife in determining the amount to be awarded.

"Society" refers to companionship.  Again, there is no market or exchange value.  The jury will decide its value.  They may take into account the condition of the home life of the spouses prior to the injury and the changes that have occurred as a result of the injury. If there were no home life to speak of, then there would be at the most a minimal loss. This might be evidenced by the fact that the wife or husband spent very little time at home, consorted with other men or women, and generally neglected her/his marital duties.  In such a case, the companionship lost by the husband/wife would be practically nil.

"Services" refers to the injured spouse's domestic services.  This loss could be demonstrated by the employment of a housekeeper, gardener or babysitter to accomplish the tasks normally undertaken by the injured spouse.  The cost of such a substitute would be the measure of damages.  As to services rendered to others, as where the injured spouse is gainfully employed, the non-injured spouse has no interest.  The injured spouse's earnings are his/her own and, therefore, any loss of earning capacity which he/she might sustain must be recovered in his or her own action.

As part of the marital obligation, one spouse is responsible for the medical and other care needed by the other spouse.  In personal injury cases, where one spouse is injured, this obligation continues.  Therefore, the non-injured spouse has a cause of action against the tortfeasor for the money expended for the care of the injured spouse.  This item of damage is in addition to the claim for loss of consortium.

VII-8

5-10-02

**D 000466**

Exhibit 13 Page 144

PROTECTED DOCUMENTS

X.   **EFFECT OF DIVORCE OR SEPARATION**

A final decree of divorce terminates the marriage as of the date of the final decree.  A divorced husband or wife has no further right to consortium or the services of his or her divorced wife or husband.  Where the spouse is divorced prior to injury, no right of action accrues to the ex-spouse for loss of services or for the recovery of her or his medical expenses, even though the alimony decree obligates him or her to pay for her/his medical services.  As to the children, the parent having custody is the parent who has the right to their services and, therefore, only that parent can assert a cause of action for the loss of such services.

Where the divorce occurs after the injury, the spouse is entitled to maintain a cause of action for loss of consortium and the medical expenses incurred by him or her up to the date of the divorce, but not thereafter.  If they were separated prior to divorce, either by agreement or court decree, the spouse's right to consortium ended as of the date of separation.

Where there has not been a divorce and the husband and wife are living apart, either under a mutual agreement of separation or a court decree, the spouse is not entitled to the services of the other spouse.  In the case of injury to the spouse under these circumstances, the uninjured spouse has sustained no damage and therefore does not have an actionable claim.

XI.   **FORMULA METHODS OF EVALUATION**

Special damages are susceptible to direct and certain proof. Evidence can be offered in the form of the expenses incurred by the plaintiff that he or she otherwise would not have had to assume, but for the occurrence of the defendant's tortious act.  Such evidence can take the form of documents, such as hospital records, physicians and surgeon's bills, receipts from physiotherapists, nurses, as well as paid bills for appliances, prostheses, medicines and drugs.  The necessity for these charges can be supported by the testimony of the attending physician or surgeon, who can also testify as to the reasonableness of the charges.  Employee records, books of account, income tax withheld and paid, and social security taxes paid can support loss of earnings.  Thus, no problems of proof are encountered when it comes to establishing the items of the special damages claimed - particularly when the individual is employed on a regular salary basis. Note, however, that a claim for lost wages must satisfy the rule of certainty, discussed previously.

The assessment of general damages poses an entirely different problem.  The law recognizes or implies that the plaintiff has suffered some damage as a consequence of the distress that he or she has been forced to undergo as a result of the tortious act of the defendant.  The law takes the further position that it is the function of the jury to determine the dollar amount, which will reasonably compensate the plaintiff for this damage.  The jury is entitled to hear a description of the kind and type of distress suffered (whether it is mental or physical), as well as whether it involves pain and suffering, discomfort, or mere inconvenience.  The plaintiff and the physician or surgeon can testify

VII-9

5-10-02

**D 000467**

Exhibit 13 Page 145

**PROTECTED DOCUMENTS**

as to the nature, intensity and duration of the distress.   In the final analysis, however, it is the jury's duty to translate these facts into dollars, and to award the plaintiff whatever amount they believe will reasonably compensate him or her for the damage suffered. Unfortunately, the individual juror has no expertise or experience in these matters, nor is he or she given any criteria to guide this decision, except that the juror is to award "reasonable compensation".   Clearly, the jury's reaction to the value of this item will vary not only in different areas of the country, but also in the same area, with one jury being more liberal or more conservative than the next.

The problem, which confronts the claims person and the lawyer, is the determination of what constitutes reasonable compensation for general damages.  This is important not only for settlement purposes, but also to indicate whether a particular verdict is excessive enough to warrant an appeal.  Likewise, the court, when hearing a motion for a new trial based upon the excessiveness of the verdict must make a decision either granting or denying the motion.  Thus, the court must apply some criteria to the verdict, in order to come to such a decision.

For many years, some lawyers developed and utilized various formulas for the purpose of determining value in areas other than bodily injury claims.  These include the value of alimony paid in a lump sum before issuance of a divorce decree and the value of property condemned for public use.  It seemed to be a natural solution for the legal profession to turn to the use of formula for the purpose of determining the amount of general damages. Three such formulas are:

1. Three Times the Medical Formula
2. Unit of Time Formula
3. Three Values Formula

GEICO uses no such formulae in arriving at fair settlement value.

All these formulae are based upon assumptions, which have no basis either in fact or in law.  The vast majority of courts do not accept such formulae.  The claims person should evaluate each case on its own merit.

## XII.  PERMANENCY DETERMINATION

Permanent disability may be defined as a disabling condition, which will not improve with the passage of time.   It will either remain stationary or deteriorate as time goes on. If there is evidence that the condition will be subject to further improvement, it has not as yet reached the permanent stage.  If the condition improves to the extent of a full recovery, then there is no permanent disability involved in the case.  On the other hand, if the condition will improve, but such improvement will not result in a full recovery, then the improved condition, when it reaches a stationary stage is the permanent condition and can be measured and evaluated as of that time.  In the case of a suit for bodily injury, the plaintiff is not required to wait until the injury reaches a permanent state before he or she can bring an action.  The amount of improvement, if any, which can

VII-10

5-10-02

**D 000468**

Exhibit 13 Page 146

**PROTECTED DOCUMENTS**

be expected, can be established by medical evidence. This can be offered as a prognosis as to the time the condition will reach a permanent state and the extent of residual disability that will be present at that time.

Cases involving permanent disability may be divided into two classes:

1. Those which involve only minor disabilities, such as restrictions of motion of a finger or a toe joint, or minor amputations, such as the removal of a phalanx of a finger or toe (neither of which have an effect on the plaintiff's earning capacity).

2. Those involving a major disability, such as restrictions of motion in a hip joint, complete immobilization of a knee joint, amputations of major members (such as a hand, foot, arm or leg), the loss of sight in an eye or loss of hearing in both ears.

All of this affects not only the claimant's earning capacity, but also his future enjoyment of life. As to both classes of cases, the jury will decide the amount that will reasonably compensate the injured person for his or her injury. In the first class, they will determine what the permanency is worth, having in mind their own experience, and the extent to which they are convinced that the injury will inconvenience the injured person. They will hear evidence from the claimant as to how the injury affects him or her, and what he or she can do and cannot do because of the condition. They will also hear the testimony of the attending physician as to his appraisal of the permanency, and what it means to the injured person. On the basis of this evidence, the jury will render its verdict. In the second class of cases (involving major permanent disabilities), the plaintiff is entitled to assist the jury in its determination by offering evidence in the form of recognized expectancy tables. These set forth the number of years the injured person would normally be expected to live or the number of years that he or she normally would be expected to have an earning capacity. They are called mortality tables and work life expectancy tables respectively. Since there is no way of predicting with certainty how long a man or woman may live, or how long he or she would be able to continue working, evidence in the form of these tables shows the average expectancy of a large number of persons. Such evidence is admissible for the purpose of assisting the jury in arriving at its verdict but the jury is not bound by it. The general rule is that in the absence of other evidence on the same subject, the jury usually accepts the tabular values.

With respect to permanent disability cases, there are usually three measurements that must be made:

1. The value of the medical attention that the injured person may have for the rest of his or her life, or for the period of time that it would be necessary.

2. The value of the impairment to his or her enjoyment of life.

3. The value of loss of earning capacity.

The first two items will be measured by the injured person's life expectancy, since the impairment will continue for the rest of his or her life, regardless of earning capacity. As

VII-11

5-10-02

**D 000469**

Exhibit 13 Page 147

**PROTECTED DOCUMENTS**

to the loss of earning capacity, this would be measured by the period of time that an average person would be able to continue working. The average person does not work up until the day he or she dies. The average person usually retires at some date, or reaches a point in life when she or he can no longer physically carry on with work. Thus, when it comes to the measurement of the loss of earning capacity this can only be computed with reference to a table, based upon the average period of time that a person would be able to work. The injured person's life expectancy would obviously exceed his work life expectancy.

The claims person should ascertain which table(s) are currently accepted and used in his or her own jurisdiction.

### XIII. WORK LIFE EXPECTANCY

The average person may be prevented from pursuing his or her usual work occupation because of the infirmities of age, retirement (either mandatory or voluntary), or other contingencies. Where it is necessary to measure the work-life of an individual who has suffered permanent disability or death, it is clear that the period of his future life that could be devoted to work is considerably less than the same person's life expectancy. There are standardized tables in this area.

Some courts calculate the work-life of the plaintiff by using a life expectancy table together with the retirement age established by his employer. The claims person should be aware of the procedure used in his or her jurisdiction.

### XIV. ANNUITY TABLES / STRUCTURED SETTLEMENTS

Annuities are an outgrowth of mortality tables. An annuity is an income payable for a specific number of years. The person on whose life the income is based is generally known as the annuitant. The income may be paid once, twice, four or twelve times yearly to the annuitant or to a third party owner. Annuities differ from one another primarily in two respects:

1.     The number of persons to whom the income is paid.

2.     The method of handling any money remaining at the death of the annuitant.

Various annuity plans are utilized by insurance companies as settlement options in the disposition of bodily injury claims. The insurance company will pay or the annuity and the income from the annuity will be periodically paid to the claimant or, in some plans, to his beneficiary.  Many courts favor the use of annuities especially in the settlement of a minor child's claim where the parents are not financially responsible. Two popular forms of annuities are:

1.     A single premium immediate annuity. This is a life income purchased by payment of a cash sum and the "pay-out" to the annuitant begins immediately.

VII-12

5-10-02

**D 000470**

Exhibit 13 Page 148

**PROTECTED DOCUMENTS**

2.  Single premium deferred annuity. This is similar to a paid up reduced pension income endowment policy except that no life insurance is provided.

Both of these plans have many variations or settlement options.

In applicable cases, the claims technician should check with his or her supervisor or manager as to whether the annuity approach would be desirable or if there are other alternate settlement options.

**A.  Estimated Range of Verdict**

Exercise your judgment based on similar claims and estimate a probable range of verdict should the case be litigated. Most cases should be settled early and without litigation before the range of verdict can be accurately estimated. Even then, enough should be known to enable the claims person to decide whether the settlement figure is well within the probable judgment value.

However, in cases that are difficult to settle, it is necessary to make a detailed analysis in order to estimate the range of verdict as accurately as possible. The viewpoint of the Company's trial attorney must be obtained because of his or her experience and appreciation of local conditions. The weight given his or her opinion depends on prior experience with the particular attorney, the Company's confidence in him or her, and the claims person's judgment.

**B.  Probable Cost of Handling, Including Investigation and Defense**

The probable cost of future investigation and litigation should be estimated. There are cases where there is no liability and it would be detrimental to the best interests of the insured or the Company to make any settlement. The cost of defense should be considered along with all the other elements of evaluation.

**XV.  SURVIVAL ACTIONS**

The common law rule was that the death of either party to the action ended the litigation. Legislation has modified the rule so that, at present time, the death of either party does not end the action. It can be continued, for or against the deceased party, by the substitution of a personal representative (administrator or executor). This type of action is referred to as a survival action, since it survives the death of either party. Where the defendant dies, the action is merely brought against his or her personal representative. If the action is pending at the time of death, the personal representative is substituted as the defendant. There are not other limitations or changes. The action is tried and the damages awarded (if there is liability) in the same manner and to the same extent as if the defendant were alive.

Where the injured person dies, whether as a result of the accident or from other causes, whatever causes of action he or she may have had during a lifetime against the tortfeasor

VII-13

5-10-02

**D 000471**

Exhibit 13 Page 149

**PROTECTED DOCUMENTS**

his or her personal representative may assert. For the cause of action to survive to the
personal representative, it must have been a cause of action that the deceased could have
asserted in his or her lifetime. Thus, if the deceased has settled the case during his or her
lifetime, or the statute of limitations had run against the claim, the deceased could not
have asserted the claim had he or she lived. Therefore, there would be no cause of action
to survive. The test, therefore, is whether or not the deceased could have asserted the
claim at the time of death. If he or she could, the action survives to his or her personal
representative, otherwise, it does not.

The survival statute merely permits the personal representative to take the place of the
deceased and to perform whatever acts in connection with the case that the deceased
could have performed if death had not intervened.  It does not give the personal
representative any greater right than the deceased possessed. It does not alter the burden
of proof, nor does it affect the running of the statute of limitations. The personal
representative must sustain the burden of proof, producing evidence of liability and
evidence of the extent of damages. The statute of limitations will continue to run against
the case, just as if the deceased were alive. Thus, if the personal representative does not
bring the action within the time limited by the statute, regardless of how much time there
is left (even one day), the affirmative defense of the running of the statute may be
interposed.

The measure of recoverable damages is the same as any other bodily injury claim with
the limitation that the damages recoverable in a survival action would be limited to the
damages incurred between the date of the accident and the date of death, and not
thereafter.  It should be noted again, that the cause of action asserted by the personal
representative is the same action that the deceased could have asserted had he or she
lived. Thus, since the deceased could not have recovered for his or her own funeral
expenses if he or she were alive, it would follow that this item, in the absence of a
statutory provision allowing such a recovery to the personal representative, could not be
asserted by the personal representative. Therefore, the recoverable items of damage in a
survival action will be the out-of-pocket expenses, loss of earning capacity, and the
mental or physical distress suffered by the deceased, during his or her lifetime.

The damages recoverable are for the benefit of the heirs at law, and are distributed as
unbequeathed items of personal property.

### XVI.  DEATH FROM CAUSES OTHER THAN ACCIDENT

The fact that the deceased died from causes other than the accident, which is the subject
matter of the action for bodily injuries, will have no effect upon the right of the personal
representative to assert the cause of action. However, the recoverable damages are
limited to those incurred during the period from the date of the accident, to the date of
death.

VII-14

5-10-02

**D 000472**

Exhibit 13 Page 150

**PROTECTED DOCUMENTS**

## XVII. INSTANTANEOUS DEATH CAUSED BY THE ACCIDENT

If the deceased was killed instantly at the time of the accident, he or she never had a cause of action for bodily injuries that could have been asserted against the tortfeasor. The deceased suffered no injury, no mental or physical distress in the form of conscious pain and suffering. He or she certainly had sustained no out-of-pocket expenses. Under these circumstances, there is no cause of action in the first place, and thus no cause of action to survive to the personal representative. (Don't confuse this item with "Actions for Wrongful Death".)

## XVIII. DEATH DUE TO THE ACCIDENT AFTER AN INTERVAL OF TIME

As far as the survival action is concerned, it makes no difference whether the deceased died as a result of the accident or not. If he or she had an assertable cause of action for bodily injuries at the time of death, the action survives to the personal representative. It may be asserted by the personal representative against the wrongdoer in the place and stead of the deceased.

Death may occur seconds, minutes, days, weeks or years after the accident. The same measurement of damages is utilized in _every_ case, regardless of the interval of time between the accident and the time of death. Where the interval of time between the accident and the time of death is short, a problem arises as to whether or not the personal representative may recover for the mental or physical distress suffered by the deceased. If the deceased was conscious during any part of the interval between accident and death, a claim could be asserted for this item. On the other hand, if the deceased never regained consciousness after the accident, states hold that he or she could not have suffered any physical or mental distress.

Some states have combined the survival action with an action for wrongful death where there is a relationship between the accident and the death. They permit both claims to be presented in the one action. The majority of states, however, have statutes that completely disassociate the two causes of action. It is possible to have an action brought under the survival statute and none under the wrongful death statute where the deceased died as a result of causes other than the accident. On the other hand, where the deceased did survive the accident for any period of time, there are two possible causes of action which may be asserted: one for the damages that the deceased sustained during his lifetime and the other for damages for wrongful death.

## XIX. LIENS

A lien is a charge or encumbrance upon property. The property against which a lien may attach can be either real or personal property and, if personal property, it can be either tangible or intangible. The following will illustrate liens, which may be asserted against the various kinds of property.

VII-15

5-10-02

**D 000473**

Exhibit 13 Page 151

**PROTECTED DOCUMENTS**

A.    **Real Property**

A mortgagee has a lien on real property that is the subject of the mortgage to the extent of the outstanding unpaid balance of the mortgage debt. An unpaid workman, who has performed services with respect to the real property, may perfect a mechanic's lien against the property for his material, work, labor, and services. Also, an unsatisfied judgment against the owner of the real property can become a lien on the property. In some states, the judgment must be recorded in the official records of the jurisdiction. Likewise, unpaid taxes become a lien on the property.

B.    **Tangible Personal Property**

Often when personal property is purchased on a time basis, the purchaser gives back a chattel mortgage on the property as security for the balance of the purchase price. The unpaid seller, or the bank to which he assigns this mortgage, has a lien on the chattel to the extent of its unpaid balance. The same result is reached when the sale is made in accordance with the provisions of the Uniform Commercial Code relating to secured transactions.

C.    **Intangible Personal Property**

This property may also be subject to the attachment of a lien. It might consist of a cause of action either for property damage, bodily injury, or a debt, such as the unpaid proceeds of a settlement of a judgment.

Where tangible property is sold or transferred and there is an outstanding lien, the lien remains attached to the property and is binding upon the subsequent purchaser or transferee, providing that he has notice (actual or constructive) of the existence of the lien. Actual notice is where the person has personal knowledge of the lien. Constructive notice in these cases usually consists of the filing of the conditional bill of sale, the chattel mortgage or a real property mortgage with the appropriate public official. In the absence of a contract provision to the contrary, the lienholder has no right to the possession of the property. He does have a right to foreclose the lien in the event of default. In such case, the property will be sold at a public sale and the proceeds used first to satisfy the lien. The balance, if any, will be paid to the owner of the property. It should be emphasized, however, that, as long as the owner of the property meets the terms of the contract by payment or otherwise, the lienholder has no right of foreclosure.

Liens may be discharged by payment, in which case absolute title to the property goes to the owner with no encumbrances whatsoever. It is possible for a potential right of lien to exist prior to the time that the property against which it will attach comes into being. For example, if a statute gives a hospital a lien on the proceeds of the plaintiff's recovery of damages to the extent of his hospital bill, the right to

VII-16

5-10-02

D 000474

Exhibit 13 Page 152

PROTECTED DOCUMENTS

assert a lien exists before there are any proceeds of recovery. When a claim is settled or a judgment in a lawsuit in favor of a plaintiff becomes effective, at that moment the proceeds of recovery come into existence and the lien will attach.

The right of lien may be created by common law, a statute, or by agreement of the parties. Where the lien is created by common law, the lienholder must comply with the common law rule with respect to notice and any other requirement that there may be in order to perfect the lien. Where there is a statute involved, strict compliance with the terms of the statute with respect to filing and notice is necessary if the lien is to be perfected. As to contracts, the provisions of the agreement will govern the requirements of the assertion of the lien.

## XX.    PRIORITIES OF LIENS

The general rule applicable to situations where there is more than one lien on an item of property is: "Prior in time is prior in right." This means that the first lien that attaches takes precedence over all subsequent liens and must be satisfied first.

## XXI.    ATTORNEY'S LIEN FOR SERVICES

Common law jealously guarded the right of an attorney to be recompensed for his work, labor and services. Therefore, when an attorney is retained, he or she immediately has a lien on his client's cause of action for his or her work and services. This common law lien attaches to the cause of action. Other liens, created by statute or by agreement, usually attach to the proceeds of recovery. Clearly, the cause of action comes into existence before the proceeds of recovery are realized. As a result, the attorney's lien, which attaches to it, is prior in time and in right with respect to all other liens.

Therefore, when an attorney gives notice to a third party of his employment, this operates as notice to the third party of the existence of the attorney's lien. The third person, which may have possession of the client's property, is bound to recognize the existence of the lien and to protect it. For example, an attorney sends a letter to the liability insurance carrier giving notice of employment as counsel for a bodily injury claimant. The letter also serves as notice of the attorney's lien. The failure of the insurance carrier to recognize the lien when settling with the claimant will expose the insurance carrier to liability to the attorney for his or her fee. The rationale behind this result is that, when the insurance carrier is in possession of any property belonging to the claimant, that property is automatically made subject to the attorney's lien. Thus, when a claim is settled, the insurance carrier has certain property belonging to the claimant in its possession. This property is the amount of money agreed upon as a settlement. To be sure, the insurance carrier's possession is only momentary, but this is sufficient. The failure of the carrier to recognize the lien will expose it to liability to the attorney for the fee.

VII-17

5-10-02

**D 000475**

Exhibit 13 Page 153

PROTECTED DOCUMENTS

The attorney's lien can easily be satisfied by merely recognizing it. Placing the name of the attorney on the check as an additional payee usually evidences this recognition. The defendant has no particular interest in the amount of the attorney's fee. The defendant's only concern is to have evidence of the fact that the lien has been satisfied. The evidence in the form of the attorney-lienholder's endorsement of the check or draft is sufficient for this purpose.

It sometimes happens that a claimant will employ one attorney and then terminate her or his employment and employ another attorney. When this happens, the defendant third party can be protected only by either placing the names of both attorneys on the draft or check as additional payees or obtaining a release of lien from the first attorney. The latter can be in the form of a letter from the attorney that he or she either has no lien or has waived it.

It should be noted that the lienholder (the attorney) has no cause of action against the defendant unless there is a settlement or judgment at which time the defendant has property belonging to the claimant in his or her hands. If the defendant has no property of the claimant (in the form of money owed) in his or her hands, there is no obligation on the part of the defendant to protect the attorney. Also, there is no means available to the attorney whereby he or she could bring an action against the defendant third party for the fee. It is only in the situation where the defendant has the claimant's money and fails to recognize the attorney's lien that the attorney has any cause of action at all. Thus, where judgment in a lawsuit is in favor of the defendant, the defendant has no money belonging to the claimant and therefore has no obligation to pay the fee of the claimant's attorney.

## XXII. HOSPITAL AND PHYSICIAN'S LIENS

Liens in favor of the physician or hospital did not exist at common law. Where there are such liens, they are created only by statute. Thus, in order for a physician or hospital to perfect a lien, the statutory requirements must be met. Since the statute is contrary to the common law, it is strictly construed. Thus where a statutory lien is asserted, the failure of the lienholder to comply strictly with all of the requirements of the statute will deny him or her benefits of a lien. Most statutes require that notice of the claimed lien be served on the defendant third party at his or her last known address and that the lien be filed with the county clerk, registrar, or other public official.

## XXIII. FEDERAL LIENS

Federal liens, including Medicare liens, liens made under the Federal Medical Care Recovery Act and liens made under the Federal employees Compensation act (the federal equivalent of worker's compensation) are often referred to as "super liens" because they trump all other liens and claims.

A.    Medicare

VII-18

5-10-02

**D 000476**

Exhibit 13 Page 154

**PROTECTED DOCUMENTS**

In third party situations, the government is subrogated to the rights of Medicare recipients against third-party tortfeasors for reimbursement of medical costs and has the right to bring a third-party action against the party responsible for the accident. The government's right to recovery exists even when no notice of the lien has been provided, if it can be shown that the responsible party, or its insurer, knew or should have known of Medicare's involvements on a claim.

B.   Federal Medical Care Recovery Act

The Act grants the government the right to recovery from a third-party tortfeasor for the cost of medical services provided to military personnel as a result of the negligence of a third party. Like in the Medicare situation, the government has the right to bring an independent third party action again the tortfeasor for recovery of the expenses paid, even if the injured party has settled with the tortfeasor's carrier.

C.   Federal Employees Compensation Act (FECA)

FECA liens allow recovery by the government for expenses paid to federal employees who are injured or killed in the scope of their employment for the federal government. The Act allows the government to have the recipient of benefits assign his/her right of action to the United States and also gives the government the right to prosecute an action on its own.

In all of the above federal lien scenarios, care should be taken to ensure that the lien is either protected (by inclusion of the applicable entity as a payee on the settlement draft) or that a hold harmless agreement is secured from the injured party and his/her counsel in which they agree to satisfy the liens out of the settlement proceeds.

**XXIV. LIEN BY A WORKERS' COMPENSATION CARRIER**

The workers' compensation laws of most states permit an injured employee several options: file a claim for workers' compensation benefits, file a lawsuit against the party responsible for the injury (but not if the employer was the responsible party), or to do both, either simultaneously or consecutively. In the event that the injured person elects to accept compensation, the workers' compensation carrier is subrogated to all the rights of the injured person against the third party. Where the injured person elects both to accept compensation and sue the third party, the worker's compensation carrier has a lien on the proceeds of recovery to the extent of the compensation and the medical payments made or to be paid in the future. Notice by the workers' compensation carrier to the negligent third party of the existence of its lien is sufficient to create a duty on the part of the third party to recognize the lien when making a settlement or paying any judgment to the injured party. As in the case of an attorney's lien, this can be met by including the insurer's name on the claimant's check.

VII-19

5-10-02

D 000477

Exhibit 13 Page 155

**PROTECTED DOCUMENTS**

### XXV.  GARAGEKEEPER'S LIEN

The garagekeeper has a bailee's lien on the property in his/her possession, for work, labor and services.  This does not give him/her a lien on the owner's cause of action against a negligent third party for property damage.  This is so, even though the work, labor and services were required as a result of the damage caused by the third party.   The garagekeepers's lien attaches only to the property in his/her possession and the payment to him/her for his/her services, is a matter solely between the garagekeeper and the owner.  This lien is frequently encountered when a repair shop refuses to release a car until the repair bill has been paid.

VII-20

5-10-02

**D 000478**

Exhibit 13 Page 156

**PROTECTED DOCUMENTS**

# CHAPTER VIII

## PHYSICAL DAMAGE

I.   **FIRST PARTY CONTRACTS DEFINED**

First party insurance, is a contract between the insurer and insured protecting the
insured's own actual losses and expenses.  Since there are only two parties involved in
this contract -- the policyholder (the first party) and the insurance carrier (the second
party) -- the insurance afforded is referred to as first-party coverage, and the losses
thereunder as first party claims, since the loss is sustained and the claim is made by the
first party to the contract.  Under this coverage, the insurer agrees to protect the
policyholder against financial loss from covered perils which he or she would otherwise
incur when such loss arises out of damage to, or destruction of, property owned by the
insured or in which the insured has an interest.

II.   **DECLARATIONS**

The declarations page of an automobile physical damage policy sets forth the name and
address of the named insured, that period of time for which the coverage shall be in
effect, the description of the automobile(s) to be insured, and the type of insurance
coverage that will be provided.  Certain representations are made by the insured in the
policy application.  These representations include:

- That the car principally will be garaged in the area where the insured resides, unless
  otherwise stated.

- The name of any lienholders having liens against any of the vehicles insured.

These representations all have a material effect on the desirability of the risk which the
insurer is being asked to assume.  Misrepresentation as to either of them may give the
insurer the right to declare its policy void and to decline to accept liability for damage to
any vehicle insured by the policy.

Each vehicle insured is specifically described by year, make, model, body type and serial
or identification number.  No other owned automobiles are insured, except that coverage
is generally extended to the newly acquired or replacement vehicles, as described in the
appropriate policy contract.

The balance of the face of the policy specifies what perils or losses are insured against
and sets forth the limit of the insurer's liability to each vehicle and the limit as to each
peril.  For example, physical damage insurance can be written to provide coverage
against damage caused by a number of specified perils including collision coverage, fire,

VIII-1

6-28-02

**D 000479**

Exhibit 13 Page 157

**PROTECTED DOCUMENTS**

lightning, transportation, theft, combined additional coverage, towing and labor costs and mechanical breakdown coverage.

## III.   INSURING AGREEMENT

The insuring agreement set forth those perils or causes of loss against which the policy provides insurance, as well as the amount of any deductible that may apply.  In the early days of automobile insurance, the basic coverage available insured only against collision of the automobile with another object or upset of the automobile.  Later came theft coverage which insured against theft of the automobile or its component parts.  Then there was coverage for fire, lightning or transportation which insured against loss caused by fire, lightning, smoke damage due to sudden and unusual faulty operation of fixed heating equipment serving the premises where the automobile was located, and loss resulting from stranding, sinking, burning, collision or derailment of any conveyance upon which the automobile was being transported.  Coverage was also available against loss by windstorm, hail, earthquake or explosion.  The fire, lightning or transportation coverage, coupled with theft coverage, produced still broader insurance by adding combined additional coverage which included insurance against damage caused by windstorm, hail, earthquake, explosion, riot or civil commotion, falling of aircraft, malicious mischief or vandalism, flood or external discharge or leakage of water.  Still broader coverage became available under the comprehensive coverage which insured against any loss or damage to the vehicle except that damage caused by collision, wear and tear, or mechanical or electrical breakdown.

The most popular automobile coverage today is the combination of comprehensive and collision coverage, although in some high risk areas (or with older automobiles) insurers may not be willing to write comprehensive coverage and may insist on limiting non-collision coverage to loss by fire and theft or a more limited list of perils.

## IV.   COLLISION COVERAGE

Under this coverage, the company agrees to pay for direct and accidental loss of, or damage to, the insured automobile caused by collision of the automobile with another object or by upset of the automobile. (Also under collision in most, but not all policies, we will pay up to $200 per occurrence, less the applicable deductible for loss to personal effects due to a collision.)  Whether an insured can recover under his collision coverage depends upon the terms of the policy as applied to the facts of the accident.  Many important terms, which are found in the collision coverage, are not defined in the policy.  Consequently, it will be useful to define and analyze some terms to determine the scope of collision coverage.

"**Object**" has been defined as any tangible thing that is visible or capable of discernment by the senses.  The term "object" is one of the most important words used in the collision policy since there cannot be a collision within the meaning of the policy without the presence of an object with which to collide.  An "object", in regard to collision coverage, has been liberally interpreted by the courts.  The term, "object", as used in a collision

VIII-2

6-28-02

**D 000480**

Exhibit 13 Page 158

PROTECTED DOCUMENTS

policy, has been held to include a wide variety of items and hazards. Some typical objects which have been held to be within the coverage of a collision policy include an animal, physical impediments upon the road (a tree stump, water or sewer pipes, boulders, stones) or an impact with the road itself, such as caused by irregularity in the surface of the highway. Many jurisdictions have also held that any impact by the insured automobile with water or land would be a recoverable item under the collision coverage. In all of the enumerated items, it is important to determine the cause of the accident. In other words, did the damage arise from the collision with an object as required by the policy? If the damage was caused by other than a collision, coverage may be afforded under comprehensive.

The term "upset", as used in the collision policy, has been defined as the loss of equilibrium or the loss of balance of the insured vehicle, regardless of whether it completely turns over.

Courts have construed the words "directly caused" to be synonymous with the term, "proximately caused." The latter term has been defined as a cause which, in an actual and continuous sequence, produces damage, such that without which the damage would not have occurred. This is important under collision coverage because the damage to the insured automobile must be directly caused by a collision. The general rule is that when there are two concurring causes of loss and only one of them is a collision or upset of the insured automobile, it is crucial to determine which cause set the other cause in motion. Where it is determined that a collision or upset started the chain of events, the recovery under the collision policy may be extended to include damages not ordinarily afforded under such a policy. For example, the insured automobile collides with an object on the road damaging the vehicle, which results in an engine fire. The collision insurer would be responsible for the immediate damage caused to the vehicle and also for the fire damage.

V.   COMPREHENSIVE COVERAGE

The basic agreement does not enumerate all the perils (losses) that are insured against. Coverage is provided on an "all-risk" basis against all direct and accidental loss of or damage to the insured automobile except if the loss or damage was caused by collision. For example, if the insured rips his seat cover with a screwdriver, this would be covered under the insured's Comprehensive Coverage.

Under Comprehensive, we will pay for loss caused other than by collision. Covered losses would include breakage of glass and loss caused by missiles, falling objects, fire, theft or larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion, or colliding with a bird or animal and, in most policies, up to $200 per occurrence for loss to robes, wearing apparel and other personal effects caused by fire, lightning, flood, falling objects, earthquake, explosion or through theft of the entire automobile. Personal effects must be owned by the named insured or a relative and must be in or upon the owned automobile at the time of loss. In some of our policies, the amount for personal effects is $100 for loss due to fire or lightning only.

VIII-3

6-28-02

**D 000481**

Exhibit 13 Page 159

PROTECTED DOCUMENTS

The claims person should realize that any loss caused by one of the above perils is covered under the comprehensive coverage, whether it involves a collision or not. For example, if a vehicle was involved in a collision and the bumper and hood are damaged, and several windows are broken, the comprehensive coverage applies to the windows, even though the breakage resulted from a collision. Of course, the damage to the bumper and the hood will not be covered under comprehensive, but under collision. Also, if a tree falls on the insured automobile, the damage would be covered under comprehensive since it was caused by a falling object. There would be no comprehensive coverage if the insured automobile sustained body damage because it collided with a tree on the road. This is because the loss was caused by collision with another object.

An issue frequently arises whether a particular loss is due to collision or to one of the perils mentioned above. The general rule is that if the proximate cause of the loss is one of the perils specifically mentioned in the policy as "not deemed to be collision," the loss is covered. For example, vandals intentionally release the brakes of an automobile and allow it to crash into a bridge and become a total loss. Coverage would be afforded under the comprehensive agreement because the loss would be considered as caused by vandalism. Also, if the insured automobile is stolen and damaged by the thief in a collision, the damage would be considered to be caused by theft and would be a comprehensive loss.

VI.   **MULTI-RISK PHYSICAL DAMAGE COVERAGE**

Although this coverage is not part of the actual policy contract, we do market Multi-Risk Physical Damage Coverage by amendment to the policy. The coverage includes comprehensive, collision and mechanical breakdown protection. In most states, it has a deductible of $250 for each loss except glass breakage which is $50 for each loss. There are state exceptions and the Multi-Risk amendment on the insured's policy should be consulted..

The comprehensive and collision <u>portions</u> of Multi-Risk Physical Damage coverage are the same as comprehensive and collision coverages discussed above.

The mechanical breakdown portion of Multi-Risk Physical Damage coverage covers losses due to mechanical breakdown of the owned auto. There are exclusions such as routine maintenance, tire wear, oxidation and others.

VII.   **RENTAL REIMBURSEMENT COVERAGE**

Although this coverage is not part of the actual policy contract, we do market Rental Reimbursement coverage by amendment to the policy. Limits vary from state to state. In two thirds of the states, the limit is $20.00 per day with a maximum of $600. In other states, the limit is $25 per day with a maximum of $750. In Texas, you can choose a daily limit of $20, $25, $30 or $35 and each has a maximum of $600, $750, $900 or $1,050 respectively. Virginia has a maximum of $750 with no daily limit.   <u>Check the amendment for each state.</u>

VIII-4

6-28-02

**D 000482**

Exhibit 13 Page 160

### PROTECTED DOCUMENTS

Reimbursement for a rental vehicle is limited to that period of time reasonably required to repair or replace the owned auto, and coverage applies only if the owned auto is withdrawn from use for more than 24 consecutive hours. Loss is covered under Comprehensive and Collision only; coverage usually does not apply to theft of the entire auto. In thefts, the supplementary payments under the policy are primary. Do not confuse Rental Reimbursement coverage with reimbursement for transportation expenses under Additional Payments We Will Make Under The Physical Damage Coverages, when there is the total theft of an insured vehicle. However, Rental Reimbursement can apply to a total theft of an insured vehicle if: 1. The period of time reasonably required to repair or replace the stolen auto exceeds 30 days; and 2. Only if the additional benefits provided under the supplementary benefits of the policy have been exhausted.

VIII.   **ADDITIONAL PAYMENTS WE WILL MAKE UNDER THE PHYSICAL DAMAGE COVERAGES**

The policy obligates the carrier, in addition to the applicable limit of liability:

A.   **Transportation Expenses**

"We will reimburse the insured for transportation expenses incurred during the period beginning 48 hours after a theft of the entire auto covered by Comprehensive Coverage under this policy has been reported to us and the police. Reimbursement ends when the auto is returned to use or we pay for the loss. Reimbursement will not exceed $20 per day or $600 per loss".

These amounts can vary; check the policy.

Also, note that the company's obligation to reimburse the insured for expenses in renting a substitute vehicle is not affected by the fact that the policy has expired. For example, the insured has a theft policy with a policy period of August 1, 2001 - March 1, 2002. the insured's car is stolen February 28, 2002. The next day he reports the theft to the police and to his automobile theft insurer. On March 2, he rents a substitute vehicle for $20 a day. The car is never recovered and the insured's daily expense for renting the substitute vehicle continues until April 1, 2002. On this date, the insurer makes a payment for the theft of his automobile. The insured is also entitled to a reimbursement for his or her rental of a substitute vehicle. However, if the policy is not renewed or cancelled there would be no coverage for the substitute vehicle if it were involved in a loss after that expiration/cancellation date.

B.   **General Average And Salvage**

"We will pay general average and salvage charges for which the insured becomes legally liable when the auto is being transported."

VIII-5

6-28-02

**D 000483**

Exhibit 13 Page 161

PROTECTED DOCUMENTS

General average is a proportional contribution, based on value of property, by each party of interest in a maritime venture to make good a loss sustained under certain conditions.

Salvage is the reward to those (usually another vessel) not part of the ship's venture who voluntarily and successfully save some part of the venture that is in peril.

In either event, the value of the property lost or damaged by the effort is contributed to by all: the ship, the freight (earnings from carrying the cargo), and the cargo. It is based upon the ratio that the sacrificed property bears to the total value of all interests.

A condition of the policy makes it applicable "while the automobile is within the United States of America, its territories or possessions, or Canada, or is being transported between ports thereof."

Your insured may have his or her automobile transported between ports of the described political and geographical locations. If some of the cargo were jettisoned by the master in order to save the ship from a peril not caused by the ship, all interests would contribute in proportion and your policy would pay your insured's share of the loss.

The obligation to pay these charges assessed against the insured is separate and apart from the agreement to pay for physical damage. On the other hand, if the insured's automobile was jettisoned and your company paid under the comprehensive coverage, it would be subrogated to the insured's claim for general average from the other interests.

C.   **Equipment**

"We will pay for loss to any of the following equipment (including loss to accessories and antennas): car phone; citizen's band radio; two-way mobile radio; scanning monitor receiver; or device designed for the recording and/or reproduction of sound, as long as the equipment is permanently installed in or upon an owned auto; and that auto is insured under the appropriate coverage."

IX.   **EMERGENCY ROAD SERVICE**

The Companies offer Emergency Road Service coverage separately at an additional annual premium. It covers; towing, lockout services, an hour of mechanical labor, changing a tire, and delivery of gas, oil or loaned battery.

VIII-6

6-28-02

**D 000484**

Exhibit 13 Page 162

PROTECTED DOCUMENTS

X.   **DEFINITIONS**

It is important to understand the definitions contained in an automobile physical damage policy in order to know who is covered under the policy, for what peril, and to what extent. "Insured" and "automobile" are especially significant.

A.   **Insured**

In addition to the insured named in the policy, persons other than the named insured may also be entitled to the status of an "insured" depending upon their relationship to the named insured and other conditions of use. Specifically, this refers to use of owned automobiles and non-owned automobiles.

B.   **Owned Automobiles**

An owned automobile (defined in the A-50 contract) means a private passenger, farm or utility automobile or a trailer for which a specific premium is charged; a private passenger, farm or utility automobile or a trailer ownership of which is acquired during the policy period, if it replaces an owned auto as described in the policy or we insure all vehicles owned by the insured on the date of such acquisition and the insured requests us to add it to the policy within 30 days afterward; and a temporary substitute vehicle. In addition to the named insured, coverage is provided for any person or organization using or having custody of the owned automobile with permission of the named insured and within the scope of such permission, except persons in the automobile business or bailees for hire. The insured owner, in allowing another to use the automobile, has the right to limit the use of the car in any manner he or she sees fit. If the user exceeds the scope of permitted use, he or she may become a converter, who is a person who has unauthorized use or control of the automobile, and thereby be deprived of insurance protection. As a converter, he or she may be held absolutely liable to the owner for any damage which the car may sustain while using it.

C.   **Non-Owned Automobiles**

This term has been defined in a physical damage policy to mean a private passenger automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute vehicle, while said automobile or trailer is in the possession or custody of the insured or is being operated by him or her. Under the basic policies, coverage for non-owned automobiles extends to the named insured and any relative residing in the same household. Further, it applies to collision coverage and to comprehensive or other physical damage coverages. Coverage is on an excess basis if there is any other applicable insurance which would apply. This is true whether such other insurance covers the interest of the named insured or spouse, the owner of the automobile, or any other person or organization. There is no coverage for non-owned automobiles furnished for regular use of the named insured, spouse or a member of the household.

VIII-7

PROTECTED DOCUMENTS

**XI.   EQUIPMENT**

The policy includes loss to the automobile and its equipment but does not define "equipment." Normal equipment includes such things as a jack and spare tire, but there are some exclusions for specified equipment. For instance, a radar or laser detector is excluded.

**XII.   EXCLUSIONS**

Damage to any covered automobile while it is being used as a public or livery conveyance is excluded unless such use is specifically described in the declarations on the policy. A common problem involves the application of the public or livery conveyance exclusion. The policy specifically excludes coverage under any of its provisions while the insured automobile is used as a public or livery conveyance. Any carrying of passengers for hire, or renting the automobile to others for their use would be excluded from coverage under the policy unless such use is stated in the policy. A typical example of an insured automobile falling within the exclusionary language is its use as a taxicab. The claims person should realize that courts consistently hold that car pools and other "share-the-ride" arrangements, even though the passengers contribute to the expense, are not considered carrying passengers for hire and therefore the exclusion is not applicable.

Also excluded is damage to wear and tear, freezing or mechanical or electrical breakdown unless such damage is the result of loss from another peril which is covered by the policy. Damage to tires is generally excluded unless coincident with and from the same cause as the loss covered by the policy, or unless damage is by fire, by malicious mischief or vandalism, or unless stolen. Coverage is also excluded for loss due to war or radioactive contamination. Glass breakage, due to collision, is excluded under the collision coverage when the car is covered by comprehensive insurance.

The exclusion concerning wear and tear, freezing, mechanical or electrical breakdown has also been the subject of controversy. To be excluded, the loss must be due and confined to one of the listed perils. For example, damage to the car radiator by freezing would not be covered. However, if the electrical system was damaged by fire and it became impossible to move the car and as a result, the radiator was damaged by freezing, coverage would be afforded. This is because freezing was caused by a covered loss.

**XIII.   LIMIT OF LIABILITY**

Most physical damage policies are written with the limit of liability as the actual cash value, with or without a deductible.

For example, a typical provision in a physical damage policy reads as follows:

VIII-8

6-28-02

**D 000486**

Exhibit 13 Page 164

**PROTECTED DOCUMENTS**

Limit of Liability

"The limit of our liability for loss: is the **actual cash value** of the property at the time of **loss**; will not exceed the cost to repair or replace the property, or any of its parts, with other of like kind and quality and will not include compensation for any diminution in the property's value that is claimed to result from the **loss**; to personal effects arising out of the one occurrence is $200; to a **trailer** not owned by **you** is $500; for custom options is limited to the **actual cash value** of equipment, furnishings or finishing (including paint) installed in or upon the vehicle only by the auto factory or an authorized auto dealer and included in the purchase price of the vehicle."

The actual cash value is intended to be the Company's maximum liability in the event the car is completely destroyed with no value remaining. In the event the vehicle is a constructive total loss, (i.e., when the cost of repairs plus the value of the salvage equals or exceed the pre-loss value of the vehicle) then the Company's liability is actual cash value, less value of salvage, less any deductible. In the case of partial loss, the Company's liability is intended to be limited to the cost of the necessary repairs, less any deductible.

It should also be recognized that the Company may take over any part of the damaged property at its agreed or appraised value. The insured cannot abandon the damaged property to the insurer and demand payment of its full value in cash. Except in unusual cases, companies seldom exercise the option to repair damaged property because of potential difficulty in satisfying the insured that the repairs were properly made and because, once the repair option is exercised, the Company will be liable for the full cost of the necessary repairs, even if such cost exceeds the actual value of the property. Also, should completion of the repairs be unreasonably delayed, the Company may become liable to reimburse the insured for loss or inconvenience he may sustain by reason of inability to use the automobile.

XIV.  **MARKET VALUE**

A problem arises when the cost of repairs with parts of other like, kind and quality, would not restore the vehicle to its former market value. In other words, in applying the limit of liability provision contained in the policy, what is the proper measure of damages recoverable under the physical damage policy?

The claims person should realize that a significant number of cases hold that the difference in value or condition of the motor vehicle prior to the collision and after the repairs is the proper measure of damages. If the car cannot be restored to its former condition, even though its outward appearance might be the same, the insured may be allowed an additional recovery to compensate him or her for the loss of market value.

VIII-9

6-28-02

**D 000487**

Exhibit 13 Page 165

PROTECTED DOCUMENTS

- **Determination of Market Value**

It is not the value to the owner which determines market value but the value to
those who constitute the market in used cars. The general rule is that market
value is measured by the price, which, in all probability, would voluntarily be
agreed upon in negotiations between an owner willing (but not forced) to sell and
a buyer willing (but not forced) to buy. Therefore, market value does not
necessarily mean "book value." This latter term refers to publications used in the
insurance industry to evaluate used automobiles such as The Red Book published
by National Market Reports, Inc., the N.A.D.A. Official Used Car Guide,
published by the National Automobiles Dealers Association or various electronic
data bases. Many cases have rejected the carrier's argument that the "book value"
method of evaluation is the only guide to determine actual cash value (market
value). The arbitration provision of the Physical Damage Policy provides a
mechanism for determining disputed evidence as to market value. Competent
appraisers are used to judge the market value of an automobile.

A problem sometimes arises as to what automobile is to be evaluated. An
automobile may be materially changed from the date of the issuance of the policy
to the date of damage or theft. For example, the owner of an auto body repair
shop purchases a used Mustang convertible from one of his customers. At the
time of the sale, the market value is $5,000. He immediately obtains an actual
cash value collision policy. The policy identifies the vehicle by model and year.
He or she is charged the standard premium for such a vehicle which is in average
condition. Subsequently, he or she substantially rebuilds the vehicle so that it
now becomes a customized Mustang with a rebuilt high-powered engine, mag
wheels, racing tires, a front sloping chassis and special paint. Upon completion of
this work, the market value of the automobile is $12,500. The insured does not
notify the carrier of the change in the automobile until the vehicle is in a collision
and becomes a total loss. His or her claim is for $12,500. Most courts would
hold that the market value of the Mustang, for claims settlement purposes, would
be based on the initial selling price of $5,000 (less the usual factors of
depreciation, etc.) and not on the increased market value of $12,5000. Such a
ruling would be based on the premise that it would be unfair for the insured to
recover $12,5000 when his or her premium was based on a vehicle of a certain
age with standard options. It is clear that a substantial portion of the increased
value in the Mustang was attributable to parts which were not needed to make the
car a working vehicle, but to parts designed to make the automobile more
aesthetically pleasing. Actual cash value coverage is not designed to insure such
value. Finally, the argument could be made that an auto body shop owner should
be aware that a customized vehicle (the rebuilt Mustang) must be insured under a
stated value policy.

XV.   OTHER INSURANCE

The Other Insurance provision reads:

VIII-10

6-28-02

**D 000488**

Exhibit 13 Page 166

## PROTECTED DOCUMENTS

"If the insured has other insurance against a loss covered by Section III
(Physical Damage), we will not owe more than our pro rata share of the
total coverage available. Any insurance we provide for a vehicle you do
not own shall be excess over any other valid and collectible insurance."

Presently, the vast majority of collision policies are written on an actual cash value rather
than a limits basis. To illustrate the application of the Other Insurance clause to collision
coverage, note the following example using actual cash value policies and limits policies.
The insured has an actual cash value collision policy with the A Insurance Company. He
or she decides to change carriers and obtains an actual cash value collision policy with B
Insurance Company. Both policies have a $100 deductible. Before the effective
expiration date of A's policy, but after the inception of B's policy, the insured has a
$5,100 collision loss. The effect of the Other Insurance clause in regard to actual cash
value policies is that each company will be obligated to pay 50% of the net loss after the
application of the $100 deductible ($50 deducted from each policy). In other words, both
A and B would contribute $2,500 making a total payment to the insured of $5,000.

If the carriers had limits policies, their contribution would vary. For example, the insured
has a $5,000 collision policy with A Insurance Company and a $10,000 collision policy
with B Insurance Company. Both of these polices have a $100 deductible. The insured
has a $5,100 collision loss. After the application of the $100 deductible, Company A
would pay 1/3 of the loss ($1,667) and Company B would pay 2/3 of the loss ($3,333)
making a total payment of $5,000.

If the deductibles in the carriers' policies are not identical, the insured would have the
benefit of the lower deductible. This means that if one policy contained a $50 deductible
and the other policy a $100 deductible, the insured would have only $50 deducted from
his or her loss payment. In other words, in both examples (involving actual cash value
policies or limits policies) he or she would receive a total payment of $5,050.

## XVI. CONDITIONS

The policy imposes certain duties on the named insured in event of loss. If the insured
fails to fulfil these duties, he or she may forfeit the right to recover loss under the policy.
One of the more important duties of an insured after loss has occurred is to:

"Protect the automobile, whether or not the loss is covered by this policy,
and any further loss due to the insured's failure to protect the auto will not
be covered. Reasonable expenses incurred for this protection will be paid
by us."

For example, as the result of an automobile accident, the insured's car is damaged to the
extent that it is not driveable. The insured decides to leave the vehicle at the scene of the
accident instead of having it towed to a place of safety and arranging for the repairs to be
made. As a result, the vehicle is exposed to the elements of the weather and the action of
vandals. All of the subsequent damage (after the accident) is not recoverable under his or
her physical damage policy. Had the insured exercised his or her duty to mitigate

VIII-11

6-28-02

D 000489

Exhibit 13 Page 167

**PROTECTED DOCUMENTS**

damages, any expenses incurred in carrying out this duty, such as the towing charges would be recoverable under the physical damage policy. The insured is also required to give notice to the Company as soon as possible and, in case of theft, the insured must promptly notify the police. The insured is also required to file proof of loss with the Company within the time stated in the policy and allow the Company to examine the damaged property and submit to examination under oath if demanded by the Company. If the insured and the Company are not able to agree to the amount of loss, either the insured or the Company may demand that the amount of loss be determined by appraisal. In an appraisal, the named insured and the Company each select a competent appraiser. The appraisers then select a competent and disinterested umpire. The appraisers each state the actual cash value and the amount of loss. If they are unable to agree, the differences are then submitted to the umpire who makes the final decision. The named insured and the Company each pays its chosen appraiser and they both share equally in the other expenses of the appraisal and the payment of the umpire.

In many agreements involving the transportation of property, the Bill of Lading contains the following clause:

> Any (transportation) carrier or party liable (other bailee for hire) on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been affected upon or on account of said property, so far as this shall not void the policies or contracts of insurance. Provided that the carrier reimburse the claimant for the premium paid thereon.

If the physical damage policy did not contain some restriction on this clause, the carrier or other-than-bailee-for-hire could wipe out the insurer's right of subrogation by taking over the benefit of the policy after the carrier had paid the loss. Consequently, the physical damage policy specifically states that it does not inure directly or indirectly to the benefit of any carrier or other bailee for hire. This is true even if the agreement between the insured and the carrier or other bailee would purport to give the benefit of insurance carried by the owner of the property. This provision voids the agreement and preserves the insurer's right of subrogation against the negligent bailee.

## XVII. ENDORSEMENTS

To know what coverage is provided by a policy, it is important to understand all endorsements attached to the policy. Endorsements attached to a particular policy are indicated in the section reserved for this purpose on the Declarations Sheet. Since endorsements amend the policy contract, the claims person should know how the basic policy has been affected by the attached endorsement. Most endorsements are self-explanatory and readily understood; others require study. Questions of interpretation of endorsements should be taken to your supervisor. Because it is not feasible to comment on every endorsement, only the Loss Payable Endorsement has been selected for discussion. It is used frequently and should be thoroughly understood.

VIII-12

6-28-02

**D 000490**

Exhibit 13 Page 168

**PROTECTED DOCUMENTS**

- **Loss Payable Endorsement**

This endorsement is frequently interpreted as a separate contract between the lienholder, (also known as a mortgagee in the real property context) and the Company. It pertains only to Physical Damage Coverages.

The Company agrees under this endorsement that the interest of the lienholder will be protected should there be loss or damage to the insured car. However, the lienholder's interest will not be protected:

1. When fraud, misrepresentation, material omission, or intentional damage has knowingly been committed by or at the direction of any *Insured*; or
2. In any case of conversion, embezzlement, secretion, or intentional damage to the vehicle(s) by or at the direction of any *Insured*, or any owner of the vehicle(s); or
3. For any *loss* or damage caused by, or reasonably expected to result from, a criminal act or omission of any *Insured* or any owner of the vehicle(s). This applies regardless of whether any *Insured*, or any owner of the vehicle(s) is actually charged with, or convicted of a crime. For the purpose of this clause, criminal acts or omissions do not include traffic violations.

If the insured fails to fulfill the obligations he or she has under the policy, such a failure would not invalidate the policy as to the lienholder. Should the insured fail to report an accident, the Company might deny liability under the policy to the insured, but would be obligated to make payment on any claim within the Physical Damage Coverages that is presented by the lienholder in whose favor the endorsement is issued. The Company would, after such a payment, be subrogated to all rights of recovery the lienholder might have.

The Company has the option of paying either the amount of the damage less the deductible or the entire principal due under the mortgage with interest. If the entire principle and interest is paid by the Company, the Company is entitled to an assignment and transfer of the security interest (lien) with all such other securities.

The lienholder agrees to notify the Company of any change of ownership or increase in hazard which comes to its attention. Should the insured fail to pay the premium, the lienholder agrees to pay if advised of this condition.

If the insured fails to file proof of loss within 91 days after the loss, the lienholder must do so within sixty days thereafter.

The lienholder's name should be included on the settlement draft or permission should be obtained from the lienholder to omit its name from the draft. Otherwise, the interest of the lienholder has not been protected to the extent agreed upon by

VIII-13

5-26-11

**D 000491**

Exhibit 13 Page 169

**PROTECTED DOCUMENTS**

the endorsement and the Company might be in the position of paying the loss twice, i.e., once to the insured and a second time to the lienholder.

## XVIII.  NOTICE TO LIENHOLDERS THAT A BINDER WAS NOT ISSUED AND NO POLICY WAS FORTHCOMING

Lienholders are placed on notice by Underwriting if a binder or policy is not issued or if the policy or binder is cancelled.

## XIX.  DENIAL OF LIABILITY

The courts generally have held that when an insurer denies liability because the insured has breached some policy provision, the insurer must precisely specify the grounds which give it the right to avoid liability under its policy.  The purpose of this requirement is two-fold: it gives the insured precise information why his claim is being denied and it gives him or her an opportunity to correct whatever may be wrong, provided that the time within which correction can be made has not expired.  In connection with such a notice it is important that the file be thoroughly reviewed by the insurer so that the notice will contain all violations or breaches known to the insurer at the date of the notice.  Any breaches or violations of which the insurer has knowledge and which have not been listed can be held to have been waived by the insurer if it attempts to assert them as defenses at a later date.

Rights or defenses cannot be waived unless the insurer is, or in the exercise of due diligence should be, aware that they exist.  If, after a denial letter has been sent, the insurer becomes aware of facts which may give it further grounds to support is denial, these grounds should also be the subject of a formal notice to the insured so that they may not be lost by waiver.

Policies of first party insurance generally provide that, within a specified period of time following the occurrence of a loss to the insured property, the insured must file with the insurer a sworn proof of loss setting forth details regarding the property damaged or destroyed and the circumstances under which the damage or destruction took place.  At common law, failure of an insured to file proof of loss within the time required would bar him or her from recovery.  This has been changed by statute in a number of jurisdictions.  Typical modifications postpone the running of the time which proof must be filed until after it has been formally demanded by the insurer.  Others require not only a formal demand but also that the insurer provide appropriate forms on which the required information can be provided by the insured.

In jurisdictions where the policy requirements with regard to filing proofs of loss have not been modified by statute, the courts will deny the insured any recovery if he or she fails to file a proof of loss as required by the terms of the policy unless the court finds that the insurer has waived the requirement, either expressly or impliedly.

VIII-14

6-28-02

**D 000492**

Exhibit 13 Page 170

**PROTECTED DOCUMENTS**

**XX.   WRONGFUL REFUSAL TO PAY**

In the case of a breach of contract, the party injured by the breach will be entitled only to recover that sum of money as will place him or her in the same financial position he or she would have enjoyed if the breach had not occurred.  Many courts apply the same reasoning when an insurer has breached its contract of insurance by failing to honor the agreement to indemnify its insured against the loss sustained.  Such courts limit an insured's right to recover from the insurer to what the insured should have recovered under the terms of the policy with interest from the date of the breach.

Some courts recognize other damages for breach of contract if, for instance, the failure to settle was an attempt to coerce the insured to accept a lower settlement.  The damages are still based upon contract and not in tort.

Other courts have taken the position that there is a particular obligation on the part of an insurer to deal fairly with its insured and if the insurer is found to have been guilty of bad faith in dealing with an insured by wrongfully refusing to pay what was rightfully due him or her, it will be penalized by way of liability in tort for compensatory damages and, in a proper case, punitive damages may be sought in addition to its liability under its policy contract.

To establish a claim for bad faith, an insured must show both the absence of a reasonable basis for denying benefits of the policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.  It is apparent that the tort of bad faith is an intentional tort.  Bad faith, by definition, cannot be unintentional.  Bad faith has been defined as "deceit, duplicity, or insincerity."  Deceit has been defined as a deliberate deceptiveness in behavior or speech.  Therefore, when the insurance company's refusal to honor the insured's claim under his or her policy is due to such described behavior, a substantial number of jurisdictions will allow the insured to recover an award for tort damages which will be in addition to what he or she is entitled to receive under the insurance policy.

The general rule is that a denial of liability or refusal to pay, based on an honest disagreement between the insurer and its insured, will not cause the insurer to be liable for consequential or punitive damages.  The honest disagreement can be on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy condition.  An important consideration in determining whether an honest disagreement existed between the insured and the insurer is whether the latter properly investigated and evaluated the claim.  For example, if the insured's refusal to honor the insured's claim was based on a perfunctory investigation or where it recklessly ignored and disregarded a proper investigation, the carrier may be liable in tort also.

It must be noted that some states have significantly changed the concept of bad faith, such that now an insured can far more easily establish a case of bad faith.  The claims

6-28-02

**D 000493**

Exhibit 13 Page 171

**PROTECTED DOCUMENTS**

handler must be aware of the applicable bad faith rules in the states for which he/she has responsibility.

### XXI.  ASSIGNMENT AND SUBROGATION

#### A.   Assignment

An assignment is the transfer of property, real or personal, to another.  A cause of action for damages is an item of personal property, and, as such, may be the subject of assignment. There is, however, one exception; causes of action for personal injury may not be assigned in whole or in part.  This is an ancient common law rule which regarded such causes of action to be personal and to be asserted only by the injured person.

The common law rule has been modified in certain areas such as workers' compensation, where some statutes specifically provide for a transfer of the claimant's cause of action to the insurer who has made the compensation payments. On the other hand, property damage causes of action may be assigned, but the third party tortfeasor is not bound by the assignment and is not required to recognize it unless and until notice of the assignment is served on him or her. When notice is served, the tortfeasor has actual knowledge that the original property damage claimant no longer owns the cause of action, and he or she must then deal with the new owner of the cause of action.  As to the assignee, he or she obtains no greater rights than those of the original claimant.  The same defenses, which were available against the original party, may be asserted against the assignee.  Where there has been an assignment and the third party tortfeasor has no notice of the assignment, he or she owes no duty to the assignee.  An assignment will require that the insurer bring suit against a third party in its own name, as assignee of the insured.

#### B.   Subrogation

When an insurer has fulfilled its legal obligation under its policy by making payment to its insured, it becomes entitled to succeed to the rights of its insured, against any third party who may be legally liable for having caused the damage for which payment was made.  The right of subrogation was an equitable right at the comon law and came into existence immediately upon payment without the necessity of any affirmative action on the part of the insured.  As the business of insurance evolved and became more complex, the policy forms used to provide different types of coverage, in many instances, spelled out in detail exactly what rights the insurer acquired and what requirements were placed on the insured with regard to the subrogation rights of the insurer.  The courts have held that when these rights and obligations were spelled out in the policy, the policy provision would take precedence over the equitable right of subrogation as it existed at the common law so that, today, reference should be made to the policy conditions of the particular policy form involved to determine the rights and obligation of the insurer and the insured with regard to claims involving damage caused by a third party.

VIII-16

6-28-02

**D 000494**

Exhibit 13 Page 172

PROTECTED DOCUMENTS

## XXII.  REAL PARTY IN INTEREST RULE

The courts, generally, require that all actions be brought in the name of the real party in interest. That is, the party who is legally entitled to receive the amount of any judgment which may be rendered by the court.  This rule is designed to prevent defendants from being badgered by legal actions which might be commenced by those with no legal rights to recover from him or her.  In the early cases, the courts held that an insurer who succeeded to the rights of its insured by way of subrogation, had become the real party in interest and would be required to bring any legal action against an allegedly responsible party in its own name.

There was considerable thinking that bringing suits in the name of the insurer might result in jury prejudice against an insurer suing a third party, so various documents were developed in an attempt to continue the insured as the real party in interest despite the fact the insured had been paid by his or her insurer so that suit could be brought in the name of the insured.

An early document developed to meet this requirement was the loan receipt which attempted to create the legal fiction that the payment was not a payment at all, but was merely a loan from the insurer to the insured, which would be repayable only out of any recovery, the insured might make from a third party.  Some jurisdictions recognized the loan receipt as sufficient to accomplish this purpose while others held that the insurer was still the real party in interest and should appear in the action as the party plaintiff.

A later development was a trust agreement in which the insured agreed to prosecute the action in his or her own name as trustee for his or her insurer and hold any recovery in trust for the benefit of the insured.  The argument supporting the use of a trust agreement as a subrogation document is based on the fact that when an insured who has been paid for his or her loss brings a suit against a third party and makes any recovery, he or she holds such recovery as an equitable trustee for the benefit of his or her insurer.  Many jurisdictions permit the trustee of an express trust to sue in his or her own name without naming the beneficiary of the trust as an additional plaintiff.  As the only difference between an express trust and an equitable trust is that the trustee under an express trust is made a trustee by a formal document rather than as a matter of equity, it was a simple matter to transform the equitable trust into an express trust by having the insured execute a formal trust agreement.  Some jurisdictions permit an insurer to bring suit in the name of its insured under any form of subrogation document.  In these jurisdictions, a subrogation agreement or subrogation receipt will be just as effective as either a loan receipt or a trust agreement.

## XXIII.  SETTLEMENT WITH THE TORTFEASOR BY THE INSURED

The general rule is that a release given by the insured to a tortfeasor who is primarily liable for the injury destroys the insurance company's right of subrogation and is a bar to

VIII-17

6-28-02

**D 000495**

Exhibit 13 Page 173

**PROTECTED DOCUMENTS**

recovery on the policy. This rests on the fundamental principle that the insured is not entitled to double compensation for the same loss. Some cases go so far as to hold that, where certain items of damage are reserved in the release, the right to recovery is nevertheless extinguished, because most courts hold that a release from liability for a tort extinguishes all claims for damages growing out of it.

Furthermore, any payment for damages received by the insured from the wrongdoer, before settlement with the insurer, reduces by operation of law the liability of that insurer to the extent of the payment. Where the insured releases his or her right of action against the wrongdoer before settlement with the insurer, that release destroys, by operation of law, the insured's right of action on the policy.

If the insurance company has paid the claim and thereafter the insured releases the claim, as between the insurer and the insured, cases hold that the insured holds such payment in trust for the benefit of the insurance carrier. It should be emphasized that the foregoing is limited to the rights and obligations of the insured and the insurer as between themselves. Where the insurer has made a payment and the third-party tortfeasor is on notice of the payment, the insurer will have a cause of action against the tortfeasor to recover its damages, regardless of whether the tortfeasor settles with the insured or not.

**XXIV.   BAILMENTS**

In some instances, particularly in those states which follow the contributory negligence doctrine, negligence of the driver of the other car may not constitute a defense to any claim of the owner of the vehicle.

For example, the owner of an automobile may have loaned his or her car to a friend, and while it was being used by the friend in the friend's own business, the accident occurred. Under these circumstances, the transfer of custody of the owner's car is called a bailment. If the friend was negligent and his or her negligence contributed to the accident, it might still be impossible to impute that negligence to the owner, depending upon the law of the state where the accident occurred. Consequently, if there is evidence of negligence on the insured, he or she may be legally liable to the owner of the damaged property because the contributory negligence of the driver of the other vehicle would not afford a defense.

**XXV.   AGENCY**

The relationship between the owner of the other car and his or her driver (the bailor and the bailee) should be thoroughly investigated. If it develops that at the time of the accident the driver was performing an errand for the owner or was acting as an agent or employee of the owner, a basis may be found for imputing the negligence of the driver of the other vehicle to the owner, thus avoiding payment by the Company.

VIII-18

6-28-02

**D 000496**

Exhibit 13 Page 174

PROTECTED DOCUMENTS

XXVI.   **IMPUTED NEGLIGENCE**

In some states, the negligence of the driver is imputed to the owner by statute if the vehicle is being driven with the permission of the owner. In other states, the owner is liable for the negligent operation of a motor vehicle by members of his family. A few states make the owner liable only if the driver is a minor. Community property statutes in some states permit the negligence of one spouse to be imputed to the other.

All claims technicians should know the law of the jurisdictions in which they handle claims. This information is generally available in summary or table form in the <u>Insurance Bar</u> and <u>Best's Recommended Insurance Attorneys</u>. These are available in all regions.

XXVII.   **LIABILITY OF THE OPERATOR OF THE PARKING FACILITY**

Under a contract of bailment, the parking lot operator is under a duty to exercise reasonable care for the preservation and the protection of the property. His or her failure to do so will expose the operator to liability. Where the operator is either unable to deliver the property or delivers it in a damaged condition, a presumption arises in favor of the owner of the automobile that the loss or damage is due to the negligence of the parking lot operator. This presumption can be overcome only by proof that the loss or damage was not due to any failure on the part of the operator to exercise ordinary care.

Where the owner is not able to establish a bailment contract, whether the relationship is that of lessor-lessee or licensor-licensee, the parking facility operator assumes no duty with respect to the protection and preservation of the property. He or she is liable to the owner only if the loss or damage is caused by wrongful act. Therefore, in such a case, the owner is confronted with the problem of establishing the operator's wrongful act as the cause of the damage, and no presumption in favor of the motorist arises from the relationship.

XXVIII.   **DURATION OF THE BAILMENT CONTRACT**

Many parking facilities do not offer service on a 24-hour basis, but are open for a limited number of hours during the day or night as the case might be. When cars are left in the parking lot beyond the closing time, it is customary for the attendant to place the keys to the car either under the mat near the driver's seat or on the back of the sun visor above the driver's seat. Where the owner is aware of the limited hours of operation and of the custom with regard to the disposition of the car keys when the car is left on the lot beyond the closing hour, the courts will hold that the owner has agreed to the termination of the bailment contract as of the closing time, and that any loss or damage to the car occurring after the closing hour will not involve the bailee's responsibility. Since the owner will be faced with a problem of proof as to whether the loss or damage occurred during the period of the bailment or after the closing time, the courts generally hold that, in such a situation, the usual presumption in favor of the bailor still is applicable. The bailee must establish that the loss or damage did not occur during the period of the

VIII-19

6-28-02

**D 000497**

Exhibit 13 Page 175

PROTECTED DOCUMENTS

bailment contract. This usually can be accomplished by the testimony of an attendant that the car was present on the lot and was undamaged at the closing hour.

XXIX.   EFFECT OF DISCLAIMER OF LIABILITY

Frequently, parking lot operators attempt to avoid the consequences of a bailment contract by printing on the back of the claim check a recital to the effect that the management assumes no responsibility of any kind for the property and that the charges are for the rental of space; or a limitation of liability to $100.00 in the event of loss or damage; or a complete disclaimer of liability for fire or theft. The weight of authority holds these disclaimers to be ineffective, regardless of whether the limitation or the terms were called to the attention of the motorist or not, the general rule being that a bailee for hire cannot, by contract, exempt himself or herself from liability for his or her own negligence or for that of his or her agents or servants.

VIII-20

6-28-02

D 000498

Exhibit 13 Page 176

PROTECTED DOCUMENTS

# CHAPTER IX

## SUIT HANDLING

### I.    INTRODUCTION

Across the nation, there has been a steady increase in the number of lawsuits filed by people who have been involved in automobile accidents.  It is of the utmost importance that we at GEICO handle these suits properly and efficiently so that we protect the interests of both the insured and the Company.

All lawsuits, whether involving first-party or liability claims, must be regarded as very serious matters.

### A.    Causes of Litigation

While some lawsuits cannot be avoided, the claim technician's function is to dispose of all claims properly and fairly.  Generally, there are only three acceptable reasons for a lawsuit:

- Excessive demand and no prior opportunity to settle on a reasonable basis.

- Clearly no liability.  (Generally, there is no objection to permitting such a case to go to suit as there is little else that can be done short of paying money that is not owed.)

- The parties are not ready to settle and the statute of limitations period is ending.

Even a settlement that does not appear favorable is frequently better than a lawsuit with its attendant risk and expenses.  We should not encourage a plaintiff's attorney to file suit by failing to make a timely offer or failing to suggest alternative dispute resolution.

### B.    Why Cases Go To Suit

- A breakdown in settlement negotiations
- Lack of early contact with claimant or attorney
- Lack of early investigation
- Personality conflict between attorney and examiner
- Heavy caseload of either attorney or adjuster
- Dispute as to liability

IX-1

6-28-02

**D 000499**

Exhibit 13 Page 177

## PROTECTED DOCUMENTS

- Unrealistic settlement expectations of either or both party/parties
- Dispute as to causation of injury
- Dispute as to value of the injury
- An unresolved or disputed coverage issue
- Client pressure on the attorney
- Stay the statute of limitations
- Plaintiff's attempt to obtain nuisance settlement in a case of no legitimate value
- Plaintiff obtains service over the defendant before the defendant leaves the state
- Instances when the case has a value of more than the insured's policy limits and the plaintiff's attorney is attempting to go after the insured's personal assets
- Plaintiff's attorney is being innovative in the nature of his claim
- Following new trends in other jurisdictions, e.g., stacking of coverages

C.    **The Stages of Litigation**

There are usually four stages in the litigation process. The following is an outline of these stages:

   1.    **Filing the Suit**

- Jurisdiction
- Service of process
- The complaint (or petition)
- The answer
- Intervention and the intervener (e.g., workman's compensation carrier)
- Amendments to the pleadings – supplemental pleadings

   2.    **Pre-Trial Discovery**

- Interrogatories (may be addressed only to a PARTY)
- Depositions (examinations before trial)
- Medical examinations
- Documents
- Requests for admissions; stipulations
- Time limitations on discovery; sanctions

   3.    **Pre-Trial Conference, Pre-Trial Order**

- Motions

IX-2

6-28-02

**D 000500**

Exhibit 13 Page 178

PROTECTED DOCUMENTS

4. **Trial**

- Selection of the jury
- Opening statements
- Plaintiff's case; defendant's case
- Rebuttal and surrebuttal
- Closing arguments
- Judge's instructions to the jury
- Jury retires for deliberations
- Verdict and entry of judgment

D. **Insured's Duties**

The policy contract requires the insured to forward immediately any suit papers received. Failure or unreasonable delay in getting the papers to the Company may raise a question of coverage that should immediately be discussed with the claims supervisor or manager, the Regional Liability Administrator (RLA) and Claims Legal.

E. **GEICO'S Obligations**

It is our responsibility to handle expeditiously the suit against the insured. We should do nothing to prejudice the insured's rights or to expose the insured to any excess verdicts or judgments.

We must at all times be sympathetic and understanding of the needs and feelings of the insured. In most situations this is probably the first time the insured has been sued. He is unfamiliar with the litigation process. He is not sure what we will do for him. He is anxious about the outcome. He is concerned about his financial future. Inform the insured of the litigation process step by step. Our goal should be to keep him informed along the way. We should let him know if we are in settlement negotiations. If the negotiations have stalled and the case is being diaried, tell him.

We should promptly inform the insured when the suit has been resolved. This should be done in all cases by mail. The letter should inform the insured of the disposition of the case. The letter should not be all "legalese," but sound like a friendly conversation. We should send this letter within five days after disposition of the case. This will reinforce the fact that we have kept on top of the situation and have looked out for the insured's interest. A copy of this letter must be sent to the defense counsel.

6-28-02

D 000501

Exhibit 13 Page 179

PROTECTED DOCUMENTS

**II.    FILING SUIT**

   **A.    Complaint**

The lawsuit begins when the party claiming injury (the plaintiff) files a complaint (or in some states services the summons) or petition with a court that the plaintiff believes has jurisdiction.

Depending on the rules of procedure as subscribed to by the jurisdiction, the complaint may be very detailed concerning the allegations. The complaint must make a case against the defendant. This also is true for a counterclaim, cross-claim or third party claim. In other jurisdictions the content of the complaint may be very general and non-specific.

Black's Law Dictionary states that the complaint shall contain: (1) the title of the case specifying the name of the court in which the action is brought, the name of the county in which the trial is required to be held, and the names of the parties to the action, plaintiff and defendant; (2) a plain and concise statement of the facts constituting a cause of action, without unnecessary repetition; each material allegation shall be distinctly numbered; and (3) a demand for the relief to which the plaintiff believes himself entitled. If the recovery of money were demanded, the amount thereof must be stated. Code N.C. 1883, 233 (C.S. 506)

   **1.    Counterclaim**

Black's Law Dictionary defines this as a claim presented by a defendant in opposition to or deduction from the claim of the plaintiff. Federal Rule of Civil Procedure 13 (FRCP). If established, such will defeat or diminish the plaintiff's claim. Under federal rule practice, and also in most states, counterclaims are either compulsory (required to be made) or permissive (made at option of defendant).

A counterclaim may be any cause of action in favor of one or more defendants or a person whom a defendant represents against one or more plaintiffs, a person whom a plaintiff represents or a plaintiff and other persons alleged to be liable.

Note:  Our counsel would file a counterclaim against a plaintiff
       Driver for contribution and/or indemnification on the
       Injuries of plaintiff's passengers, as appropriate, but would
       Not file a counterclaim for personal injuries of the client.
       The client <u>must</u> be advised of his right to make such a claim,
       Especially in compulsory counterclaim jurisdictions.

IX-4

6-28-02

**D 000502**

Exhibit 13 Page 180

**PROTECTED DOCUMENTS**

2.    **Cross-Complaint**

Black's Law Dictionary states that whenever the defendant seeks affirmative relief against any named co-defendant, relating to or depending upon the contract or transaction upon which the action is brought, or affecting the property to which the action relates, he may, in addition to his answer, file at the same time, or by permission of the court subsequently, a cross-complaint against that co-defendant. The cross-complaint must be served upon the parties affected thereby and such parties must respond to the cross-claim as they would to the original complaint. This is allowed when a defendant has a cause of action against a co-defendant that affects the subject matter of the action. The only real difference between a complaint and a cross-complaint is that the first is filed by the plaintiff and the second by the defendant against a co-defendant. This is usually for contribution and/or indemnification. Both contain a statement of the facts and each demand affirmative relief upon the facts stated. The difference between a counter-claim and a cross-complaint is that in the former the defendant's cause of action is against the plaintiff and the latter against a co-defendant.

3.    **Third Party Complaint**

A defendant may bring in a new person or entity as a third party defendant alleging that the new party is liable for any amounts assessed against the defendant in favor of the plaintiff. A third party action must be served – just like a complaint – on the third party defendant and he or she can end up in default if he or she fails to answer. It is basically an action for contribution and/or indemnification against a person not originally named as a party by the plaintiff. The plaintiff will frequently file an amended complaint naming the third party defendant as a defendant after the third party has been brought in. (This process is called the plaintiff's "amending over" to include the third party defendant in the plaintiff's lawsuit).

B.    **Importance of Pleadings (Generally speaking, the complaint and the answer)**

The complaint contains allegations that form the basis of the plaintiff's case and the answer contains the allegations that form the basis of the company's defense. The examiner should point out discrepancies and inaccuracies in the complaint to the company's defense attorney. Additional investigation frequently is suggested by the pleadings. Copies of pleadings should always be sent to Claims Legal when a claim on control goes into suit.

If the pleadings contain a paragraph requesting <u>punitive damages</u> because of the circumstances surrounding the occurrence, this should be called to the attention of the defense attorney. In the letter acknowledging the suit, if appropriate under the terms of the policy in question, the insured or insureds should be notified that an

IX-5

6-28-02

**D 000503**

Exhibit 13 Page 181

**PROTECTED DOCUMENTS**

award for punitive damages <u>might not</u> be covered under the insurance policy.
Questions concerning coverage for punitive damages should be discussed with the
Regional Liability Administrator (RLA) and Claims Legal.

**C.     Summons**

After the complaint is filed with the court, the clerk of the court issues a
summons. A summons is a legal document which the clerk of the court forwards
to a sheriff, marshal, or other person empowered by law to serve defendants. The
purpose of a summons is to notify the defendant that a suit has been filed against
him/her, that an answer to the suit must be filed with the court within a specified
period of time, and the penalty for failing to respond to the complaint within the
specified time frame. If we do not respond within the time frame as listed on the
summons, a default may occur.

In most jurisdictions, a copy of the complaint or petition is served with the
summons. However, some states allow the plaintiff a period of time to file the
complaint after the summons is served. In some others, only the summons is
served and the defendant or the defendant's attorney must secure the complaint
from the clerk's office.

**D.     Service**

Prevailing law in a given jurisdiction determines what does or does not constitute
proper service on a defendant. Some jurisdictions require that the defendant be
personally served, while others view the leaving of the summons at the dwelling
of the defendant as proper service. In some special circumstances, a summons
may be mailed to a defendant. Law in all jurisdictions provides for Service upon
infants and incompetents; this is usually handled through the appointment of a
guardian.  Corporations are served through "agents" authorized to accept service
and, in absence of such, through a state official designated for this purpose,
usually the Secretary of State.

**1.     Checking Service**

The manner in which service of process must be made effectively to
subject the insured to the jurisdiction of the court is prescribed in each
state. Always determine the time and place of service and the person
served, and whether the service was made by mail, in person, or in some
other manner. Give this information to our attorney so that he or she can
determine whether service of process was proper.

**2.     Notice of Service**

When an insured is served, he is then obligated by the terms of the policy
to "send us all papers dealing with claims or suits immediately." While an

IX-6

6-28-02

**D 000504**

Exhibit 13 Page 182

PROTECTED DOCUMENTS

insured has this obligation placed upon him or her by the terms of the policy, good practice is to remind the insured of the importance of this obligation while the investigation of the claim is underway. If the examiner feels there is a good chance that suit will be filed, remind the insured of his or her obligation in writing. The insured should be instructed to call us immediately upon receipt of a summons and complaint and to send to us the summons and complaint via registered or certified mail.

If we are notified by plaintiff attorney that suit has been filed, we should investigate the status of service, contact the insured, advise him or probability of service and instruct the insured to contact us by telephone and to forward summons and complaint immediately as soon as he is served!

When the insured informs us of service, obtain the following information: date of service, name of plaintiff, name of defendant(s), court, case number, answer due date, and how service was effectuated.

Once we have been informed of suit, we must locate the file and put it on daily diary until the summons is received. If we do not receive suit papers on schedule, we need to determine how much time (exact date) before answer is due. We may need to obtain a copy from the clerk of the court or request our counsel to get one. We may even need our defense counsel to put in an appearance or request for an extension of time. Bring this matter to the attention of a supervisor or Regional Liability Administrator.

**3.  Waiving Defense of Defective Service**

If there is a defect in service, we should make every effort to avoid waiving it where there is some advantage to be gained in obtaining a dismissal. All information concerning the service should be given to the defense attorney as soon as possible, since a special type of initial pleading is necessary to avoid waiving a defect in service.

If there is no advantage to be gained from a dismissal for ineffective service, the effort will only add to legal expenses. If it appears advisable not to question service, even though there is some slight defect, obtain the insured's written consent to waive arguments regarding potentially defective service. This is especially important if the ad damnum exceeds the policy limits. If service is not questioned, the insured might later contend that he was exposed to liability that could have been avoided with proper handling.

The Waiver of Defective Service form (C-92) (see Exhibit 1) has been prepared for the insured to consent to waiving a defect in service. A

IX-7

6-28-02

**D 000505**

Exhibit 13 Page 183

PROTECTED DOCUMENTS

personal meeting makes possible a thorough explanation of the situation and offers the opportunity for the attorney to answer any questions raised by the insured. If it is impractical to set up an in-person meeting with the insured, his or her written consent may be obtained by correspondence if the claims supervisor approves. Such a letter to the insured must be carefully written, explaining fully the advantages and disadvantages of the waiver.

E.     Answer

Once the insured (defendant) has been served with a summons, the defendant must "answer" the complaint within a specific time frame. When the summons is not answered timely, the court might enter a default against the defendant.

The answer is the formal written statement made by a defendant setting forth the grounds of his defense(s).

Under Federal Rule of Civil Procedure 12, a person may use an answer to set up all defenses, but he also has the option to use a motion to assert certain defenses. Many states follow the federal rules.

It is the examiner's responsibility to insure a timely and proper response to the lawsuit. The examiner should ask the following questions when preparing to have a complaint answered:

- Does the plaintiff have a proper cause of action?
- Does the insurance policy cover the defendants?
- Was suit filed in the proper jurisdiction?
- What is the statute of limitations?
- Is more investigation needed for a proper defense?

Counsel for the defendant develops the answer. The function of the answer is to respond to the allegations. Some states permit a very general response while other states require that the answer respond to each allegation stated in the complaint. We normally request the court to award reimbursement for expenses that we incur in defending the suit.

1.     Forms of Denial

- Outright denial of the allegation
- If we are without knowledge or information as to the truth of an allegation, we must state so. This has the effect of a denial.
- We might deny only portions of the allegation and admit what is true.
- If we fail to deny an allegation, it will be deemed admitted.
- If there are allegations in the pleading which do not permit or require a response, they are considered denied.

IX-8

6-28-02

D 000506

Exhibit 13 Page 184

**PROTECTED DOCUMENTS**

- Some jurisdictions (MD for example) allow general denials in tort cases. These can read, "defendant denies generally all allegations of negligence and damages."

**2.  Affirmative Defenses**

Under the Federal Rules of Civil Procedure (FRCP) and most state rules, all affirmative defenses must be raised in the answer. Such defenses include:

- Assumption of Risk
- Contributory Negligence
- Comparative Negligence
- Duress
- Estoppel
- Statute of Limitations
- Release
- Payment
- Award
- Arbitration
- Fraud
- Res Judicata
- Jurisdiction
- Seat Belt
- Waiver

**F.  Other Pleadings and Motions**

**1.  Joinder**

Black's Law Dictionary defines this as "joining or coupling together; uniting two or more constituents or elements in one; uniting with another person in some legal step or processing; union; concurrence". This motion is utilized to add individuals whose participation in the suit is necessary to protect an interest of justice or to assure that complete relief can be accorded among those already parties to the suit.

**2.  Consolidation of Actions**

The act or process of uniting several actions into one trial and judgment, by order of a court, where all the actions bear sufficient relationship to each other, pending in the same court and involving substantially the same subject-matter, issues and defenses; or the court may order that one of the actions be tried, and the others decided without trial according to the judgment in the one selected.

IX-9

6-28-02

**D 000507**

Exhibit 13 Page 185

**PROTECTED DOCUMENTS**

3.   **Motion to Sever**

This is a motion to separate one suit from another where a consolidated trial would prejudice a party's position.

4.   **Declaratory Judgment**

<u>Black's Law Dictionary</u> defines this as a statutory remedy for the determination of a justifiable controversy where the party bringing the action is in doubt as to his legal rights. This type of lawsuit results in a binding adjudication of the rights and status of litigants even though no consequential relief is awarded. Such judgment is conclusive in a subsequent action between parties as to matters declared and, in accordance with the usual rules of issue preclusion, as to any issue actually litigated and determined.

Declaratory Judgment Act. Federal statute enacted in 1934, which permits the bringing of a complaint for a declaration of rights if there is an actual controversy between the parties. The judgment is binding as to present and future rights of the parties to the action. Most states have statutes patterned on the Uniform Declaratory Judgments Act.

\*  5.   **Motion to Dismiss**

A motion filed before trial used to assert one or more of the following defenses to a Complaint:

- the court lacks personal jurisdiction over the defendant
- venue of the case is improper
- service of process is insufficient or defective
- the Complaint, even accepting everything alleged as true, fails to state a claim upon which relief can be granted
- the Complaint fails to join a necessary party

In cases pending in federal court, a motion to dismiss must be made before or at the same time a responsive pleading such as an Answer is filed or the defense is deemed to have been waived.

In state court, motions to dismiss can also be used for failure to answer discovery. For example, if Plaintiff fails to answer discovery after a court order requiring answers by a certain date, the defense can file a motion to dismiss for failure to answer discovery.

IX-10

3-25-09

D 000508

Exhibit 13 Page 186

**PROTECTED DOCUMENTS**

6.   **Motion for Judgment on the Pleadings**

Black's Law Dictionary states that under FRCP 12 (c) any party may move after the pleadings are closed for judgment thereon. It is a device for disposing of cases when the material facts are not in dispute and only questions of law remain.

7.   **Motion to Compel Plaintiff to Post a Bond**

When plaintiff is an out-of-state resident.

8.   **Motion for Summary Judgment**

Black's Law Dictionary states that FRCP 56 permits any party to a civil action to move for a summary judgment on a claim, counterclaim or cross-claim when he believes that there is no genuine dispute of material fact and that he is entitled to a judgment as a matter of law.  The motion may be directed toward all or part of a claim or defense and it may be made on the basis of the pleadings or other portions of the record in the case or it may be supported by affidavits and a variety of outside material.

Note:   Almost always done after some discovery or with affidavits supplementing information in pleadings.

9.   **Motion to Strike**

Black's Law Dictionary states that on motion of either party, the court may order stricken from the applicable pleading any insufficient defense, or any redundant, immaterial, impertinent or scandalous matter. FRCP 12 (f).

10.   **Motion to Preclude**

A motion to prohibit the other side from introducing evidence which it would have been able to introduce had they complied with the earlier request, e.g., for failure to service a Bill of Particulars or failure to provide answers to interrogatories.

11.   **Motion for Further Bill of Particulars**

This is used when the complaint does not clearly set forth the nature of the plaintiff's claim.

IX-11

6-28-02

**D 000509**

Exhibit 13 Page 187

**PROTECTED DOCUMENTS**

**12.    Motion to Secure Medical Reports from Plaintiff**

In some states, medical reports can only be "discovered" pursuant to an order of the court.

**13.    Motion for Judgment**

Black's Law Dictionary defines this as the request of a party for the judgment of the court in his favor. (Note: in Virginia, a tort lawsuit is called a motion for judgment).

**G.    Agreements to Defer Filing Answer**

Occasionally, a plaintiff's attorney will file suit merely to obtain service before the insured leaves the jurisdiction or to toll the statute of limitations. The plaintiff's attorney might agree that it is unnecessary for the Company to file any pleadings at the present time if there is a possibility of negotiating a compromise settlement. It is contrary to Company policy to rely on a verbal agreement of this nature, because a misunderstanding could result in future default judgment. A written agreement should be obtained stating that the attorney will not take a default judgment for a specified period of time and that they will notify us if service is obtained on the insured. If the agreement cannot be obtained in writing, our defensive pleadings must be filed.

It has long been customary in some jurisdictions to get an agreement with the plaintiff's attorney to extend the time to answer a lawsuit, in order to delay incurring the expense of a defense attorney on a case that we want to settle and which should be ripe for settlement in a very short period of time. The usual practice is to get an agreement in writing that an answer or other plea must be filed within ten days of written notice from the plaintiff's attorney.

Because of possible delays in mail, change of personnel, the increasing volume of claims, etc., any such extension of time should be to a particular date in the future. The examiner should have some record other than the claim file log notes and the claims manager should also have a control on this to avoid a default.

We must remember that this practice is not applicable in all jurisdictions so that it is not wise to do this in a jurisdiction in which we are not certain it has been approved.

Procrastination is not a sufficient reason for using this technique. A proper case for such an agreement is one in which we are almost at a settlement or where suit is filed in order to get service on a transient insured and there are only a few items left to check out, either on damages or liability in order to reach a decision on settlement value.

IX-12

6-28-02

**D 000510**

Exhibit 13 Page 188

## PROTECTED DOCUMENTS

If a second extension is needed, approval for the extension should be obtained from the branch managers or regional claims director. The second extension should also be confirmed in writing with the plaintiff's attorney.

H.   **Defaults**

A suit not answered within the time prescribed in the summons is eligible to be determined by the court to be in "default". There are many possible results of a default, all of which are bad.

If an insured is served with a summons and fails to notify the Company and allows the case to go into default, he or she may thereby have completely waived whatever protection he or she is entitled to under the policy.

If an insured is served and gives us proper notice, and we fail to have an answer filed, then we, the insurance company, become liable for all penalties the default may impose upon the defendant.

When the court enters a default, the defendant is precluded, as a matter of law, from defending on the facts; the question of liability has been decided against the defendant by virtue of the default. When the opportunity to defend on the question of liability is taken away, the insured's exposure normally increases. When this happens as a result of the Company's negligence, it is tantamount to removing the policy limit. The insured may undertake an action against GEICO for negligence that exposed the insured to substantial financial loss, causing him or her to suffer unnecessary additional expense, attorney fees, etc.

Any time a case goes into default, whether it was caused by the insured's failure to notify the Company or as the result of an error made by our Company, the examiner should immediately bring the default notice to the attention of his/her Supervisor, Manager or RLA. Claims Home Office Legal should also be notified immediately.

I.   **Venue**

Venue customarily refers to the county or district where the lawsuit is filed. (Venue sometimes is used to refer to the location of where an accident/injury occurred.)

It is important to ask ourselves if the venue is appropriate and favorable to us and, if not, what we can do to get the case to a more favorable venue. Some states have liberal laws as to where suit should be filed. Where the parties live or where the accident occurred usually are proper locations for a suit to be tried. A case may have more than one appropriate venue.

IX-13

6-28-02

**D 000511**

Exhibit 13 Page 189

**PROTECTED DOCUMENTS**

III.    **LIABILITY IN EXCESS OF POLICY LIMITS**

When the amount sued for in the lawsuit exceeds the policy limits, the insured should immediately be advised of this fact and informed that he or she may employ an attorney (at the insured's own expense) to protect his or her interests beyond the policy limits. In some states, and in some extraordinary circumstances, the attorney will be at our expense. By first class mail, send an Excess Ad Damnum Letter to the insured. Include a copy of the letter and request that the insured sign and return the copy to the Company. If the copy is not returned, send a copy of the letter by certified mail.

The Company may elect to settle or defend a suit against the insured but it has a duty to settle if there is an opportunity for a reasonable disposition commensurate with the liability, injury and damages involved. Failure to take advantage of such settlement opportunities may result in the Company being required to pay the entire amount of any resulting judgment, even in excess of the policy limits.

Liability of the Company in excess of the policy limits is of real concern. In the early days of automobile insurance, companies had the right to control the defense of litigation, but the duty to settle was not recognized. Because of the obvious inequity in permitting an insurance company arbitrarily to subject its insured to a substantial loss on the mere possibility of the Company's saving money, the theory of excess liability came into existence.

Under this theory, an insured may recover from the Company any loss in excess of the policy limits if the insured can establish that the Company did not deal in good faith or that it was negligent in the handling of the claim.

Follow these guidelines to reduce the danger of a finding of excess liability:

- When any letter or call is received which threatens excess liability, the examiner must immediately discuss the case with the claims supervisor. This includes letters or calls containing policy-limit demands and time-limit demands. If there is any reasonable probability that such a case would have a potential recovery value in excess of the policy limit, the claim supervisor is to discuss it with the Regional Liability Administrator and, if appropriate, Claims Legal.

- Conduct a prompt and thorough investigation.

- Be fair and reasonable in settlement negotiations; never take an arbitrary or unreasonable position.

- Be certain that the case is realistically evaluated. If much less is offered in settlement than is carried in the reserve, this fact might be introduced as evidence of bad faith.

IX-14

6-28-02

**D 000512**

Exhibit 13 Page 190

**PROTECTED DOCUMENTS**

- Send an Excess Ad Damnum Letter immediately upon learning that the insured has been served with a summons in which the amount sued for is in excess of the policy limits. Be sure that the letter includes all points covered in the sample in the Exhibits Section of Chapter X of this Manual.

- Engage competent trial counsel to represent the insured.

- Make sure that the case is properly prepared for trial. Know the identities of all the witnesses and how they will testify.

- Give careful consideration to the opinions of trial counsel as to liability and settlement value. An in-depth discussion with trial counsel on the possible outcome of the case should be conducted as soon as possible prior to the commencement of the trial.

- Advise the insured of significant developments as they occur.

- Occasionally, a case involves close questions of liability and value. If the Company and the insured's attorneys are not in agreement and the case is sufficiently large, consider obtaining an unbiased opinion from a competent attorney who is not connected with the case.

- Remember that all letters and memoranda in the claim file and in the Claims System may be used against the Company in a trial on the excess liability question.

For an insured to establish a right of action against the Company for liability in excess of the policy limits, the insured must show that he or she has been damaged because the Company did not fulfill its obligations. If claims are properly handled, there is no cause for undue concern over the vague possibility of an excess verdict. Threats to hold the Company for excess liability should not deter the intelligent claims handler from following sound practices.

## IV.    CLAIM HANDLING AFTER SUIT IS FILED

The preferred practice is to negotiate and settle meritorious claims before suit is filed. If suit cannot be avoided, the continuing unit examiner bears primary responsibility for the direction of the case, including settlement efforts.

In some instances, it may be appropriate to attempt settlement <u>after</u> suit is filed and <u>before</u> referring a case to defense attorneys to file necessary pleadings. To allow sufficient time for a thorough exploration of settlement possibilities, we sometimes ask plaintiffs' attorneys for an extension of time within which to file our pleadings. Occasionally, the lawyer representing the plaintiff will offer to stipulate to an extension

6-28-02

**D 000513**

Exhibit 13 Page 191

PROTECTED DOCUMENTS

of time. Whether sought by us or offered by a plaintiff's attorney, it is Company policy that an extension of time within which to file pleadings will not be accepted unless the agreement is in writing from the attorney representing the plaintiff. This policy is applicable whether claims personnel, staff counsel or a defense attorney obtains the extension of time.

Additionally, our policy is expanded so that stipulations to extend time to file pleadings should not be accepted for more than 60 days beyond the answer date. As a practical matter, if a case cannot be settled within a sixty-day period, it is not likely that a reasonable settlement will be obtained without substantial legal effort. Handling suits beyond sixty days without filing an answer involves risks we want to avoid. Claims Legal may approve exceptions to this policy. In some jurisdictions, the court must approve an extension of time to file pleadings.

After a case has been referred to counsel, counsel has an ethical obligation to represent competently the insured. Counsel cannot be effective unless he is kept informed of all aspects of the case, including the status of negotiations. We must, therefore, inform our attorneys of demands and offers on a timely basis. Failure to carry out this obligation will frequently place our attorneys in embarrassing situations and will also deprive the Company of helpful suggestions and recommendations from counsel. If a case is settled, the attorney assigned to handle the defense should be immediately informed of the fact of settlement and the settlement amount.

A.   **Handling Courtesy Copies of Suit Papers**

Courtesy copies of suit papers are copies of a lawsuit the plaintiff's attorney either plans to bring in the absence of a settlement or a lawsuit that has been filed but not yet served.

The following procedures are to be used for handling courtesy copies of suit papers:

- Within seven days of receipt of the papers, the claim is to be evaluated, authority requested as needed, and the plaintiff's attorney contacted for settlement.

- At the first contact with plaintiff's attorney after receipt of the courtesy copies he or she should be asked about the status of service upon the insured.

- Within seven days of receipt of the courtesy copies, the insured must by contacted by mail advising the insured that suit papers have been prepared against the insured and advising the insured of his duty to promptly notify us if and when service takes place.

IX-16

3-25-09

**D 000514**

Exhibit 13 Page 192

PROTECTED DOCUMENTS

- If the case does not settle within our evaluation of the claim, the examiner should suggest an alternative dispute resolution forum, e.g., mediation. If that fails, the plaintiff should proceed with service so that the matter can be concluded.

- The examiner should monitor the file for service by checking every 10 days. If the examiner refers the matter to counsel to monitor service, the file must be referred exactly as if service has been accomplished with the added instruction that until service is accomplished, counsel is to monitor the case for service.  Naturally, a case is not to be referred to counsel to monitor service unless that counsel will be handling the defense of our insured.

- Precautions must be taken to ensure that an answer is not filed on behalf of the insured prior to proper service. An answer should not be filed merely on the basis of the receipt by the claims examiner of courtesy suit papers

**B.    Suit Processing**

Upon the receipt of suit papers, the examiner must review the documents and do the following: check coverage again, check service, check venue, determine affirmative defense and consider the need for a declaratory judgment.

After considering all of the above, the examiner must take the following steps:

- Assign defense counsel
- Develop a suit referral letter
- Suit acknowledgment letter
- Complete Suit Referral Section in ClaimIQ
- Processing CRIS suit data

**1.    Assignment of Defense Counsel**

It is the examiner's responsibility to transmit the summons to defense counsel who will file an answer with the court within the time frame as outlined by the summons. Appearance on behalf of an insured in a lawsuit should be authorized only after a determination of proper service upon the insured.  Every precaution should be taken to prevent a default against an insured.

Careful consideration must be given to the recommendation of counsel retained by the Company to represent the insured. It must always be recognized that counsel is the legal representative of the insured and

IX-17

3-25-09

D 000515

Exhibit 13 Page 193

PROTECTED DOCUMENTS

claims technicians should never ask counsel to do anything adverse to the interest of the insured.

When selecting which defense firm to use, the examiner must consider:

- venue (where is the suit filed)
- seriousness of the injuries
- punitive damages
- liability and damages
- whether to defend or settle
- experience, reputation, and effectiveness of counsel
- staff counsel (guidelines below)

The examiner has three types of defense counsel to choose from and consideration should be made in this order: staff counsel; designated fee counsel; and fee counsel not previously approved.

a.     **Staff Counsel**

The examiner is responsible for identifying appropriate lawsuits to be referred to Staff Counsel.

b.     **Staff Counsel Referral Guidelines**

The following are general guidelines for litigation cases that should not normally be referred to Staff Counsel.

- Lawsuits involving a conflict of interest or having the potential for or appearance of a conflict.

- Lawsuits involving two insureds; e.g., both sides in a double insured case.

- Lawsuits involving a claim with an excess verdict almost certain; e.g., policy limits were offered in settlement and refused, a missed time limit response, etc.

- Lawsuits against any of the GEICO insurance companies without Claims Legal approval, except UM/UIM and no-fault claims where suing the Company is the usual procedure.

- Lawsuits demanding punitive damages against the insured, because such a demand can create the potential for a conflict of interest.  If punitive damages are first requested after the referral, the case should be immediately reviewed for any potential conflict of interest. If punitive damages are routinely

IX-18

6-28-02

**D 000516**

Exhibit 13 Page 194

**PROTECTED DOCUMENTS**

demanded, your judgment will be needed as to when it really represents a potential conflict.

- Lawsuits involving a coverage question; i.e., reservation of rights or non-waiver agreement involved unless the expressed permission of Claims Legal has been obtained prior to the referral.

- Lawsuits with unusual or complicated questions of law unless previously discussed with Claims Legal if on control and with Staff Counsel if not on control.

- Any case on appeal without express permission from Claims Legal in advance

c.   **Referral of Property Cases**

- First-party property cases may be referred to Staff Counsel but Staff Counsel retains the right to refuse the case.

- Third-party property liability cases will be referred to Staff Counsel unless approval to use outside counsel has first been obtained from the Claims Legal AVP. Staff Counsel may refuse third-party suits referred to Staff Counsel.

   The policy limit involved is not a determining factor as to whether or not a case would be referred to Staff Counsel. Furthermore, certain cases are especially appropriate for referral to Staff Counsel and whenever possible should be so referred. (i.e., threshold defense cases in No-Fault states).

   Exceptions to the above guidelines may be obtained on individual cases by contacting Claims Legal in advance of the referral.

d.   **Designated Fee Counsel**

   The Company has a number of outside defense counsel who has been approved to handle suits for us. Examiners should consult with their supervisor to get information on attorneys used in a particular geographic area.

e.   **Fee Counsel Not Previously Approved**

   We sometimes will encounter situations where suit is filed in an area where we do not have a designated defense attorney, or we do

IX-19

6-28-02

**D 000517**

Exhibit 13 Page 195

PROTECTED DOCUMENTS

not have a record of having used local counsel in a previous case. There can also be instances where a conflict of interest develops making it necessary to utilize alternate counsel and we have only one attorney designated for the area.

Under these circumstances, the region must select a defense counsel and get authorization from Claims Legal. The examiner should first discuss the alternate counsel with the Claims Manager and RLA and then submit a Notice of Change to Attorney/Adjuster Listing form (C96-A) (Exhibit 2) to Claims Legal for approval.

**f.    Referring Counterclaims to Counsel**

If our insured has filed an action for damages against a party and has received a property damage counterclaim, the claims supervisor should consider assignment of this defense to the insured's own attorney under the following guidelines:

- The insured's attorney should be experienced and capable

- The fee should be reasonable and consistent with the counterclaim and agreed upon before assignment, if possible.

- Consideration should also be given as to whether the counterclaim was initiated merely as a defensive step or whether it is meritorious.

Failure to file a proper pleading within the prescribed period may result in a default judgment against the insured or the Company. Every precaution should be taken to avoid such a possibility. This is one of the most serious errors a claimshandler can make.

If we have a written stipulation from the plaintiff's attorney that he or she will not take a default judgment and up-to-date negotiations indicate the possibility of settlement, we should so inform defense counsel.

**\*   2.    Suit Referral Document**

Whether the suit papers go to the attorney with or without a copy of the claim file, the examiner should complete a referral document to send to the defense attorney which contains a summary of the file. The summary should include an evaluation of the liability and damage issues involved and our recommendation for future handling. If our attorney disagrees with our thinking, he or she should then give us an opinion and

IX-20

3-25-09

**D 000518**

Exhibit 13 Page 196

**PROTECTED DOCUMENTS**

recommendation for future handling including additional investigation and the use of discovery proceedings. Finally, we should always advise our attorney whether we will conduct settlement negotiations. Normally, the examiner will negotiate with plaintiff's attorney, but if the defense attorney is really a talented negotiator, the examiner may feel it is more advantageous for defense counsel to deal with the plaintiff's counsel.

a.    **Suit Referral Document Checklist**

Tailor each suit referral document to the specific facts and issues of the individual case. Include only as much detail as the situation warrants. Only those points pertinent to the individual case should be covered in the document. The following checklist is a guideline:

- Identify why suit was filed.  Is there disagreement as to value?  As to liability?  Is there an attempt to obtain a nuisance settlement? Disagreement as to causation or injury?

- Give the accident facts that are material to the liability or damages issues.

- Identify any coverage issue and advise how it is being handled and whether any non-waiver or reservation of rights has been issued.  (See Chapter IV.)

- Identify potential legal issues. Emphasize those which may be used as an affirmative defense, assumption of risk, intra-family immunity, Federal Tort Claims Act, etc.  (See Chapter VI)

- Identify instances where there is potential exposure in excess of the policy limits in light of the facts or damages and the Ad Damnum clause. Provide the attorney with a copy of the Ad Damnum Letter to the insured.  (See Chapter X)

- Discuss material discrepancies in the testimony of witnesses.

- Describe what investigation remains outstanding, and provide names and phone numbers of adjusters working on the case.

- Briefly describe each plaintiff. Give name, age, marital status, employment situation and salary, and detail the

IX-21

3-25-09

**D 000519**

Exhibit 13 Page 197

**PROTECTED DOCUMENTS**

injury and special damages, noting those that have been
verified.

- Outline the material to be obtained through pretrial
  discovery and the form of discovery to be undertaken, e.g.,
  interrogatories or depositions. Specify who is to be
  deposed.

- Give your opinion as to value and the status of settlement
  negotiations.

- Specify who will conduct settlement negotiations - the
  attorney or the Company.

- Discuss questions of service of process, joinder of
  additional parties to the suit, counter claims, etc. Give
  specific details as to how service was accomplished.

- State recommendations as to further handling.

- Ask for the attorney's opinion on coverage, liability, and
  damage issues, and recommendations for future handling.

b.  **We Must Avoid the Obvious Pitfall Related to Litigation
    Management**

The real client is the insured. We must not allow our zeal to control
costs to interfere with the insured's interests. Remember, the
defense attorney's primary duty is to the insured. We must never
put an attorney in a conflict of interest position. We have an
obligation to protect the insured's interests. We must not place the
Company' interests ahead of the interests of the insured. In the
dispute between an insured and a third party, protection of the
insured must outweigh our interest in cost control.

3.  **Acknowledging the Suit**

Suit papers require priority handling by all personnel at all times, and the
procedures contained in this manual are to be instituted as soon as the
Company is advised of any filing, even if service of process has not been
attempted.

The examiner is responsible for directing the handling of a suit and must
be guided by the facts developed in the investigation, by Company policy
and technical procedures, and by knowledge of and experience with
defense counsel representing the insured.

IX-22

6-2-09

**D 000520**

Exhibit 13 Page 198

**PROTECTED DOCUMENTS**

All suit papers must be acknowledged in writing to all persons named in the suit for which we are providing a defense. Review the suit papers to determine the appropriate acknowledgment letter.  (See the "Exhibits" Chapter in this manual for sample Suit Acknowledgment, Excess Ad Damnum, and Punitive Damages letters.)  A copy of the acknowledgment should be sent to the defense attorney handling the case.

a.    **Excess AD Damnum Letters**

An Excess Ad Damnum Letter adapted to the individual case is to be sent to anyone to whom we owe a defense, when the amount demanded in the suit exceeds the policy limit or limits. If we are defending several persons, a separate letter must be sent to each defendant.  Amended complaints may require additional Excess Ad Damnum Letters.

Certain jurisdictions do not require the plaintiff to state an exact ad damnum in the initial pleadings.  A special "Excess" letter, the 'Unlimited Excess Ad Damnum" letter, is then used.  If, prior to settlement, the plaintiff makes known an exact ad damnum, a second, regular Excess Ad Damnum Letter must be sent to the defendant(s).

b.    **Punitive Damage Letters**

A request/demand for punitive damages requires a letter to all defendant(s) to whom we owe a defense under the policy.  If the Ad Damnum Clause(s) exceeds the policy limits, or the inclusion of a Punitive Damage Clause would put the total ad damnum over the policy limits(s), a special letter (Excess Ad Damnum and Punitive Damages Letter) should be sent.

If the punitive damage clause and the ad damnum clause do not, together, exceed the policy limit(s), a regular Punitive Damages Letter must be sent.

c.    **Other Acknowledgments of Suits**

When the amount asked in the suit is not in excess of the policy limit or limits, an acknowlegment must still be sent to anyone to whom we owe a defense, since the plaintiff upon application to the court may increase the ad damnum at any time.  If suit is brought against several insureds, separate acknowledgments should go to each.

IX-23

6-2-09

**D 000521**

Exhibit 13 Page 199

PROTECTED DOCUMENTS

All letters described above should be sent by regular mail, in
duplicate, with a request that one copy be signed and returned to
the Company. If we do not receive the signed copy, the letter must
be sent again by certified mail, return receipt requested, addressee
only.

**d.   Amendments to Original Suit**

If the original complaint is amended, then a new applicable letter
should be sent to the insured with copies to the defense attorney.

**4.   Counting Suits or Opening Suit in CRIS**

Before opening the suit in CRIS you need to determine the suit count.
Each feature counts as a separate suit. The inclusion of several defendants
in the same action does not increase the number of suits, but if separate
features are opened and suits filed against one or more insureds, the suits
are counted separately.

**a.   Count as Suits**

- Each plaintiff and cause of action against an insured under BI
  or PD coverages. This includes small claims actions.

- Each declaratory relief action in which the Company is named
  as a defendant.

- Each action in which the Company is a defendant in a suit to
  enforce contribution.

- Each cause of action under BI or PD coverages where the
  Company is the excess carrier and the value of the ad damnum
  is in excess or might be in excess (not specifically set out) of
  the limits of coverage of the primary carrier.

- Actions that the Company is defending in court under
  Uninsured Motorist Coverage.

**b.   Do Not Count as Suits**

- Friendly suits

- Court-approved settlements of non-litigated cases

IX-24

6-2-09

**D 000522**

Exhibit 13 Page 200

**PROTECTED DOCUMENTS**

- Declaratory relief actions in which the Company is the plaintiff

- Actions which the Company is defending in arbitration under Uninsured Motorist Coverage

- Actions under BI or PD coverages where the Company is the excess carrier and the ad damnum is within the limits of coverage of the primary carrier. When the value and ad damnum or the demand figure are known to lie within the limits of the primary carrier, the examiner should discuss with his supervisor whether further action should be taken or if the file should be closed.

c.    **General Rules for Counting Suits**

In determining the number of suits, the number of plaintiffs shall be used regardless of whether they are joined in one summons or not. Each separate and distinct cause of action should be reported as an individual suit. Where several plaintiffs join in one suit and only one summons and complaint is actually served on a defendant, the suit count shall be the same number of suits as there are plaintiffs and causes of action.

A claim shall be construed to be "in suit" as soon as notice of service is received at the Company office responsible for the control of the claim file. It shall only be removed from such classification when it has been settled or a final disposition otherwise reached.

d.    **Illustrations of Suit Counts**

Wife only injured, one suit brought, husband and wife plaintiffs. Husband's count is for loss of service. Do not open a separate feature for husband claim for loss of service.     **Suit Count = 1**

Wife and husband injured, one suit brought. Both named plaintiffs. Husband sues for own injuries and includes another count for his loss of consortium.     **Suit Count = 2**

Wife and minor child injured, one suit brought covering injuries to both. Husband also named as plaintiff with separate counts for loss of services of each. Do not open a separate feature for husband claim for loss of services.     **Suit Count = 2**

Same as above, but husband is also injured and includes count for own injuries.     **Suit Count = 3**

IX-25

6-2-09

**D 000523**

Exhibit 13 Page 201

**PROTECTED DOCUMENTS**

Wife killed, one suit brought. Husband sues as heir and also has count for special damages including funeral expenses.

Suit Count = 1

Individual killed, one suit brought by four heirs.

Suit Count = 1

## V.   EVIDENCE AND DISCOVERY

### A.   Evidence

The legal definition of "evidence" is "any species of proof, or probative matter, legally presented at the trial of an issue, by the act of the parties and through the medium of witnesses, records, documents, concrete objects, etc., for the purpose of inducing belief in the minds of the court or jury as to their contention".

A better explanation for our purposes might be:  the trial of a lawsuit is a process whose objective is the resolution of conflict.  The court and jury are the parties charged with the responsibility of performing this function.  Since the court and jury have no means of investigating the case before them, they must rely upon information furnished by the interested parties.  This information is called <u>evidence</u>.

We are responsible for securing and preserving evidence that may be needed at trial months or years later. Physical evidence should be labeled and kept in a secure place. Names, addresses and telephone numbers of all witnesses and nearest relatives or others should be promptly ascertained. A periodic check on the whereabouts of all witnesses should be made until the case is settled.  The best time to gather evidence is as early in the case as possible, while the facts are still fresh.

There are three types of evidence.

- Oral is the testimony of the witnesses.
- Documentary consists of written data, i.e., books, papers, reports, public and private records.
- Demonstrative is of a visual nature i.e., movies, videos, photographs and x-rays.

To be admitted, i.e. to be accepted by the judge at the trial, evidence must be <u>material</u>, <u>relevant</u> and <u>competent</u>.  Material means it must prove or disprove a matter at issue.  Relevant means it must have a clear connection to the case. Competent means it must come from a source that is able or qualified to give the information. A witness who had the ability to see, hear and recall the event is an example of a source of evidence that is all three of the above.

IX-26

6-2-09

**D 000524**

Exhibit 13 Page 202

**PROTECTED DOCUMENTS**

1. **Hearsay Rule**

"Hearsay" is defined as an out-of-court statement made by someone other than the declarant, offered for the truth of the matter asserted. Hearsay evidence is normally inadmissible at a trial. The above definition of hearsay is very technical and best left to the lawyers. For our purposes, we need to understand that a witness, under most circumstances, will be permitted to testify about those persons, places and things that are <u>personally known by that witness.</u> The hearsay rule prevents (under most circumstances) the witness from testifying about <u>what someone else said.</u>

Generally, the hearsay rule bars second-hand statements offered for the <u>truth</u> of the matter. If some other purpose can be shown, like intent or mental status, the statement can be admissible.

2. **Admissible Evidence**

- The plea of guilty at a motor vehicle hearing is admissible but the defendant is allowed to explain the plea.

- The majority rule is that conviction of a prior crime (criminal offense arising out if the same situation that produced the civil case) can't be admitted in the civil case. However, evidence of a prior conviction of certain types of crimes, especially perjury or fraud, usually will be admitted to impeach a witness.

- Testimony in prior proceedings is allowed as an admission against interest if it qualified as such against a party to a lawsuit. However, if it is testimony of a witness, it may not be introduced at a later trial unless the witness again takes the stand and then only to impeach his testimony.

- Compromise offers (settlement offers) are not admissible as evidence of negligence. The fact that repairs are made, so that no further accidents occur, is not admissible on the issue of negligence. Certain safety investigations are inadmissible.

- Admission against interest is a statement or conduct that asserts facts that are contrary to that person's best interest.

- A prior inconsistent statement is a statement made previously which indicates a different position from the position being taken at trial.

IX-27

6-2-09

**D 000525**

Exhibit 13 Page 203

**PROTECTED DOCUMENTS**

- A statement of conduct by an agent of a principal can be admissible as if were the actual statement or conduct of the principal if the agent was acting within the scope of his authority when he made the statement/conduct.

- Declaration of pain and suffering can be admissible.

B.   Discovery

    1.   **Discovery Procedures**

In most jurisdictions, discovery procedures exist which allow one party to a lawsuit to compel the disclosure of information by the adverse party. Examiners and adjusters should be familiar with the procedures in each state with which they are concerned. There are significant differences between states. In some, the defense is entitled to a medical examination by a doctor of its choice, and in other states, it is not. In some states depositions of witnesses may be taken by the insured's attorney, and in other jurisdictions, there is no such provision. In a few states, either party can require the other to disclose the identities of witnesses. If an accident occurs in one state and suit is filed in another, discovery and other procedural matters are governed by the rules of the court in which the suit is filed.

While it is important to develop evidence in every way possible, discovery procedures should not be used if the information can be obtained efficiently by other means. Every effort should be made to ensure that the cost of defense is in proportion to the importance of the case.

    2.   **Discovery Defined**

Black's Law Dictionary defines discovery in a general sense as the ascertainment of what was previously unknown; the disclosure or coming to light of what was previously hidden; the acquisition of notice or knowledge of given acts or facts; as to the regard of discovery of fraud affecting the running of the statute of limitations, or the granting of a new trial for newly discovered evidence.

In other words, discovery is a term describing the process by which one party finds out about the other party's case, which includes securing the sworn testimony of witnesses. The provisions governing discovery also, as a rule, provide the opportunity to view and conduct reasonable examinations of any tangible evidence that may be used in the trial. Discovery concerns getting the facts, seeing the people involved in the accident in an atmosphere similar to what will be experienced in the

IX-28

6-2-09

**D 000526**

Exhibit 13 Page 204

**PROTECTED DOCUMENTS**

courtroom, determining the chances of success and providing access to
witnesses who may have refused to cooperate.

3.      Scope of Discovery

In general, under the Federal Rules of Civil Procedure, parties may obtain
discovery regarding any matter, not privileged, which is relevant to the
subject matter involved in the pending action, whether it relates to the
claim or defense of the party seeking discovery or to the claim or defense
of any other party, including the existence, description, nature, custody,
condition and location of any books, documents, or other tangible things
and the identity and location of persons having knowledge of any
discoverable matter. It is not grounds for objection that the information
sought will be inadmissible at the trial if the information sought appears
reasonably calculated to lead to the discovery of admissible evidence.

4.      Limit of Discovery

Under the Federal Rules of Civil Procedure, the frequency or extent of use
of discovery can be limited if:

● the discovery sought is unreasonably cumulative or duplicative, or
  is obtainable from some other source that is more convenient, less
  burdensome, or less expensive;

● the party seeking discovery has had ample opportunity by
  discovery in the action to obtain the information sought;

● the discovery is unduly burdensome or expensive, taking into
  account the needs of the case, the amount of controversy,
  limitations on the parties' resources, and the importance of the
  issues at stake in the litigation.

5.      Limitations of Time and Complying with Discovery

A court may impose sanctions against a party who is dilatory in complying
with the time limitations of discovery. Therefore, do not let defense
counsel permit the case to drag on because plaintiff is not complying with
discovery. We can force discovery by applying to the court for an order.

6.      Degree of Discovery

The degree of discovery needed in a given case is most often dictated by
the quality of the initial investigation. The better our investigation the
better we will be able to control discovery. We will be able to know
exactly what we need to develop throughout this process. Generally, a

IX-29

6-2-09

**D 000527**

Exhibit 13 Page 205

**PROTECTED DOCUMENTS**

great deal of discovery is not required in a case that contains a thorough investigation.

We need to analyze the case and identify the questions that need to be answered before defenses can be formulated. We then identify the witnesses who most likely have the needed answers. Decide which method (i.e., deposition, interrogatory, or medical examination) will be sufficient to get the needed answers. Then proceed based on these conclusions and limit the discovery to the areas identified.

7.    **Discovery Methods**

Under the Federal Rules of Civil Procedure and the governing rules in most states, parties may obtain discovery by one or more of the following methods:

- Depositions upon oral examination or written questions.
- Written interrogatories
- Bill of particulars
- Production of documents for inspection and other purposes
- Physical and mental examinations
- Requests for Admission (Facts or factors that will be admitted during trial).

8.    **Depositions or EBT's (Examination before Trial)**

A deposition (called on EBT in some states) is a method of obtaining information from witnesses. It is the testimony of a witness, made under oath, but not in open court, and written down so that it can be used when the case comes to trial.  It can be taken either orally or in written form. Oral depositions are sworn statements that the witness gives verbally in the presence of the attorneys who ask the questions.  Depositions are usually recorded by a stenographer and then transcribed. Written depositions are also sworn statements given by the witness who answers written questions with written responses.

When we desire an oral EBT or deposition of a witness, most states do not require that a petition to the court be made.  In some states, depositions can only be taken with the court's permission. In order to take a deposition (with or without a court's permission) all parties are entitled to advance notice; the amount of time for the notice varies from state to state.

As with oral depositions, we must give reasonable written notice when taking a written deposition.  The notice is served upon the witness and all other parties to the suit and must include the questions along with the name and address of the person who is to question them. The Federal

IX-30

6-2-09

D 000528

Exhibit 13 Page 206

**PROTECTED DOCUMENTS**

Rules of Civil Procedure state that within 30 days after the notice and the written questions are served, a party may serve cross-questions upon all of the parties. Within 10 days after being served with these cross-questions, a party may redirect questions upon all other parties. This 10-day rule also applied to further redirect questions and cross-questions.

For our purposes, depositions/EBT's help us determine what the witness will testify to at trial and what the overall impression the witness will make on a jury. They also help us to uncover additional facts. Depositions may lead to a stronger or weaker defense. They may also bring about settlement. At a trial, any part or all of a deposition of a party may be used against the <u>party</u> who was deposed. The deposition may be used for the purpose of contradicting or impeaching the testimony of the witness.

Videotape depositions may be used in lieu of a witness appearing at trial if the witness is a great distance from place of the trial or is unable to testify because of age, illness, imprisonment or infirmity.

9.    **Records Deposition**

In some jurisdictions, a party may request a records deposition of a person or business entity such as the plaintiff's health care provider or employer. A representative from the deposed organization is scheduled to appear with all records but may provide a complete copy of all records and <u>not</u> appear. This is being used more frequently to make sure complete records are obtained and/or to get prior medical history.

10.   **Interrogatories**

Another method of discovery is the use of interrogatories that are written questions that one party sends to another party. Any party may serve any other party written interrogatories. Interrogatories may be served upon plaintiff after commencement of an action. Each interrogatory is answered separately and fully in writing under oath. They are signed by the person making the answer and any objections signed by the attorney making them. Under the Federal Rules of Civil Procedure, the answer and objection must be completed within 30 days after service of the interrogatories. Interrogatories may be used at the trial to the extent permitted by the rules of evidence in the jurisdiction in question.

11.   **Bill of Particulars**

A Bill of Particulars in New York acts the same as interrogatories. It is designed to aid the defendant in developing a proper answer and preparing for trial by giving detailed information regarding the cause of action as stated in the complaint. In practice, it is a written statement of the

IX-31

6-2-09

**D 000529**

Exhibit 13 Page 207

**PROTECTED DOCUMENTS**

particulars of a demand. After the complaint and answer, the Bill of Particulars is the next procedure in the litigation process. Sometimes the special damages (medical bills and wage loss information) will accompany the bill of particulars. In the other states, a defendant (in addition to interrogatories) can request that the court require the plaintiff to flesh out the complaint. Such a request is called a motion for a more definite statement.

12.    **Production of Documents for Inspection and Other Purposes**

Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy any designated documents including writings, drawing, graphs, charts, photographs, compilations from which information can be obtained, or to inspect and copy, test, or sample any tangible things; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property. The request may be served upon the plaintiff after commencement of the action, with or after service of the summons and complaint. The request shall set forth the items to be inspected either by individual item or by category, and described each item and category with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts. The Federal Rules of Civil Procedure allow 30 days for a written response after the request. The documents for inspection shall be produced as they are kept in the usual course of business and should be organized and labeled. If an item is objected to, reasons shall be specified.

13.    **Physical and Mental Examinations of Persons**

When the mental or physical condition of a party is in question or controversy, the court in which the action is pending may order the party to submit to an examination by a physician. The order may specify the time, place, manner, condition and scope of the examination and the person or persons by whom it is made. After the examination, we must deliver to the party examined a copy of the examining physician's report on his findings to include results of test diagnosis and conclusions.

In some jurisdictions medical examinations or physicals may be accomplished prior to a court order. Some jurisdictions limit the number of examinations.

IX-32

6-2-09

**D 000530**

Exhibit 13 Page 208

PROTECTED DOCUMENTS

14.   **Request for Admissions**

A party may serve upon any other party a request for the admission of the truth in a matter that relates to statements or opinions of facts, application of law, or the genuineness of documents.

The Federal Rules of Civil procedure provide that the matter in question will be admitted unless 30 days after service a denial is made.  If an objection is made, the reason shall be stated. The answer should specifically deny the matter or explain why the party cannot truthfully admit or deny the matter. If a matter is admitted, then it is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission!

VI.   **TRIAL PREPARATION**

Each case is different. Therefore, we should take this into account when preparing for trial. What must be done in one case does not necessarily mean it will work or should be done in another.  In preparing for a trial, the examiner should (in consultation with defense counsel) consider each of the following points:

- Is there a need for additional discovery?

- What witnesses need be called?

- Who will be the trial judge and what can we expect from the judge at trial?

- Do we want a jury or bench trial?

- Is a bifurcated trial permitted and, if so, desirable?

- What is the jury-appeal of the plaintiff, the defendant, the doctors and the various witnesses?

- Has a final pre-trial order been entered?

Before trial, the examiners should do the following:

- Review coverage

- Review the facts.

- Review physical evidence.

- Review medical information.

IX-33

6-2-09

**D 000531**

Exhibit 13 Page 209

**PROTECTED DOCUMENTS**

- Review special damages.

- Discuss case with manager.

- Make sure reserve is proper.

- Keep in constant touch with defense counsel and the insured.

## VII.  TRIAL

This is the last stage of the litigation process, unless an appeal is instituted based on the outcome.  This is where all our effort and the defense counsel's preparation will finally be tested.

When we are notified of the trial date, we should review the claim file to ensure that it is ready for trial.  We should contact defense counsel to make sure everything is in order. Negotiation for settlement should always be on our mind.  If we settle before trial, we should obtain a dismissal or withdrawal.

Another thing to do when we are notified of the trial date is to complete the Trial Date in the Litigation Tab of ClaimIQ.  The Trial Calendar is located in the Litigation section of ClaimIQ and in the Claims Reports provided by Management Information. When a trial date is entered into the Litigation Tab of ClaimIQ, the calendar is populated. The information can be viewed by "adjuster" and "section" for all trials.

Notification of the suit can be made through the Litigation section of ClaimIQ after entering the trial date.  After entering the date, the hyperlink to the left of the box will open the adjuster's Outlook calendar.  They can select "Invite Attendee" and add their Regional Management (and Claims Home Office on CONTROL FILES) in order to notify them of a trial date.  Some regions may also require the use of the Suit Calendar form (C-20) (Exhibit 3).  This form notifies Regional Management (and Claims Home Office on CONTROL FILES) of a trial date.  This is a manual form that is generated by the examiner.  The C-20 must be completed in duplicate (in triplicate on control files) immediately upon receipt of a trial date, either definite or approximate.  The carbon copy is stapled in the left inside section of the file jacket.  The original is forwarded to the office assistant (or to whomever is designated by your management) who will record the information on the Division Trial Calendar.  Claims Management can review this Division Trial Calendar weekly.  The Trial Date should be updated in the Litigation tab if a change in trial dates is made or if a case is removed from a court calendar.

The Litigation Trial Calendar on ClaimIQ enables the examiner to maintain control of the weekly calendar status.  In those regions that opt not to use the ClaimIQ trial calendar, the Claims Examiner must utilize the Weekly Trial Calendar form (C-98) (Exhibit 4) and maintain it at their desk.  It is used to record suits scheduled for the week and their disposition.

IX-34

6-2-09

**D 000532**

Exhibit 13 Page 210

## PROTECTED DOCUMENTS

Pursuant to TCM-214, Claims Legal must be consulted before the commencement of any case to be tried before a jury or a case to be tried before a Judge if he or she has the power to award damages above $50,000. The consultation should take place at least 10 days before trial when possible. Examiners should consult TCM-298 to determine whom they should call in Claims Legal.

**A. Trial Process Check List**

- Has the attorney kept you informed of the progress of the suit and how the witnesses are presenting themselves at trial?
- Are all the witnesses available? If not, how does this impact our case?
- What is the impact of any circumstantial evidence?
- What is the make-up of the jury? Ask counsel to describe each juror. Differences in employment, health and accident history tell a great deal about attitudes and beliefs. We should be aware of juror bias in some localities.
- What evidence will the defense attorney put on at trial?
- Who are the witnesses that will be called at trial (all parties) and how persuasive or influential does counsel expect their testimony to be?
- Will the videotape deposition testimony be used at trial? If so, why?

**B. Post-Trial**

Once a verdict has been rendered, the following issues should be considered:

- What were the components of the jury's damage award? Is the award excessive in light of the evidence presented?
- Was a motion for judgment, notwithstanding the verdict, filed? If no, why?
- Are there legitimate grounds for appeal? If so, what are they and what is the likelihood of our prevailing on the appeal?
- Did counsel poll the jurors following the verdict?

Where a verdict is returned against the insured in excess of the policy limit, the question of whether an appeal is to be authorized by the Company must be made as expeditiously as possible so that if the Company decides not to appeal, the insured will still have sufficient time to take an appeal on his own if that is his desire. Where a verdict is obtained against the insured in excess of the policy limit and an opportunity exists for the settlement of the claim for the policy limit, the

**PROTECTED DOCUMENTS**

decision not to settle is a very serious one and Claims Legal must be consulted before any such final decision is made.

## VIII.   CLOSING THE SUIT

After we have either negotiated or have won or lost the litigation, we must close the suit file. The first step is to promptly inform the insured when the suit has been resolved by phone and then in writing, within five days of the deposition of the case. The letter should not be all "legalese" but sound like a friendly conversation.

At this stage, we will be receiving the closing papers from our attorney, which may include a bill for fees from fee counsel. Update the Litigation Tab with the trial disposition on ClaimIQ. (Or where applicable complete the C-20 by checking the disposition of the case on the face of the C-20 and forward it to the manager.)

The suit must be closed in CRIS. This is done by keying a suit disposition code, the ATTNY-ADJ code and then pressing enter. If we have multiple suits opened on the feature, each suit must be closed one at a time, with a valid disposition code and ATTNY-ADJ code.

## IX.   ATTORNEY PERFORMANCE REVIEW

The Attorney Performance Review form (C-39-A) (Exhibit-5) is intended to gather information on the law firm that handled the suit. This information will produce a record of the quality of the attorney's performance. The examiner will complete a C-39-A upon closure of all C-103s and control files involving the use of defense counsel. No copy will be kept in the claim file. The original is to be given to the claims manager for review. If there has been only superficial handling of the file by the attorney, there is no need to complete a C-39-A. The form should be completed whether the case is resolved through negotiation, ADR or trial.

The claims manager should review all C-39-A for any significant problems including appropriateness of billing. If the examiner has been critical of an attorney's performance, the claims manager should review the file to see whether the examiner's comments are justified. Claims Home Office should be advised of serious difficulties. Completed forms are to be permanently stored in the Attorney's Performance Review (APR) file.

On an annual basis, the claims manager should go over each APR file and summarize the C-39-A accumulated over the past year. A report of any negative findings should be given to the Regional Assistant Vice President for Claims with a copy to Claims Home Office. If the performance of a firm is deteriorating, a discussion should be held with the managing partner in the firm to whom we look for responsibility. The Regional Assistant Vice President for Claims must agree in any case before a warning is given. Any change in representation must have the concurrence of Claims Home Office. Where possible, the

IX-36

6-2-09

**D 000534**

Exhibit 13 Page 212

**PROTECTED DOCUMENTS**

AVP for Claims should visit the firm in person to advise them of any adverse findings as noted in the annual APR review and to discuss steps to correct them.

- **Completion of Form C-39-A**

  Complete each section in detail.

  The questions in the first five sections of the C-39-A are self-explanatory. Use the space for "Comments" to explain the reasons for the checked ratings in each category. Use a separate sheet if more elaboration is desired.

  The "Overall Rating" section of the form reflects the attorney's overall handling of that particular case and should not indicate the examiner's general feelings about the firm. The "Excellent" category should usually be reserved for successful handling of unusually complex or difficult cases.

  The Summary Comments Section should be completed by the examiner to summarize the overall performance of the firm. A poor or unsatisfactory rating should be explained in detail.

  Claims Home Office will verify the adequacy and timeliness of the C-39-A reviews in conjunction with the regular Claims Quality Performance Review. The C-39-A is produced in duplicate, upon closure of the litigation. No copy will be kept in the claim file. The original will be given to the claims supervisor and manager for review. The claims supervisor will review all C-39-A's.

**X.   ANALYSIS OF SUIT HANDING BY DEFENSE COUNSEL**

Defense costs consist of various tasks performed.  The cost of these tasks is directly related to the time necessary to accomplish them (i.e., a firm's proximity to the court house, expertise and research time).  The time varies, based on the complexity of the task performed, which varies based on the individual case.

This discussion is about the approximate, reasonable time needed for an attorney to perform his duties.  Each case must be looked at on its own individual merits when determining reasonable cost.

**A.   Receipt of Suit**

There are two ways we assign a case to defense counsel.  The first is an initial call and follow-up with suit papers to inform counsel of the litigation. The second is a formal referral that includes a referral letter, a copy of the suit papers and our file.

A telephone assignment consists of the examiner's calling the appropriate counsel and giving a designated person the necessary information. That person then

IX-37

6-2-09

**D 000535**

Exhibit 13 Page 213

**PROTECTED DOCUMENTS**

creates some internal form and gives it to a managing attorney or a specific attorney to review to see if, and what, immediate action is needed.

After a phone assignment, the examiner may not have enough time to type referral letters and copy file contents. He may need to send the suit papers immediately by mail or fax.  Any calls from the defense firm for clarification after the referral telephone call and/or receipt of the suit papers will add time.

When defense counsel receives the suit papers, they will be matched to the file (if called-in) or a new case will be created. They will then be given to a managing attorney/senior attorney, reviewed, and then assigned to an individual attorney for handling.

Once the defense firm receives a copy of our file contents, the assigned defense attorney must do a complete review.  He will mark the documents of greatest importance. The file will be compared to your suit referral letter. The more complete the referral letter, the easier the review and the less time consumed.

After this initial file review, there may be questions or a disagreement with some aspects of the referral letter or the instructions given. These may generate a phone call or letter to the examiner. After the file review, the defense attorney may:

1.   Telephone the claims examiner to discuss the case and/or service.

2.   Contact the client/insured by phone.

3.   Prepare an answer that may include interrogatories.

**SUMMARY OF RECEIPT OF SUIT HANDING TIME**

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Phone Referrals | 5 - 10 minutes | .08 - .16 |
| Suit Papers (only) | 10 -15 minutes | .16 - .25 |
| File Review | 60 - 90 minutes 1 hr. to 1-1/2 hrs | 1.0 - 1.5 |
| Answer | 45 - 90 minutes 1-1/2 hrs. | .75 - 1.5 |
| Total Time | 120 - 205 minutes 2 hrs - 3 hrs 25 min | 2.00 to 3.41 |

IX-38

6-2-09

**D 000536**

Exhibit 13 Page 214

PROTECTED DOCUMENTS

B.   Discovery (Pre-trial)

1.   Interrogatories

When the defense attorney receives the plaintiff's answers to
interrogatories, he must review them in depth and prepare a written report
to Claims containing a summary of the answers and any recommendations
for further handling.

Defense counsel usually will receive interrogatories from the plaintiff's
attorney, which must be responded to.  One method is to contact the
client/insured by phone or letter and ask him to come to the office to meet
with attorney.  The attorney reviews questions with the client and drafts
answers. The file contents are again reviewed. Answers are then typed in
final form and mailed to the client/insured for review and signature.  Upon
their return, the papers are reviewed and signed by the attorney.  The other
method is to have the interrogatories answered by mail. This is the most
common due to scheduling difficulties or travel distance.  The
client/insured is sent the interrogatories with a cover letter asking him to
draft answers and return same.  He prepares draft answers and mails them
back. Upon receipt of the draft answers, the attorney will review them
along with the claims file.  Usually a call to the client is needed to clarify
some of the answers. The attorney then edits the draft answers and inserts
information from the investigative file.  The answers are typed in final
form and mailed to the client for review and signature. When the answers
are returned, the attorney will review and sign them.

## SUMMARY OF INTERROGATORIES HANDLING TIME

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Receipt & Review | 30 min. to 60 min. (1/2 hr.)    (1 hr.) | .50 to 1.00 |
| Preparation Clients/ Insureds Answer/ Client Meeting | 90 min. to 150 min. (1.5 hr.) (2.5 hrs.) | 1.50 to 2.50 |
| Answers Typed | 15 min. | .25 |
| Preparation Clients/Insureds Answer (Mail) | 90 min. to 150 min. (1.5 hr.) (2.5 hrs.) | 1.50 to 2.50 |

IX-39

6-2-09

D 000537

Exhibit 13 Page 215

PROTECTED DOCUMENTS

| | | |
|---|---|---|
| Total Time: w/ Client Meetings | 135 min. to 225 min. (2 hrs. 15 min.) (3 hrs 45 min.) | 2.25 to 3.75 |
| Total Time: w/o Client Meetings | 120 min. to 210 min. (2 hrs.) (3 hrs.) 30 min. | 2.00 to 3.50 |

2.    Depositions/EBT's

After review of plaintiff's answers to interrogatories, defense counsel will decide if further records are necessary and, if so, may attempt to obtain those records via the deposition of the person/entity who has possession of the records, e.g. doctor's and employer's records. Normally, the records are mailed in compliance with the request and no actual deposition takes place. Review time is totally dependent on amount of records and copies are usually sent to the examiner.

a.    Plaintiff's Deposition / EBT

The attorney will prepare to take a deposition by reviewing his file which contains investigative material, police report, recorded interviews, medical reports, bills, answers to interrogatories, any additional medical reports, and prior history records.  The attorney takes the deposition by thoroughly questioning the plaintiff on all aspects of liability and damages. Time will have to be allowed for travel to and from the site of the deposition.  The attorney prepares a report to the Company that contains a summary of the deposition and a discussion of further action to be taken.

### SUMMARY OF PLAINTIFF'S DEPOSITION HANDLING TIME

| | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 1 to 3 hrs. | 1.0 to 3.0 |
| Taking of Deposition | 1-1/2 hrs to 2-1/2 hrs | 1.5 to 2.5 |
| Report to Company | 15 min. to 45 min. | .25 to .75 |
| Total Time | 2 hrs. 45 min. to 6 hrs. 15 min | 2.75 to 6.25 |

IX-40

6-2-09

D 000538

Exhibit 13 Page 216

PROTECTED DOCUMENTS

b.    **Defendant's Deposition/EBT**

The defense attorney will meet with the client/insured and have him/her review the answers to interrogatories and the recorded interview. The attorney will then prepare the insured by explaining the process and what to expect. The defense attorney is present while the plaintiff's counsel takes the insured's deposition and will enter any necessary objections. Time will have to be allowed for travel to and from the site of the deposition.

## SUMMARY OF CLIENT/INSURED DEPOSITION CHARGES

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 15 min. to 1 hr. | .25 to 1.0 |
| Taking of Deposition (Monitoring) | 1 hr. to 1-1/2 hrs. | 1.0 to 1.5 |
| Report to Company | 15 min. to 45 min. | .25 to .75 |
| Total Time | 90 min. to 135 min. (1-1/2 hrs. to 3 hrs. 15 min.) | 1.5 to 3.25 |

c.    **Treating Doctor's Deposition**

In preparation for conducting a treating doctor's deposition, defense counsel will review the medical reports, bills, and medical file and may research professional books. The defense attorney will thoroughly question the doctor on all aspects of the injury. He will then prepare a summary of the deposition and include his opinion of the testimony, chances of defending, and further action needed. Time will have to be allowed for travel to and from the site of the deposition.

## SUMMARY OF TREATING DOCTOR DEPOSITION HANDLING TIME

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 2 to 4 hrs. | 2.0 to 4.0 |
| Taking of Deposition | 1-1/2 hrs. to 2-1/2 hrs. | 1.5 to 2.5 |

IX-41

6-2-09

**D 000539**

Exhibit 13 Page 217

**PROTECTED DOCUMENTS**

| | | |
|---|---|---|
| Report to Company | 15 min. to 45 min. | .25 to .75 |
| Total Time | 3 hrs. 45 min. to 7 hrs. 15 min. | 3.75 to 7.25 |

**d.** **Defense Physician (IME) Deposition**

In preparation for the plaintiff's taking the deposition of the defense IME doctor, defense counsel will review the IME report, other medical reports, and research professional books. He will discuss the information with the IME physician. The defense attorney will be present while the plaintiff's attorney questions the physician's findings, relationship, and causation by accident and treating doctor's findings. The defense attorney will prepare a summary of the deposition, including his opinion of the testimony, defense posture, and further action. Time will have to be allowed for travel to and from the site of the deposition.

**SUMMARY OF DEFENSE PHYSICIAN (IME) DEPOSITION**

| | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 30 min. to 1 hr. | .50 to 1.0 |
| Taking of Deposition | 1 hr. to 2 hrs. | 1.0 to 2.0 |
| Report to Company | 15 min. to 45 min. | .25 to .75 |
| Total Time | 1 hr. 45 min. to 3 hrs. 45 min. | 1.75 to 3.75 |

**e.** **Fact Witness**

In preparation for conducting a fact witness deposition, the defense attorney will review liability issues and evidence. At the deposition, he will question the witness about the facts of the loss and then prepare a report to the Company summarizing the deposition and giving his opinion of the testimony and recommended further action. Time will have to be allowed for travel to and from the site of the deposition.

IX-42

6-2-09

D 000540

Exhibit 13 Page 218

PROTECTED DOCUMENTS

### SUMMARY OF FACT WITNESS DEPOSITION HANDLING TIME

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 30 min. to 1 hr. | .50 to 1.0 |
| Taking of Deposition | 1 hr. to 1-1/2 hrs. | 1.0 to 1.5 |
| Report to Company | 15 min. to 30 min. | .25 to .50 |
| Total Time | 1 hr. 45 min. to 3 hrs. | 1.75 to 3.00 |

f.   **Expert Witness Deposition**

Accident reconstruction and accountant experts

The defense attorney will prepare for taking the deposition of the plaintiff's non-medical experts by reviewing the expert's report and related material. He will question the expert on his findings and send a summary report to the Company. Allow time for travel.

### SUMMARY OF ACCIDENT RECONSTRUCTION AND ACCOUNTANT HANDLING TIME

|  | Actual Time | Conversion Hundredths of an Hour |
|---|---|---|
| Preparation | 1 hr. to 2 hrs. | 1.0 to 2.0 |
| Taking of Deposition | 1. hr. to 2 hrs. | 1.0 to 2.0 |
| Report to Company | 15 min. to 45 min. | .25 to .75 |
| Total Time | 2 hrs. 15 min to 4 hrs. 45 min. | 2.25 to 4.75 |

C.   **Pre-Trial Preparation**

1.   **Pre-trial Conference**

When preparing for a pre-trial conference, the defense attorney will review the file and have a discussion with the client/insured. He will then discuss the case with the examiner, as well as strategy and any settlement authority. In some jurisdictions, he may have to prepare a pre-trial statement. There may be waiting time. An effective counsel will be able to

IX-43

6-2-09

**D 000541**

Exhibit 13 Page 219

PROTECTED DOCUMENTS

accomplish other tasks while waiting for the judge and will charge minimally for waiting.  The assigned claims examiner may be required to attend.

Time:        1 hour to 8 hours

2.   **Court Ordered Mediation or Non-Binding Arbitration Preparation and Actual Conference**

Defense attorney will review the file and have a conversation with the client/insured.  He will discuss the case, strategy and settlement authority with the examiner. There may be travel and waiting time. As to waiting time, see above.  The assigned claims examiner may be required to attend.

Time:        4 hours to 8 hours

3.   **Motion for Summary Judgment**

The defense attorney will research the matter, prepare a written motion and present his arguments to the court.  There may be travel and waiting time. As to waiting time, see above.

Time:        Preparation researching and writing - 2.5 hour to 3.5 hours.
             Argument before the court - 1 to 3 hours plus travel time.

4.   **Motion to Compel**

The defense attorney prepares a written motion and then presents his arguments to the court.

Time:        Ordinary cases - preparation 45 minutes to 1.5 hours.
             Arguments before court - - 1 to 3 hours. Plus travel time.

D.   **Trial**

1.   **Trial Preparation**

Prior to trial, an attorney may visit the accident scene.

Time: ·      30 minutes to 3 hours depending on area.

The attorney will meet with the client/insured to review trial procedures and explains what most likely will happen.

Time:        30 minutes to 1 hour overall.

IX-44

6-2-09

D 000542

Exhibit 13 Page 220

**PROTECTED DOCUMENTS**

2.    **Actual Trial**

Firms will usually have a per day charge for trial time. There may be an additional charge for trial preparation time after business hours on the day before the trial day. The attorney will review the file for the next day's testimony and proceedings. Expect to see two to three hours of trial preparation time per day during trial. Pre-trial charges will have a separate fee. In a typical soft tissue case, six to ten hours preparation time might be appropriate.

The length of the trial depends on the jurisdiction, the complexity of the case, the number of witnesses, settlement posture, etc. Even the simplest trial may take up to a day and a half.

The preceding discussion is a summary of what a defense attorney will do in a typical case. Each bill must be evaluated on its merits in light of the nature of the case involved. It is up to the examiner to know the case and what he wants to happen. The more the examiner does, the less time the attorney will spend and the lower the cost will be.

E.    **Analysis of Legal Bills**

The analysis of attorney's bills is an important factor in managing legal expenses. Attorneys use three basic fee arrangements: hourly, flat fee, or contingent fee. The most common billing arrangement we have with defense firms is hourly. Fees can range from $50 to $160 per hour.

Flat fee is a single-amount fee for a specific job. The fee is one figure regardless of how much time a lawyer spends on the job, the amount sued for or the circumstances. In some small cases the hourly rate cost may be less than the flat rate and in some heavy and difficult cases, the flat rate will be much less than if billed at the hourly rate. Some subrogation collection cases are flat fee arrangements.

Contingent fee is based on a percentage (33% - 50%) of the amount of money obtained through negotiations or verdict. If there is no recovery, there will be no legal fee. Mostly the plaintiff's side uses this fee arrangement. Subrogation/collection firms use this arrangement.

• **Reviewing Attorney Bills**

Examiners responsible for suit files must be familiar with the fee structures for the defense firms in their region. This knowledge should include hourly charges, any flat rate arrangements as well as any unique billing practices. We should have defense counsel bill us on an interim basis. This could be monthly

IX-45

6-2-09

**D 000543**

Exhibit 13 Page 221

**PROTECTED DOCUMENTS**

to every six months. Quarterly billing may be advantageous to both the
attorney and the Company.

Each billing should be in increments of 1/10 hr. and should tell us who
performed the services, what was done, time it took, and the hourly rate of the
person doing the work. Use an adding machine to double-check the bill.
While automated accounting has probably eliminated many errors, mistakes
are still possible. Therefore, an adding machine tape should appear in all cases
other than those with extremely nominal invoices. If a calculator without tape
is used, initial the bill and indicate it was checked with a calculator without
tape.

Do not accept a bill that simply shows total hours and dollars. Should you
receive that type of invoice, direct a letter to the firm and request a detailed
daily breakdown showing time and work accomplished.

Analyze the bill from the standpoint of instructions contained in the suit
referral letter as well as any follow up letters. Did the attorney perform any
unauthorized discovery or investigation? If so, we are entitled to a
satisfactory explanation before making payment. Compare individual items on
the invoice against documents in the claim file. For example, if the attorney is
billing us for telephone calls to the examiner on a particular date, there should
be some evidence of the phone call in the file. The claim file should also, of
course, be documented for all items of discovery as well as pleadings.
Periodic billing will occasionally produce some overlap, particularly if we
have delayed paying a bill. You must make sure we have not already paid for
portions of an invoice before making payment in full.

Occasionally two attorneys from the same firm will participate in the case and
we will receive double charges for a file review and possibly some additional
handling. Generally, duplicate handling and double billing is unacceptable and
we should insist on an explanation.

Determining whether or not the hours charged for a particular item are
reasonable is probably one of the most difficult tasks facing an examiner. You
must avoid "nit-picking" while exercising sound judgment. For example, we
know that business phone calls rarely exceed 10 to 15 minutes, so a charge for
a one-hour phone call would normally require an explanation. We also know
that a standard deposition in an uncomplicated case can usually be completed
in two to three hours. Unless there are some unusual circumstances,
deposition times longer than this should probably be questioned. Reason must
prevail and questionable items should probably be discussed with your
supervisor.

Do not attempt to obtain authority to pay defense counsel's bill unless all
questionable items or differences of opinion have been resolved. Every bill

IX-46

6-2-09

**D 000544**

Exhibit 13 Page 222

PROTECTED DOCUMENTS

must be carefully reviewed before being approved for payment and copies of all letters questioning bills must be retained within the regions.

Review the bills, do not rubber-stamp them. Our defense attorney should be willing to discuss fees openly and candidly.  You should not hesitate to question the need for certain charges.

## XI.   APPEAL/BONDS

### A.    Obtaining the Bond

Whenever possible, all bonds (appeal, supersedeas, release of attachment, discharge of injunction, counter replevin, cost removal or any other defendant's bond) should be arranged through Fidelity and Deposit (F & D) Company.  The application for one of these bonds must be submitted on the Request for Bond form (C-175) (Exhibit 6) signed by an authorized person.  Appeal of a verdict by a jury or a judge's decision cannot be made without Home Office authorization. Where a bond is necessary to perfect an appeal or prevent execution on an underlying judgment, any bond application (other than a jury bond) must be approved by Claims Home Office.  All bond applications must be discussed with Claims Legal before being submitted.

In any case in which there is a question as to whether all of the damages contained in the verdict are covered by our policy, special attention must be given.  For example, if there is a verdict in excess of policy limits or for punitive damages where such are not insurable, the insured's agreement to the appeal must be obtained, unless authority is given by Claims Home Office Legal to assume the risk and accept liability for the uncovered damages. Unless otherwise authorized, the insured must obtain that part of the appeal bond pertaining to damages not covered by the policy.  Under no circumstances is the insured's name to be signed to an appeal bond by a Company associate. See TCM-26 for list of F & D offices and list of regional personnel authorized to apply for bonds.

### B.    Procedures

#### 1.    Applications

Bonds are to be obtained by application to the F & D office closest to the jurisdiction where the bond is required, regardless of the location of the claims technician. When the bond must be obtained from another source, the advice of counsel should be solicited.

IX-47

6-2-09

**D 000545**

Exhibit 13 Page 223

**PROTECTED DOCUMENTS**

2.    **Use of Form C-175**

Preliminary application to F & D for a bond will usually be made by telephone. As soon afterward as possible, the C-175 written application should be sent to the F& D issuing office. Be sure that the principal is a person entitled to the protection of the GEICO policy, i. e., and an insured as defined. Information on the C-175 must be precise and may have to be obtained from our legal representative. A claim number must appear on all applications and an authorized person must sign the application. An original and two copies should be prepared. One copy is for the claim file, the other should be sent to the AVP for Claims or to the Branch Office Manager. The original is sent to F & D and will be returned by F & D to the person who has signed the application.

C.    **Discharge of Bonds**

1.    **Docket Entry**

To release or discharge appeal bonds or release of attachment bonds, a copy of the docket entry (satisfaction of judgment, dismissal order, etc.) must be obtained by the examiner and given to Risk Management, Underwriting and Policy Management (UPM). For Cost Bonds, a letter from the examiner to the bonding company stating that litigation has been terminated and cost paid is sufficient. No notice is required on the termination of other types of bonds unless the principal involved is $10,000 or more.

3.    **Billing for Bonds**

The Risk Manager, Underwriting and Policy Management (UPM) will send a carbon copy of the bill for a bond to the examiner. Payment must be requisitioned promptly on the file. All payments are to be sent to UPM, not to the payee.

IX-48

6-2-09

D 000546

Exhibit 13 Page 224

PROTECTED DOCUMENTS

EXHIBIT 1

## WAIVER OF DEFECTIVE SERVICE

RE: Claims Number
Accident:
Suit Title:

I do hereby waive any defect there may have been in the service of the Summons and/or Complaint concerning the captioned matter and consent to the entering of an appearance in my behalf by the legal representatives of Government Employees Insurance Company.

_____          _____
(Date)                                           (Signature)

### MEMBER NATIONAL INSURANCE CRIME BUREAU

C-92 (06-02) NS

IX-49

6-2-09

D 000547

Exhibit 13 Page 225

PROTECTED DOCUMENTS

EXHIBIT 2

## NOTICE OF CHANGE TO ATTORNEY -- ADJUSTER LISTING

**IDENTIFICATION (PLEASE PRINT OR TYPE ONLY)**

| PRESENT CODE | PRESENT FIRM NAME |
|---|---|
| CITY | STATE |

ACTION REQUIRED:          INSTRUCTIONS

| ADD TO: | ☐ Attorney-Adjuster Code Book | If you check the 'ADD' book complete all items below. |
|---|---|---|
| CHANGE TO: | ☐ Attorney-Adjuster Code Book | If you check the 'CHANGE' block complete only those items to be changed. |
| DELETE FROM: | ☐ Attorney-Adjuster Code Book | If you check the 'DELETE' block no further information is needed. |

SEND TO V. P. CLAIMS
UNDER 'NEW INFORMATION' YOU MUST INCLUDE 'IRS ID #' and 'OCCUPATION CODE (S)'.

**NEW INFORMATION:**

| FIRM NAME | | STREET ADDRESS | |
|---|---|---|---|
| MAILING ADDRESS | CITY | STATE | ZIP |
| DAY PHONE | NIGHT PHONE | IRS ID # | OCCUPATION CODE(S) |

OCCUPATION CODES
| A - ADJUSTER | D - DOCTOR | I - INVESTIGATOR | P - APPRAISER | S - SUBROGATION |
|---|---|---|---|---|
| C - COURT COST | G - PHOTOGRAPHER | L - LAWYER | M – MISCELLANEOUS | |

APPROVALS:

REGIONAL AVP FOR CLAIMS          DATE

VICE PRESDIENT – CLAIMS          DATE

COMMENTS:

DATE COMPLETED _____          DATE REGION NOTIFIED _____

C-98-A (5-88) NS

IX-50

6-2-09

**D 000548**

Exhibit 13 Page 226

PROTECTED DOCUMENTS

**EXHIBIT 3**

### SUIT CALENDAR

TO:   □ HOC  □ Regional Claim Director or Manager      Date: ...........................................

From: ...........................................................      Trial Date: .......................................
         [Examiner]
Claim No...........................................................      Continued from: ..............................

Insured: ...................................................      □ Control File     □ C-103 File     □ P. D.

Plaintiff:...................................................................................................................

Place of Trial: ......................................................................................................................
                      (City)                              (State)
Defendant's Atty:..................................................................................................................

| Policy Limits | Reserve | Demand | Offer | Authorized | Reinsurance |
|---|---|---|---|---|---|
| □ BI<br>□ PD<br>□ UM | $ | $ | $ | $ | □ Yes □ No |

Structured Settlement Offered? □ Yes  □ No   Alternative Dispute Resolution Offered? □ Yes □ No □ N/A

Supervisor Evaluation:..............................................................................................

Remarks:

C-20 (5-87)

IX-51

6-2-09

D 000549

Exhibit 13 Page 227

PROTECTED DOCUMENTS

EXHIBIT 4

### WEEKLY TRIAL CALENDAR

WEEK OF

| TRIAL DATE | CLAIM NUMBER | INSURED | PLACE OF TRIAL | DEFENSE ATTORNEY | DISPOSITION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

C-98 (2-56)

IX-52

6-2-09

**D 000550**

Exhibit 13 Page 228

**PROTECTED DOCUMENTS**

**EXHIBIT 5**

**ATTORNEY PERFORMANCE REVIEW**
(for C-103 and Control files)

REGION: _____          TOTAL AMOUNT OF FEE $:_____

| CLAIMS EXAMINER: | CLAIMS MANAGER: | |
|---|---|---|
| CLAIM: | INSURED: | LOSS DATE: |
| FIRM: | CITY: | ATTORNEY HANDLING: | ATTORNEY CODE: |

_____STAFF COUNSEL          _____OUTSIDE COUNSEL (Listed)          _____ UNLISTED COUNSEL

**GENERAL OFFICE CHARACTERISTICS**
1.   Was assignment acknowledged promptly?                                     _____ Yes _____ No
2.   Were timely status reports submitted?                                         _____ Yes _____ No
3.   Were phone calls returned timely?                                             _____ Yes _____ No
4.   Did attorney cooperate with Company personnel?                            _____ Yes _____ No
5.   Was the fee?                                          _____ High _____ Average _____ Low

**PRE-TRIAL PREPARATION**
1.   Did attorney submit a thorough analysis of the file on a timely basis? _____ Yes _____ No
2.   Were the appropriate pleadings filed? _____ Yes _____ No
3.   Were discovery procedures properly utilized? _____ Overdone _____ OK _____ Inadequate
4.   Were any serious errors made? _____ Yes _____ No  If yes, explain below (e.g., allowed case to go into default)
5.   Did attorney provide us with final recommendations well in advance of trial? _____ Yes _____ No
6.   COMMENTS:

**NEGOTIATIONS**
1.   If this was a case to settle, did our attorney initiate negotiations on a timely basis? _____ Yes _____ NO
2.   Was our attorney's evaluation realistic? _____ Yes _____ No
3.   Were the actual negotiations, if any, well handled? _____ Yes _____ No
4.   Results obtained? _____ Poor _____ Fair _____ Good _____ Excellent
5.   Did attorney recommend ADR? _____ Yes _____ No _____ Not applicable
6.   COMMENTS:

**TRIAL**
1.   Was adequate notice of trial given? _____ Yes _____ No
2.   Did our attorney keep the company closely informed during the course of the trial? _____ Yes _____ No
3.   Was our attorney properly prepared for trial? _____ Yes _____ No
4.   Demonstrated trial ability (if personally observed)? _____ Poor _____ Fair _____ Good _____ Excellent
5.   Results obtained? _____ Poor _____ Fair _____ Good _____ Excellent
6.   COMMENTS:

**SUMMARY COMMENTS**

**OVERALL RATING**          _____ Excellent                    _____ Satisfactory
                          _____ Unsatisfactory
Would you recommend using this firm/attorney again?          _____ Yes _____ No

C-39-A (2-97) NS

IX-53

6-2-09

**D 000551**

Exhibit 13 Page 229

**PROTECTED DOCUMENTS**

EXHIBIT 6

**GOVERNMENT EMPLOYEES COMPANIES**
**WASHINGTON, D. C.**

\_\_\_\_\_ GEICO
\_\_\_\_\_ GEICO General

TO FIDELITY AND DEPOSIT
COMPANY OF MARYLAND

\_\_\_\_\_ GEICO Indemnity
\_\_\_\_\_ GEICO Casualty

REQUEST FOR BOND

Please execute a bond as hereinafter described under our General Application and Indemnity Agreement with your Company.

Policy No. _____ Claim No. _____ Date: _____

Name of Insured _____ Address _____

Name of our Attorney _____ Address _____

Description of Bond Requested _____

Amount of Bond $ _____ Application Policy Limits _____

Name of Plaintiff _____

Name of Principal _____ Address _____
                    (Person to be Bonded)

GIVE THE FOLLOWING INFORMATION FOR:

□ Appeal Bonds  - Attach Notice of Appeal
            Amount of Judgment $ _____

            Time for Perfecting Appeal Expires on _____

□ Other Judicial Proceedings Bonds _____

            (Note: Complete either 1 or 2 below)

For additional information, contact _____

1. I CERTIFY that the amount of the bond herewith requested is WHOLLY WITHIN THE POLICY LIMITS and that
   there is coverage.                                    **Government Employees Companies**

                                        BY _____
                                              (Authorized Official or Attorney)

                                        _____

                                                      (Telephone Number)

2. If the bond is NOT WHOLLY WITHIN THE POLICY LIMITS, complete the following:

      The amount of the bond exceeds the coverage of the policy by $ _____

      With respect to the Excess:

□ The insured has been requested to make his own arrangements for providing security.

□ The Company will assume the risk and accept liability in excess of the policy limits.
                                        **Government Employees Companies**

C-175 (10-86) NS                        BY_____
                                              (Authorized Official or Attorney

IX-54

6-2-09

D 000552

Exhibit 13 Page 230

**PROTECTED DOCUMENTS**

**SUIT ACKNOWLEDGEMENT LETTER**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Because the amount you are being sued for may be increased at any time by the plaintiff upon application to the court, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

X-1                              11-14-07
                                **D 000553**

Exhibit 13 Page 231

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,                          _NOTE_:   This letter may be dictated down to the beginning of

/S/                                              paragraph #2 and the balance will be done by the typist from a
                                                 format sheet. You must add the ending.

Claims Examiner

copy be                                          Send the letter regular mail in duplicate with a request that one

returned,                                        signed and returned to the Company.  If the signed copy is not

cc: Attorney                                     the letter must be sent again by Certified Mail, Return Receipt,
                                                 Addressee Only.

                                                 In many states, if we are operating under a reservation of rights
                                                 or if the complaint contains a punitive damages count, the
                                                 insured may retain an attorney at _our_ expense. Check with your
                                                 RLA or Clams Legal.

X-2

11-14-07

**D 000554**

Exhibit 13 Page 232

**PROTECTED DOCUMENTS**

**SUIT ACKNOWLEDGEMENT LETTER STAFF COUNSEL**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party. The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Because the amount you are being sued for may be increased at any time by the plaintiff upon application to the court, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-3                                          11-14-07

**D 000555**

Exhibit 13 Page 233

PROTECTED DOCUMENTS

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

_NOTE:_ This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company.  If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at _our_ expense. Check with your RLA or Clams Legal.

X-4

11-14-07

**D 000556**

Exhibit 13 Page 234

PROTECTED DOCUMENTS

**EXCESS AD DAMNUM LETTER**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please **do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.**

Since the amount you are being sued for is more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-5                                                          11-14-07
                                                            **D 000557**

Exhibit 13 Page 235

**PROTECTED DOCUMENTS**

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE:* This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company. If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at <u>our</u> expense. Check with your RLA or Clams Legal.

X-6

11-14-07

**D 000558**

Exhibit 13 Page 236

PROTECTED DOCUMENTS

**EXCESS AD DAMNUM LETTER - STAFF COUNSEL**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party. The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since the amount you are being sued for is more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

X-7                                         11-14-07
                                            **D 000559**

Exhibit 13 Page 237

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

***NOTE:*** This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company.  If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may

retain an attorney at <u>our</u> expense. Check with your RLA or Clams Legal.

X-8

11-14-07

**D 000560**

Exhibit 13 Page 238

**PROTECTED DOCUMENTS**

**UNLIMITED EXCESS AD DAMNUM LETTER**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  Please notify them immediately if you intend to pursue a claim against [plaintiff]) or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since the amount sued for is not specified and may be more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits.  You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

X-9                                    11-14-07
                                       **D 000561**

Exhibit 13 Page 239

PROTECTED DOCUMENTS

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE*: This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company. If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at <u>our</u> expense. Check with your RLA or Clams Legal.

X-10

11-14-07

**D 000562**

Exhibit 13 Page 240

**PROTECTED DOCUMENTS**

**UNLIMITED EXCESS AD DAMNUM LETTER - STAFF COUNSEL**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party. The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since the amount sued for is not specified and may be more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-11                                        11-14-07
                                            **D 000563**

Exhibit 13 Page 241

**PROTECTED DOCUMENTS**

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE:* This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company.  If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at our expense. Check with your RLA or Claims Legal.

X-12

11-14-07

**D 000564**

Exhibit 13 Page 242

**PROTECTED DOCUMENTS**

### EXCESS AD DAMNUM AND PUNITIVE DAMAGES LETTER

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for is more than the policy limits and there is a claim for punitive damages in the complaint. Your policy does not provide coverage for punitive damages. You may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

X-13                                    11-14-07
                                        **D 000565**

Exhibit 13 Page 243

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,                        _NOTE:_  This letter may be dictated down to the beginning of

/S/                               paragraph #2 and the balance will be done by the typist from a
                                  format sheet. You must add the ending.

Claims Examiner
                                  Send the letter regular mail in duplicate with a request that one

copy be                           signed and returned to the Company.  If the signed copy is not

returned,                         the letter must be sent again by Certified Mail, Return Receipt,
                                  Addressee Only.
cc:  Attorney
                                  In many states, if we are operating under a reservation of rights
                                  or if the complaint contains a punitive damages count, the
                                  insured may
                                  retain an attorney at _our_ expense. Check with your RLA or
                                  Clams Legal.

X-14                                          11-14-07
                                              **D 000566**

Exhibit 13 Page 244

PROTECTED DOCUMENTS

**EXCESS AD DAMNUM AND PUNITIVE DAMAGES
LETTER - STAFF COUNSEL**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party. The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for is more than the policy limits and there is a claim for punitive damages in the complaint. Your policy does not provide coverage for punitive damages. You may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

X-15                                    11-14-07
                                        **D 000567**

Exhibit 13 Page 245

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

***NOTE:*** This letter may be dictated down to the beginning of paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one signed and returned to the Company.  If the signed copy is not the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may retain an attorney at our expense. Check with your RLA or Clams Legal.

X-16

11-14-07

D 000568

Exhibit 13 Page 246

**PROTECTED DOCUMENTS**

<u>NON-SPECIFIED EXCESS AD DAMNUM AND PUNITIVE DAMAGES LETTER</u>

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for is not specified and may be more than the policy limits; there is also a claim for punitive damages in the complaint. Your policy does not provide coverage for punitive damages. You may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-17                                11-14-07
                                  **D 000569**

Exhibit 13 Page 247

PROTECTED DOCUMENTS

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE:* This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a
format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company.  If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt,
Addressee Only.

In many states, if we are operating under a reservation of rights
or if the complaint contains a punitive damages count, the
insured may
retain an attorney at <u>our</u> expense. Check with your RLA or
Claims Legal.

X-18

11-14-07

**D 000570**

Exhibit 13 Page 248

**PROTECTED DOCUMENTS**

### <u>NON-SPECIFIED EXCESS AD DAMNUM AND PUNITIVE DAMAGES LETTER - STAFF COUNSEL</u>

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party. The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for is not specified and may be more than the policy limits; there is also a claim for punitive damages in the complaint. Your policy does not provide coverage for punitive damages. You may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

X-19                                             11-14-07
**D 000571**

Exhibit 13 Page 249

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

***NOTE:*** This letter may be dictated down to the beginning of paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one signed and returned to the Company.  If the signed copy is not the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may retain an attorney at <u>our</u> expense. Check with your RLA or Clams Legal.

X-20

11-14-07

**D 000572**

Exhibit 13 Page 250

**PROTECTED DOCUMENTS**

**PUNITIVE DAMAGES LETTER**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract.  Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since there is a claim for punitive damages in the lawsuit filed against you and your policy does not provide coverage for punitive damages, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages.  You need not hire your own attorney, but you have the right to do so under the policy.  The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

X-21                                    11-14-07
**D 000573**

Exhibit 13 Page 251

**PROTECTED DOCUMENTS**

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE:* This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company. If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at our expense. Check with your RLA or Clams Legal.

X-22

11-14-07

**D 000574**

Exhibit 13 Page 252

**PROTECTED DOCUMENTS**

**PUNITIVE DAMAGES LETTER - STAFF COUNSEL**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.  The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since there is a claim for punitive damages in the lawsuit filed against you and your policy does not provide coverage for punitive damages, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages.  You need not hire your own attorney, but you have the right to do so under the policy.  The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

X-23                                    11-14-07
                                        **D 000575**

Exhibit 13 Page 253

PROTECTED DOCUMENTS

Sincerely,

/S/

Claims Examiner

copy be

returned,

cc: Attorney

*NOTE*: This letter may be dictated down to the beginning of

paragraph #2 and the balance will be done by the typist from a format sheet. You must add the ending.

Send the letter regular mail in duplicate with a request that one

signed and returned to the Company. If the signed copy is not

the letter must be sent again by Certified Mail, Return Receipt, Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may
retain an attorney at our expense. Check with your RLA or Clams Legal.

X-24

11-14-07

**D 000576**

Exhibit 13 Page 254

**PROTECTED DOCUMENTS**
**RESERVATION OF RIGHTS LETTER - LATE NOTICE**

Mr. John Doe
3403 Deerwood Road
Arlington, Virginia

Claim: 0001234560101011

Dear Mr. Doe:

This will acknowledge receipt of your accident report dated February 5, 20--, for an accident involving your ----
Chevrolet which occurred October 28, ----, at the intersection of 14th and L Streets, N. W., Washington, D. C.

Condition_____of your policy provides, in part, as follows:

(Quote the exact policy language.  The policy contract must be checked in each case for correct Condition number
and language.)

In view of the delay on your part in promptly notifying the Company of this accident, which delay may have
prejudiced the rights of the Company, and for other reasons, it is necessary to advise you that any action taken by
the Company in investigating and/or adjusting or attempting to adjust, and/or handling or defending any litigation
growing out of the accident which occurred on October 28, ----, at 14th and L Streets, N. W., Washington, D. C.,
shall not be construed as a waiver of the right of the Company to deny/disclaim liability at any time under the
terms of the insurance policy issued to you because of any breach of the provisions, terms, or conditions thereof.

*   It is understood that the acknowledgment of this notice shall not be considered a waiver of your right under the
    policy.  You have the right to retain personal counsel to advise you concerning all issues raised in this reservation
    of rights.

Very truly yours,

J. J. Jones

Claims Examiner
February 12, 20--

NOTE: This letter must be dictated in its entirety. The applicable policy language must be included in the letter in
its entirety. It may be sent First Class Mail except in those states, which require Certified Mail. Your RLA will
provide the names of the Certified Mail stated in your Region.

X-25

1-30-08
**D 000577**

Exhibit 13 Page 255

**PROTECTED DOCUMENTS**

**RESERVATION OF RIGHTS LETTER**

Mr. John Doe
915 Maple Street
Oakland, California

Claim:  11-234567 -A: Insured: John Doe

Dear Mr. Doe:

With respect to the automobile accident occurring on October 1, 20--, at Oakland, California, in which you were involved while driving your automobile, you are hereby notified that the Government Employees Insurance Company in investigating the said accident or any claim arising therefrom, or in negotiating for compromise settlement, or in making any settlement, or in any way acting or failing to act, does not waive any of its rights or admit any obligations under the policy.

We are making this reservation of rights because (state your reason).

The service of this notice upon you does not deprive you of any rights you may have against the Company, and your acknowledgement of this notice shall not be considered a waiver of your rights under said policy or policies. You have the right to retain personal counsel to advise you concerning all issues raised in this reservation of rights.

Very truly yours,

J. J. Jones

Claims Examiner
JJJ/pah

June 1, 20--

Note: This letter must be dictated in its entirety. The applicable policy language must be included in this letter in its entirety.  It may be sent First Class Mail except in those states, which require Certified Mail. Your RLA will provide the names of the Certified Mail states in your Region.

X-26

1-30-08
**D 000578**

Exhibit 13 Page 256

**PROTECTED DOCUMENTS**

**RESERVATION OF RIGHTS LETTER TO INTERESTED PARTIES**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Your Client:

Dear:

I am in receipt of your correspondence of _____.

Please be advised that (appropriate company) is reserving its rights to disclaim/deny coverage for this loss.

If you have any questions, please contact me at the number below.

Sincerely,

/S/

Claims Examiner
1-800-1003, extension 4240

* * Use this letter in those states that **do not** require a copy of the ROR letter
sent to the insured be also sent to the interested parties.

X-27

2-9-07
**D 000579**

Exhibit 13 Page 257

**PROTECTED DOCUMENTS**

**SUIT ACKNOWLEDGEMENT LETTER**

**CALIFORNIA**

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  This firm is experienced in defense litigation and will vigorously defend you in the lawsuit, protect your interests and keep you advised of developments.   Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Although you need not, you have the right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained to represent you in this matter.  If you hire your own attorney, we recommend that you select an attorney experienced in negligence defense litigation.  The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

X-28                                 11-15-05
                                     **D 000580**

Exhibit 13 Page 258

PROTECTED DOCUMENTS

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-29

11-15-05
**D 000581**

Exhibit 13 Page 259

**PROTECTED DOCUMENTS**

<u>UNLIMITED EXCESS AD DAMNUM LETTER</u>

<u>CALIFORNIA</u>

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. This firm is experienced in defense litigation and will vigorously defend you in the lawsuit, protect your interests and keep you advised of developments.   Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for [is not specified / may be increased at any time by the plaintiff upon application to the court] and may be more than the insurance policy limits. You have the right at any time to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests. If you hire your own attorney, we recommend that you select an attorney experienced in negligence defense litigation. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-30                                        11-15-05

**D 000582**

Exhibit 13 Page 260

**PROTECTED DOCUMENTS**

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-31

11-15-05
**D 000583**

Exhibit 13 Page 261

PROTECTED DOCUMENTS

## SUIT ACKNOWLEDGEMENT - COVERAGE ISSUE
## UNDER INVESTIGATION LETTER

### CALIFORNIA

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  This firm is experienced in defense litigation and will vigorously defend you in the lawsuit, protect your interests and keep you advised of developments.   Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

The amount sued for [is not specified / may be increased at any time by the plaintiff upon application to the court] and may be more than the insurance policy limits.  You have the right at any time to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests.  If you hire your own attorney, we recommend that you select an attorney experienced in negligence defense litigation.  The defense attorney provided by GEICO will do his or her best to protect your interests.

[For coverage question cases or cases being investigated under a reservation of rights, add the following paragraph:]

In certain circumstances, you may hire an attorney at our expense.  You have the right to hire an attorney at our expense to protect your interest until such time as we have resolved the issue of [discuss the particular issue under investigation here].  We will advise you when the issue has been resolved.  At that time we will also advise you whether or not an attorney retained by you may continue in the case at our expense.  If you do hire an attorney at our expense, that attorney must have at least five (5) years of tort litigation experience and possess errors and omissions insurance coverage.  Also, your attorney must promptly contact this office and obtain our agreement with respect to fees.

X-32

11-15-05
**D 000584**

Exhibit 13 Page 262

**PROTECTED DOCUMENTS**

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-33

11-15-05

**D 000585**

Exhibit 13 Page 263

**PROTECTED DOCUMENTS**

<u>**CONFLICT LETTER - CALIFORNIA**</u>

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. This firm is experienced in defense litigation and will vigorously defend you in the lawsuit, protect your interests and keep you advised of developments.   Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

[Select language appropriate to your case and modify the following as necessary:]

We are providing a defense for you in this case under a [reservation of rights / non-waiver of rights] for the following reasons:  [ provide the appropriate reasons here].
<u>or</u>
We are providing a defense for you in this case, but not indemnifying you in this case because [provide an explanation here].

You need not hire your own attorney, but you have the right to do so.  If you do choose to hire your own attorney at our expense, that attorney must have at least five (5) years of tort litigation experience and possess errors and omissions insurance coverage.  Also, your attorney must promptly contact this office and obtain our agreement with respect to fees.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

X-34                                              11-15-05
                                                **D 000586**

Exhibit 13 Page 264

**PROTECTED DOCUMENTS**

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-35

11-15-05
**D 000587**

Exhibit 13 Page 265

**PROTECTED DOCUMENTS**

## EXCESS AD DAMNUM BUT UNLIKELY TO EXCEED POLICY LIMITS LETTER

### CALIFORNIA

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. This firm is experienced in defense litigation and will vigorously defend you in the lawsuit, protect your interests and keep you advised of developments. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

You have been sued for an amount in excess of your policy limits and may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. Although you have the right to hire an attorney, we believe that it is unnecessary at this time because we do not believe that there is a substantial possibility of any verdict exceeding our policy limits and the defense attorney provided by GEICO can adequately protect your interests. Should our opinion change, you will be advised immediately. If you do hire your own attorney, we recommend that you select an attorney experienced in negligence defense litigation.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

X-36                                    11-15-05
                                        **D 000588**

Exhibit 13 Page 266

**PROTECTED DOCUMENTS**

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-37

11-15-05

**D 000589**

Exhibit 13 Page 267

**PROTECTED DOCUMENTS**

### NON-WAIVER AGREEMENT

WHEREAS, the Government Employees Insurance Company did heretofore issue and deliver to John Doe of Oakland, California, as named insured, a policy of automobile public liability and property damage insurance covering an automobile described as a 20-- Ford; and

WHEREAS, during the term of said policy, said automobile was involved in an accident which occurred on August 31, 20--, on the State Highway about one mile south of the City of Camarillo, in Ventura County, California, while being driven by one Richard Roe; and

WHEREAS, said Government Employees Insurance Company contends that it has no liability or obligation toward John Doe, James Smith, Richard Roe, or anyone else, including any claimants who might be involved in said accident, or for any claims or judgments arising out of or resulting from said accident under said insurance policy by reason of the fact that the said John Doe, James Smith, and Richard Roe did intentionally inform the insurance company and its agents and attorney falsely to the effect that the car was being operated at the time of the accident by the said John Doe, whereas, just as a matter of fact, the same was actually being driven by Richard Roe and the said parties did make reports and statements to the investigating officers and other parties involved in said accident to the same effect; and

WHEREAS, the undersigned is desirous of having said insurance company continue with its investigation of said accident and any claims arising therefrom and continue to have its attorney furnish a defense on behalf of the undersigned in the lawsuit arising out of said accident; and

WHEREAS, the undersigned does hereby acknowledge and agree that by reason of the matters above stated he is not covered by the said insurance policy and that said insurance company does not owe him any duty or obligation whatsoever under said policy otherwise:

NOW, THEREFORE, in consideration of the foregoing, IT IS HEREBY AGREED by the undersigned, that in investigating said accident and any claims resulting therefrom, and in furnishing a defense on behalf of the undersigned in any action now filed or which hereafter may be filed, said insurance company shall not be deemed to have acknowledged or recognized any liability, duty or obligation to the undersigned or to anyone else under said policy, or otherwise, and the undersigned does hereby agree that said insurance company shall not have any duty or obligation whatsoever to investigate said accident or claims further or furnish any defense on behalf of the undersigned or to pay any court costs or any portion of any judgment which might at any time be awarded or rendered against the undersigned, it being recognized by the undersigned that any and all acts or steps theretofore taken by said insurance company on behalf of the undersigned shall be deemed to have been taken solely as a matter of courtesy and accommodation to the undersigned, and at any time hereafter the said insurance company shall have the privilege of tendering back to the said undersigned the defense of said action upon twelve hours notice to the undersigned.

DATE: _____, _____, and _____

_____
John Doe

GOVERNMENT EMPLOYEES INSURANCE COMPANY

By: _____

X-38

11-15-05
**D 000590**

Exhibit 13 Page 268

**PROTECTED DOCUMENTS**

**AGREEMENT TO DEFEND**

WHEREAS, a policy of insurance, number 1034891, issued by the Government Employees Insurance Company to John Patrick Doe covering a 20—Oldsmobile, motor number BA103054, effective for 6 months from April 8, 20--, provides that the Company will pay on behalf of John Patrick Doe, according to the limits of liability as stated therein, such as he might be required to pay because of legal liability for bodily injury sustained by any person caused by accident and arising out of the ownership, maintenance or use of the automobile, AND WHEREAS, said policy of insurance also provides that the Company shall pay on behalf of any person driving the automobile with the named insured's permission, according to the limits as stated therein, such sums which said person might be required to pay because of legal liability for bodily injury sustained by any person caused by accident arising out of the ownership, maintenance or use of the automobile,  AND WHEREAS, said policy of insurance requires that the insured shall cooperate with the Company in securing and giving evidence and shall otherwise assist the Company;

AND WHEREAS, after the occurrence of an accident in which said automobile was involved in a collision with a stone wall in Warwick, Rhode Island, information was given to the Company, its agents and attorneys by John Patrick Doe, Mrs. Mary Doe and Mrs. Helen Smith alleging that said automobile was being driven by Mrs. Helen Smith at the time of the accident, AND WHEREAS similar information was given to the investigation officers, AND WHEREAS there would be no liability under the Bodily Injury Coverage of the policy for any injury sustained by Mrs. Helen Smith under such circumstances;

AND WHEREAS, it has also been alleged that at the time of said accident the automobile was being driven by Mrs. Mary Doe under the expressed instruction of Mrs. Helen Smith, in which situation the Company contends that there would be no liability under the Bodily Injury Coverage for any injury sustained by Mrs. Helen Smith;

AND WHEREAS, the Company is advised that Mrs. Helen Smith has received accord and satisfaction, for any injuries she sustained, from John Patrick Doe in the form of a refrigerator, kitchen stove and other consideration;

AND WHEREAS, said Government Employees Insurance Company contends that it has no liability or obligation toward John Patrick Doe or Mrs. Mary Doe or anyone else, including any claimants or judgments arising out of or resulting from said accident under said insurance policy by reason of the fact that various and inconsistent statements have been made by the parties concerned and because of the insured's failure to cooperate with the Company;

AND WHEREAS, the undersigned are desirous of having said insurance company furnish a defense on behalf of the undersigned in connection with an action filed in the United States District Court for the District of Columbia, Civil Division, bearing civil action file number 00-61; AND WHEREAS the undersigned do hereby acknowledge and agree that by reason of the matters above stated they are not covered by the said insurance policy and that said insurance company does not owe them any duty or obligation whatsoever under said policy, or otherwise;

NOW, THEREFORE, in consideration of the foregoing, it is hereby agreed by and between Government Employees Insurance Company and John Patrick Doe and Mrs. Mary Doe that the Government Employees Insurance Company will defend the action aforesaid pending in the United Stated District Court for the District of Columbia against the undersigned, John Patrick Doe and Mrs. Mary Doe, but without obligation to pay any judgment that might be rendered against John Patrick Doe or Mrs. Mary Doe, as a result of the accident arising out of the use of the automobile by Mrs. Mary Doe and John Patrick Doe on November 29, 20--.

X-39                                    11-15-05

Exhibit 13 Page 269

**PROTECTED DOCUMENTS**

IN WITNESS WHEREOF, we have this_____day of_____, _____, affixed our signatures hereto

_____

_____

_____

DISTRICT OF COLUMBIA

ss:

CITY OF WASHINGTON

On this____day of_____, _____, before me personally appeared John Patrick Doe and Mrs. Mary Doe, to me known, and known to me to be the same persons described in and who executed the above instrument and they acknowledged to me that they executed the same.

_____

Notary Public

(SEAL)

My Commission Expires: _____.

X-40                                    11-15-05

**D 000592**

Exhibit 13 Page 270

**PROTECTED DOCUMENTS**

**FORMAL DISCLAIMER LETTER**

Mr. John Doe
5560 River Road
Riverdale, Maryland

CLAIM: 0006987840101019          INSURED: John Does

Dear Mr. Doe:

With respect to the automobile accident occurring on January 10, 20--, the Government Employees Insurance Company hereby disclaims and denies any and all liability and obligation to you and to others under the policy number 2045677, issued to you.  The applicable policy provides, in part, as follows:
[Quote exact policy language applicable]

This disclaimer is made because [give specific reasons or reasons].

[If suit is pending, give information stating that the attorney's appearance has been, or is being withdrawn, or will be withdrawn within a specific time.]

The Government Employees Insurance Company will take no further action with respect to any claim which you might have against us or with respect to any claim or suit against you which has arisen, or may arise, out of the said accident and hereby withdraws from the matter entirely.

Very truly yours,

J. J. Jones

Claims Examiner
JJJ/ab

June 1, 20--

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**ADDRESSEE ONLY**

NOTE: This letter must be dictated in its entirety.

If a further reason for disclaiming should become known at a later time another letter must be sent.

X-41                          11-15-05
                              **D 000593**

Exhibit 13 Page 271

## PROTECTED DOCUMENTS

### DISCLAIMER LETTER TO INTERESTED PARTIES

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Your Client:

Dear:

I am in receipt of your correspondence of _____.

Please be advised that there is no coverage available for this loss.  Therefore, (appropriate company) will take no further action with respect to this claim.

If you have any questions, please contact me at the number below.

Sincerely,

/S/

Claims Examiner
1-800-1003, extension 4240

**\*\* Use this letter in those states that <u>do not</u> require a copy of the disclaimer/denial letter sent to the insured be also sent to the interested parties.**

X-42

2-9-07
**D 000594**

Exhibit 13 Page 272

PROTECTED DOCUMENTS

AFFIDAVIT OF COVERAGE

STATE OF_____

_____COUNTY: ss.

I,_____, Assistance Vice President of GOVERNMENT EMPLOYEES INSURANCE COMNPANY, a corporation organized and existing under the laws of Maryland, do hereby certify that the attached copy of the declaration sheet (extension certificate) and policy contract form are identical to the declaration sheet (extension sheet) and policy number 123-45-67, effective January 7, 20--, issued to John R. Doe, Apartment 28, 412 West Street, New York, New York, by Government Employees Insurance Company.

_____
(Enter the name of the Assistant Vice President of Underwriting or Claims who who will sign the Affidavit)?

Subscribed and sworn to before me this_____day of _____, _____.

_____
Notary Public

NOTE: This Affidavit should be modified to fit the document sought to be certified in a particular case and the subject policyholder.

X-43                                11-15-05
                                    **D 000595**

Exhibit 13 Page 273

**PROTECTED DOCUMENTS**

**AFFIDAVIT OF FORGERY**

STATE OF_____ ss:

I,_____, BEING FIRST DULY SWORN, DEPOSE

AND SAY: THAT I RESIDE AT_____AND THAT MY

PLACE OF BUSINESS IS_____. THAT I AM THE

PERSON NAMED AS A PAYEE OF CHECK NO._____, DATED_____

DRAWN ON_____TO THE ORDER OF_____
              (Name of Bank)
FOR_____ _____DOLLARS ($_____ ), AND

DRAWN AGAINST THE ACCOUNT OF_____
                                        (Name of Company)

THAT I HAVE NEVER SIGNED OR ENDORSED SAID CHECK NOR HAVE I EVER AUTHORIZED,
PROCURED, RATIFIED OR APPROVED THE SIGNING OR ENDORSING OF MY NAME ON SAID
CHECK; AND THE NAME WRITTEN THEREON WHICH PURPORTS TO BE MY SIGNATURE IS A
FORGERY AND WAS MADE WITHOUT MY KNOWLEDG OR CONSENT.

   CHECK THE APPROPRIATE BOX:

   /_/    THAT SAID FORGERY OF MY SIGNATURE TO THE BEST OF MY
          KNOWLEDGE AND BELIEF WAS MADE BY_____

   /_/    I HAVE NO KNOWLEDGE OF THE PERSON OR PERSONS WHO FORGED
          MY SIGNATURE AS AFORESAID.

THAT I HAVE NEVER RECEIVED THE WHOLE OR ANY PART OF THE PROCEEDS OF THE CHECK
NOR HAVE I RECEIVED ANY BENEFIT FROM SUCH PROCEEDS EITHER DIRECTLY OR
INDIRECTLY.

TELEPHONE: HOME_____

          BUSINESS_____

                                          _____
                                          Multiple signatures

Subscribed and sworn to before me this_____day of _____, _____.
Accepted :

_____                   _____
     Bank Officer                              Notary Public

_____ Date              _____
                                               State of

                        X-44                          11-15-05
                                                  **D 000596**

Exhibit 13 Page 274

**PROTECTED DOCUMENTS**

**EXPANDED EXPENSE CODES**

| OLD | NEW (First position) | CODE/DESCRIPTION (Second position) | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| 30 | L | A | - | Attorney's professional fee (time) |
| | | | | (Other than as listed below) |
| | | C | - | Clerical or overhead expenses |
| | | F | - | Friendly suit, "prove up" hearings |
| | | G | - | Travel time |
| | | I | - | Issuing payments |
| | | M | - | Attorney's fees for ADR (time) |
| | | N | - | Non-litigation - case management |
| | | O | - | Legal opinion |
| | | P | - | Paralegal services |
| | | R | - | Develop release or other legal format |
| | | T | - | Attorney's fees for trial (time) |
| | | Z | - | All other |
| | | | | |
| 31 | E | A | - | Appraisal - Auto |
| | | C | - | Towing expense (cartage) |
| | | E | - | ERS expense |
| | | H | - | Storage Expense (holding) |
| | | P | - | Appraisal - other property |
| | | S | - | Salvage Expense (includes pool charges) |
| | | T | - | Time, charged by property adjuster to |
| | | | | negotiate, settle or pay |
| | | Z | - | All Other |

**EXPANDED EXPENSE CODES** (Continued)

| OLD | NEW (First position) | CODE/DESCRIPTION (Second position) | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| 32 | C | C | - | Fees paid to a court |
| | | | | |
| 35 | | E | - | Costs and fees for non-medical expert |
| | | I | - | Fees to independents to attend ADR, |
| | | | | trial or deposition |
| | | L | - | Locate and make available witness for |

X-45

6-28-02

**D 000597**

Exhibit 13 Page 275

**PROTECTED DOCUMENTS**

| | | | | |
|---|---|---|---|---|
| | | | | trial |
| | | M | - | Fees to mediators or arbitrators |
| | | P | - | Fees for service of process |
| | | R | - | Reconstruction |
| | | S | - | Stenographer |
| | | W | - | Costs paid to a court |
| | | Z | - | All other |
| | | | | |
| | | **EITHER IRS NUMBER OR** | | |
| | | **ATTORNEY/ADJUSTER CODE IS REQUIRED** | | |
| | | | | |
| 34 | F | B | - | Bureau of vital statistics - death, autopsy, marriage, birth, etc. |
| | | F | - | Police Report (prior or subsequent accidents) |
| | | H | - | Homicide reports |
| | | M | - | Military reports |
| | | P | - | Police reports (current accident) |
| | | Z | - | All other |

X-46

6-28-02
**D 000598**

Exhibit 13 Page 276

**PROTECTED DOCUMENTS**

**EXPANDED EXPENSE CODES** (Continued)

| OLD | NEW (First position) | | CODE/DESCRIPTION (Second position) | | |
|-----|-----|-----|-----|-----|-----|
| | | | | | |
| 36 | M | * | F | - | Film Review |
| | | * | L | - | Liability IME |
| | | | M | - | Medical peer review |
| | | * | P | - | PIP/ Med Pay, IME |
| | | | R | - | Rehabilitation |
| | | * | T | - | Medical expert testimony, deposition, trial or preparation |
| | | | U | - | Utilization review – audit/utilization |
| | | * | X | - | X-rays or other diagnostics taken at time of IME |
| | | | Z | - | All Other |
| | | | | | |
| | | * | = | | **IRS NUMBER REQUIRED** |
| | | | | | |
| 37 | A | | A | - | Credit or asset report |
| | | | C | - | Costs for claims staff to attend trial or ADR |
| | | | F | - | Hourly fee/flat rate to appear as Company representative at ADR |
| | | | H | - | Hourly fees/flat rate |
| | | | M | - | Miscellaneous/Overhead |
| | | | Z | - | All Other |
| | | | | | |
| 39 | O | | P | - | Photocopy fees for PIP or other files |
| | | | R | - | Reimbursement/Cost share to reimburse attorney for costs advanced. Co-defendants for IME's |
| | | | Z | - | All Other |

**D 000599**

Exhibit 13 Page 277

**PROTECTED DOCUMENTS**

**EXPANDED EXPENSE CODES** (Continued)

| OLD | NEW | CODE/DESCRIPTION | | | |
|-----|-----|------------------|---|---|---|
| | (First position) | | (Second position) | | |
| | | | | | |
| 42,43, | R | | A | - | Asset and locate |
| 44,46, | | | B | - | Attorney's fees |
| 47,49, | | | C | - | Credit check |
| 50,51, | | * | D | - | Advanced deductible |
| 52. | | | F | - | Filing fees |
| | | * | I | - | Refund insured's interest |
| | | | M | - | ADR fees |
| | | | P | - | Police report |
| | | * | R | - | Deductible refund |
| | | | S | - | Service of process - suit |
| | | | T | - | Tag trace/MVR |
| | | | W | - | Witness fees |
| | | | X | - | Attorney fee - non-cash recovery |
| | | | Y | - | Collection fee - non-case recovery |
| | | | Z | - | All other |
| | | | | | |
| | | * = | ATTORNEY/ADJUSTER CODE NOT REQUIRED. | | |
| | | | | | |
| 60 | P | | A | - | Appraisal photos |
| | | | I | - | Independent adjuster photos |
| | | | P | - | Police reports |
| | | | S | - | Professional photos |
| | | | T | - | Trial exhibits |
| | | | Z | - | All other |

X-48                                          6-28-02

D 000600

Exhibit 13 Page 278

**PROTECTED DOCUMENTS**

**EXPANDED EXPENSE CODES** (Continued)

| OLD | NEW<br>(First position) | CODE/DESCRIPTION<br>(Second position) | | |
|-----|-----|-----|-----|-----|
| 62 | S | A | - | Activity or background checks |
| 63 | | B | - | Bureau/official records (costs) |
| | | C | - | Litigation costs other than attorney fees |
| | | E | - | BUO expense |
| | | F | - | Police report - current accident (cost) |
| | | H | - | Handwriting experts |
| | | I | - | Private investigator fees |
| | | K | - | Peer review expense |
| | | L | - | Attorney fees for SIU - related litigation |
| | | O | - | Cause and origin investigation |
| | | P | - | Police report - prior or subsequent accident |
| | | R | - | Search (investigators time) |
| | | S | - | Surveillance (includes film or tape) |
| | | T | - | Translator/Interpreter |
| | | Z | - | All other |

X-49                     6-28-02
**D 000601**

Exhibit 13 Page 279

PROTECTED DOCUMENTS

## PERSONAL UMBRELLA POLICY EXCESS AD DAMNUM LETTER

Date

Name
Address
Address

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. A representative of the law firm will contact you with the name of the attorney to your case. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

You are being sued for $[amount]. You have primary liability coverage limits of [$amount / $amount] and your personal umbrella policy has a $[amount] limit.

Because the amount you are being sued for may be increased at any time by the plaintiff upon application to the court, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

X-50                                          11-15-05

**D 000602**

Exhibit 13 Page 280

**PROTECTED DOCUMENTS**

Sincerely,

/S/

Claims Examiner

cc: Attorney

X-51

11-15-05
**D 000603**

Exhibit 13 Page 281

**PROTECTED DOCUMENTS**

## PERSONAL UMBRELLA POLICY EXCESS AD DAMNUM LETTER
## STAFF COUNSEL

Date

Name
Address
Address

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  A representative of the law firm will contact you with the name of the attorney to your case.  Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.  The defense attorney is a salaried GEICO employee who represents our insureds in automobile or homeowner lawsuits.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

You are being sued for $[amount].  You have primary liability coverage limits of  [$amount / $amount] and your personal umbrella policy has a $[amount] limit.

Because the amount you are being sued for may be increased at any time by the plaintiff upon application to the court, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy.  The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court.  You will be given ample notice of the date, time and place of trial or other court appearances.  Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials.  Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

X-52                              11-15-05
**D 000604**

Exhibit 13 Page 282

**PROTECTED DOCUMENTS**

Please inform the defense attorney and GEICO if you change your address or intend to be absent.  The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

If you have any questions, please contact me at the number below.  Please refer to our claim number when call or writing about this claim.

Sincerely,

/S/

Claims Examiner

cc:  Attorney

X-53

11-15-05

**D 000605**

Exhibit 13 Page 283

**PROTECTED DOCUMENTS**

<u>7 Day Trial Call-in Sheet</u>

<u>SEVEN DAY TRIAL SUMMARY SHEET</u>

<u>(Please complete as thoroughly as practicable. Use additional sheets if necessary.)</u>

To: _____

From: _____ Adj. Code: _____ Ext. _____

Claim #: _____

Insured: _____ Loss location: _____ D/L: _____ Time: _____

Insured to be present at trial? Y N If not, please explain:
_____

Policy limits: _____ Reserve: _____

Trial date: _____ Jurisdiction: _____   _____

Venue: _____ Character of venue: Liberal/Moderate/Conservative

Comments re venue: _____

Property Damage $                    Collision $                        No/Low  Y  N  Denied?

Reconstructionist?: Plaintiff _____ Defendant _____ Seat belt defense? _____

Loss Facts:
_____
_____
_____
_____

Other insurance available to plaintiff, defendant and/or co-defendant?  If so, please specify coverage and limits.
_____

Plaintiff: _____ DOB: _____ Position in Vehicle: _____ Reserve: _____

[Note: if more than one plaintiff, provide information for each; use separate sheet if necessary.]

Employer: _____ Occupation: _____ Spouse: _____

Injuries:
_____
_____

PPD: Yes  No  % _____ By Whom: _____ PPD: _____

X-54                                        11-15-05

**D 000606**

Exhibit 13 Page 284

## PROTECTED DOCUMENTS

Question of causality re injuries?_____

IME Dr.:_____ Date:_____ Results:_____

Film Review?_____ Records Review?_____

|  | Submitted | Considered |  |
|---|---|---|---|
| Medicals: $ | _____ / | _____ | Diagnostic Tests:_____ |
| Wages: $ | _____ / | _____ | HRS/WKS/DAYS Missed:_____ |
| Other: $ | _____ / | _____ |  |
| Total: $ | _____ / | _____ |  |

Discovery status: Complete? Incomplete? Items left to be completed? If discovery not complete, when will that happen?
_____

Was summary judgment motion filed on threshold or liability issue? If so, result:_____ If not, please explain:
_____

Plaintiff's witness (expert and lay; expert's reputation; appearance to jury, etc.):


Defense witness (expert and lay; expert's reputation; appearance to jury; interviewed by defense attorney; subpoenaed, etc.):



Strengths of case:


Weaknesses of case:


Any special or unusual facts, circumstances or applicable law CHO Legal should be aware of?


Trial counsel for the defense:_____   _____

Trial Counsel's evaluation. Attach written evaluation (including settlement and verdict range, % of winning, recommendations, and advise whether to try or not). If counsel's written evaluation is not available, please speak to counsel to obtain the answer to these questions.

_____
_____
_____
_____

Control File: Y N Claims Home Office Attorney:_____   CHO Authority:_____

X-55                                    11-15-05

**D 000607**


Exhibit 13 Page 285

## PROTECTED DOCUMENTS

Structure  Y  N  $ _____ ADR:  Y  N  High/Low: _____ Control Contract:  Y  N  High/Low _____
If none of the above offered, please explain: _____

_____

Last Demand: _____   Last Offer: _____

Judge hearing case: _____   Has this or any judge placed value on
case?

If so, please explain: _____

Examiner's Recommendations:

Manager's Recommendations:

RLA's Recommendations:

Examiner: _____       Date: _____
Manager's App: _____       Date: _____
RLA's Auth: _____       Date: _____
Claims Home Office Auth: _____       Date: _____

Is conference call with CHOL, Region, and defense counsel (i.e., attorney who will try the case) requested?

_____
_____
_____
_____

X-56                          11-15-05
                              **D 000608**

Exhibit 13 Page 286

PROTECTED DOCUMENTS

# CHAPTER XI

## SUBROGATION

### I.    INTRODUCTION

The importance of subrogation cannot be overemphasized.  Dollars paid on all Physical
Damage Coverages, especially, have been greatly reduced through the use of subrogation.
With the growing popularity of Uninsured and Underinsured Motorists coverage, it is
probable that the future will bring an increase in recoveries under this coverage.

### II.   BASIS OF SUBROGATION CLAIMS

When an insured's car is damaged in a collision with another car, whose driver was at
fault, the insured can either make a claim under his or her Collision Coverage or proceed
against the other driver.  If the insured accepts payment under the policy, the Company
then "stands in the shoes" of the insured and can attempt to recover that payment from
the wrongdoer.  The Company's right of recovery is known as "subrogation" and, in most
states, is acquired by operation of law <u>after the Company makes payment</u> in conformity
with the policy contract.  The individual against whom the claim is made has the same
defenses against the Company that he or she has against the insured.

The Company has no right of subrogation until after payment has been made under the
terms of the policy.  The Company must have a clear obligation to make payment to our
insured for there is no right of subrogation if the Company makes a payment that is not
required by the policy.

To eliminate any questions as to the Company's rights, a condition of the policy
expressly provides for subrogation under the Liability, Physical Damage, and Uninsured
Motorists Coverages.  The insured assigns to the Company any claim he or she may have
against a third party, to the extent of the Company's payment.

### III.  PRORATING EXPENSES

Although the Company is not required to do so, as an additional service, it
normally includes the insured's deductible amount in the subrogation claim.
Often it is economically wise to settle or make payment arrangements for less than a full
recovery, particularly when liability in the subrogation claim is doubtful or when the
person against whom the claim is made is not insured and has few assets.  The insured
may share with the Company any expenses involved in the recovery in the same
proportion as his or her deductible amount bears to the total settlement.

XI-1

6-28-02

**D 000609**

Exhibit 13 Page 287

**PROTECTED DOCUMENTS**

**IV.** **MAKING CLAIM ON THE INSURED'S BEHALF**

It is improper for the Company to pursue any claim other than a subrogation on the behalf of the insured. For example, the Company cannot seek recovery on the insured's behalf for personal injury, loss of use, damage to other personal property, etc. To do so would be considered the unauthorized practice of law. A corporation may not practice law.

**V.** **CONSIDERATIONS IN SETTLING**

The subrogation claim can frequently be used to advantage in settling liability claims arising out of the same accident, since the relinquishment or waiver by the Company of a subrogation claim is as much an exchange of value as the payment of money. Often the maximum recovery can be made of the Company's subrogation claims if they are handled in conjunction with other claims. Although examiners are not primarily concerned with the handling of subrogation claims, they cannot properly fulfill the requirements of their job unless they are alert to all subrogation possibilities.

**VI.** **SETTLEMENT BY INSURED**

Before settling Physical Damage claims, be certain that the insured has not already recovered for damage from the other party or insurance company. If the insured has accepted such a settlement, he or she is not entitled to payment under the policy because the subrogation condition contained in the policy contract has been breached. However, if any subrogation claim the Company would have acquired would have been of doubtful merit, or if the insured made as good a settlement as the Company would have made, he or she may be paid the difference between the amount payable under the policy and what he or she settled for.

Whether any payment will be made to an insured under these conditions is a matter of judgment. Each case must be considered on its own merits.

If the Company makes payment to the insured after he or she has settled his or her claim against the other party, no subrogation claim is acquired as the Company "stands in the insured's shoes." This means that the Company's claim is no better than the insured's claim was. If the insured's claim was dissolved by a settlement <u>before</u> the Company had a subrogation claim, the subrogation claim is lost.

**VII.** **NOTICE OF SUBROGATION**

If there is any appreciable delay in the insured's decision as to whether he or she will collect under his or her Physical Damage Coverage or proceed against the wrongdoer, put the other insurance company on notice of the Company's possible subrogation claim. If the name of the other company is unknown or if the other driver is uninsured, the notice

XI-2

6-28-02

**D 000610**

Exhibit 13 Page 288

**PROTECTED DOCUMENTS**

should go to the driver of the other vehicle or the person responsible for its use. If the notification is directed to the other driver, he or she should be requested to forward it to his or her insurance company. Form letter CL-24 may be used for this purpose.

After a payment has been made in which we have a subrogation interest, the file is to remain open and the examiner or adjuster is to refer the file to the Payment Recovery Unit without closing the file.

If the identity of the responsible carrier is known, the Payment Recovery examiner is responsible for sending form letter S-6. This letter should be sent as soon as payment is made so that the Company's subrogation claim is not prejudiced. For example, after the insured settles with the Company, he or she might then also accept payment from the other party or their insurer for the same damage.

<u>In some states, the insured's execution of a release of his or her liability claim against the other party effectively destroys the Company's subrogation claim.</u> The only recourse then is for the Company to attempt to recover from the insured. In some states, a release executed by the insured does not bar the insurance company's subrogation claim if notice of the subrogation claim is given prior to settlement by the insured. If the other party or his or her insurance company settles with the insured after notice of the Company's subrogation interest, it does so at its own peril. Failure to protect the subrogee (the holder of a subrogation claim) may subject the paying company to paying twice for the same damage.

## VIII.   EVALUATING THE SUBROGATION CLAIM

Many subrogation claims are settled on a compromise basis because of questions of liability or of the amount of damages. If the insurance company against which the subrogation claim is made can establish that the subrogee paid more than the reasonable cost of repairs, the recovery may be limited to the reasonable repair cost.

In evaluating a subrogation claim, the Payment Recovery examiner must carefully consider the same elements of liability and damages as a Liability Examiner does on a Property Damage Liability claim. He or she must decide when to accept a compromise and when to insist on full recovery. The percentage of recovery should be in line with the chances of prevailing in the event of litigation.

There are also questions of expense in pursuing subrogation claims. If the probable expense necessary for a greater recovery is not proportionate to the increase in the recovery, serious consideration should be given to a compromise. Because a subrogee will lose a portion of its recovery if it files a suit, some insurance companies refuse to consider subrogation claims on their merits. Instead, offers are made on clean liability cases representing the value of the claims less litigation expense.

XI-3

6-28-02

**D 000611**

Exhibit 13 Page 289

**PROTECTED DOCUMENTS**

If the claim examiner or adjuster is of the opinion that it would be prejudicial to attempt recovery of subrogation, he should discuss the file with his supervisor. If the supervisor agrees, the adjuster will not direct the file to the Payment Recovery Unit.  If the subrogation examiner feels it unwise to assert a claim because of possible exposure to Bodily Injury Liability claims, he or she should discuss the matter with the Payment Recovery manager.

A great deal can be done to eliminate risks incident to subrogation if claims are handled properly.

XI-4

6-28-02

**D 000612**

Exhibit 13 Page 290

PROTECTED DOCUMENTS

# CHAPTER XII

## ARBITRATION

I.   **INTRODUCTION**

Arbitration is not considered a substitute for good claims handling.  Subrogation claims against the adverse carrier and liability claims made against GEICO are to be reviewed realistically to determine the liability and valuation.  Cases of questionable liability or questionable valuation will be negotiated directly with the adverse carrier as long as an amicable settlement is possible.  Every effort is to be made to keep problem cases from going into arbitration simply because they are a problem.

II.   **ARBITRATION DEFINED**

Arbitration is a method of resolving a dispute.  It is the resolution of a dispute by an impartial (third) party chosen by the parties to the dispute who agree in advance to abide by the arbitrator's award that is issued after a hearing at which both parties have an opportunity to be heard.

III.   **PURPOSE**

To minimize lawsuits, a number of property and casualty insurance companies, including our Company, have entered into a series of agreements that provide certain types of disputes between the various companies be resolved through arbitration.

In general, subrogation arbitration applies to material damage subrogation claims of not more than $100,000, but not to claims as to which a company asserts a defense of lack of coverage on grounds other than (1) delayed notice, (2) no notice or (3) non-cooperation.  Note that the types of disputes that are covered by these agreements are disputes between insurance companies that are due to a subrogation claim involving property damage.

IV.   **PARTICIPATING MEMBERS**

The examiner or adjuster should make every effort to determine whether the adverse insurance company is a signatory to the arbitration agreements so as to avoid the unnecessary filing and withdrawal of suits.  The examiner or adjuster should seek the advice and assistance of the Payments Recovery Unit before any unfamiliar step is taken.  We should be careful to avoid allowing any statute of limitations to run, and particular care must be given to claims against governmental agencies because of the likelihood of

XII-1

6-28-02

**D 000613**

Exhibit 13 Page 291

**PROTECTED DOCUMENTS**

unusually short periods of limitations and notice requirements. For claims involving the U. S. government, see the Federal Tort Claims Act. See the Arbitration Forums Membership Directory for lists of companies that are signatories to the arbitration.

**V.    CLAIMS PERSONNEL RESPONSIBILITY**

- If arbitration is filed against the Company in a claim file that is closed, reopen the file and establish the proper reserve(s). Complete the Respondents portion of the Arbitration Forums, Inc. Automobile Subrogation Arbitration Forum Application ("A" Form).

- If an "A" Form is filed by the adverse carrier, but we believe we would prevail in arbitration, the claims examiner or adjuster should complete the "Respondent Information and Allegations" portion and file a counter-claim against the adverse carrier.

- It is also imperative that we recognize that damages demanded in arbitration can exceed the limits or remaining limits available under a policy on any given claim. It is the obligation of the adjuster handling any response to recognize these circumstances and protect both the insured and company from any excess potential.

  In these circumstances an affirmative defense is necessary to address the allegations made by the initiating party. Where damages are sought in excess of available coverage the examiner should state as an Affirmative Defense the policy limits available.

- If we receive an adverse decision, the award is to be paid promptly. The award does not include the claimant's deductible, so our check is paid to the applicant only. If the claimant's deductible has not been paid, a second check should be requisitioned, made payable to the claimant, and forwarded with the applicant's check so they are aware of the payment. The applicant will forward the check to the claimant.

**VI.    PAYMENT RECOVERY EXAMINER'S RESPONSIBILITY**

- If reasonable efforts to effect a subrogation recovery fail and it is determined that we should be successful in arbitration, the subrogation examiner should file an "A" form.

- If our "A" Form draws a counter-claim, the Payment Recovery Examiner is to refer the file immediately to the claims examiner or adjuster to answer as respondent.

- Handle all procedural matters concerning collection and apportionment of

XII-2

1-30-08

**D 000614**

Exhibit 13 Page 292

**PROTECTED DOCUMENTS**

recoveries made through arbitration.

XII-3

6-28-02

**D 000615**

Exhibit 13 Page 293

**PROTECTED DOCUMENTS**

### VII.   THE AUTOMOBILE SUBROGATION FORUM APPLICATION ("A" FORM)

This form was created by the Arbitration Forums (AF) for use by both Applicant and
Respondent. The following notes refer to the various parts.  The Applicant Carrier sends an
original and one copy of the "A" Form and Contentions Sheet to the proper (AF) field
office and three copies to each Respondent Company.  The Respondent(s) completes the
first copy and sends it along with its Contention Sheet and other supporting documents to
the proper AF field office.  It also completes the second copy and sends it along with a
copy of its Contentions Sheet to the Applicant.  The third copy is kept in the Respondent's
file.

- Before submitting our application, as Applicant or Respondent, review the
  entire form for accuracy and neatness.  We are judged on our appearance in
  Arbitration the same as we would be in court.

- As Respondent, we must answer "yes" or "no" to the <u>Admission of
  Coverage</u> question.  A "yes" answer or a failure to answer will "estop"
  (i.e., prevent) us from making a later denial.

- Whether it is better to have an individual case heard by a single arbitrator
  will depend on our previous experience with a particular committee.  Check
  with someone in your division or office who is acquainted with that
  Committee. If the dollar value on the case is less than $2,500, hearing by a
  one-man panel will occur. If the damages are over $2,500, you must send a
  written request to have a three-man panel hear the case.

- The Applicant must have contacted the Respondent prior to submitting an
  "A" Form to AF. The applicant, as evidence of satisfaction of the condition
  precedent to arbitration, must include on the respondent's portion of the
  form the name of the respondent company, its representative's name and
  address, and the file number.  If this information is not available, the "A"
  Form must be accompanied by a memorandum explaining why the
  information is not available.

- The contentions are a synopsis of the case. They should be brief and
  relevant, inconsistencies are to be avoided.

### VIII.  SUPPORTING PAPERS

A good file, in application or answer, contains the material listed below.   GEICO's
experience with arbitration has shown that a completely documented file is the best
way to ensure a favorable decision

- Behind the Contentions Sheet, attach copies of all referenced
  statements and any other reports or factual documents, which would be

XII-4

6-28-02

**D 000616**

Exhibit 13 Page 294

**PROTECTED DOCUMENTS**

helpful in our case.  When attaching copies of statements, it is helpful to the

XII-5

6-28-02

**D 000617**

Exhibit 13 Page 295

**PROTECTED DOCUMENTS**

Committee to indicate by mark, or some other designation, the highlights of each statement. Should the Committee wish to review the statements, their attention will be called to the important areas and the entire statement will not have to be read.

- When we wish to contest the amount of damages claimed, we must submit evidence of our evaluation. Point out the discrepancies when the adverse carrier's evaluation differs from ours. Include pictures of damage, if helpful.

- Virtually all states recognize the loss of use as a recoverable damage in tort. If loss of use is being subrogated, it is important to identify the elements necessary in that state to prove loss of use. All states require that the amount requested must be reasonable. Specifically, the length of time it took to repair the damaged vehicle must be reasonable under the circumstances, and the cost of the rental per day must be reasonable for a vehicle of like kind. In some states a replacement vehicle must actually be rented before loss of use will be recoverable. In other states the plaintiff just has to show that the amount being requested is reasonable and that he/she was without the use of the vehicle for the time requested. Still other states do not require the plaintiff to actually have incurred the expense of alternate transportation, but do require the plaintiff to show that he/she needed a vehicle during the time requested. Once you know the necessary elements for the state involved, you can argue appropriate defenses.

## IX. SPECIAL ARBITRATION AGREEMENT

This agreement is an outgrowth of the Automobile and Property Subrogation Arbitration Agreement, wherein certain companies have agreed to resolve inter-company disputes concerning:

- Contribution on bodily injury and property damage claims.

- Coverage, if they are insurers of the same insured.

If, after referring to the Agreement, Rules, and list of signatory companies, the examiner or adjuster believes arbitration should be initiated, it should be discussed with the Claims Manager prior to filing an application.

For Membership information contact Arbitration Forums telephonically: 888 ARB – FILE

If the claim is a Control File, the Claims Attorney should be advised by memorandum if we decide to submit a claim to arbitration or if a Notice of Hearing is received. The memorandum should include the following information:

XII-6

6-28-02

D 000618

Exhibit 13 Page 296

PROTECTED DOCUMENTS

- The claim number under which the claims office filed an application or received such a Notice of Hearing.

- The decision rendered by the arbitration panel.

**X.   AMERICAN ARBITRATION ASSOCIATION**

This Association in used to resolve disputes arising under Uninsured Motorist Coverage. If the insured and the Company cannot agree on whether there is legal liability on the part of the uninsured driver or to the settlement value of the claim presented, either or both matters shall be settled in accordance with the rules of the American Arbitration Association as provided for under the terms of the policy.

**XI.   INTERNATIONAL RECIPROCAL ARBITRATION**

The Automobile Physical Damage Subrogation Arbitration Agreement  (to which the Company is a signatory) and Canadian Inter-Company Arbitration Agreements (to which the Company is not a signatory) are subject to geographic limitations, as they only have jurisdiction over disputes which arise out of losses occurring within their respective countries involving companies which are signatories to their Agreements.

The International Reciprocal Arbitration Agreement was created to provide an instrument which would permit the signatory companies to the two above Arbitration Agreements to cross the international boundary in pursuit of their right of recovery.

This Agreement applies the compulsory features of the Automobile Physical Damage Subrogation Arbitration ("Agreement") or the Canadian Inter-Company Arbitration Agreement to accidents between nationals of the respective programs and to the nationals of one country involved in an accident in the other country.

The place of the accident determines which organization has jurisdiction.  If the accident occurs in Canada and the companies have signed the International Reciprocal Arbitration Agreement, jurisdiction is conferred to the Canadian Agreement.  If the loss occurs in the United States, jurisdiction is conferred to the Automobile Physical Damage Subrogation Arbitration Agreement.

XII-7

6-28-02

**D 000619**

Exhibit 13 Page 297

PROTECTED DOCUMENTS

# CHAPTER XIII

## CONTROL FILE HANDLING AND PROCEDURES

Control files are those claims files, which because of their seriousness or because of questions of policy, procedure or coverage, are controlled or supervised by Claims Home Office Legal.

Referral to Claims Legal does not prevent the Region from immediately settling cases within regional authority if circumstances warrant a prompt settlement or tender of the policy limit.

I.    **CONTROL FILE CRITERIA**

    A.  **Mandatory Control Files**

A control file is mandatory and should be established promptly when it is first apparent that the claim file may involve one or more of the following:

1    A loss potential in combined amount exceeding regional authority.  It is expected that associates handling cases with control file potential will be aware of regional authority.  (See TCM-50).  Also, authority and control file status is on an <u>occurrence</u> basis.  It is therefore possible that an accident involving several policyholders has minimum limits.  In control file cases where more than one policyholder is involved in an accident or a series of accidents, this fact should be conveyed as early as possible to Claims Legal.

2    Suits against the company or an associate:

- Involving alleged improper handling by a company associate or Agent,
- Seeking punitive damages,
- Alleging bad faith or extra-contractual (breach of contract) liability, or
- Arising from a loss involving a Company car, a car leased by the company or a car owned by an associate used for Company business.
- Alleging a defective Company policy and/or procedure.

3    Claims against BI/UM/UIM/PIP coverage with complex coverage issues such as material misrepresentation, failure to cooperate, or late notice where disclaimer must be seriously considered.

4    Any case arising out of a claim file or the claims handling of a claim file, where it is contemplated that GEICO will be a plaintiff (or a party seeking affirmative relief) in a lawsuit.

XIII-1

08-31-05
**D 000820**

Exhibit 13 Page 298

**PROTECTED DOCUMENTS**

5    Confirmed catastrophic injury cases ordinarily should not be placed on control unless it is alleged our offer of the policy limits was late and is the reason for the failure of the case to settle.  Exposure to "bad faith" or extra-contractual liability may arise in cases with relatively low policy limits and catastrophic losses.  Notification (telephonic or by Outlook message) to Claims Legal is imperative whenever there is a catastrophic loss alleged and:

-    A demand for policy limits is not accepted or deferred for any reason (See TCM-275), or
-    A tender of the policy limits is not accepted because the claimant seeks to recover from an excess carrier or from the personal assets of the insured.  These files ordinarily should not be placed on control unless it is alleged our offer of the policy limits was late and is the reason for the failure of the case to settle.

•    Common catastrophic injuries include:
-    Fatality
    -    Spinal cord Injury with para or quadriplegia
    -    Fracture of multiple members or non-union
    -    Brain damage with mental deficit
    -    Massive internal injuries affecting body organs (especially removal)
    -    Limb amputation
    -    Blindness
    -    Severe 2nd/3rd degree burns
    -    Back injury resulting in incontinence
    -    Brachial plexus nerve damage
    -    Fractured bilateral os calcis (Heel Fracture)
    -    Ortho injuries requiring two or more surgeries (other than arthroscopic)

In general, not all catastrophic injury claims in Florida are required to go on control in an urgent status as soon as the injury is recognized, without regard to policy limits, liability issues, or coverage concerns.  If the region elects to tender limits promptly, the file need not go on control unless there are more injured claimants than limits available or the offer has been declined.

This procedure is not intended to prevent the Region from immediately settling cases within Regional authority if circumstances warrant a prompt settlement or tender of the policy limits.  If a tender of the policy limits does not result in a case being resolved, the file should then be put on control as soon as possible and, upon receipt by Claims Legal, the assigned attorney shall exercise line authority.  However, if there are split limits (50/100 or less) and no more than two injuries, it need not go on control.  If there is a single limit and more than one injury claim, then the file should go on control.

XIII-2

08-31-05
**D 000621**

Exhibit 13 Page 299

PROTECTED DOCUMENTS

(The two preceding paragraphs replace TCM-297 Florida, July 27, 1999.)

\*   6   Medical specials exceed $30,000 under BI, UM and UIM.

    7   Accidents involving pollution of surface streams or groundwater.

Except for Florida catastrophic injury cases, mandatory control files must be forwarded to Claims Legal within seven days of recognition of control file criteria. In cases where there are liability features in one file and UM or UIM features in another file, both files must go on control. The entire loss is considered one occurrence. (This paragraph supercedes in pertinent part TCM-297 dated September 6, 1994.)

When one liability or UM/UIM feature meets one of the mandatory control criteria, all liability and UM/UIM features are on control and authority to settle any of the control features rests with Claims Legal. The Region retains its authority to make expense payments. The region also retains authority over PD, PIP, Med Pay or other coverages unless those coverages meet control file criteria. The claims attorney exercises line responsibility over control files.

**B. Elective Control Files**

In the following situations, a control file is not mandatory, but may go on control after certain steps, later identified, have been carried out:

Questions of Company policy;

- New or unusual questions of law or procedure;

- Any claim involving bodily injury where the Federal Tort Claims Act (FTCA) applies to the insured and provides a potential defense (See FTCA, Chapter VI);

- Disputes between this Company and another insurer in which it is indicated that litigation may be instituted by either insurer concerning questions as to the existence of coverage under policies written by either insurer, or the extent to which the policies written by either insurer would apply;

- Rehabilitation potential on any liability or no-fault PIP claim when such potential is reviewed and agreed to by the Regional Rehabilitation Coordinator.

- Appeals whether initiated by GEICO or any other party to the litigation. Claims Legal must be involved in any

XIII-3

**PROTECTED DOCUMENTS**

- decision to initiate or respond to an appeal.  A telephone call between the region and CHOL will usually suffice.

Line management in each regional or branch office is responsible for identifying the situations and then ensuring that appropriate action is taken.  Once the file is on control, the claims attorney assumes line responsibility for the file.

Ordinarily, 7 or 30 day trial summaries, discussions on whether or not to take an appeal, and telephone inquiries will be handled by Claims Home Office as miscellaneous control files.  In the extraordinary circumstance that a control file is warranted, the request for a control file should be made by the Sr. Liability Attorney, Sr. Claim Attorney or AVP of CHOL.

### C.  Miscellaneous Correspondence Files

These are less formal referrals of files to Claims Legal when the approval of a Claims Attorney is required because of a specific problem.  Examples include requests to disclaim coverage when the region has documented the lack of coverage, permission to pay an attorney's bill, which is in excess of regional authority, or requests for trial authority in cases not otherwise meeting control file criteria.

These limited referrals should be confined to cases, which can be resolved in one or two contacts with the claims attorney.  After discussing and with the approval of the AVP of Claims Home Office, or his designees, a request may be made that a file, which has been referred through Miscellaneous Correspondence, be put on control.

## II.   OPENING THE CONTROL FILE / NOTIFICATION

### A.  The INDEX/Critical Information and CLIQ Screens

The examiner should check the INDX screens in IDOC or Critical Information screen in Oasis for pacesetter policy on all 300/300 limits and higher.  See the Claim (1) screen in CLIQI.  Claims Legal personnel will activate the "HO" and "HO ATTY" fields whenever the file is opened in Claims Legal.  Code and name in TCM-298 identify claims attorneys.  If the file is set up "no coverage", the "HO" and "HO ATTY" fields are not activated.

### B.  Control File Alert Form (Alert Form)

The Alert Form, C-566, (Exhibit 1) is the preferred medium for Home Office notification (but see the 180-day rule, below).  The objective is to provide early, cost-effective notification when control file criteria (see page XIII-1) is met.  If documents are available, they should accompany the form (see page XIII-6). **The Alert Form should not be delayed in order to obtain documents.** Instructions for use of the form are on Exhibit 2.

XIII-4

08-31-05
**D 000623**

Exhibit 13 Page 301

PROTECTED DOCUMENTS

The Alert Form is flexible. There is space for narrative description, analysis, and comment. Continuation sheets may be used. It is not necessary to duplicate narrative, which is already contained on the ALOGI or other documents like the suit referral letter. The examiner may print specific ALOGI screens and attach to the file. The examiner will not print the entire ALOGI for the file. An Alert Form without adequate narrative attached will be returned to the supervisor. Where other documents are used to convey basic information, they should be specifically cited on the Alert Form and tabbed for ease of reference. Notwithstanding the foregoing, the examiner will provide a minimal description of the accident. Do not use terms such as "Vehicle 1"; use names of drivers, passengers or pedestrians.

The Alert Form may accompany any file except miscellaneous correspondence (see above). Ordinarily, a Control File Summary (CFS) will not be required. There are circumstances where a claims attorney may require the CFS in order to ensure that the examiner and the attorney have a complete and mutual understanding of the file. Examples of such circumstances are complex cases with several plaintiffs and significant injuries, reinsurance cases (see page III-16 et seq.), or other cases requiring immediate close supervision. Absent such special circumstances, a CFS is not required on any file submitted to Claims Legal by Alert Form within 180 days of the loss. A claims attorney may require a CFS on a case submitted after 180 days. An examiner may opt to submit a CFS on any file. If a CFS is submitted on a file previously placed on control by Alert Form, the CFS should clearly state on its face that a control file already exists for that claim.

Do not send an Alert Form on any update. Use the routing slip (Exhibit 5), a CFS, or other memo.

C. Control File Summary (CFS)

The purpose of the CFS is to produce a fact-based, reasoned recommendation in a complex or difficult case. Follow the format at Exhibits 3 or 4. Notification should not be delayed pending preparation of a CFS; in this situation, use the Alert Form and the CFS may follow as an update.

D. Control File Alert (CFA) Mailbox

Claims Home Office Legal (CHOL) has an Outlook mailbox for the purpose of sending CFA referrals electronically. The Outlook mailbox is titled "<u>CHO Control File Alert</u>" in the Outlook directory.

If the CFA is **Urgent**, mark the corresponding box in the CFA itself <u>and</u> send the email marked as "Importance: High" by clicking the red exclamation point located on the email task bar.

XIII-5

**PROTECTED DOCUMENTS**

Since not all Regional offices have upper level scanning, if all relevant documents are not scanned to the file, then the CFA and file material must still be sent by mail to CHOL.

For those CFA files with the documents scanned to the file, and for those new files that do not yet have any documents associated with them, simply email the CFA to the above described mailbox.

For those files which contain documents relevant to CHO review, it is imperative that the CFA identify where relevant documents are stored in ECF. A notation to "See ECF docs" is <u>not</u> appropriate, but "See 11/5/09 demand letter in IP John Smith" after describing or summarizing the important points therein is sufficient.

Police reports and AD paperwork do not need to have their location specifically described as both have designated locations in ECF.

**E. Documentation**

All documents must be secured by Acco fastener with holes punched top center. The Control File Alert Form (Alert Form) or Control File Summary (CFS) should be on top followed by the Summary Loss Report and pull off tabs with claim number, loss date and insured's name. Place all related documents together; for example, you should not scramble medical records among witness statements or litigation documents. Medical bills should be separated from treatment reports. This may require reorganization of materials from the chronological organization of the regional claims file. A logical grouping of documents is more important than blind adherence to chronological development.

As per Section D above, CFA referrals may only be sent electronically to Claims Home Office Legal (CHOL) if the documents are scanned to the file or if the file is new and does not yet have any documents associated with it. For electronic CFA referrals, it is imperative that the CFA identify where relevant documents are stored in ECF. A notation to See ECF docs" is <u>not</u> appropriate, but "See 11/5/09 demand letter in IP John Smith" after describing or summarizing the important points therein is sufficient. Police reports and AD paperwork do not need to have their location specifically described as both have designated locations in ECF.

A claims attorney is responsible primarily for review of coverage assessment, proper reserving, determination of liability, assessment of damages, extension of settlement authority, and determination of contribution or subrogation issues in control files cases. Therefore, the claims attorney needs adequate substantiation in order to make decisions or review recommendations. At the same time, the claims attorney is less effective if the examiner submits documentation that is excessive or poorly organized. Therefore, the examiner or supervisor must exercise some discretion in selecting relevant substantiation that is adequate but not excessive. The following guidelines will help:

XIII-6

11-24-09

**D 000625**

Exhibit 13 Page 303

## PROTECTED DOCUMENTS

- Submit all documents relating to the facts of liability including police reports, photos and sketches.

- Witness statements should be transcribed or summarized.  Do not send tapes.

- Submit any substantive correspondence with the insured or claimant including excess ad damnum letters reservations of rights.

- Submit tax returns or other wage loss data.

- For PIP files, send complete medical records and bills.  For normal liability files, submit only:

  - Hospital admission and discharge reports
  - Emergency room reports
  - Operation reports
  - Diagnostic test reports, including x-ray reports
  - Physician follow-up notes and reports
  - Independent medical examinations (IME's)
  - A summary of medical bills by date, provider, amount of charges.

In cases where there appears to be excessive treatment or psychosomatic injuries are raised, the entire medical record will probably be requested.  In minimal impact cases, it is necessary to submit repair estimates and photos on both vehicles.  Unless requested, do not send attorney bills.  In reviewing file documents for inclusion in the control file, the examiner should apply the following test:

**Will the information contained in the document assist the claims attorney in making necessary decisions in the file?**

Documents that are cumulative or redundant should not be sent to the control file unless requested.  If the examiner discovers material information in nursing notes, the examiner should submit it with a note of explanation.  Occasionally, a claims attorney may request records, which are normally not submitted if there is some indication of materiality.  Finally, an inexperienced examiner may request assistance from a claims attorney in reviewing and screening records, but training is normally the function of the supervisor.

F.   **Electronic Records**

Electronic Records must be considered part of the claims file and include CLIQ,

CLINQI, SINQ, CLREG, ADTARI and ALOGI.  Information that is substantive and appropriate should be on ALOGI including messages regarding reserving, updates and authority.  SYSM or Outlook may be used for informal remarks.

XIII-7

08-31-05
**D 000626**

Exhibit 13 Page 304

PROTECTED DOCUMENTS

\* As per Section D above, CFA referrals may only be sent electronically to Claims Home Office Legal (CHOL) if the documents are scanned to the file or if the file is new and does not yet have any documents associated with it.

G. **Coverage Issues**

Forward a copy of a completed C-380, Coverage worksheet (Exhibit 6), and a completed Coverage Problem Worksheet (Exhibit 7) with the CFAF or CFS.

H. **Supervision of Control Cases by a Region or Branch Office**

While claims managers approve Alert Forms or control file summaries, this does not in any way relieve the Regional Liability Administrator, Regional Claims Director or Branch Office Manager from responsibility for work quality. Regional Liability Administrators, Regional Claims Directors or Branch Office Managers may, at their discretion, review certain types of correspondence or particular files. **The Alert Form will not be delayed to obtain a particular signature; it is only required that someone in the supervisory chain review it and sign it.** Approval by a manager or RLA indicates that the Alert Form or CFS meets all standards set out in the chapter.

Claims attorneys will routinely communicate and correspond directly with the claims examiner. A claims attorney may request intervention by regional managers in specific cases. Memos addressed to a supervisor should be routed directly to that addressee for review without delay.

III. **CONTROL FILE PROCESSING**

A. **Progress Reports**

It is the examiner's responsibility to keep Claims Legal informed of developments in a case on control. Several methods of update are available: typewritten memo including CFS (see above), standard form memo (see Routing Slip, Exhibit 5), ALOG/SYSM, or telephone. The examiner should keep a record of each document submitted to Claims Legal. Any telephone conference should be summarized on ALOGI. Headers for control file memos should include a summary of existing reserves and, if applicable, any BI, UM/UIM or PIP payments already made on the file. Attached documents may be stapled; if the documents are too thick for a standard stapler, holes must be punched in the top center and an Ace fastener must secure them.

A time limit or policy limits demand involving control authority must be conveyed to Claims Legal within one business day. This includes files already on control or those within control file criteria (see page XIII-1).

Occasionally, files lapse into periods of inactivity. During a particular diary period, there may be no correspondence or any other communication. In this situation, there is no change in status of the file. Examiners are not expected to report no change in status in any format. However, examiners are expected to

XIII-8

11-24-09

**D 000627**

Exhibit 13 Page 305

PROTECTED DOCUMENTS

review the adequacy of reserves each time a file comes up on diary. Examiners may request permission from Claims Legal to extend the normal 30-day diary. Each feature should also show any amounts paid under advance payments or no-fault payments. PIP control file status reports should include all medical bills and reports, as well as any rehabilitation reports.

**B.  Use of the Routing Slip (Exhibit 5)**

The purpose of the routing slip is to facilitate the transmittal of routine documents to the control file. Use of this form does not relieve the examiner of the duty to evaluate and comment on the effect of the documents on the disposition of the claim.

Analysis by the examiner is required in certain update situations. A detailed rationale must appear on the form or addendum if the transmittal is intended to:

- Obtain settlement authority,

- Initiate an adjustment in reserves, or

- Obtain Claims Legal approval for a file-handling recommendation.

**C.  Authorization**

All settlement authorizations on control files for loss payments under BI, PD or UM/UIM coverage must be obtained from Claims Legal, even though the amount requested for the individual claim may be within the authority of the region. Authority from Claims Legal on expense items is unnecessary unless the cumulative amount of expense payments already on the file exceeds the region's authorization or would exceed authorization if the expense under consideration were paid.

Request for authorization should be made as early as possible in claim handling. Absent a time limit demand, requests for settlement authority should be in writing. If it is necessary to obtain settlement authorization from Claims Legal by telephone or E-mail the claims attorney will confirm the authorization by written memorandum or by E-mail. If authorization is given by ALOG/SYSM, the examiner should reference the ALOGI entry in the claim file (C-232, C-446, C-86 or other Regional Form). The Claims Supervisor must not be left out of the loop when settlement authority is granted to the Claims Examiner via ALOGI. Claims Legal will notify the supervisor, via Email, of any authority granted.

The following information should be provided with any authorization request; if more than one claimant is involved, provide separately the special damages, demands and requested authorization for each claimant:

- Brief description of injuries

XIII-9

08-31-05
**D 000628**

Exhibit 13 Page 306

### PROTECTED DOCUMENTS

- Special damages, with bodily injury specials and property damage specials grouped separately for each claimant. Indicate which specials have been verified and which have not been verified

- The progression of demands and offers

- Evaluations by the adjuster or attorney and comments on the liability

- Evaluations by the Regional or Branch Office

- In litigation cases, the attorney's opinion of our chances of successful defense, probable range of verdicts, present settlement value and recommendations for future handling

- Requests for authorization for each claimant separately

All authorization requests from the Regional or Branch Offices on Control files must carry the examiner and supervisor's signature as well as either the signature of the Continuing Unit Manager, the Regional Liability Administrator or the Regional Claims Director.

### D. PIP Control File Handling

To comply with statutes and regulations, it may be necessary for an examiner to request payment of certain medical services by telephone or E-mail.

All telephone authorizations must be acknowledged in writing by the examiner with copies of the bills and reports and Claims Legal should follow up with written authorization.

### E. Settlements

Examiners will notify Claims Legal by memorandum or E-mail. Do not send copies of releases and suit closing papers unless specifically requested to do so by Claims Legal.

## IV. CLOSING CONTROL FILES

Normally a control file is not ready for closure until a signed release is received. If there is a problem with the release, advise the claims attorney. When a claim file on control is ready for closure, advise Claims Legal by ALOG/SYSM. Claims Legal will make the necessary changes to "HO" and "HO ATTY" fields in CLIQ. Do not close a reinsurance file until authority to do so is received from Claims Legal.

At the time of control file closure, the contents will be destroyed. Original photographs will be returned to the examiner, as well as any other material, which should be preserved.

XIII-10

08-31-05
**D 000629**

Exhibit 13 Page 307

**PROTECTED DOCUMENTS**

Exhibit 1

INITIAL REPORT ☐

CONTROL FILE ALERT

SEE PRIOR CORRESPONDENCE ☐

| | |
|---|---|
| CLAIM #: _____ INSURED: _____ COMPANY: _____ | |

CLAIM #: _____  INSURED: _____  COMPANY: _____

REGION/

DATE/THIS NOTICE: _____  DATE/LOSS: _____  RISK STATE: _____  BRANCH: _____

EXAMINER

LOSS LOCATION: _____  NAME/CODE/PH: _____

| ALERT STATUS: | COVERAGE HAS BEEN VERIFIED? |
|---|---|
| ☐ ROUTINE   ☐ URGENT | COVERAGES INVOLVED @ LIMITS:  ☐ YES  ☐ NO  ☐ AT ISSUE  Explain in "Discussion" |
| ☐ CALL MGR AT: _____ | ☐ BI @ _____  ☐ UM/UIM @ _____  ☐ PIP @ _____ |
| | ☐ Pacesetter Plus @ _____  ☐ OTHER INS. Explain in "Discussion" |

REASON FOR NOTIFICATION:   ☐ MEETS CF CRITERION # _____   ☐ OTHER: _____

ISSUES REQUIRING HO ACTION:  ☐ COVERAGE  ☐ RESERVES  ☐ SETTLEMENT AUTHORITY  ☐ APPEAL ISSUES
☐ POLICY LIMITS DEMAND  ☐ PIP AUTHORITY  ☐ OTHER: _____

DOCUMENTS ATTACHED:   ☐ COMPLETE FILE  ☐ SELECTED DOCUMENTS  Listed Over  ☐ PENDING HO INSTRUCTION

(MUST BE LEGIBLE)
FACTS:

LIABILITY ASSESSMENT:   ☐ FULL  ☐ PARTIAL (COMPARATIVE NEGLIGENCE)  ☐ DOUBTFUL  ☐ UNKNOWN
LIABILITY INVESTIGATION:   ☐ COMPLETE  ☐ CONTINUING  ☐ UNNECESSARY

NUMBER OR BI/UIM FEATURES: _____     $$ PAID TO DATE (ALL FEATURES) _____

RESERVES: CURRENT TOTAL: _____     ADJUSTMENT: ☐ NOT NEEDED ☐ CALL MGR AT: _____

RECOMMENDED RESERVE ADJUSTMENT:
DIRECT RESERVE INSTRUCTION TO:

COMPLETE SYSM/OUTLOOK NAME

LITIGATION:   ☐ IN SUIT  VENUE: _____          DEF ATTY: _____
☐ UM/UIM ARBITRATION

STATUS:          TRIAL DATE:          PLTF ATTY: _____

C-566 (10-99) NS

XIII-11

08-31-05

**D 000630**

Exhibit 13 Page 308

**PROTECTED DOCUMENTS**

INJURIES (List by Claimant Name, type of injury, occupation and age. For PIP claims, add wage loss and current treatment):

PLAN FOR FUTURE ACTION: DISCUSS ANY INVESTIGATIVE PROBLEMS:

DISCUSSION/DOCUMENTS ATTACHED:

SUPERVISOR COMMENT:

SIGNATURE:                                                          DATE:

C-566 (10-99) NS

XIII-12

08-31-05
**D 000631**

Exhibit 13 Page 309

**PROTECTED DOCUMENTS**

**EXHIBIT 2**

### INSTRUCTIONS FOR CONTROL FILE ALERT FORM

The Control File Alert Form is intended to provide very early notification to Claims Legal of claims, which meet established control file criteria noted in Part I of this chapter.

**ALERT STATUS:** The majority of files will fall in the "routine" category, which means that Claims Legal does not require emergency action in response to the notice. If a file is characterized as "urgent", the submission must include sufficient file information to explain the issues and the action required. "Call Mgr At:" indicates a need that the claims attorney calls the supervisor for further discussion.

**OTHER INSURANCE:** Indicate any other coverage applicable to the loss from any carrier including, but not limited to, workers' compensation, secondary or excess coverage or umbrella coverage.

**REASON FOR NOTIFICATION:** "Meets CF Criterion:" refers to an established list of control file criteria listed in Part I of this chapter.

**ISSUES REQUIRING HO ACTION:** This section calls for selection of actions or processes needing immediate attention by Claims Legal. For example, the CF criteria may be "catastrophic injury" but the actions needing attention are reserves and a response to a policy limits demand.

**DOCUMENTS ATTACHED:** See Claims Manual page XIII-6. List attached documents in the Discussion block.

**FACTS:** Facts relevant to the control file issues may be presented in <u>legible</u> handwritten form with continuation on the reverse of the form. Additional Continuation Sheets may be used. You may print ALOGI screens, which convey facts regarding the file.

**LIABILITY ASSESSMENT:** In BI cases, "Full" means all or predominant fault lies with the insured. In a comparative negligence jurisdiction, "Partial" means some fault lies with both parties. "Doubtful" means that we have at least one viable defense on the merits of the case against the insured. In UM/UIM cases, these terms refer to the liability of the adverse party. Use the Discussion block to cite cases, statutes, and for analysis.

**RESERVES:** Total is gross total of all combined reserves. Recommended reserve adjustment should be broken down by feature.

**SUPERVISOR COMMENT:** Some comment is mandatory by first line manager only. Submission of alert should not be delayed to obtain approval of claims manager, RLA, etc.

**DISCUSSION:** Discuss any coverage issues, laws applicable to liability, or venue considerations. List documents attached. Set out any specific requests of Claims Legal.

XIII-13

08-31-05
**D 000632**

Exhibit 13 Page 310

**PROTECTED DOCUMENTS**

EXHIBIT 3

## CONTROL FILE SUMMARY

TO:      A. S. Kalinsky, Claims Legal

FROM:   Examiner – Region

SUBJECT:   Claim Number, Named Insured, Company and Reserves,
           By Claimant, by Feature

DATE:

A.   <u>COVERAGE</u>

   1. Auto matches the coverage information and has been identified.  If not, explain.

   2. Policy limits: Explain any Coverage question.

   3. List any endorsements that may affect coverage for this loss.

   4. Is there a GEICO Pacesetter policy?   Any other applicable excess or umbrella coverage?

   5. Has the claim been entered in the control file field of the CRIS system?

   6. Reason for submission (see Control File Criteria, page XIII-1, Claims Manual).

B.   <u>FACTS OF THE ACCIDENT</u>

   1. Where, when and how did loss occur?  (In all most unusual fact situations, two or three
      sentences will be sufficient).

   2. If the insured, any witness or any person involved in the loss has a version different from the
      above, give his or her name and briefly explain their version.

   3. Any policy investigation?   Any charges against any party?  Pleas made and disposition.

   4. Amount of PD, Coll., or damage to other property.

C.   <u>DIAGRAMS</u>

Include an informative and neatly drawn diagram showing direction, position of all
parties, witnesses and pertinent landmarks.

XIII-14

08-31-05
**D 000633**

Exhibit 13 Page 311

PROTECTED DOCUMENTS

EXHIBIT 3
Page 2

**D.**   **WITNESS**

List names of witnesses and indicate which have given statements and which have not been contacted or refused to give statements.

**E.**   **CLAIMANTS – INJURIES AND SPECIAL DAMAGES**

In separate paragraphs, list all possible BI, PIP and UM claimants. Give a concise statement of the injury, disability, (whether partial, total of permanent), and in column order, the special damages of each claimant including property damage items. Identify the claimant(s) as "pedestrian", "passenger in the insured car", or "passenger in the claimant car". Describe each claimant by name, age occupation, income and martial status.

**F.**   **SUITS PENDING** -- If none – indicate non-pending.

1.   Title and location of each suit.

2.   Indicate ad damnum and whether or not an excess or acknowledgment letter has been sent.

3.   Identify plaintiff and defense attorney and set forth any relevant information about each. (These should be professional and not something we would not want discovered). Discuss any pertinent information about the place of trial.

4.   Best estimates of trial date.

**G.**   **APPLICABLE LAW**

1.   Mention any statute or case law that may apply.

2.   If comparative negligence rules apply, indicate the type and your estimate of each party's percentage of negligence. (In complicated losses, some explanation of how you decided the percentage of each person's negligence should be included.)

**H.**   **POSSIBILITY OF CONTRIBUTION**

Identify all defendants and possible defendants, their involvement and the names of their carriers, if known.

**I.**   **NEGOTIATIONS** – If none, write none.

List progression of all offers, demands and any time limits involved.

XIII-15

08-31-05
**D 000634**

Exhibit 13 Page 312

**PROTECTED DOCUMENTS**

EXHIBIT 3
Page 3

J.    SUGGESTED FUTURE INVESTIGATION AND RECOMMENDATIONS

　　1.   Is completed?  If not, what further information needed?

　　2.   List any specific ideas and recommendation for further handling.

K.    AUTHORIZATION REQUESTED   -  If none, write none.

　　1.   Amount requested on each Claimant.

　　2.   Who will do the negotiating?


＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Claims Examiner


＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Claims Supervisor


＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

RLA or RCD


XIII-16

Exhibit 13 Page 313

**PROTECTED DOCUMENTS**

EXHIBIT 4

### CONTROL FILE SUMMARY - PIP

TO:      A. S. Kalinsky, Claims Legal

FROM:    Examiner – Region

SUBJECT:     CLAIM #:
             NAMED INSURED:
             COMPANY:
             DATE OF LOSS:
             TOTAL PIP PAID TO DATE:
             TOTAL PIP RESERVE:
             ACCIDENT STATE:

DATE:

Brief Reason for placing file on Control.

A.    <u>COVERAGE</u>

   1.   Vehicle, Vin number, no-fault coverage per injured (total exposure for all injured if more than one), Liability Coverage limits.

   2.   Coverage question, policy number, named insured, address and permissive use?

   3.   Contract form – Restrictive PIP Endorsement.

   4.   Insured vehicle identification?

   5.   Has the claim been entered in the control file field of the CRIS System?

B.    <u>RESERVES</u>

This section may be omitted if only one injured is involved and the information on that one person is shown under subject above.

   1.   Name of first claimant.

      Total medical paid to date for each feature, total reserve for each feature.

XIII-17

08-31-05
**D 000636**

Exhibit 13 Page 314

**PROTECTED DOCUMENTS**

EXHIBIT 4
Page 2

    2. Name of second claimant.

        Same as above.

    3. Etc.

**C.**    <u>FACTS OF THE ACCIDENT</u>

    1. Where and when.

    2. Facts as we have them.

    3. Any discrepancies in versions of how accident occurred.   Were any of the injured in the
       course of their employment?

    4. Liability examiner assigned to file if split file.

**D.**    <u>CLAIMANTS</u>

    1. Name, age, date of birth, address, occupation, earnings, principle injuries, rehabilitation
       assignment?

**E.**    <u>FUTURE HANDLING</u>

    1. Possible IME

    2. Rehab referral

    3. Reserve change.

    4. Medical bill audit.

    5. Payment authority.

_____
Claims Examiner

_____
Claims Supervisor

_____
RLA or RCD

<div align="center">XIII-18</div>

**PROTECTED DOCUMENTS**

EXHIBIT 5

---

## ROUTE TO: CLAIMS HOME OFFICE, GEICO PLAZA – 3E

---

**CONTROL FILE DOCUMENT TRANSMITTAL**

REGION _____

TO: _____, Claims Legal

FROM: _____, Ext. _____

DATE: _____

CLAIM #: _____  INSURED: _____

RESERVES:    Feature   Current Reserve      Adequate? (Yes/No)     Adjustment

FILE EXPENSES TO DATE: $ _____

DOCUMENTS ATTACHED: _____   _____

_____   _____   _____

HOME OFFICE ACTION REQUESTED: _____

REMARKS:

_____

_____

_____

_____

_____

SIGNED:_____      APPROVED: _____
                                                   _____

C-568 (8-97) NS

XIII-19

08-31-05

**D 000638**

Exhibit 13 Page 316

**PROTECTED DOCUMENTS**

**EXHIBIT 6**

DATE: _____
COVERAGE WORKSHEET

COMPANY CODE _____ _____
IDOC POLICY NUMBER _____
INSURED'S NAME _____
CLAIM NUMBER _____
VEHICLE INVOLVED _____
LIENHOLDER _____

INSURED'S ADDRESS _____
_____
LOSS DATE _____
VIN # _____

☐ Bound Policy Loss. [25]
☐ Loss date is after the paid-to-date. [26]
☐ Lapse/suspension endorsements on policy. [29]
☐ Policy cancelled on or before loss date. [31]
☐ Policy Endorsement initiated Prior. [33]
☐ Policy not cancelled, however, loss date is on or after effective date of expiration/cancellation notice. [34]
☐ No match on vehicle. [37]
☐ Driver selected which has an excluded status. [50]
☐ Loss date not within effective date. [55]

☐ Endorsement processed after loss date. [57]
☐ Endorsement on policy not listed. [67]
☐ Vehicle cancelled before loss date. [75]
☐ No record of policyholder.
☐ Coverage(s) requested not available. (Specify coverage(s)). _____
☐ Need insured's phone number.
☐ Provide information for affidavit of coverage.
☐ Need certified copy of policy.
☐ Vehicle condition code (N.Y.). _____
☐ Need broker's phone number.

COMMENTS:
_____
_____
_____
   (Adjuster/Examiner Code & Ext.)    _____

CODE STRIP

| AUTO | | | | VIN NUMBER | | |
|------|---|---|---|---|---|---|
| STATE | TERRITORY | YEARS | CONTRACT | AUTO RATE | MERIT | SYM. |
| AGE | R.S. | V-COND CODE | POLICY EFFECTIVE DATE | | POLICY EXPIRATION DATE | |

☐ COVERAGE          ☐ NO COVERAGE          ☐ MESSAGE

BI _____
PD _____
PIP _____
APIP _____
MED _____
UM _____
UM-UND _____

COMP _____
COLL _____
TOW _____
RR _____
OTHER _____
OTHER _____
OTHER _____

☐ COVERAGE SAME AS C-387-A

ADDITIONAL _____

INFORMATION _____
_____

_____          _____
UNDERWRITER                    DATE

C-380 (9-94)

XIII-20

08-31-05
**D 000639**

Exhibit 13 Page 317

**PROTECTED DOCUMENTS**

**EXHIBIT 7**

**COVERAGE PROBLEM WORKSHEET**

EXAMINER/CODE: _____     DATE: _____

CLAIM NUMBER: _____     LOSS DATE: _____
LOSS LOCATION: _____
REPORT DATE: _____     REPORTED BY: _____

INSURED: _____     CO-INSURED: _____
POLICY NUMBER: _____     COMPANY CODE: _____
RISK STATE: _____     CONTRACT NUMBER: _____
POLICY EFFECTIVE DATES: _____     CANCELLATION DATE: _____
REISSUE DATE: _____

PORS:  Y   N   DATE: _____
CAN NOTICE:   Y   N   DATE: _____
NOTICE TO LIENHOLDER:   Y   N   N/A   IF YES, DATE: _____
IF INSD AUTO INVOLVED, IS AUTO CO-OWNED:   Y   N   IF YES, BY WHOM? _____

C-380 OBTAINED:   Y   N   OPINION: _____
ROR SENT:   Y   N   TO WHOM: _____
REASON FOR ROR: _____

FACTS OF LOSS, NUMBER OF CLAIMANTS INVOLVED, INJURIES INVOLVED:

CLAIMANTS HAVE UM?   Y   N          CARRIERS(S): _____

COVERAGE ISSUES INVOLVED:

INSURED'S VERSION OF COVERAGE SITUATION:

E3XAMINER'S OPINION AND RECOMMENDATIONS FOR HANDLING:

SUPERVISOR'S OPINION/COMMENTS:

RLA OPINION/COMMENTS:

XIII-21

08-31-05
**D 000640**

Exhibit 13 Page 318

**PROTECTED DOCUMENTS**

**APPENDIX**

\*    **NEW YORK NO-FAULT CONTROL FILE PROCEDURES**

The requirements for placing New York No-Fault files on control when a suit or
arbitration is filed in the State of New York are below.

(Nothing in this procedure is meant to change the requirement for contacting Claims
Home Office on any claim where payment of more than policy limits is involved!)

    A.  It is **not necessary** to place a New York No-Fault file on control because it
       contains an allegation of "bad faith" when the loss occurs in the State of New
       York.

    B.  Closed files that have never been on control but now need to go on control
       because reserves are required for defense or settlement of the suit or arbitration.

        1.  **When a suit or arbitration is filed by the injured party, the case must
          be placed on control.**

        2.  When a suit or arbitration is filed by or on behalf of the provider, the Region is
          authorized to handle (post reserves, settle or defend as deemed appropriate)
          **without** putting it on control.

        3.  When there is an exception to the above, the Claim Manager or Regional
          Liability Administrator must call and discuss it with Valerie Coffey or Alan
          Nadelbach in Claims Home Office.

    C.  Closed files that were on control but now need to be reopened because reserves are
       required for the defense or settlement of the suit/arbitration.

        1.  **When a suit or arbitration is filed by the injured party, Claims Home
          Office must be notified.  Copies of supporting information must be
          viewable on the claims system or sent to the CHO file.**

        2.  When a suit or arbitration is filed by or on behalf of the provider, the Region
          is authorized to handle (post reserves, settle or defend as deemed appropriate)
          without putting it on control.

        3.  When there is an exception to the above, the Claim Manager or Regional
          Liability Administrator must call and discuss it with Valerie Coffey or Alan
          Nadelbach in Claims Home Office.

5-26-11

**D 000641**

Exhibit 13 Page 319

**PROTECTED DOCUMENTS**

D. Open control files with all features closed for an injured party but defense or settlement of the suit/arbitration require the feature to be reopened.

1. **When a suit or arbitration is filed by the injured party, Claims Home Office must be notified. Copies of supporting information must be viewable on the claims system or sent to the CHO file.**

2. When a suit or arbitration is filed by or on behalf of the provider, the Region is authorized to handle (post reserves, settle or defend as deemed appropriate) without putting it on control.

3. When there is an exception to the above, the Claim Manager or Regional Liability Administrator must call and discuss it with or Valerie Coffey or Alan Nadelbach in Claims Home Office.

E. Open control files on which a suit or arbitration is filed for an injured party and Claims Home Office has maintained handling authority.

1. Claims Home Office must continue to be involved in all aspects of the handling here.

2. To facilitate handling, Claims Home Office needs the following where available;

   a. A single Examiner who will report on all aspects of the claim handling as well as the suit/arbitration.

   b. Copies of the Summons and Complaint, if a suit was filed, and/or copies of the AR-1, if arbitration was demanded.

   c. Copies of the answers and any completed discovery.

   d. Copies of the "referral summary" and "the evidence packet" sent or being sent to defense counsel.

   e. A brief referral summary that explains the plan for defending the decision to defend, pay or compromise.

   f. Approval of the defense by the Claim Manager and RLA (the approval can be in ALOG or on the referral summary sent to us).

3. It is critical that we are notified of the suit or arbitration filing as soon as possible after the filing; not more than 30 days after the Region receives notice of the filing.

XIII-23

5-26-11
**D 000642**

Exhibit 13 Page 320

**PROTECTED DOCUMENTS**

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

Performance review criteria and guidelines may be accessed via the link below.

*   Performance Review Criteria and Guidelines

### I.  Claims Reporting System – Call Handling

   **A. Monitoring Purpose:**
   Incoming calls are recorded and evaluated as part of an ongoing effort to maintain and improve the quality of our customer interactions, our compliance with state and local laws, and our promotion of fair claims practices. These recordings are not, and will not, be used for claims investigative purposes.

   **B. Review Criteria:**

   The review criteria for CSR and TCRI level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center.

   Ratings for each category consist of "SAT" or "Non-SAT." Good claims judgment and common sense should be used when deciding upon the rating.

### II. Claims Reporting System – File Handling

   **A. Review Criteria and SPR Forms**

   The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are encouraged to use stricter standards.

XIV - 1

3/25/09

Confidential Information of the Government Employees Insurance Company

**D 000643**

Exhibit 13 Page 321

**PROTECTED DOCUMENTS**

Ratings to be used will be the following:

- **S (Satisfactory) -**    Documentation/performance in accordance with company and state regulatory requirements
- **NS (Not Satisfactory) -**    Documentation./performance which is below acceptable standards
- **N/A (Not Applicable) -**    Does not apply.

An NS in any subcategory <u>automatically</u> makes the category an NS; for example, an NS rating in the subcategory of *Coverage* will make the entire category of *Investigation* an NS. However, an NS in a category does <u>not</u> automatically make the *Overall* rating an NS. Good claims judgment should be used when deciding whether the *Overall* rating is NS. The *Overall* should be NS when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

## III.    TIP Requirements

### A. 24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment, transfer from another claims level</u> or <u>once additional information is received</u> to make *actual contact*[1] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact. For example, a file transferred from TCRII to CU due to age of the case would be exempt (N/A) from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt (N/A).

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt (N/A) from 24-Hour Contact. To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require immediate telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message. In these cases, aggressive attempts should be made to contact the interested party. Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

---

[1] Actual contact is placing a call, then either talking to the person or leaving a message.

XIV - 2

PROTECTED DOCUMENTS

**B. Interested Parties**

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 24-Hour Contact TIP.

The following interested parties are subject to 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers
- Claimant owner and/or spouse
- Claimant driver

All attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

**C. Internet**

**1. Inquires:**

    a. **2 Hour CSR TIP.** All CSR email "Inquiries" must be acknowledged and responded to <u>within two hours of receipt in the KANA mailbox</u> and in accordance with the TIP guidelines outlined below. Contact attempts must be made by telephone or CHO approved email templates. Contact by the ICSR does not constitute TIP on Upper Level or AD inquiries, unless such contact completely satisfies all aspects of the inquiry.

    b. **Upper-level TIP.** All upper-level email "Inquiries" received before 4:30 p.m. on a business day must be acknowledged and responded to by the end of the calendar day in which the inquiry was received and in accordance with the TIP guidelines outlined below. Any inquiry received after 4:30 p.m. or on a weekend must be responded to by the end of the next business day. Inquiry receive time is the time at which the recipient is notified of the message.

XIV - 3

**PROTECTED DOCUMENTS**

Upper-level units
- Inquiry Received: 8:00 a.m. – 4:30 p.m. Monday through Friday – TIP must be must met by the end of the calendar day in which the inquiry was received.

- Inquiry Received: After 4:30 p.m. or on weekend – TIP must be met by 4:30 p.m. local time the next business day.

c. **Date and Time.** "Inquiry" TIP will be measured during the following times:

CSR units:
8:00 a.m. – 8:00 p.m., Monday through Saturday
10:00 a.m. and 6:00 p.m. on Sundays and holidays

**The two hour CSR TIP will begin at 8:00 a.m. the next business day only for inquiries that come in after-hours.**

All other claims units:
8:00 a.m. – 4:30 p.m., Monday through Friday only.

d. **Customer Specified Time.** The standard TIP will not apply when the customer indicates a "best time to contact" on their email inquiry. If a specific time is indicated, contact must be made within 2 hours (+/-) of that time. The following parameters will also apply:

"**Morning**" – anytime between 8:00 a.m. (10:00 a.m. on Sundays and holidays) and 11:59 a.m.
"**Afternoon**" – anytime between 12:00 p.m. and 5:59 p.m.
"**Evening**" – anytime between 6:00 p.m. and 9:00 p.m.
"**Holiday**" – refers to the holiday's actual calendar date, not necessarily the date observed by the company.

e. **Inquiry/Response Retention.** A copy of all "Inquiry" emails and our response to those questions must be retained, by either copy/pasting to ALOGI, or by scanning a printed copy to the ECF file.

f. **Response Quality.** The ICSR may respond using an email template alone if an email template satisfies all aspects of the inquiry. The KANA email templates have been approved by Claims Home Office. Additional email templates will require CHO approval. Email should not be used to communicate with customers other than by the approved KANA email templates, eloquence emails, or in the exception situations outlined in the Claims Email Policy. The use of any "free form" email is unacceptable.

XIV - 4

4/29/10
Confidential Information of the Government Employees Insurance Company

**D 000646**

Exhibit 13 Page 324

**PROTECTED DOCUMENTS**

\* **2. Loss Reports:**

    **a. CSR Level 24–Hour TIP:** CSR level internet loss reports must be established, assigned and TIP must be attempted within 24 hours of receipt in the KANA mailbox. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and holidays.

    **b. Liability level 24–Hour TIP:** If the loss is not automatically established and assigned via ATLAS, liability level file handlers will have 24 hours from the time of initial notification to *attempt contact* on all interested parties. This will be measured between the hours of 8:00 a.m. and 4:30 p.m. on Monday through Friday, and does not include holidays.

        If an INET loss report is received after-hours, 24-hour TIP will begin at 8:00 a.m. the next applicable business day.

    **c. Out-of-Region Guidelines.** TIP will be measured according to the previously stated TIP guidelines, from the time the new loss is assigned to the handing region's adjuster code (or notice is given to the handling region).

XIV - 5

5/26/11

Confidential Information of the Government Employees Insurance Company

**D 000647**

Exhibit 13 Page 325

**PROTECTED DOCUMENTS**

**CLAIMS MANUAL**

**TABLE OF CHANGES**

| Change No. | Section (s) and Page(s) No. | Date of Change |
|---|---|---|
| 1 | Chapter XIII – Entire Chapter | 11-4-02 |
| 2 | Chapter XIV – Entire Chapter | 2-3-05 |
| 3 | Chapter XIII – Entire Chapter | 8-31-05 |
| 4 | Chapter III – Section VI, page 7 | 11-15-05 |
| 4 | Chapter III, Section VIII, pages 11, 12, 13, 15, 18 | 11-15-05 |
| 4 | Chapter V, Section XXXIV, pages 39, 40, 41 | 11-15-05 |
| 4 | Chapter VI – Section III, B, page 14 | 11-15-05 |
| 4 | Chapter VII, Section 1, page 1 | 11-15-05 |
| 4 | Chapter X, Entire Chapter | 11-15-05 |
| 4 | Chapter XIII, Section I, A, page 3 | 11-15-05 |
| 5 | Chapter XIV, Section I, A, page 1 | 3-2-06 |
| 5 | Chapter XIV, Section II, A, pages 3, 4 | 3-2-06 |
| 5 | Chapter XIV, Section IV, D, page 8 | 3-2-06 |
| 6 | Chapter XIII, Appendix, pages 22-24 | 8-11-06 |
| 7 | Chapter IV, Section XIII, page 14 | 1-10-07 |
| 7 | Chapter IV, Section XV, A, page 18 | 1-10-07 |
| 7 | Chapter IV, Section XV, B, page 19 | 1-10-07 |
| 7 | Chapter IV, Section XV, C, page 20 | 1-10-07 |
| 7 | Chapter IV, Section XV, D, pages 21, 22 | 1-10-07 |
| 7 | Chapter IV, Section XV, E, pages 22, 23 | 1-10-07 |
| 7 | Chapter IV, Section XV, F, pages 23, 24 | 1-10-07 |
| 7 | Chapter IV, Section XV, G, page 24 | 1-10-07 |
| 7 | Chapter IV, Section XV, H, page 25 | 1-10-07 |
| 7 | Chapter IV, Section XV, I, page 26 | 1-10-07 |
| 8 | Chapter IV, Section VIII, C, page 11 | 2-9-07 |
| 8 | Chapter IV, Section XV, A, page 17 | 2-9-07 |
| 8 | Chapter IV, Section XV, B, page 19 | 2-9-07 |

This manual was completely revised in 2002. Chapters I, II and IV through VII were published and distributed May 10, 2002. Chapters III and VIII through XIII were distributed June 28, 2002. Changes to the manual since those dates are listed above.

**D 000648**

Exhibit 13 Page 326

**PROTECTED DOCUMENTS**

**CLAIMS MANUAL**

**TABLE OF CHANGES**

| Change No. | Section (s) and Page(s) No. | Date of Change |
|---|---|---|
| 8 | Chapter IV, Section XV, C, page 20 | 2-9-07 |
| 8 | Chapter IV, Section XV, D, page 21 | 2-9-07 |
| 8 | Chapter IV, Section XV, E, page 22 | 2-9-07 |
| 8 | Chapter IV, Section XV, F, page 23 | 2-9-07 |
| 8 | Chapter X, pages 27, 42 | 2-9-07 |
| 8 | Chapter XIV, Section I, A and B, page 1 | 2-9-07 |
| 8 | Chapter XIV, Section IV, A, page 5 | 2-9-07 |
| 9 | Chapter XIV, Section IV, A, page 5 | 6-14-07 |
| 10 | Chapter XIV, Section IV, D, pages 7 and 8 | 8-2-07 |
| 11 | Chapter II, Section II, E, page 5 | 1-30-08 |
| 11 | Chapter II, Section III, E, pages 9, 10, 11 | 1-30-08 |
| 11 | Chapter III, Section III, B, page 3 | 1-30-08 |
| 11 | Chapter IV, Section VIII, B, page 11 | 1-30-08 |
| 11 | Chapter IX, Section VIII, page 36 | 1-30-08 |
| 11 | Chapter X, pages 25 and 26 | 1-30-08 |
| 11 | Chapter XII, Section V, page 2 | 1-30-08 |
| 12 | Chapter II, Section II, E, page 5 | 12-23-08 |
| 12 | Chapter II, Section III, E, pages 10,12,13,14 | 12-23-08 |
| 12 | Chapter III, Section II, pages 1,2 | 12-23-08 |
| 13 | Chapter IX, Section II, F, page 10 | 3-25-09 |
| 13 | Chapter IX, Section IV, page 16 | 3-25-09 |
| 13 | Chapter IX, Section IV, B, pages 17, 20, 21, 24 | 3-25-09 |
| 13 | Chapter IX, Section VII, page 34 | 3-25-09 |
| 13 | Chapter IX, Section VIII, page 36 | 3-25-09 |
| 13 | Chapter IX, Exhibits, page 51 | 3-25-09 |
| 13 | Chapter XIV, Entire Chapter | 3-25-09 |

This manual was completely revised in 2002.   Chapters I, II and IV through VII were published and
distributed May 10, 2002.   Chapters III and VIII through XIII were distributed June 28, 2002.   Changes to
the manual since those dates are listed above.

D 000649

Exhibit 13 Page 327

**PROTECTED DOCUMENTS**

CLAIMS MANUAL

TABLE OF CHANGES

| Change No. | Section (s) and Page(s) No. | Date of Change |
|---|---|---|
| 14 | Chapter IX, pages 22-54 | 6-2-09 |
| 15 | Chapter II, Section III, B, page 7 | 11-24-09 |
| 15 | Chapter XIII, Section II, D, page 5 | 11-24-09 |
| 15 | Chapter XIII, Section II, E, page 6 | 11-24-09 |
| 15 | Chapter XIII, Section II, F, page 8 | 11-24-09 |
| 16 | Chapter XIV, Section III, C, pages 3 and 4 | 4-29-10 |
| 17 | Chapter II, Section II, E, page 4 | 5-26-11 |
| 17 | Chapter VII, Section VI, B, page 5 | 5-26-11 |
| 17 | Chapter VIII, Section XVII, page 13 | 5-26-11 |
| 17 | Chapter XIII, Appendix, pages 22 and 23 | 5-26-11 |
| 17 | Chapter XIV, Section III, C, 2, page 5 | 5-26-11 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

This manual was completely revised in 2002.   Chapters I, II and IV through VII were published and distributed May 10, 2002.  Chapters III and VIII through XIII were distributed June 28, 2002.   Changes to the manual since those dates are listed above.

D 000650

Exhibit 13 Page 328

PROTECTED DOCUMENTS

# *Tucson*
# Continuing Unit
# Reference Manual



Rev 6/10/08

1

D 000651

Exhibit 13 Page 329

**PROTECTED DOCUMENTS**

## Montana

| | |
|---|---|
| Negligence: | 50% or less can collect |
| Joint & Several: | If ph fault exceeds 50%, J&S applies |
| Financial Responsibility: | 25/50/10 |
| Statue of Limitations: | BI- 3 yrs   PD- 3 yrs , UMBI – 8 yrs |
| Medical Payments: | Stacking for all occupants in vehicle/ No subro |
| UIM: | Stacking<br>Add-on<br>Can't require exhaustion of underlying limits.<br>We should intervene when suit is filed against UM tort feasor |
| BI: | **Ridley vs. Dubray**<br>Pay claimant accident-related medical bills/wages as incurred if requested. (Medical records and chart notes are required to support billing submitted.)<br><br>**If you have a case where you feel Ridley payments should be suspended, you must review with manager or RLA.**<br><br>**IF specials exceed limit, claimant does not have to sign a release (discuss with supervisor). Still must defend Insured. Make sure you and your supervisor discuss and send Walter's letter.** |
| Release Limits: | With the insured's permission |
| Suit Handling: | Answer filed within 20 days<br>3 years to serve. |
| Liens: | |
| Other: | * 3rd Party Bad Faith<br>• UM- Physical contact required<br><br>If claimants are from Montana , but have a loss in another state, they may be entitled to Ridley payments.  Discuss with RLA/CHO. |
| Exclusions | Check policy version.  Newer policies may exclude coverage only up to financial responsibility limits. |

9

D 000652

Exhibit 13 Page 330

**PROTECTED DOCUMENTS**

Permissive Use

Older policies may require us to pay full limits.  See RLA.
If driver was given permission initially, the owner's liability must continue to cover the vehicle even though the permittee may have exceeded the scope of permission up to the minimum limits. (Horace Mann v. Hampton)

Punitives

Driver using vehicle without permission of owner.  The court ruled that it was against public policy to not provide minimum limits.  (Allstate Ins. v. Harkinson)
No for liability (M.C.A. 33-15-317) and no for UM/UIM.

10

D 000653

Exhibit 13 Page 331

PROTECTED DOCUMENTS

# MONTANA
# WRONGFUL DEATH AND SURVIVAL ACTION

### Who can bring a claim?

**Survival Action:** Representatives or successors in interest.
Mont. Code Ann. § 27-1-501

**Wrongful Death:** Personal representative of decedent's estate brings claim
which vests in heirs of decedent.
Mont. Code Ann. § 27-1-513

### What damages are recoverable? (economic & non-economic)

**Survival Action:** Lost earnings damages (including that portion attributable to
economic consumption) from the time of injury to death; the present value of the
decedent's reasonable earnings during his or her life expectancy; medical and funeral
expenses; pain and suffering; and other special damages.

**Wrongful Death:** Loss of consortium, comfort and society; and the reasonable
value of the contributions in money (heirs not entitled to economic consumption
allocation) that the decedent would reasonably provided for support, education,
training, and care of the heirs during the life expectancies of the decedent and
survivors.

### Intestate Succession or Probated Estate? Distribution by personal
representative.

### Is a "one person" limit applicable to all derivative death claims?
Yes; see Bain v. Gleason, 223 Mont. 442, 447, 726 P.2d 1153, 1158 (1986), Wohlberg
v Hartford Acci. & Indem. Co. (1967, DC Mont) 262 F Supp 711.

### Court Approval Needed?

**Survival Action:** No, unless there is a dispute.

**Wrongful Death:** No.

1

D 000654

Exhibit 13 Page 332

PROTECTED DOCUMENTS

**Statute of Limitations:**

Survival Action: 3 year limitation.  Mont. Code Ann. § 27-2-204

Wrongful Death: 3 year limitation from the date of death.  Carroll v. W.R. Grace & Co., 252 Mont. 485, 830 P.2d 1253, (Mont. 1992).

2

D 000655

Exhibit 13 Page 333

PROTECTED DOCUMENTS

TCM-POLICY EXCLUSION-FAMILY-UIM-MT

TECHNICAL CLAIMS MEMORANDUM

TO:        All Claims Associates

FROM:      Claims Home Office-Legal, EDS-19

SUBJECT:   Montana – Limitation on Family Exclusion – Individually Named

RE:        L&R MT-301; Montana State Auditor Advisory Memorandum Interpreting MCA
           §61-6-301(1)(b)

DATE:      April 14, 2009

**BACKGROUND:**

The Montana State Auditor issued an Advisory Memorandum that will be effective on July 30,
2009. This memorandum addresses and affects the Named Driver Exclusion and the Family
Exclusion under non required coverage such as UIM and Med Pay and advises that a general
family exclusion, excluding all family members is invalid in Montana as against public policy.
Geico's Montana policies do contain a "Family Exclusion" under BI coverage and under
Montana law this is not enforceable.

**ANALYSIS:**

Under MCA §61-6-301(1)(b), in order to be valid, a family exclusion under UIM coverage and
(any other not required coverage) must specifically name the family member that is excluded. In
effect a Named Driver Exclusion is required. A general Family Exclusion is never valid. If a
carrier's policy is not in compliance, new forms must be submitted by July 9, 2009 for approval
by the Insurance Department. Once approved the carrier has sixty days to send the new forms to
all policyholders.

**SIGNIFICANCE:**

GEICO's Montana policies do not contain an exclusion for family members under the UM/UIM
or Med Pay section of our policy therefore we are in compliance as to those sections of the
policy. Associates need to be aware that any Family Exclusion under BI coverage, whether in
our policy or another carrier's is not enforceable in Montana. If a UM claim is made under a
Geico policy because of another carrier's family exclusion, associates need to challenge the other
carrier's coverage position.

John Quagliato

1

Confidential Information of the GEICO Companies
© Government Employees Companies

1001779

D 000656

Exhibit 13 Page 334

**PROTECTED DOCUMENTS**

TCM-COVERAGE-MEDICAL PAYMENTS-STACKING-MT

TECHNICAL CLAIMS MEMORANDUM

TO:        All Claims Associates

FROM:      Claims Home Office-Legal, DT-26

SUBJECT:   Montana:  Anti-Stacking Language Disallowed

RE:        Legal & Regulatory Exhibit MT-297; State Farm Mut. Auto. Ins. Co. v. Gibson, 2007 MT 153, 337 Mont. 509; 163 P.3d 387 (2007).

DATE:      December 4, 2007

**BACKGROUND:**

The Montana Supreme Court has once again invalidated anti-stacking language. *See* State Farm Mut. Auto. Ins. Co. v. Gibson, 2007 MT 153, 337 Mont. 509; 163 P.3d 387 (2007). The court stated that an anti-stacking provision in an insurance policy that permits the insurer to receive valuable consideration for coverage that is not provided violates Montana public policy and is contrary to the insured's "reasonable expectation" of stacking coverage.

**ANALYSIS:**

The Gibson family was insured with State Farm, carrying $5,000 in MPC coverage on three separate policies for a Ford Escort, a Ford F-150, and a Pontiac Grand Am.  They were involved in an accident while occupying the Escort and attempted to stack all three MPC coverages.  State Farm denied this request by invoking their policy language that stated:  "These *persons* have to sustain the *bodily injury* a. while they operate or *occupy* a vehicle covered under the liability section."  There was also an exclusion that indicated there was no coverage "for medical expenses for *bodily injury*: a. sustained while *occupying* or through being struck by a motor vehicle owned or leased by *you* or any *relative* if it is not insured for this coverage under this policy."  When the Gibson family made a claim for the stacking of MPC coverage, State Farm refused to provide MPC in excess of that contained in the Escort's policy on the grounds that the MPC provided in the other two policies did not apply to the accident because the Gibsons were not operating or occupying the other two vehicles at the time of the accident.  State Farm filed a Declaratory Judgment Action and prevailed at trial.  The Gibson family appealed the adverse ruling.

In prior decisions involving stacking cases, the Montana Supreme Court concluded that a provision that defeats coverage for which valuable consideration has been received violates Montana public policy.  When reaching a decision in Gibson, the Court noted its prior rulings

1

Confidential Information of the GEICO Companies
© Government Employees Companies

1001588

D 000657

Exhibit 13 Page 335

**PROTECTED DOCUMENTS**

invalidating anti-stacking language in underinsured motorist coverage, noting that "we have applied the same public policy considerations to MPC and held that when an insurer receives valuable consideration for each policy, the insurer cannot refuse to pay the benefits due pursuant to each policy." State Farm argued that the case of Lierboe v. State Farm, 2003 MT 174, 316 Mont 382, 73 P.3d 800 (2003) supported its position. In the Lierboe case, Kristine Lierboe attempted to stack MPC coverage from her Jeep Cherokee as well as a Dodge Dakota which was owned by Shining Mountain Design and Construction, a corporation in which Lierboe has shareholder interest. The Montana Supreme Court concluded MPC stacking was impermissible in the Lierboe case because the insured "was not covered under more than one policy because she was not a named insured on the policy for the Dodge and was not occupying the Dodge at the time of the accident." The Lierboe court also stated that "Lierboe did not have reasonable expectations of coverage because she did not qualify as an insured under the Shining Mountain policy and did not purchase or pay for the policy covering the Dodge."

In contrast, according to the Montana Supreme Court, the Gibsons "reasonably expected that, consistent with the insuring language, medical expenses of both family members would be covered." Thus, the court ruled that State Farm's anti-stacking provisions violate public policy by allowing State Farm to receive valuable consideration for coverage that is not provided. In so ruling, the Montana Supreme Court limited the ruling in Lierboe "to those instances in which a claimant seeks to stack coverages from a vehicle she does not own and from an insurance policy she did not purchase."

<u>SIGNIFICANCE:</u>

The Montana Supreme Court reaffirmed its position on the stacking of automobile coverages in the case of State Farm v. Gibson. Anti-stacking clauses will generally be disfavored and ruled against public policy. All associates handling Montana claims should be aware of this consistent position of the Montana Supreme Court.

However, claims associates should know that Montana enacted legislation in 2007 that allows the enforcement of anti-stacking language in automobile insurance policies if the premiums charged for the coverage actuarially reflect the limiting of coverage separately to the vehicles covered by the policy. If insurers in Montana choose to attempt the enforcement of anti-stacking policy language and use the correct prescribed actuarial standard, it is likely that the Montana Supreme Court will have another opportunity to rule on the constitutionality of this latest effort by the legislature. At this time GEICO Direct has not attempted to comply with the new anti-stacking legislation so claims should continue to be handled in the same fashion until further notice. Please refer to TCM 1001.502 for more discussion on this enacted legislation.

A.S. Kalinsky

2

Confidential Information of the GEICO Companies
© Government Employees Companies

1001588

D 000658

Exhibit 13 Page 336

PROTECTED DOCUMENTS

TCM -UM/UIM/MEDPAY-COVERAGE- STACKING-MT

TECHNICAL CLAIMS MEMORANDUM

TO:            All Claims Associates

FROM:          Claims Home Office-Legal, DT-26

SUBJECT:       Montana State Advisory Memorandum;
               Filing for Non-Stacked UM/UIM Coverage

RE:            Legal & Regulatory Exhibit MT-292-A;  Mont. Code Ann. § 33-23-203

DATE:          November 26, 2007

**BACKGROUND:**

This TCM supplements TCM 1001502 dated July 9, 2007, concerning an amendment to Mont. Code Ann. § 33-23-203, that allows for the enforcement of anti-stacking language in automobile policies if the premiums charged for the coverage actuarially reflects the limitation of coverage. In the aftermath of this legislation, the Montana State Auditor and Commissioner of Insurance published an advisory memorandum with specific instructions to insurers who wish to have non-stacking UM/UIM and med pay.

**ANALYSIS:**

The Montana Supreme Court has previously ruled that anti-stacking insurance provisions are unconstitutional because the sale of "illusory coverage" constituted a violation of substantive due process. The amendments to Mont. Code Ann. § 33-23-203 is the legislature's attempt to overcome the Montana high court's objections to anti-stacking language.

The advisory memorandum states that an insurer seeking to avoid stacking must:

- file new premium rates with an actuarial certification and supporting actuarial documentation demonstrating that the new rates reflect limiting coverage; and

- file new policy forms stating that coverage will be limited (not stacked). These forms must be filed separately from the rate filing and approved by the Commissioner.

The instructions for filing rates for UM/UIM and med pay coverage are attached to the advisory memorandum and are self-explanatory.

1

Confidential Information of the GEICO Companies
© Government Employees Companies

1001585

**D 000659**

Exhibit 13 Page 337

PROTECTED DOCUMENTS

SIGNIFICANCE:

The Montana State Auditor and Commissioner of Insurance published an advisory memorandum in the aftermath of the enactment of HB 587, which amended Mont. Code Ann. § 33-23-203. The advisory memorandum includes guidance for insurers seeking to incorporate anti-stacking language in the UM/UIM and med pay portions of their automobile policies. Instructions for filing rates for UM/UIM and med pay coverage are attached to the advisory memorandum and are self-explanatory.  GEICO Direct is filing the necessary policy language and rates.

A.S. Kalinsky

2

Confidential Information of the GEICO Companies
© Government Employees Companies

1001585

D 000660

Exhibit 13 Page 338

PROTECTED DOCUMENTS

TCM-COVERAGE-STACKING-MT

TECHNICAL CLAIMS MEMORANDUM

TO:        All Claims Associates

FROM:      Claims Home Office-Legal, DT-26

SUBJECT:   Montana: Stacking Premiums

RE:        Legal & Regulatory Exhibit MT-292; HB 587 and Mont. Code Ann., §
           33-23-203

DATE:      July 9, 2007

## BACKGROUND:

Effective April 17, 2007, Montana enacted legislation that amends Mont. Code Ann., § 33-23-203. The new law modifies Montana's insurance coverage stacking law and states that coverage may not be stacked if the premiums charged actually reflect the limiting of coverage separately to the vehicles covered by the policy and the premium rates have been filed with the Insurance Commissioner.

## ANALYSIS:

The Montana legislature has made multiple attempts to enact legislation limiting the stacking of automobile coverage, such as UM, UIM and med pay. Each time the legislature has attempted to take action, the Montana Supreme Court has ruled their efforts unconstitutional because of violations of substantive due process. HB 587 attempts to satisfy the Supreme Court's objections to the sale of "illusory coverage" by indicating that coverage specified under one policy or under more than one policy issued by the same company may not be added together (stacked) *if the premiums charged for the coverage actually reflect the limiting of coverage separately to the vehicles covered by the policy.*

Previously, Mont. Code Ann., § 33-23-203 did not apply to an insurance policy that contains a provision offsetting its uninsured or underinsured motorist limits against liability limits available to a policyholder from a third party. However, HB 587 has removed this exception to the overall legislative scheme found in Mont. Code Ann., § 33-23-203 and its provisions now do apply to such coverage.

1

Confidential Information of the GEICO Companies
© Government Employees Companies

1001502

D 000661

Exhibit 13 Page 339

PROTECTED DOCUMENTS

**SIGNIFICANCE:**

Montana has enacted legislation that allows the enforcement of anti-stacking language in automobile insurance policies if the premiums charged for the coverage actuarially reflect the limiting of coverage separately to the vehicles covered by the policy.  If insurers in Montana choose to attempt the enforcement of anti-stacking policy language and use the correct prescribed actuarial standard, it is likely that the Montana Supreme Court will have another opportunity to rule on the constitutionality of this latest effort by the legislature.  At this time GEICO Direct has not attempted to comply with the new anti-stacking legislation so claims should continue to be handled in the same fashion until further notice.

A.S. Kalinsky

Confidential Information of the GEICO Companies
© Government Employees Companies

1001502

D 000662

Exhibit 13 Page 340

PROTECTED DOCUMENTS

TCM- Loss of Consortium-Adult Child-MT

TECHNICAL   CLAIMS   MEMORANDUM

TO:        All Claims Associates

FROM:      Claims Home Office-Legal, EDS-19

SUBJECT:   Montana Supreme Court Decision: Renville vs. Fredrickson; 2004 MT 239, 323
Mont. 503, 2004 Mont. LEXIS 417; Treichel v. State Farm Mut. Auto. Ins. Co.,
280 Mont. 443

RE:       Claim for Negligent Infliction of Emotional Distress

DATE:     November 12, 2004

**BACKGROUND:**

In Renville vs. Fredrickson, 2004 MT 239, 323 Mont. 503, 2004 Mont. LEXIS 417 the Court
revisited the tort of negligent infliction of emotional distress and reaffirmed the requirement that
the emotional distress be severe. The Court also considered a claim for loss of consortium of an
adult child by a parent who did not see the actual accident. As to that claim the Court held that
the Wrongful Death Statute controlled what injuries were compensable and that all claims had to
be brought by the Personal Representative. With regard to whether negligent infliction of
emotional distress triggers a separate limit, the Montana Supreme Court looks to the definition of
Bodily Injury in the insurance policy. If the definition is clearly limited to bodily injury then a
second limit would not be triggered.

In Treichel v. State Farm Mut. Auto. Ins. Co., 280 Mont. 443 the Court held that State Farm
failed to define "bodily injury" and did pay damages for non bodily injury claims such as loss of
consortium. While a loss of consortium claim is derivative and subject to one limit, the negligent
infliction of emotional distress is a separate direct injury to the individual and thus would not be
subject to one limit unless the insurance policy clearly establishes that only bodily injury is
covered. While the emotional distress claim would be a separate injury there would be no
coverage under the policy since emotional distress presently is not considered a bodily injury.

Geico's Montana A-30 policy does define bodily injury which is a good thing, however, we do
pay claims for loss of consortium as an element of damages albeit under one limit. Negligent
infliction of emotional distress is a separate injury but may not be covered under an insurance
policy if the policy limits coverage to an adequately defined "bodily injury".

1

Confidential Information of the GEICO Companies
© Government Employees Companies

1000920

D 000663

Exhibit 13 Page 341

PROTECTED DOCUMENTS

## ANALYSIS:

The Montana Supreme court found that in the tort of negligent infliction of emotional distress, the distress must be more than one would customarily feel at the serious injury of one's child. Once the trial court determines that the distress is sufficient to trigger the claim, the jury determines if it has in fact occurred and then what value it has.

## SIGNIFICANCE:

To determine if an emotional distress claim is viable look at whether there have been significant effects on lifestyle such as depression, counseling, and physical changes such as lack of appetite and inability to sleep. These are all possible indications of emotional distress beyond what one would normally expect. If symptoms like these are present, it is more likely that a claim for negligent infliction of emotional distress will be allowed.

We believe that 'bodily injury' is adequately defined in our policy and thus the claim for emotional distress would not be covered as it is not a bodily injury.

A. S. Ralinsky

2

Confidential Information of the GEICO Companies
© Government Employees Companies

I000920

D 000664

Exhibit 13 Page 342

PROTECTED DOCUMENTS

C

TCM- 90 MT

**MEMORANDUM**

TO:       ALL CLAIMS ASSOCIATES

FROM:    CLAIMS HOME OFFICE

SUBJECT:  MONTANA COVERAGES DO NOT STACK; NO BI AND UIM FROM
          SAME POLICY

DATE:     NOVEMBER 22, 2000

This TCM supplements TCM-90 MT dated August 14, 2000, and is effective
immediately.

Before May 2, 1997, med pay, UM, and UIM coverages in Montana could be
stacked intra-policy (within the same policy).    Effective May 2, 1997,
Montana statute 33-23-203 was amended to prohibit stacking of these
coverages unless specific insurance policy language expressed a contrary intent.
Our policy language clearly prohibits stacking, and has prohibited it since we
began using the A-30-MT in October, 1997.

Additionally,  under the authority of *Stutzman v. Safeco*, 945 P.2d 32, one
may not recover under both the liability and underinsured motorist coverages
of our policy if the potential underinsured auto is an "insured auto," as that
term is defined in Section IV of the A-30-MT.

Steve Kalinsky

C

Confidential Information of the GEICO Companies
© Government Employees Companies

**D 000665**

Exhibit 13 Page 343

PROTECTED DOCUMENTS

TCM-Minimum Liability Coverages-Obligation to Pay-MT
TCM-Settlement-Minimum Limits-Obligation to Pay-MT
TCM-Settlement-Releases-Entitlement-MT

TCM-90-MT

MEMORANDUM

TO:        ALL CLAIMS PERSONNEL

FROM:      HOME OFFICE CLAIMS LEGAL

SUBJECT:   PAYMENT OF MINIMUM POLICY LIMITS WITHOUT
           OBTAINING A RELEASE IN MONTANA

           WATTERS, ET. AL. V. GUARANTY NATIONAL INSURANCE
           COMPANY, 2000 MT 150 ( JUNE 6, 2000)

DATE:      AUGUST 14, 2000

This TCM supplements TCM-90 in all its previously issued versions, and is effective immediately.

The Supreme Court of Montana, in Watters v. Guarantee National Insurance Company, held that in cases where liability and damages are clear, an insurer is obligated to pay the minimum financial responsibility liability limits (25/50/10) to a claimant even when the claimant refuses to give a release.  In weighing the options available to an insurer as they pertain to minimum limits, the court ruled that an insurer's obligation to effectuate prompt, fair and equitable settlement of claims outweighed the obligation to protect the insured by obtaining a full release.   The court reasoned that a "settlement" under Montana's Unfair Trade Practices Act does not require a release:

In cases where liability is clear, and the claimed damages clearly exceed the minimum limits, we will be required to pay the minimum limits even if we cannot obtain a release. This "advance" is to be made irrespective of the insured's liability limits.  In other words, if the insured carries 300/300 BI, we will still be required to advance 25/50.

When this ruling governs our course of conduct, communication with the insured becomes paramount.  We should communicate to the insured in writing the following:

-that the value of the case exceeds the limits available;

-that we've done all we can to resolve the matter within the available limits;

-that the claimant won't give us a full release;

MT_settlement_releases_entitlement.doc
1000553

D 000666

Exhibit 13 Page 344

PROTECTED DOCUMENTS

-that the insured has personal exposure for all sums above the limits in cases where the payment will exhaust the available coverage;

-that we are going to pay the limits without the benefit of a release as required by the <u>Watters</u> decision;

-that if suit is filed, we will provide a defense to the lawsuit (this assumes the complaint doesn't allege only intentional acts or other entirely uncovered events);

-that the insured has a right to contribute toward any settlement;

-that the insured has a right to obtain private counsel, at his expense, to advise him concerning his personal exposure and other matters.

Any questions concerning this TCM should be directed to Claims Home Office.


John Quagliato
Home Office Claims Legal
X2434

MT_settlement_releases_entitlement.doc
1000553

**D 000667**

Exhibit 13 Page 345

**PROTECTED DOCUMENTS**

TCM-Underinsured Motorist-Stacking-MT

TCM-90
MONTANA

MEMORANDUM

TO:        CLAIMS TECHNICAL PERSONNEL - MT CLAIMS - REGION IV

FROM:      Claims Department

SUBJECT:   Montana: Bennett v. State Farm Mutual

RE:        Inter-Policy Stacking (Legal and Regulatory Exhibit MT-202)

DATE:      May 25, 1994

The issue in this case is whether an insured is entitled to inter-policy stacking of underinsured motorists (UIM) coverage, i.e., the stacking of UIM under separate policies. Bonnie Bennett sought a declaration that she was entitled to the cumulative amount of the underinsured motorist coverage provided by two automobile policies issued to her and her husband by State Farm. The question evolved into whether the "other insurance" clause which prohibits stacking of underinsured motorist coverage provided by separate policies from the same insurer was void as against public policy. The Court concluded that the "other insurance" clause was void as against Montana public policy and, therefore, Bennett was entitled to the underinsured motorist coverage on both policies.

Policy provisions that validate "anti-stacking" provisions in underinsured motorists endorsements are void where separate premiums have been charged and collected on each covered vehicle, even though no statute requires the insurer to provide underinsured motorist coverage.

Since GEICO does not currently offer UIM in Montana, there are no necessary policy changes.

Roger F. Albizu, Jr.

Attachment is not included – Refer to Paper Copy

1000336

MT_underinsured_motorist_stacking.doc

D 000668

Exhibit 13 Page 346